Harfenist Kraut & Perlstein, LLP
Steven J. Harfenist, Esq. (Atty Id. No. 045671989)
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
T: (516) 355-9600
F: (516) 355-9601
E: sharfenist@hkplaw.com
*Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
------------------------------------------------------------X
HEIDI BERGMANN-SCHOCH, COALITION OF NEW
JERSEY FIREARM OWNERS, GUN OWNERS OF
AMERICA, INC., and GUN OWNERS FOUNDATION,

                                      Plaintiffs,

Civil Action No.: 25-CV-997

         -against-

MATTHEW PLATKIN, in his official capacity as
the Attorney General of New Jersey,
COLONEL PATRICK J. CALLAHAN, in his official
capacity as the Superintendent of the New Jersey
State Police, and SCOTT A. COFFINA, in his official
capacity as the Burlington County Prosecutor,

                                    Defendants.
------------------------------------------------------------X

### LOCAL CIVIL RULE 10.1 STATEMENT

The street and post office address of each named party is:

       HEIDI BERGMANN-SCHOCH
       145 Rahilly Road
       Wrightstown, NJ 08562

       COALITION OF NEW JERSEY FIREARM OWNERS
       P.O. Box 768
       Sewell, NJ 08080

       GUN OWNERS OF AMERICA, INC.
       8001 Forbes Place
       Springfield, VA 22151

GUN OWNERS FOUNDATION
8001 Forbes Place
Springfield, VA 22151

MATTHEW PLATKIN
Office of the Attorney General of New Jersey
25 Market Street
Trenton, NJ 08611

COLONEL PATRICK J. CALLAHAN
Office of the Superintendent
New Jersey State Police
P.O. Box 7068
West Trenton, NJ 08628

SCOTT A. COFFINA
Burlington County Prosecutor's Office
49 Rancocas Road
Mt. Holly, New Jersey  08060

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW Plaintiffs Heidi Bergmann-Schoch, Coalition of New Jersey Firearm Owners, Gun Owners of America, Inc., and Gun Owners Foundation ("Plaintiffs"), by and through undersigned counsel, and allege as follows:

## INTRODUCTION

1.    This case involves a challenge to New Jersey's unconstitutional and ahistorical ban on the possession, transportation, and carrying of widely available and commonly owned hollow point self-defense ammunition, which New Jersey law calls "hollow nose or dum-dum" ammunition.[1]

---

[1] "Hollow nose" is a New Jersey colloquialism for what is commonly known as "hollow point" ammunition. New Jersey law does not define the term "dum-dum," but the term has been used to refer to expanding bullets generally. *See* Leon, *infra*, at 199. For the sake of simplicity, Plaintiffs adopt the alternative terms "hollow point ammunition" and "self-defense-ammunition" to refer to the ammunition the challenged statute prohibits. To the extent the statute prohibits other types of expanding bullets which do not feature hollow points or noses, Plaintiffs also challenge that prohibition under the "hollow point" and "self-defense" shorthand terms adopted herein.

2.      In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 33 (2022), the Supreme Court unambiguously held that the Second Amendment "guarantees … a right to 'bear' arms in public for self-defense."  And in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court explained that this "inherent right of self-defense has been central to the Second Amendment" and, to that end, "handguns are the most popular weapon chosen by Americans for self-defense...." *Id.* at 628, 629.

3.      Rejecting those principles, New Jersey forbids a person from publicly possessing the most effective types of self-defense ammunition, despite the hollow point's overwhelming popularity – with law enforcement and armed citizens alike – as the quintessential type of "self-defense" ammunition.

4.      In addition to defying the widespread preferences of the American people, New Jersey's ban is also ahistorical.  While the hollow point was first introduced in the 1880s,[2] New Jersey's ban came nearly a *century* later in 1978.[3]  Today New Jersey remains the *only state* to criminalize the "bear[ing]" of hollow point ammunition.  And, of course, "20th-century evidence … does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66 n.28.  And the earlier evidence is clear – there was never an early American tradition of prohibiting the public carry of *any* type of ammunition, much less hollow point or self-defense ammunition.

5.      New Jersey's ban on hollow point ammunition applies to both handgun and long gun (*i.e.*, rifle and shotgun) ammunition, including the component parts thereof.

---

[2]  Dave Campbell, *Back to Basics: Pistol Bullets*, <u>Am. Rifleman</u> (Mar. 14, 2018), https://tinyurl.com/2fb7cvjb.

[3]  "Under the Code, possession of 'dum-dum' or hollow-nose bullets … is an offense.  No such prohibition currently exists."  S. Judiciary Comm. Statement to S., No. 738 with S. Comm. Amends., at 9 (N.J. May 15, 1978), https://tinyurl.com/bdhjrv6u.

6.      N.J.S.A. § 2C:39-3(f)(1) broadly states that "[a]ny person, other than a law enforcement officer or persons engaged in activities pursuant to subsection f. of N.J.S.2C:39-6, who knowingly has in his possession any hollow nose or dum-dum bullet … is guilty of a crime of the fourth degree," punishable by up to 18 months' imprisonment and a fine of up to $10,000. N.J.S.A. §§ 2C:43-6(a)(4), 2C:43-3(b)(2).

7.      N.J.S.A. § 2C:39-6(f) contains some limited exceptions to the general prohibition of hollow point ammunition, lifting the prohibition "in the woods or fields or upon the waters of this State for the purpose of hunting, target practice or fishing," and while "carrying firearms necessary for target practice" at "any rifle or pistol club" recognized under state law.

8.      N.J.S.A. § 2C:39-3(g)(2)(a) further exempts "keeping such ammunition at [a] dwelling, premises or other land owned or possessed … or [when] carrying such ammunition from the place of purchase to said dwelling or land...."

9.      However, there is no exception for carrying hollow point ammunition in a firearm to be used for self-defense in public, or even for publicly possessing or transporting such ammunition generally.

10.     Consequently, New Jersey bans public possession of what is quintessential self-defense ammunition, in a handgun that is the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629.

11.     Making it a criminal offense to carry ordinary ammunition in ordinary handguns for self-defense, the "central component" of the Second Amendment, New Jersey's ban operates to largely "confine the right … to the home[,] … nullify[ing] half of the Second Amendment's operative protections," even though "[m]any Americans hazard greater danger outside the home than in it." *Bruen*, 597 U.S. at 29, 32, 33.

12.     New Jersey's restriction on the exercise of an enumerated right lacks any historical tradition, infringes on New Jerseyans' Second Amendment rights, and is an extreme outlier among the states.

13.     N.J.S.A. § 2C:39-3(f)(1) therefore violates the Second and Fourteenth Amendments to the United States Constitution.

**PARTIES**

14.     Plaintiff Heidi Bergmann-Schoch ("Bergmann-Schoch") is a natural person, a citizen of the United States and of the State of New Jersey, and resides in Wrightstown, Burlington County, New Jersey.  She is a member of Gun Owners of America, Inc. and a member of the Coalition of New Jersey Firearm Owners.  She is a law-abiding person, eligible to purchase and possess firearms under both state and federal law.  Bergmann-Schoch has a valid New Jersey Permit to Carry a Handgun and, as a firearm instructor and range safety officer, trains other New Jerseyans to operate their firearms safely and effectively.  Bergmann-Schoch does not currently possess hollow point ammunition, but desires to utilize such ammunition in a firearm she carries for self-defense. However, she is prohibited by New Jersey law from carrying such ammunition outside her home.  Bergmann-Schoch carries her firearm outside her home frequently and would carry hollow point ammunition in her firearm outside her home but for New Jersey's ban on the carrying of hollow point ammunition.  *See* Declaration of Heidi Bergmann-Schoch, Exhibit C.

15.     Plaintiff Coalition of New Jersey Firearm Owners ("CNJFO") is a nonprofit organization incorporated in New Jersey with an address at P.O. Box 768, Sewell, NJ 08080.  As a 501(c)(3) organization formed in 2015, CNJFO's mission is to support and defend the Second Amendment through education and awareness.  CNJFO advocates for lawful, safe, and responsible firearms ownership in New Jersey, including by regular reporting on the State's firearms laws.

CNJFO has many members who reside across New Jersey.  Many of CNJFO's members maintain New Jersey Permits to Carry a Handgun and routinely carry handguns in public for self-defense. CNJFO's members desire to possess, transport, and carry hollow point ammunition for self-defense outside their homes, but are unable to do so because New Jersey law currently bans such activity.  *See* Declaration of John C. Pyle, Exhibit A.

16.    Plaintiff Gun Owners of America, Inc. ("GOA") is a California non-stock corporation with its principal place of business at 8001 Forbes Place, Springfield, VA 22151.  GOA is organized and operated as a nonprofit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code.  GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners.  GOA has more than 2 million members and supporters across the country, including residents of the District of New Jersey, many of whom publicly carry handguns on a daily basis for self-defense and who desire to carry hollow point ammunition outside the home.  Many of these gun owners, like the individual Plaintiff, will be and are being irreparably harmed by Defendants' unconstitutional infringements upon the Second Amendment's guarantees.  *See* Declaration of Erich Pratt, Exhibit B.

17.    Plaintiff Gun Owners Foundation ("GOF") is a Virginia non-stock corporation with its principal place of business at 8001 Forbes Place, Springfield, VA 22151.  GOF was formed in 1983 and is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code. GOF is supported by gun owners across the country, including within New Jersey, who fund the organization's activities so that it can, *inter alia*, file litigation such as this to preserve, protect, and defend their right to keep and bear arms.  *See* Declaration of Erich Pratt, Exhibit B.

18.     Together, GOA and GOF represent the interests of thousands of their members and supporters who are being irreparably harmed by Defendants' laws, customs, policies, and practices. Moreover, (a) GOA and GOF's affected members and supporters each would have standing to sue individually to challenge Defendants' laws, customs, policies, and practices; (b) the interests GOA and GOF seek to protect are germane to their organizational purposes; and (c) neither the claims asserted, nor the relief requested, require the participation of individual members and supporters in this lawsuit. Indeed, the members and supporters of GOA and GOF overwhelmingly support litigation such as this, which protects and defends their constitutional rights.

19.     Defendant Matthew Platkin is sued in his official capacity as the Attorney General of the State of New Jersey. As Attorney General, Defendant Platkin is the "chief law enforcement officer" of New Jersey and is responsible for "general supervision of criminal justice." N.J.S.A. § 52:17B-98. Under New Jersey law, the Attorney General is the "head of the Department of Law and Public Safety," has "general responsibility for the department's operations," and is responsible for the formulation and adoption of rules and regulations and the "general administration of the department, its officers and employees." N.J.S.A. §§ 52:17B-2, 52:17B-4. Defendant Platkin may be served at the Office of the Attorney General of New Jersey, 25 Market Street, Trenton, NJ 08611. Defendant Platkin has the authority and responsibility to administer and enforce the statute Plaintiffs challenge.

20.     Defendant Colonel Patrick J. Callahan is the Superintendent of the New Jersey State Police and is sued in his official capacity. Defendant Callahan is the "executive and administrative head of the Division of State Police" within the Department of Law and Public Safety. N.J.S.A. §§ 52:17B-7, 52:17B-3. As the Superintendent, he and the State Police are responsible for enforcing New Jersey's criminal laws, including the statute at issue here. Defendant Callahan may

be served at the New Jersey State Police Headquarters, 1040 River Road, Ewing Township, NJ 08628.

21.    Defendant Scott A. Coffina is the prosecutor for Burlington County, New Jersey, and is sued in his official capacity.  Defendant Coffina is "vested with the same powers" in his county "as the attorney general" and "shall use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws."  N.J.S.A. § 2A:158-5. As County Prosecutor, Defendant Coffina is responsible for enforcing and prosecuting New Jersey's criminal laws, including the statute at issue here, and is the prosecutor for the County where Plaintiff Bergmann-Schoch lives.  Defendant Coffina may be served at the Courts Facility, 49 Rancocas Road, Mt. Holly, NJ 08060.

## JURISDICTION AND VENUE

22.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1651, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988.

23.    Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## STATEMENT OF FACTS

### I.    THE SECOND AMENDMENT

#### A.    Methodology

24.    The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

25.    In its landmark 2008 decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court rejected the nearly uniform opinions reached by the courts of appeals, which for years had claimed that the Second Amendment protects only a communal right of a state

to maintain an organized militia. *Id.* at 581. Setting the record straight, the *Heller* Court explained that the Second Amendment recognizes, enumerates, and guarantees to *individuals* the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Id.* at 592.

26.    Then, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court explained that the Second Amendment is fully applicable to the states through operation of the Fourteenth Amendment. *Id.* at 791.

27.    Next, in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the Court reaffirmed its conclusion in *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," and that this "Second Amendment right is fully applicable to the States." *Id.* at 411.

28.    And as the Supreme Court explained in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside the home" free from infringement by either federal or state governments. *Id.* at 10.

29.    Finally, the Supreme Court's latest pronouncement on the Second Amendment reaffirms the text, history, and tradition framework from *Heller* and *Bruen*. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024) (explaining that *Bruen* reiterates "the appropriate analysis"); *see also id.* at 714 (Gorsuch, J., concurring) ("reinforc[ing] the focus on text, history, and tradition, following exactly the path we described in *Bruen*").

30.    In addition to clearly recognizing the right of "'law-abiding, responsible citizens' … to public carry" (*Bruen*, 597 U.S. at 38 n.9), *Bruen* rejected outright the methodology previously

used within this and other circuits to judge Second Amendment challenges. *See Range v. Att'y Gen. U.S.*, 2024 U.S. App. LEXIS 32560, at *5-6 (3d Cir. Dec. 23, 2024) (acknowledging abrogation of Third Circuit precedent and the two-step interest-balancing methodology).

31.    Prior to *Bruen* and *Rahimi*, the Third Circuit had adopted a two-part test for analyzing Second Amendment cases: "First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. … If it does not, our inquiry is complete.  If it does, we evaluate the law under some form of means-end scrutiny.  If the law passes muster under that standard, it is constitutional.  If it fails, it is invalid." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *see also Bruen*, 597 U.S. at 19 n.4 (collecting and rejecting cases using two-part test).

32.    Rejecting this widespread atextual, "judge-empowering," interest-balancing approach as "one step too many," *Bruen* directed (again) the federal courts to first principles: to assess the text of the Second Amendment, as informed by the historical tradition.  597 U.S. at 19, 22.

33.    First, the Court "decline[d] to adopt that two-part approach" used in this and other circuits, reiterating that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17.

34.    Second, the Court held that, "[t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified

command.'" *Bruen*, 597 U.S. at 17; *see also Rahimi*, 602 U.S. at 692 ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.").

35.    Third, in reviewing the historical evidence, the *Bruen* Court cabined review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment, but only to the extent that it "mere[ly] confirm[s]" a Founding-era tradition. *Bruen*, 597 U.S. at 37. Indeed, the Court noted that "post-ratification" interpretations "cannot overcome or alter th[e] text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 36, 37; *see also id.* at 37-60 (discussing the lack of relevant historical prohibitions on concealed carry in public).

36.    In other words, according to the Second Amendment's text, and as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" a protected "Arm," then the ability to do so "shall not be infringed." It does not matter at all how important, significant, compelling, or overriding the government's justification for or interest in infringing the right. Nor does it matter whether a government restriction "minimally" versus "severely" burdens (infringes) the Second Amendment. There are no relevant statistical studies to be consulted. There are no sociological arguments to be considered. The ubiquitous problems of crime or the density of population do not affect the equation. The only appropriate inquiry then, according to *Bruen*, is what the "public understanding of the right to keep and bear arms" was during the ratification of the Second Amendment in 1791. *Bruen*, 597 U.S. at 36-38.

37.     The Third Circuit has held – twice – that 1791 *alone* is the proper time period of historical review for a Second and Fourteenth Amendment challenge to state action.  Indeed, on remand in light of *Rahimi*, the Third Circuit "reiterate[d]" that, "for the reasons stated in our earlier opinion, … the constitutional right to keep and bear arms should be understood according to its public meaning in 1791...." *Lara v. Comm'r Pa. State Police*, 2025 U.S. App. LEXIS 813, at *20 (3d Cir. Jan. 13, 2025) (citation omitted); *see also Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 (3d Cir.) ("[T]o maintain consistency in our interpretation of constitutional provisions, we hold that the Second Amendment should be understood according to its public meaning in 1791."), *cert. granted, vacated, remanded sub nom. Paris v. Lara*, 2024 U.S. LEXIS 4283 (Oct. 15, 2024) (ordering further consideration in light of *Rahimi*).

38.     In addition to providing the proper time focus for historical review, the Supreme Court also has instructed as to the scope of the protected persons, arms, and activities covered by the Second Amendment.

39.     First, *Heller* explained that, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.  *Heller* cited to *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), which held that "'the people' … refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *See also Heller*, 554 U.S. at 581 (Second Amendment "is exercised individually and belongs to all Americans.").

40.     Second, *Heller* turned to the "substance of the right: 'to keep and bear Arms.'" *Heller*, 554 U.S. at 581.  The Court explained that "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*." *Id.* at 583.  Next, the Court

instructed that the "natural meaning" of "bear arms" was "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 584. And "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id.* *Bruen* was more explicit, explaining that the "definition of 'bear' naturally encompasses public carry." *Bruen*, 597 U.S. at 32.

41.    Third, with respect to the term "Arms," the Court explained that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *Heller*, 554 U.S. at 582, and "that general definition covers modern instruments that" so much as "*facilitate* armed self-defense." *Bruen*, 597 U.S. at 28 (emphasis added); *see also Rahimi*, 602 U.S. at 691-92 ("As we explained in *Heller* … the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. … Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.").

42.    In other words, the "right to keep and bear arms" presumptively applies to "all Americans," presumptively extends to all "bearable arms," and presumptively covers all locations. Anything limiting that expansive reach must comport with a broad and enduring historical tradition – demonstrating that certain persons, arms, or activities were never considered within the scope of the Second Amendment in the first place.

### B.    New Jersey's Ban on Hollow Point Ammunition Violates the Second Amendment

43.    New Jersey's law operates to deprive "the people" of their Second Amendment rights while outside the home, notwithstanding the Second Amendment's protections.

44.    This Court's intervention is necessary to make it clear to New Jersey that it is not free to thumb its nose at the text of the Second Amendment or the opinions of the Supreme Court,

and that the Second Amendment is neither a "constitutional orphan" nor a "second-class right." *Silvester v. Becerra*, 583 U.S. 1139, 1149 (2018) (Thomas, J., dissenting from denial of certiorari); *McDonald*, 561 U.S. at 780; *Bruen*, 597 U.S. at 70.

45.    N.J.S.A. § 2C:39-3(f)(1) operates to generally prohibit the public carry of "hollow nose or dum-dum bullet[s]" for self-defense – *i.e.*, the "bear[ing]" of "Arms."  U.S. Const. amend. II.

46.    Bullets and ammunition for firearms unquestionably are "Arms" under the Second Amendment's plain text.  As the *Heller* Court observed, the term "Arms" was originally understood to mean "any thing that a man wears for his defence, or takes into his hands, *or useth in wrath to cast at or strike another*."  *Heller*, 554 U.S. at 581 (emphasis added).  Hollow point bullets are quite literally a "thing … cast at [and which] strike another," being projectiles which are fired from firearms in self-defense.  Thus, just as previous generations understood 'bows and arrows' to be "Arms," so too are 'firearms and bullets' today.  *Id.* (emphases added) ("Servants and labourers shall use bows *and arrows* on Sundays, &c. *and not bear other arms*."); *see also Rahimi*, 602 U.S. at 691 ("As we explained in *Heller*, … the reach of the Second Amendment is not limited only to those arms that were in existence at the founding.").

47.    Hollow point ammunition is widely available and commonly used for lawful self-defense.  Indeed, hollow point bullets "are the most common bullet" not only "for law enforcement" but also "for civilian self-defense and hunting."  Jesse Leon, *New Jersey's Ammunition Restriction Rings "Hollow*,*"* 48 Seton Hall J. Legis. & Pub. Pol'y 193, 197-98 (2023).[4]

---

[4] *See also Top 5 9mm Defensive Carry Ammo*, <u>MidwayUSA</u>, <u>https://tinyurl.com/27tsvupw</u> (last visited Jan. 27, 2025) ("The combination of penetration, expansion, accuracy, and stopping power

48.    Consequently, hollow point ammunition is in "common use," *Heller*, 554 U.S. at 624, and being a flat ban on *bearing* a type of "Arm," N.J.S.A. § 2C:39-3(f)(1) is subject to the very same "*Heller*-style per se invalidation"[5] that *Heller* levied upon a flat ban on *keeping* a type of "Arm."  *See Heller*, 554 U.S. at 629 ("It is enough to note, as we have observed, that the American people have considered the [hollow point] to be the quintessential self-defense [round]. … Whatever the reason, [hollow points] are the most popular [ammunition] chosen by Americans for self-defense [outside] the home, and a complete prohibition of their use is invalid."). Accordingly, N.J.S.A. § 2C:39-3(f)(1) is invalid without the need for further analysis.

49.    Moreover, because New Jersey restricts the quintessential "self-defense" ammunition, N.J.S.A. § 2C:39-3(f)(1) flatly contravenes the Supreme Court's guidance that "individual self-defense is 'the *central component*' of the Second Amendment right."  *Bruen*, 597 U.S. at 29.

50.    Separately, because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *Heller*, 554 U.S. at 582, "the Constitution presumptively protects" hollow point ammunition, and Defendants "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.  Defendants cannot.

51.    Even if one were to read "Arms" so narrowly as to exclude ammunition – in contravention of *Heller*, *Bruen*, and *Rahimi* – ammunition remains protected nonetheless.  Indeed, "*Heller* did not differentiate between regulations governing ammunition and regulations governing

---

make [hollow points] the most popular option for defense rounds."); *Ammunition*, Brownells, https://tinyurl.com/5evuj6k5 (last visited Jan. 27, 2025) (offering all manner of hollow point "self-defense" ammunition for sale).
[5] *See, e.g.*, *Peruta v. County of San Diego*, 742 F.3d 1144, 1170 (9th Cir. 2014).

the firearms themselves." *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir.

2014), and one way or another, courts have routinely held that the Second Amendment protects

ammunition. *See United States v. Miller*, 307 U.S. 174, 180 (1939) ("The possession of arms also

implied the possession of ammunition...."); *N.Y. State Firearms Ass'n v. James*, 2024 U.S. Dist.

LEXIS 80568, at *16 (W.D.N.Y. May 2, 2024) ("[A]lthough the Second Amendment does not

protect ammunition directly, arms lose their deadly force without ammunition, which is why courts

have consistently held that ammunition is protected by the Second Amendment."); *Nat'l Ass'n for

Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 93 (D. Conn. 2023) ("[C]omponents of firearms that are

necessary to their operation, such as ammunition, are covered by the Second Amendment.");

*Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right

to purchase them, … and to purchase and provide ammunition suitable for such arms...."); *see also

Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment)

("Constitutional rights thus implicitly protect those closely related acts necessary to their

exercise.").

52.    A contrary conclusion – that the Second Amendment protects firearms but not

ammunition – is akin to holding that the First Amendment protects paper, but not ink.

53.    Furthermore, just as how "[i]t is no answer to say … that it is permissible to ban

the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed,"

*Heller*, 554 U.S. at 629, so too is it no answer to say that hollow point ammunition may be banned

simply because other ammunition types remain available. As the Court observed in *Bruen*,

whether presumptively protected "Arms" ultimately may be banned is a historical question. *Bruen*,

597 U.S. at 28 ("[W]e use history to determine which modern 'arms' are protected by the Second

16

Amendment....").[6]  And as the Court made clear, the Defendants bear the burden of proving the existence of an early historical tradition supporting their ammunition ban today.  *Id.* at 24.

54.     For this reason, the Ninth Circuit's pre-*Bruen* decision upholding a San Francisco ban on hollow point sales was erroneous beyond its already improper use of interest balancing. Utilizing "intermediate scrutiny," the Ninth Circuit had held the law did not "place a substantial burden on the Second Amendment right" because it "limit[ed] only the manner in which a person may exercise Second Amendment rights by making it more difficult to purchase certain types of ammunition," and individuals still could "obtain hollow-point bullets outside of San Francisco's jurisdiction."  *Jackson*, 746 F.3d at 968.  Indeed, the regulation at issue there "prohibit[ed] only the sale of hollow-point ammunition within San Francisco, and was not a flat ban on the use or possession of such bullets" in public, as is the case here.  *Id.*  Even so, with respect to the Ninth Circuit's reasoning, "nothing in … *Heller* suggested that a law must rise to the level of the absolute prohibition" to be unconstitutional.  *Jackson v. City & County of San Francisco*, 576 U.S. 1013, 1016 (2015) (Thomas, J., dissenting from denial of certiorari).  Rather, "when the Government *regulates arms-bearing conduct*, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'"  *Rahimi*, 602 U.S. at 691 (emphasis added); *see also Bruen*, 597 U.S. at 17 (mandating its test for mere firearm "regulation[s]," not 'absolute deprivations without alternatives').  Thus, *Jackson* remains persuasive only for the proposition that "restrictions on ammunition … regulate[] conduct within the scope of the Second Amendment" – *i.e.*, that they infringe the right to keep and bear arms.  *Jackson*, 746 F.3d at 968.  On this threshold

---

[6] But even if a historical tradition of a particular regulation existed at the Founding, such tradition cannot trump the people's overwhelming preferences today.  Indeed, such tradition would "provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today."  *Id.* at 47.

point, the Ninth Circuit got it right, and had it not proceeded to interest balancing, text and history should have compelled invalidation.

55.    Because the challenged New Jersey statute governs arms and activities that are presumptively protected by the Second Amendment's text, New Jersey must show a broad and enduring historical tradition, circa 1791, denying Americans' right to carry a firearm, loaded with ammunition used by all other Americans in other states, outside the home for self-defense. Because New Jersey cannot make such a showing, the challenged restrictions violate the Second Amendment, which provides that the right to keep and bear arms "shall not be infringed."[7]

## II.    NEW JERSEY'S BAN ON "HOLLOW NOSE" AMMUNITION

56.    Although other types of ammunition exist at the margins, modern ammunition typically falls into one of two categories.  The first is ammunition predominantly used for target shooting, which typically consists of a lead core surrounded by a copper jacket.  Based on these characteristics, this ammunition generally is known as "full metal jacket," "FMJ," or "ball" ammunition, and as discussed *infra*, these bullets are generally ill-suited for self-defense.  Indeed, while "ball" ammunition is a cost-effective choice for punching holes in paper, it is not designed to mushroom or expand, and thus tends to travel farther through solid targets, risking "overpenetration" and injury to innocent bystanders in a self-defense context.

57.    The second major category of modern ammunition is "self-defense" ammunition, usually featuring a hollow point bullet that is designed to petal, mushroom, or expand upon

---

[7] While not a constitutional challenge to New Jersey's law, a New Jersey district court recently held that New Jersey's ban on "hollow nose" ammunition, as applied to qualified retired law enforcement officers, violated the federal Law Enforcement Officers Safety Act (LEOSA).  *Fed. L. Enf't Officers Ass'n v. Grewal*, 2022 U.S. Dist. LEXIS 109902, at *65 (D.N.J. June 21, 2022). The Third Circuit affirmed the district court's order.  *Fed. L. Enf't Officers Ass'n v. Att'y Gen. N.J.*, 93 F.4th 122, 136 (3d Cir. 2024).

impact.[8]    As discussed *infra*, these bullets are particularly suited for self-defense, and are overwhelmingly chosen by Americans for that purpose, due not only to the decreased risk of "overpenetration" but also the greater ability to expand and stop within an intended target, thereby more quickly stopping a deadly threat (the singular purpose of self-defense).

58.    Thus, when an individual seeks to purchase ammunition for a handgun, they generally have the choice between range or training ("ball") ammunition and "self-defense" hollow point ammunition.

59.    New Jersey law compels citizens to choose the inferior option for self-defense outside the home.  Indeed, dating only to 1978, N.J.S.A. § 2C:39-3(f)(1) generally bans possession of "hollow nose or dum-dum bullet[s]."  *See* S. Judiciary Comm. Statement to S., No. 738 with S. Comm. Amends., at 9 (N.J. May 15, 1978).

60.    N.J.S.A. § 2C:39-3(g)(2) then provides an exception for "keeping such ammunition" in a person's "dwelling, premises or other land owned or possessed by him, or [for] carrying such ammunition from the place of purchase to said dwelling or land...."

61.    N.J.S.A. § 2C:39-6(f) contains some additional exceptions for carrying a firearm loaded with hollow point ammunition outside the home "in the woods or fields or upon the waters of this State for the purpose of hunting, target practice or fishing," and while "carrying firearms necessary for target practice" at "any rifle or pistol club" recognized under state law.

---

[8] "Hunting" ammunition is most closely related to "self-defense" ammunition, often featuring the same bullet designs.  Acknowledging that the use of effective ammunition reduces unnecessary suffering and therefore is safer and more humane, "[h]unting with hollow nose ammunition is permitted in New Jersey."  *Transportation and Use of Hollow Point Ammunition by Sportsmen*, N.J. State Police, https://tinyurl.com/bp8ne55e (last visited Jan. 29, 2025).

62.    In other words, for purposes of carrying certain ammunition for self-defense outside the home, this statute bans commonly owned and carried hollow point ammunition, including the bullet components necessary for reloading.[9]

63.    Of note here, Plaintiffs challenge New Jersey's flat ban on the possession, transportation, and carrying of hollow point or self-defense ammunition outside the home for self-defense.

64.    And, because New Jersey broadly bans the unlicensed carry of handguns outside the home, individuals who wish to carry hollow point ammunition in their firearms must be licensed by New Jersey to carry with a Permit to Carry a Handgun ("PCH").  This means that the individuals who would be carrying firearms loaded with hollow point ammunition already have been vetted by New Jersey to be among the most law-abiding citizens in New Jersey.[10]

65.    The United States Department of Justice, National Criminal Justice Reference Service provides a report detailing some differences between "hollow point" self-defense ammunition and "ball" (or "full metal jacket" or "FMJ") ammunition, the primary alternative on the market.[11]

---

[9] N.J.S.A. § 2C:39-3(f)(1) does not distinguish between live ammunition (*i.e.*, already loaded ammunition) or merely the bullets necessary to load the ammunition, and thus, Plaintiffs understand that this statute bans the outside-the-home carry of all hollow point ammunition, even mere components thereof that cannot be fired from a firearm.

[10] *See, e.g.*, Amicus Brief of Gun Owners of America, Inc. et al. at 20-25, *Wolford v. Lopez*, No. 1:23-cv-00265-LEK-WRP (D. Haw. July 14, 2023), ECF No. 53, https://tinyurl.com/yu8khkc3 (citing crime statistics from several states to conclude that "Americans with CCW permits are an extremely law-abiding demographic").

[11] Carter K. Lord, *Hollow Point Versus Ball Duty Ammo*, NCJRS Virtual Libr. (July 1997), https://tinyurl.com/5yrmvv9n.

66.    This report states that hollow point ammunition, among other things, "penetrates less than ball ammunition," "penetrates body armor less effectively than ball ammunition," and "ricochets less than ball ammunition."  Lord, *supra*.

67.    In contrast, "ball" ammunition, the major alternative that New Jerseyans can lawfully carry outside the home, "penetrates more than hollow point ammunition," "penetrates body armor more effectively than hollow point ammunition," and "ricochets more than hollow point ammunition."  *Id.*

68.    Notwithstanding that hollow point ammunition is *less* likely to penetrate body armor, at least one court has defied basic physics to mistakenly conclude the opposite.  *See Bowser v. Borough of Freehold*, 99 F. App'x 401, 404 n.6 (3d Cir. 2004) ("Bowser also possessed hollow-point bullets, which are a type of ammunition that is capable of penetrating body armor....").  This factual claim could not be more wrong.

69.    Moreover, "[t]oday, police officers almost universally wear body armor.  The most common body armors worn by police fall into the National Institute of Justice's Level IIA, II, or IIIA standards, all of which are designed to stop pistol-caliber bullets.  Hollow point bullets are no greater threat to police than FMJ ['ball'] rounds.  Calling them 'cop killer' bullets is a rhetorical device designed to stigmatize them."  Leon, *supra*, at 202.

70.    In any event, hollow point ammunition is preferred for self-defense because it is designed not to overpenetrate the intended target and is more likely to stop a threat faster and with fewer shots than "ball" ammunition.  These are some of the reasons that citizens across America choose hollow point ammunition for the firearms they carry for self-defense.[12]

---

[12] As the Second Circuit recently observed with respect to New York's character requirement that carry licensees use firearms "only in a manner that does not endanger oneself or others," cases of

71.     These are also some of the reasons that police officers choose to carry hollow point ammunition as well.  *See Elizabeth Police Department General Orders*, Elizabeth Police Dep't 32 (Jan. 13, 2021), https://tinyurl.com/4r27r7yn (including "Winchester RA45TPY 45+P 230 grain T-Series" and "Winchester 147 grain SXT," both hollow points, on an approved list of ammunition for law enforcement in Elizabeth, New Jersey).

72.     The overwhelming sea change in ammunition used by police, from "ball" ammunition to hollow point ammunition, is not a new phenomenon, as the United States Department of Justice, Law Enforcement Assistance Administration published a document in 1976 discussing the problems with "ball" ammunition.[13]

73.     That report explains that "law enforcement personnel and agencies have expressed growing concern over the desirability of using the standard 158 grain round nose lead bullet … declaring a lack of confidence in its effectiveness as police service ammunition."  *Police Report, supra*, at 1.

74.     However, the same service handgun, if loaded with hollow point ammunition, "provide[s] the police officer with an effective personal defense weapon...."  *Id.* at 5.

75.     Specifically, the report identified some of the issues with "ball" ammunition as "the lack of stopping or knock-down power...."  *Id.* at 4.  The report states that the ".38 special caliber handgun, loaded with traditional ['ball' ammunition] does not offer sufficient assurance to the police officer who must use it that he will be capable of instantly stopping a deadly attack on himself or others."  *Id.* at 5.  Finally, the report concludes with a recommendation that the "Police

---

"self-defense" obviously remain valid.  *Antonyuk v. James*, 120 F.4th 941, 985 (2d Cir. 2024).  In other words, everyone seems to agree that *effectively* stopping an attacker is not a bad thing.
[13] *Handgun Ammunition Suitable for Police Use*, City of Albuquerque Police Dep't (1976) [hereinafter *Police Report*], https://tinyurl.com/ycxbhys8.

Department adopt the use of the … jacketed hollow nose cartridge … for standard issue to all police officers." *Id.*

76.    In other words, the ammunition that New Jersey requires those with PCHs to carry outside the home for self-defense is so outdated and substandard when compared to modern hollow point ammunition, that the Department of Justice was aware of the fact in 1976, two years before the enactment of 2C:39-3.

## III.    PLAINTIFF HEIDI BERGMANN-SCHOCH

77.    Plaintiff Heidi Bergmann-Schoch is an adult female citizen of the State of New Jersey, residing in Wrightstown, Burlington County, New Jersey.  She is a citizen of the United States, a law-abiding person, and has no disqualification under state or federal law which would prohibit her from purchasing, possessing, or carrying a firearm.  She possesses a current and valid New Jersey Permit to Carry a Handgun, and works as firearms instructor and range safety officer. In this capacity, Plaintiff Bergmann-Schoch trains other New Jerseyans on the safe and effective use of firearms.  *See* Bergmann-Schoch Declaration, Exhibit C.

78.    Bergmann-Schoch does not currently possess hollow point ammunition in her home, even though that is allowed under New Jersey law.  Because she routinely carries her firearm outside her home for self-defense, Bergmann-Schoch refrains from keeping hollow point ammunition altogether, to avoid inadvertent mix-ups of what ammunition she can and cannot take outside.

79.    New Jersey's ban on hollow point self-defense ammunition outside the home prevents Bergmann-Schoch from carrying this ammunition for self-defense in public, where she fears arrest and prosecution if she were to do so.  But for the challenged statute, Bergmann-Schoch would carry hollow point ammunition in her firearm outside her home.

80.    Indeed, Bergmann-Schoch prefers to use hollow point ammunition in the firearm she publicly carries due to the decreased risk of overpenetration and the increased effectiveness of stopping a threat.   Indeed, by being forced to carry inferior ammunition alternatives for self-defense in public, it is more likely that such a bullet could pass through an attacker and hit an innocent bystander, due to those sorts of rounds' generally increased penetration, were Bergmann-Schoch ever to need to use her firearm in self-defense.

81.    Bergmann-Schoch is aware that the New Jersey State Police have arrested numerous individuals for, among other things, possessing hollow point ammunition.[14]   And she is also aware that the Burlington County prosecutor's office likewise has prosecuted individuals for possession of hollow point ammunition.[15]   Accordingly, Defendants present a credible threat of enforcement.   *See Schrader v. DA of York Cnty.*, 74 F.4th 120, 125 (3d Cir. 2023) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical'" and such prosecution is "'ample demonstration' that [a] concern is credible."). Defendants certainly have not "disavow[ed] enforcement," and "[c]ourts often determine there is a credible threat of prosecution where the government refuses to make such a representation." *Greenberg v. Lehocky*, 81 F.4th 376, 386 (3d Cir. 2023).

---

[14] *State Police Arrest Two and Seize Rifle, Hollow Point Ammunition, and Drugs*, N.J. State Police (Sept. 18, 2020), https://tinyurl.com/mve7fuw9; *Motorist Aid Leads to Seizure of a Firearm, High Capacity Magazine, and Hollow Point Ammunition*, N.J. State Police (Sept. 23, 2020), https://tinyurl.com/3eevdavm; *Bordentown Station State Troopers Arrest Men for Having Gun, Hollow Point Ammo*, TAPinto Bordentown, https://tinyurl.com/2u5f4xrn (Aug. 24, 2021).
[15] *See, e.g.*, *Two Willingboro Men Charged with Illegal Handgun Possession*, Burlington Cnty. Prosecutor (Oct. 7, 2022), https://tinyurl.com/yxfvvv5c; *Mt. Laurel Police Dep't Highlights Recent Arrests, Investigations*, TAPinto Mount Laurel (Nov. 5, 2024), https://tinyurl.com/4ftudtcv.

82.    Given that the New Jersey State Police aggressively enforces the ban on possessing hollow point ammunition outside the home, Bergmann-Schoch has refrained from violating the ban so as not to be charged with a crime and risk the loss of her PCH.

83.    But for New Jersey's ban on carrying hollow point ammunition outside her home, Bergmann-Schoch would carry her firearm everywhere she is lawfully able to carry, loaded with hollow point ammunition rather than, for example, "ball" ammunition.  However, because of the challenged statute, Bergmann-Schoch is forced to load her self-defense firearm with less effective ammunition that is subpar and not as effective for self-defense.

84.    Bergmann-Schoch's Second Amendment rights, including the central component of self-defense, have been and are currently being violated and infringed by virtue of her inability to possess, transport, and carry hollow point ammunition in public.

## IV.    PLAINTIFFS GOA, GOF, AND CNJFO

85.    In addition to Plaintiff Bergmann-Schoch, the organizational Plaintiffs have members and supporters who are harmed by New Jersey's unconstitutional restriction on possessing, transporting, and carrying hollow point ammunition outside their homes for self-defense.

86.    As explained in the Declaration of Erich Pratt, Exhibit B, GOA has spoken to a member who has refrained from publicly carrying hollow point ammunition for self-defense because he fears arrest and prosecution.  This member explained that he currently possesses hollow point ammunition in his home, and would carry this ammunition outside his home for self-defense, but for the statute banning his intended conduct.

87.    Another GOA member explained that he owns hollow point ammunition at home but leaves it loaded into a separate firearm that he never carries outside his home.  He explained

that he does this to avoid inadvertently carrying the wrong firearm loaded with hollow point ammunition in public, and to avoid violating New Jersey's ban on effective self-defense ammunition outside the home.

88.    Another GOA member stated that he wishes to publicly carry hollow point ammunition because he is part of his church security team.  He would prefer to use hollow point ammunition to avoid the higher risk of overpenetration, should he ever need to use his firearm to defend his congregation in a crowded building.  This GOA member explained that hollow point ammunition is designed generally not to suffer from the overpenetration issues that plague "ball" and similar ammunition.

89.    Likewise, CNJFO has spoken "to a number of CNJFO members … who desire to possess, transport, and carry hollow point ammunition..."  *See* Declaration of John C. Pyle, Exhibit A at 16.  As CNFJO explains, "hollow point ammunition has better stopping power than non-hollow point ammunition."  *Id.*at 7.

90.    CNJFO spoke with one member who advised that they carry a revolver "loaded with 'full metal jacket' ammunition and would possess, transport, and carry hollow point ammunition in their handgun if it were not illegal to do so."  *Id.* at 17.

91.    Another CNJFO member stated that they reload their own ammunition, and this member "fears prosecution if they were to stop at a 'non-exempt location,' such as a as the grocery store, after buying a box of hollow point projectiles (not even loaded ammunition) at the local sporting goods store to lawfully reload ammunition in their home."  *Id*. at 19.

92.    CNFJO explained that other members travel around the State of New Jersey "in recreational vehicles or other mobile living quarters" and these members use these vehicles "to sleep in while traveling and who desire to carry hollow point ammunition while residing away

from a fixed place of residence." Specifically, another member utilizes "utilizes a horse trailer that contains separate living accommodations to attend various events. However, due to New Jersey's limited exception for possessing hollow point ammunition only in a 'dwelling' or similar 'premises' or 'land' this member 'owns' or 'possesses,' this member is not able to possess adequate self-defense tools even within their own mobile residence, where they lay their head at night." *Id*. at 21.

93.    And the Vice President & Treasurer of CNJFO stated that he too "desire[s] to carry hollow point ammunition in [his] firearm that [he] carr[ies] in public because" it has "better stopping power" and he "want[s] to be able to carry the best possible ammunition" in a self-defense scenario. *Id*. at 20.

94.    These examples of real and concrete harms to real persons are widely shared by many members and supporters of the organizational Plaintiffs.

95.    Being Second Amendment advocacy organizations, protection of the rights and interests advanced in this litigation is germane to the organizational Plaintiffs' respective missions. The organizational Plaintiffs routinely litigate cases throughout the country on behalf of their members and supporters, and the organizational Plaintiffs are capable of fully and faithfully representing the interests of their members and supporters without individualized participation.

96.    The Second Amendment rights of these members and supporters have been and are currently being violated and infringed by virtue of their inability to possess, transport, and carry effective self-defense ammunition in their firearms, outside their home for self-defense, instead being relegated to substandard "ball" and similar ammunition, even as New Jersey allows law enforcement to carry hollow point ammunition.

**COUNT I**

**U.S. CONST. AMENDS. II, XIV
RIGHT TO KEEP AND BEAR ARMS
42 U.S.C. § 1983 AGAINST DEFENDANTS**

97.    The foregoing allegations are repeated and realleged as if fully set forth herein.

98.    New Jersey's ban on carrying effective self-defense ammunition outside the home for self-defense violates Plaintiffs' Second Amendment rights that "shall not be infringed."

99.    New Jersey's ban on carrying effective self-defense ammunition, as applied to those traveling and staying overnight in a recreational vehicle or other mobile conveyance that contains living accommodations, violates the Second Amendment as a flat ban on a class of arms within the home. As the Supreme Court held, the "home" is "where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628.

100.    Plaintiffs are members of "the people" who desire to "keep" and "bear" a protected "Arm" (ammunition).[16]

101.    *Bruen* held that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

102.    Thus, the burden is on Defendants to prove, based on Founding-era historical tradition, that New Jersey's law banning the possession and use of effective self-defense

---

[16] The "Arms" protected by the Second Amendment include "weapons of offence, or armour of defence.... '[A]rms' [are] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Heller*, 554 U.S. at 581. Ammunition, necessary for the use of a firearm, are thus protected "Arms" under the Second Amendment.

ammunition outside the home, like hollow point ammunition, somehow comports with the original public understanding of the Second Amendment.

103.    However, there is no historical analogue for banning hollow point ammunition and no other state bans the use of effective self-defense ammunition like New Jersey does.

104.    Thus, New Jersey's ammunition ban violates the Second and Fourteenth Amendments and conflicts with *Bruen*'s clear teachings.

105.    As such, Defendants' laws, customs, practices, and policies damage Plaintiffs in violation of 42 U.S.C. § 1983, by reducing (and thereby infringing) the Second Amendment's "central component" – protection of the right to "keep and bear arms" for self-defense – to an inkblot. *See Bruen*, 597 U.S. at 29.

106.    By infringing the Second Amendment right to bear arms in public in these ways, the challenged statutes and regulations violate the Second Amendment, which apply to Defendants by operation of the Fourteenth Amendment, both facially and as applied to Plaintiffs, and are therefore invalid.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1.    An order declaring that the challenged provisions in N.J.S.A. § 2C:39-3(f)(1) are unenforceable, unconstitutional, and violate the Second and Fourteenth Amendments;

2.    An order permanently enjoining Defendants and all other officers, agents, servants, employees, and persons under the authority of the State, from enforcing the ban on possession, transportation, and carrying of enumerated types of self-defense ammunition outside the home;

3.    Nominal damages;

4.      Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988; and

5.      Such other further relief as is necessary to effectuate the Court's judgment or that the Court otherwise deems just and appropriate.

Dated:  Lake Success, New York
         February 4, 2025

                                    Respectfully submitted,
                                    HARFENIST KRAUT & PERLSTEIN, LLP


                          By:       *Steven J. Harfenist*
                                    _____
                                    Steven J. Harfenist
                                    *Attorneys for Plaintiffs*
                                    3000 Marcus Avenue, Suite 2E1
                                    Lake Success, New York 11042
                                    T: (516) 355-9600
                                    F: (516) 355-9601
                                    E: SHarfenist@hkplaw.com


                                    Stephen D. Stamboulieh
                                    MS Bar No. 102784
                                    Stamboulieh Law, PLLC
                                    P.O. Box 428
                                    Olive Branch, MS 38654
                                    T: (601) 852-3440
                                    E: stephen@sdslaw.us
                                         * *Pro Hac Vice forthcoming*