Harfenist Kraut & Perlstein, LLP
Steven J. Harfenist, Esq.
(Atty Id. No. 045671989)
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
T: (516) 355-9600
F: (516) 355-9601
E: sharfenist@hkplaw.com
*Attorney for Plaintiffs*

Stephen D. Stamboulieh*
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
T. (601) 852-3440
stephen@sdslaw.us
MS Bar No. 102784
*Admitted Pro Hac Vice

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------------------X

HEIDI BERGMANN-SCHOCH, COALITION OF NEW
JERSEY FIREARM OWNERS, GUN OWNERS OF
AMERICA, INC., and GUN OWNERS FOUNDATION,

**Civil Action No.:**
**25-CV-997(CPO)(MJS)**

Plaintiffs,

-against-

MATTHEW PLATKIN, in his official capacity as
the Attorney General of New Jersey, COLONEL
PATRICK J. CALLAHAN, in his official
capacity as the Superintendent of the New Jersey
State Police, and LACHIA L. BRADSHAW, in her
Official capacity as the Burlington County Prosecutor,

Defendants.

-------------------------------------------------------------X



## PLAINTIFFS' MEMORNDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT

# TABLE OF CONTENTS

*__Page__*

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ...................................................................................................... 1

LEGAL STANDARD ................................................................................................. 5

ARGUMENT ............................................................................................................... 6

I.    PLAINTIFFS HAVE STANDING ............................................................ 6

II.   NEW JERSEY'S BAN ON THE CARRY OF HOLLOW POINT
      AMMUNITION VIOLATES THE SECOND AND FOURTEENTH
      AMENDMENTS ....................................................................................... 13

      A. Second Amendment Methodology ...................................................... 13

      B. Ammunition Is Protected by the Second Amendment ........................ 21

      C. New Jersey's Ban on the Carry of Commonly Used Hollow Point
         Ammunition Violates the Second Amendment's Plain Text
         Without Further Analysis .................................................................... 24

      D. New Jersey's Ban on the Carry of Hollow Point Ammunition
         Violates *Bruen* Without Further Analysis .......................................... 26

      E. The Second Amendment Presumptively Protects Plaintiffs' Desired
         Course of Conduct ............................................................................... 27

      F. There Is No Historical Tradition of Prohibiting the Carry or
         Possession of Hollow Point Ammunition in Public .............................. 28

CONCLUSION ......................................................................................................... 31

# TABLE OF AUTHORITIES

*Page*

**U.S. Constitution**

Amendment II ................................................................................................ passim

Amendment XIV ...................................................................................... 13, 14, 16

**Cases**

*Andrews v. State*, 50 Tenn. 165 (1871) ....................................................22

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) ...................................18

*Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979) ...................................6

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)............................... 13, 25

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... passim

*Drummond v. Robinson Township*, 9 F.4th 217 (3d Cir. 2021) ...................... 23, 30

*Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017) ....................................15

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .........................................23

*Ezell v. City of Chicago*, 846 F.3d 888 (7th Cir. 2017) .........................................23

*Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023)......................................................23

*Greenberg v. Lehocky*, 81 F.4th 376 (3d Cir. 2023).................................................12

*Hernandez-Morales v. Att'y Gen.*, 977 F.3d 247 (3d Cir. 2020)............................6

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977).......................10

*Jackson v. City & County of San Francisco*, 746 F.3d 953 (9th Cir. 2014)...........22

*Lara v. Comm'r Pa. State Police*, 125 F.4th 428 (3d Cir. 2025).................. 6, 17, 19

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)...........7

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................................13

*MedImmune, Inc. v. Genentech, Inc.*, 549 U. S. 118 (2007) ....................................7

*N.Y. State Firearms Ass'n v. Nigrelli*, 2023 U.S. Dist. LEXIS 222331

   (W.D.N.Y. Sept. 21, 2023) ....................................................................................22

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ........................... passim

*Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353 (3d Cir. 2015)..........................10

*Nitkin v. Main Line Health*, 67 F.4th 565 (3d Cir. 2023) ..................................5

*NRA v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) ..........................................18

*Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294 (3d Cir. 1996) ...............................7

*Pipito v. Lower Bucks Cnty. Joint Mun. Auth.*, 822 F. App'x 161 (3d Cir. 2020)....7

*Reese v. BATFE*, 127 F.4th 583 (5th Cir. 2025) .........................................18

*Rhode v. Bonta*, 145 F.4th 1090 (9th Cir.)...............................................23

*Schrader v. DA of York Cnty.*, 74 F.4th 120 (3d Cir. 2023) ..............................12

*Sec'y U.S. Dep't of Labor v. Kwasny*, 853 F.3d 87 (3d Cir. 2017) ........................6

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .............................................6

*Tait v. City of Philadelphia*, 639 F. Supp. 2d 582 (E.D. Pa. 2009) ........................7

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) .............................23

*Texas v. BATFE*, 737 F. Supp. 3d 426 (N.D. Tex. 2024) ..................................11

*Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131 (3d Cir. 2009) ...............7

*United States v. Berger*, 715 F. Supp. 3d 676 (E.D. Pa. 2024) ...........................22

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010).................................15

*United States v. Miller*, 307 U.S. 174 (1939) ....................................... 22, 28

*United States v. Quailes*, 126 F.4th 215 (3d Cir. 2025)..................................17

*United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002)....................................6

*United States v. Rahimi*, 602 U.S. 680 (2024)..................................... passim

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) .................................19

*United States v. Williams*, 113 F.4th 637 (6th Cir. 2024).................................18

*Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024) .......................................18

**Statutes**

18 U.S.C. § 922(g)(1)....................................................................8

N.J.S.A. § 2A:158-5.....................................................................12

N.J.S.A. § 2C:39-3(f)(1) .................................................................. passim

N.J.S.A. § 2C:39-3(g)(2)(a) ......................................................................4, 8

N.J.S.A. § 2C:39-6(f) ...............................................................................4, 8

N.J.S.A. § 2C:39-6(f)(1) ...............................................................................4

N.J.S.A. § 2C:39-6(f)(2) ...............................................................................4

N.J.S.A. § 2C:39-7(a) ...................................................................................8

N.J.S.A. § 2C:43-3(b)(2) ...............................................................................4

N.J.S.A. § 2C:43-6(a)(4) ...............................................................................4

N.J.S.A. § 52:17B-3 .....................................................................................11

N.J.S.A. § 52:17B-7 .....................................................................................11

N.J.S.A. § 52:17B-98 ...................................................................................11

**Other Authorities**

*A Brief History of Ammo*, Widener's (Feb. 13, 2020) ...............................30

*A Brief History of Firearms – Self Contained Cartridge and the American West*,
Okla. Rifle Ass'n (Jan. 28, 2025) .........................................................30

Adam Andrzejewski, *Why Are Federal Bureaucrats Buying Guns and Ammo?*
*$158 Million Spent by Non-Military Agencies*, Forbes (June 30, 2021) ..............26

*Ammunition*, Brownells....................................................................................25

*Bordentown Station State Troopers Arrest Men for Having Gun, Hollow Point*
*Ammo*, TAPinto Bordentown, https://tinyurl.com/2u5f4xrn (Aug. 24, 2021) .....11

Dave Campbell, *Back to Basics: Pistol Bullets*, Am. Rifleman (Mar. 14, 2018)......3

David Alan Johnson, *Revolutionary War Weapons: The American Long Rifle*,
Warfare Hist. Network (Apr. 2005)........................................................29

*Handgun Ammo*, Target Sports USA....................................................................25

Harry Schenawolf, *Loading and Firing a Brown Bess Musket in the Eighteenth*
*Century*, Revolutionary War J. (Oct. 1, 2014)........................................29

*Home and Self Defense Ammo*, Sportsman's Warehouse........................................25

Jesse Leon, *New Jersey's Ammunition Restriction Rings "Hollow,"*

    48 Seton Hall J. Legis. & Pub. Pol'y 193 (2023) ...............................................1, 25

*Minie Ball: The Civil War Bullet that Changed History*, HistoryNet ....................29

*Motorist Aid Leads to Seizure of a Firearm, High Capacity Magazine, and*

    *Hollow Point Ammunition*, N.J. State Police (Sept. 23, 2020)............................11

*Mt. Laurel Police Dep't Highlights Recent Arrests, Investigations*,

    TAPinto Mount Laurel (Nov. 5, 2024)..................................................................12

*Personal Defense*, Winchester ...............................................................................26

S. Judiciary Comm. Statement to S., No. 738 with S. Comm. Amends.

    (N.J. May 15, 1978) ...............................................................................................3

*Self Defense*, Federal..............................................................................................26

*State Police Arrest Two and Seize Rifle, Hollow Point Ammunition, and Drugs*,

    N.J. State Police (Sept. 18, 2020) ........................................................................11

*Top 5 9mm Defensive Carry Ammo*, MidwayUSA ................................................25

*Two Willingboro Men Charged with Illegal Handgun Possession*,

    Burlington Cnty. Prosecutor (Oct. 7, 2022)........................................................12

**Rules**

Fed. R. Civ. P. 56(a)..................................................................................................6

**INTRODUCTION**

This case involves a constitutional challenge to N.J.S.A. § 2C:39-3(f)(1), New Jersey's atextual and ahistorical ban on the transportation and carrying of widely available and commonly owned hollow point self-defense ammunition, which New Jersey law calls "hollow nose or dum-dum" ammunition.[1]  Dating only to 1978, the challenged statute is an extreme outlier, both historically and nationally.  Indeed, the Framers never restricted the types of ammunition people could carry.  The same is true of the Reconstruction generation, which saw the introduction of conical bullets, brass cartridges, and thereafter hollow point ammunition, but never banned any of it for public carry.  And, consistent with this uniform history, *no other state* today has enacted a hollow point ban like New Jersey's.  If there were ever an outlier firearm regulation, this would be it.  The challenged statute violates the Second Amendment, it should be declared unconstitutional, and its continued enforcement should be enjoined.

---

[1] "Hollow nose" is a New Jersey colloquialism for what is commonly known as "hollow point" ammunition.  New Jersey law does not define the term "dum-dum," nor does the State Police know what that term means.  *See* Plaintiffs' Statement of Undisputed Material Facts ("SMF") ¶31.  Even so, others have used the term generally to refer to bullets that expand on impact.  *See* Jesse Leon, *New Jersey's Ammunition Restriction Rings "Hollow,"* 48 Seton Hall J. Legis. & Pub. Pol'y 193, 199 (2023).  For the sake of simplicity, Plaintiffs adopt the alternative terms "hollow point ammunition" and "self-defense ammunition" to refer to the ammunition the challenged statute prohibits.

1

In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 33 (2022), the U.S. Supreme Court unambiguously held that the Second Amendment "guarantees … a right to 'bear' arms in public for self-defense." And in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court explained that this "inherent right of self-defense has been central to the Second Amendment" and, to that end, "handguns are the most popular weapon chosen by Americans for self-defense...." *Id.* at 628, 629. Finally, in the Supreme Court's most recent pronouncement on the Second Amendment, the Court reaffirmed *Heller* and *Bruen*'s textual and historical approach, instructing courts to determine "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Thus, courts must apply "faithfully the balance struck by the founding generation...." *Id.*

Rejecting those principles, New Jersey's hollow point ban prohibits a person from publicly carrying not only the most *effective* type, but also by far the most *popular* type of self-defense ammunition among armed citizens and law enforcement alike. Of course, such a prohibition fails to clear the constitutional starting gate. A ban on "Arms" that are "in common use" is simply "invalid," *Heller*, 554 U.S. at 627, 629, because "the traditions of the American people … demand[] our unqualified deference." *Bruen*, 597 U.S. at 26. Neither judge nor legislator can

2

second-guess the "'arms' that [are] overwhelmingly chosen by American society for th[e] lawful purpose" of self-defense. *Heller*, 554 U.S. at 628.

In addition to defying the widespread preferences of the American people, and thus being categorically invalid, New Jersey's hollow point ban is also ahistorical. While the hollow point was first introduced in the 1880s,[2] New Jersey's ban came nearly a *century* later in 1978.[3]  Of course, "20th-century evidence … does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66 n.28.  And that earlier evidence is clear – there was never an early American tradition of prohibiting the public carry of *any* type of ammunition, much less hollow point or self-defense ammunition.

Unsurprisingly, then, New Jersey's patently unconstitutional scheme represents an anomaly among the 50 states, as *no other state* prohibits its citizens from transporting or carrying hollow point ammunition, the most effective type of ammunition for self-defense.  Indeed, even notoriously anti-gun California, New York, and Hawaii do not restrict the carry of hollow point ammunition like New Jersey does.

---

[2] Dave Campbell, *Back to Basics: Pistol Bullets*, Am. Rifleman (Mar. 14, 2018), https://tinyurl.com/2fb7cvjb.

[3] "Under the Code, possession of 'dum-dum' or hollow-nose bullets … is an offense. No such prohibition currently exists."  S. Judiciary Comm. Statement to S., No. 738 with S. Comm. Amends., at 9 (N.J. May 15, 1978), https://tinyurl.com/bdhjrv6u.

New Jersey's hollow point ban is also onerous. The challenged statute applies to both handgun and long gun (*i.e.*, rifle and shotgun) ammunition, including the component parts thereof. And N.J.S.A. § 2C:39-3(f)(1) broadly states that "[a]ny person, other than a law enforcement officer or persons engaged in activities pursuant to subsection f. of N.J.S.2C:39-6, who knowingly has in his possession any hollow nose or dum-dum bullet … is guilty of a crime of the fourth degree," punishable by up to 18 months' imprisonment and a fine of up to $10,000. N.J.S.A. §§ 2C:43-6(a)(4), 2C:43-3(b)(2).

Although the challenged statute contains some limited exceptions, none applies here. For instance, the challenged prohibition lists "in the woods or fields or upon the waters of this State for the purpose of hunting, target practice or fishing," and while "carrying firearms necessary for target practice" at "any rifle or pistol club" recognized under state law. N.J.S.A. §§ 2C:39-6(f)(2), (f)(1). The statute also exempts "keeping such ammunition at [a] dwelling, premises or other land owned or possessed … or [when] carrying such ammunition from the place of purchase to said dwelling or land...." N.J.S.A. § 2C:39-3(g)(2)(a). But there is no exception for carrying hollow point ammunition in a firearm to be used for self-defense in public, or even for transporting such ammunition generally. Thus, as it is a criminal offense to carry ubiquitous hollow point ammunition in handguns, the "quintessential … weapon" (*Heller*, 554 U.S. at 629) for self-defense, the "*central component*" of the

4

Second Amendment (*id.* at 599), New Jersey's ban undermines "half of the Second Amendment's operative protections," even though "[m]any Americans hazard greater danger outside the home than in it." *Bruen*, 597 U.S. at 29, 32, 33. In other words, New Jersey's ban impedes Americans' ability to engage in armed self-defense, the heart of the Second Amendment.

Plaintiffs include a New Jersey gun owner and three Second Amendment advocacy organizations that collectively represent thousands of similarly situated members and supporters, both within this district and across the State and the country. Plaintiffs are law-abiding Americans who wish to publicly carry hollow point ammunition for self-defense in New Jersey, free from detention, arrest, and prosecution under the challenged statute.

Because the challenged statute is inconsistent with Founding-era historical tradition, it violates the Second and Fourteenth Amendments. Plaintiffs therefore request permanent injunctive relief, as well as declaratory and other relief, to rectify and prevent further violation of their rights.

## LEGAL STANDARD

Summary judgment "is appropriate when, construing the evidence in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Nitkin v. Main Line Health*, 67 F.4th 565, 570 n.2 (3d Cir. 2023) (quoting *Sec'y U.S. Dep't of*

*Labor v. Kwasny*, 853 F.3d 87, 90 (3d Cir. 2017)); *see also* Fed. R. Civ. P. 56(a).

And "[w]ether the Second Amendment conflicts with the statutory scheme at issue

here is a question of law...." *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 433

n.7 (3d Cir. 2025) (citing *Hernandez-Morales v. Att'y Gen.*, 977 F.3d 247, 249 (3d

Cir. 2020)); *see also United States v. Quinones*, 313 F.3d 49, 59 (2d Cir. 2002) (The

"constitutionality of a criminal statute," and indeed the textual and historical analysis

required by *Bruen*, 597 U.S. 1, present "pure question[s] of law.").

## ARGUMENT

## I.   PLAINTIFFS HAVE STANDING

To demonstrate standing, a "plaintiff must have (1) suffered an injury in fact,

(2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is

likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578

U.S. 330, 338 (2016).  But a "plaintiff need not 'first expose himself to actual arrest

or prosecution to be entitled to challenge [the] statute'" when "fear of criminal

prosecution under an allegedly unconstitutional statute is not imaginary or wholly

speculative," even if a "criminal penalty provision has not yet been applied...."

*Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 302 (1979); *see also id.* at 303 (standing

lies when statute "authorizes imposition of criminal sanctions against" violators).

Thus, "Damocles's sword does not have to actually fall … before the court will issue

an injunction," *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C.

6

Cir. 2016), and "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit...." *MedImmune, Inc. v. Genentech, Inc.*, 549 U. S. 118, 128-29 (2007) (emphasis removed). Traceability and redressability are "closely related" and typically "overlap" when a plaintiff challenges government action. *Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 143 (3d Cir. 2009).

With respect to the first standing prong, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Pipito v. Lower Bucks Cnty. Joint Mun. Auth.*, 822 F. App'x 161, 164 (3d Cir. 2020). And "[i]n the absence of an equivalent express disavowal, the Third Circuit generally concludes that there is a threat of enforcement and that the dispute is ripe for adjudication." *Tait v. City of Philadelphia*, 639 F. Supp. 2d 582, 594 (E.D. Pa. 2009) (citing *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1299 (3d Cir. 1996)). It is undisputed that N.J.S.A. § 2C:39-3(f)(1) prohibits Plaintiffs from publicly carrying hollow point ammunition for self-defense. Indeed, the challenged statute criminalizes "[a]ny person, other than a law enforcement officer or persons engaged in activities pursuant to subsection f. of N.J.S.2C:39-6, who knowingly has in his possession any hollow nose or dum-dum

7

bullet...." *Id.* None of the statute's exceptions apply to the general public carry of this ammunition for self-defense. *See* N.J.S.A. §§ 2C:39-6(f), 2C:39-3(g)(2)(a).

Plaintiffs have alleged an intention to publicly carry hollow point ammunition. Plaintiff Heidi Bergmann-Schoch ("Schoch") is a citizen of the United States and of the State of New Jersey, and resides in Wrightstown, Burlington County, New Jersey. Plaintiffs' Statement of Material Facts Not in Dispute ("SMF") ¶3. Schoch is a member of Plaintiffs Gun Owners of America, Inc. ("GOA") and the Coalition of New Jersey Firearm Owners ("CNJFO"). *Id.* ¶4. Schoch is a law-abiding person, eligible to purchase and possess firearms under both state and federal law, and possesses a valid New Jersey Permit to Carry a Handgun. *Id.* ¶5.

Schoch frequently carries her firearm in public for self-defense and is trained to do so, being a certified firearms instructor and operator of a firearms training business. SMF ¶6. To that end, Schoch wishes to publicly carry hollow point ammunition in her self-defense firearm, but does not due to the challenged statute's criminal prohibition which, upon conviction, would result in her loss of Second Amendment rights under federal and New Jersey law. *Id.* ¶7; *see* 18 U.S.C. § 922(g)(1); N.J.S.A. § 2C:39-7(a). In Schoch's experience as a firearms instructor, hollow point ammunition is greatly preferable for self-defense because "hollow point ammunition expands or mushrooms upon impact … causing the bullet to slow down significantly, causing increased damage.... It also does not over penetrate as

compared with full metal jacket ammunition." SMF ¶8. If Schoch were able to lawfully carry hollow point ammunition in public, she would immediately purchase some and do so. *Id.* ¶7.

The same is true for many of the members and supporters of Plaintiffs CNJFO and GOA who live throughout New Jersey. SMF ¶¶10, 19. For example, one CNJFO member currently carries a revolver loaded with "full metal jacket" ammunition, which they explain is inferior for self-defense when compared to hollow point ammunition. This member would carry hollow point ammunition but for the challenged statute. *Id.* ¶12. Another CNJFO member often travels to various events in New Jersey, staying in a mobile trailer overnight (a temporary residence). This member would keep hollow point ammunition in their self-defense firearm in their mobile trailer, but for the challenged statute's prohibition. *Id.* ¶15. Likewise, one GOA member keeps hollow point ammunition at home, but stores it in a firearm he never carries publicly, in order to avoid inadvertently violating the challenged statute. *Id.* ¶21. Finally, another GOA member wishes to publicly carry hollow point ammunition as part of his church security team, due to the risk of overpenetration in crowded spaces that is endemic to non-self-defense ammunition types. *Id.* ¶22.

Next, Plaintiffs CNJFO and GOA have representational standing to bring suit on behalf of their members because "(a) [their] members would otherwise have

9

standing to sue in their own right; (b) the interests [they] seek[] to protect are germane to the organization[s'] purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 365 (3d Cir. 2015). First, at least one of Plaintiffs CNJFO and GOA's members, Plaintiff Schoch, has standing to sue in her own right. Second, challenging the enforcement of an unconstitutional firearm regulation is relevant to Plaintiffs CNJFO and GOA's organizational purposes of preserving and defending the Second Amendment rights of gun owners. *See* SMF ¶¶9, 16-17. Third, neither the claims asserted nor the relief requested requires the participation of individual members of Plaintiffs CNJFO or GOA, because Plaintiffs "seek[] a declaration, injunction, or some other form of prospective relief" which, "if granted, will inure to the benefit of those members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiff Gun Owners Foundation ("GOF") has standing through its supporters too, because it has the indicia of membership sufficient to confer associational standing. GOF is a nonprofit legal defense and educational foundation that is supported by gun owners across the country, including within New Jersey. SMF ¶17. GOF receives all of its funding from its supporters, who voluntarily fund its activities. *Id.* ¶18. GOF litigates cases on behalf of its supporters. *Id.* GOF's supporters receive information about its activities through a quarterly newsletter and

10

regular emails about its activities. *Id.* And GOF's supporters regularly communicate their views to GOF about issues on which GOF should focus. *Id.* Thus, "[t]he foregoing, together, suffice for GOF's associational standing."). *Texas v. BATFE*, 737 F. Supp. 3d 426, 438 (N.D. Tex. 2024).

Next, there exists a credible threat of prosecution by Defendants, which also satisfies the traceability prong. Defendant Jennifer Davenport is the Attorney General of New Jersey and is the "chief law enforcement officer" responsible for "general supervision of criminal justice," including enforcement of the challenged statute. N.J.S.A. § 52:17B-98. Defendant Jeanne Hengemuhle is the Acting Superintendent of the New Jersey State Police and is the "executive and administrative head of the Division of State Police" responsible for enforcing New Jersey's criminal laws, including the challenged statute. N.J.S.A. §§ 52:17B-7, 52:17B-3. The State Police robustly enforce the State's ban on hollow point ammunition, and routinely arrest those who violate the ban. SMF ¶26. Indeed, the State Police have arrested numerous individuals for possessing hollow point ammunition.[4] Finally, Defendant Lachia Bradshaw is the Burlington County

---

[4] *State Police Arrest Two and Seize Rifle, Hollow Point Ammunition, and Drugs*, <u>N.J. State Police</u> (Sept. 18, 2020), https://tinyurl.com/mve7fuw9; *Motorist Aid Leads to Seizure of a Firearm, High Capacity Magazine, and Hollow Point Ammunition*, <u>N.J. State Police</u> (Sept. 23, 2020), https://tinyurl.com/3eevdavm; *Bordentown Station State Troopers Arrest Men for Having Gun, Hollow Point Ammo*, <u>TAPinto Bordentown</u>, https://tinyurl.com/2u5f4xrn (Aug. 24, 2021).

Prosecutor and is "vested with the same powers" in her county "as the attorney general," and "shall use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws," including the challenged statute.  N.J.S.A. § 2A:158-5; *see* SMF ¶25.  The Burlington County Prosecutor's Office likewise has prosecuted individuals for possession of hollow point ammunition.[5]  *See* SMF ¶25.  Obviously, being that they routinely enforce the challenged statute, no Defendant has disclaimed its enforcement.

Accordingly, Defendants present a credible threat of enforcement to Plaintiffs. *See Schrader v. DA of York Cnty.*, 74 F.4th 120, 125 (3d Cir. 2023) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical'" and such prosecution is "'ample demonstration' that [a] concern is credible.").  Defendants certainly have not "disavow[ed] enforcement," and "[c]ourts often determine there is a credible threat of prosecution where the government refuses to make such a representation."  *Greenberg v. Lehocky*, 81 F.4th 376, 386 (3d Cir. 2023).

---

[5] *See, e.g.*, *Two Willingboro Men Charged with Illegal Handgun Possession*, Burlington Cnty. Prosecutor (Oct. 7, 2022), https://tinyurl.com/yxfvvv5c; *Mt. Laurel Police Dep't Highlights Recent Arrests, Investigations*, TAPinto Mount Laurel (Nov. 5, 2024), https://tinyurl.com/4ftudtcv.

Finally, a favorable ruling declaring the challenged statute unconstitutional, and enjoining Defendants from enforcing it, would redress Plaintiffs' injury. Accordingly, all Plaintiffs have standing.

## II.    NEW JERSEY'S BAN ON THE CARRY OF HOLLOW POINT AMMUNITION VIOLATES THE SECOND AND FOURTEENTH AMENDMENTS

### A.    Second Amendment Methodology

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In its landmark 2008 decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court rejected the nearly uniform opinions reached by the courts of appeals, which for years had claimed that the Second Amendment protects only a communal right of a state to maintain an organized militia. *Id.* at 581. Setting the record straight, *Heller* explained that the Second Amendment recognizes, enumerates, and guarantees to *individuals* the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Id.* at 592.

Two years later in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court explained that the Second Amendment is fully applicable to the states through operation of the Fourteenth Amendment. *Id.* at 791. And in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the Court reaffirmed its conclusion in *Heller*

13

that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," and that this "Second Amendment right is fully applicable to the States." *Id.* at 411. As the Court later explained, *Caetano* confirms that the Second Amendment's "general definition covers modern instruments that *facilitate* armed self-defense," such as "stun guns." *Bruen*, 597 U.S. at 28 (emphasis added) (citing *Caetano*, 577 U.S. at 411, 411-12).

And as the Supreme Court further explained in *Bruen*, the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside the home" free from infringement by either federal or state governments. *Bruen*, 597 U.S. at 10. Finally, the Supreme Court's latest pronouncement on the Second Amendment reaffirms the textual and historical framework from *Heller* and *Bruen*. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024) (explaining that *Bruen* reiterates "the appropriate analysis"); *see also id.* at 714 (Gorsuch, J., concurring) ("reinforc[ing] the focus on text, history, and tradition, following exactly the path we described in *Bruen*").

In addition to recognizing the right of "'law-abiding, responsible citizens' … to public carry," *Bruen* also rejected outright the methodology used within this Circuit and other circuits to judge Second Amendment challenges. *Bruen*, 597 U.S.

14

at 38 n.9.  Prior to *Bruen*, the Third Circuit had adopted a two-part test for analyzing Second Amendment cases: "First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, our inquiry is complete.  If it does, we evaluate the law under some form of means-end scrutiny."  *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (citation omitted); *see also Bruen*, 597 U.S. at 22 n.4 (collecting cases using two-part test).  Other circuit courts adopted and used a substantially similar formula, which invariably utilized the very same "judge-empowering 'interest-balancing inquiry'" that *Heller* had rejected.  *See Heller*, 554 U.S. at 634; *see also Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117 (S.D. Cal. 2017) ("the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit"), *aff'd*, 742 F. App'x 218 (9th Cir. 2018).

Rejecting this widespread atextual, "judge-empowering" interest-balancing approach as "one step too many," *Bruen* directed (again) the federal courts to first principles: to assess the text of the Second Amendment, informed by the historical tradition.  *Bruen*, 597 U.S. at 19, 22.  First, the Supreme Court "decline[d] to adopt that two-part approach" used in this and other circuits, and reiterated that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Id.* at 17.

15

Second, the Supreme Court held that, "[t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Bruen*, 597 U.S. at 17; *see also Rahimi*, 602 U.S. at 692 ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.").

Third, in reviewing the historical evidence, the *Bruen* Court cabined review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment, but only to the extent that it "mere[ly] confirm[s]" a Founding-era tradition. *Bruen*, 597 U.S. at 37.  Indeed, the Court noted that "post-ratification" interpretations "cannot overcome or alter th[e] text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 36, 37; *see also id.* at 37-60 (discussing the lack of relevant historical prohibitions on concealed carry in public).

16

In other words, according to the Second Amendment's text, and as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" an "Arm[]," then the ability to do so "shall not be infringed." It does not matter at all how important, significant, compelling, or overriding the government's interest is in infringing the right. Nor does it matter whether a government restriction "minimally" versus "severely" burdens (infringes) the Second Amendment. There are no relevant statistical studies to be consulted. There are no sociological arguments to be considered. The ubiquitous problems of crime or the density of population do not affect the equation. The only appropriate inquiry then, according to *Bruen*, is what the "public understanding of the right to keep and bear arms" was during the ratification of the Second Amendment in 1791. *Bruen*, 597 U.S. at 46-47.

Following the Supreme Court's instruction, the Third Circuit has explained that "the constitutional right to keep and bear arms should be understood according to its public meaning in 1791," and that "laws enacted in the late-19th century" or later "'do not provide as much insight into' the original meaning of the right to keep and bear arms as do earlier sources." *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir.), *reh'g en banc denied*, 130 F.4th 65 (3d Cir. 2025), *followed by United States v. Quailes*, 126 F.4th 215, 222 (3d Cir. 2025) (alteration in original) ("Practices into the 19th century provide 'confirmation of [what the Founding-era

17

laws] established.'"); *accord Reese v. BATFE*, 127 F.4th 583, 594 (5th Cir. 2025) ("founding-era laws are far more probative of what 'the people' meant when the Second Amendment was ratified"); *United States v. Williams*, 113 F.4th 637, 648 (6th Cir. 2024) ("Under *Bruen*, … courts must study how and why the founding generation regulated firearm[s]"); *Worth v. Jacobson*, 108 F.4th 677, 692, 696 (8th Cir. 2024) ("*Bruen* strongly suggests that we should prioritize Founding-era history," and "it is questionable whether the Reconstruction-era sources have much weight"); *NRA v. Bondi*, 133 F.4th 1108, 1115 (11th Cir. 2025) ("the Founding era is the primary period against which we compare the Florida law").[6]

In addition to providing the proper time focus for historical review, the Supreme Court also has instructed as to the scope of the protected persons, conduct, and arms covered by the Second Amendment.

**First, the people.**    *Heller* noted that, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S.

---

[6] To be sure, some courts outside this Circuit have disagreed with the Supreme Court's Founding-era focus. *See, e.g.*, *Antonyuk v. James*, 120 F.4th 941, 972 (2d Cir. 2024) ("1868 and 1791 are both focal points of our analysis").  But not even Reconstruction-era evidence can support the statute challenged here, because no jurisdiction banned the public carry of hollow points until 1978 – far too late to be relevant under any reading of *Bruen*.  Thus, with respect to the public carry of self-defense ammunition, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same...." *Bruen*, 597 U.S. at 38.

at 580. *Heller* cited to *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), which explained that "'the people' ... refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *See also Heller*, 554 U.S. at 581 (Second Amendment "is exercised individually and belongs to all Americans."). Thus, as the Third Circuit recently explained, "[t]he Second Amendment's reference to 'the people' covers all adult Americans," and the term "cast[s] a wide net" to include 18-to-20-year-olds and even felons as a presumptive matter. *Lara*, 125 F.4th at 435, 436. It is indisputable that Plaintiffs, being law-abiding American citizens, are members of "the people."

**Second, the protected arms.** With respect to the term "Arms," the Court explained that such term includes "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," and at the Founding, "all firearms constituted 'arms.'" *Heller*, 554 U.S. at 581. Thus, because not only those items in "existence in the 18th century are protected" by the Constitution, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *id.* at 582, and "that general definition covers modern instruments that" so much as "*facilitate* armed self-defense." *Bruen*, 597 U.S. at 28 (emphasis added); *see also Rahimi*, 602 U.S. at 691-92 ("As we explained in *Heller* ... the reach of the

19

Second Amendment is not limited only to those arms that were in existence at the founding. … Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers."). There is no question as to handguns' protection under the Second Amendment. Indeed, "the Second Amendment protects the possession and use of weapons that are 'in common use at the time,'" and there is no "dispute that handguns are weapons 'in common use' today for self-defense." *Bruen*, 597 U.S. at 21, 32 (cleaned up). And, as explained in Section II(B), *infra*, the Second Amendment's protection of modern "Arms" unquestionably applies to modern forms of ammunition.

**Third, the protected conduct.** In its analysis, *Heller* turned to the "substance of the right: 'to keep and bear Arms.'" *Heller*, 554 U.S. at 581. The Court explained that "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*." *Id.* at 583. Next, the Court instructed that the "natural meaning" of "bear arms" was "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 584. And "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id. Bruen,* in fact, was more explicit, explaining that the "definition of 'bear' naturally encompasses *public* carry." *Bruen*, 597 U.S. at 32 (emphasis added).

20

At bottom, the Second Amendment's plain text presumptively applies to "all Americans," presumptively extends to all "bearable arms," which includes ammunition, and presumptively covers the public carry of firearms. Any "firearm regulation" (*Bruen*, 597 U.S. at 17) governing those activities is presumptively unconstitutional, and Defendants bear the burden of showing that any such regulation comports with a broad and enduring historical tradition demonstrating that certain persons, activities, or arms were never considered within the scope of the Second Amendment in the first place. Defendants will be unable to make that showing.

**B.    Ammunition Is Protected by the Second Amendment**

Bullets and ammunition for firearms unquestionably are "Arms" under the Second Amendment's plain text. As the *Heller* Court observed, the term "Arms" was originally understood to mean "any thing that a man wears for his defence, or takes into his hands, *or useth in wrath to cast at or strike another*." *Heller*, 554 U.S. at 581 (emphasis added). Hollow point bullets are quite literally the "thing … cast at [and which] strike another," being projectiles which are fired from firearms in self-defense. Thus, just as previous generations understood 'bows and arrows' to be "Arms," so too are 'firearms and bullets' today. *Id.* (emphases added) ("Servants and labourers shall use bows *and arrows* on Sundays, &c. *and not bear other arms*."); *see also Rahimi*, 602 U.S. at 691 ("As we explained in *Heller*, … the reach

21

of the Second Amendment is not limited only to those arms that were in existence at the founding.").

Courts throughout the United States have confirmed that the Second Amendment protects ammunition. Even prior to *Bruen*, the Ninth Circuit held that, "without bullets, the right to bear arms would be meaningless." *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). Indeed, "*Heller* did not differentiate between regulations governing ammunition and regulations governing the firearms themselves." *Id.* Numerous courts – including the Supreme Court – are in accord. *See United States v. Miller*, 307 U.S. 174, 180 (1939) ("'The possession of arms also implied the possession of ammunition....'") (citation omitted); at 181 ("Twenty-four Cartridges suited to the Bore of his Musket or Firelock, each Cartridge containing a proper Quantity of Powder and Ball"); *N.Y. State Firearms Ass'n v. Nigrelli*, 2023 U.S. Dist. LEXIS 222331, at *6 (W.D.N.Y. Sept. 21, 2023) ("The protection that ammunition enjoys under the Second Amendment is derivative of the right to bear arms. Therefore, reviewing courts do not distinguish between laws impacting access to ammunition from laws restricting access to arms themselves."); *see also Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to … purchase and provide ammunition suitable for such arms...."); *United States v. Berger*, 715 F. Supp. 3d 676, 700 (E.D. Pa. 2024) ("ammunition is the means by which firearms are effective

22

at serving their purpose as weapons and restrictions on type and usage may run afoul of the Second Amendment"); *Rhode v. Bonta*, 145 F.4th 1090, 1106 (9th Cir.) ("[B]ecause ammunition is necessary to the operation of a firearm, California does not dispute that the right to keep ammunition is entitled to protection under the Second Amendment."), *vacated, reh'g en banc granted*, 159 F.4th 1171 (9th Cir. 2025).  Unsurprisingly, then, Defendant Hengemuhle's predecessor agreed during discovery that ammunition is necessary to effectively use a firearm.  SMF ¶30.

To hold otherwise would render the Second Amendment's protections meaningless.  *Heller* invalidated a law requiring that handguns be "rendered and kept inoperable at all times" – *i.e.*, that handguns contain *no ammunition*.  *Heller*, 554 U.S. at 630.  Consistent with that holding, the Seventh Circuit later explained that the "right to possess firearms for protection 'wouldn't mean much without the training and practice that make it effective,'" and so "[r]ange training … lies close to the core of the individual right of armed defense."  *Ezell v. City of Chicago*, 846 F.3d 888, 892, 893 (7th Cir. 2017) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *accord Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017); *Gazzola v. Hochul*, 88 F.4th 186, 195 (2d Cir. 2023) (calling ammunition "necessary").  Accordingly, the Third Circuit has cited *Ezell* with approval.  *See Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021).

One final point bears emphasis. The availability of *other* ammunition types for public carry in New Jersey – such as full metal jacket – changes nothing about the analysis. Just as how "[i]t is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed," *Heller*, 554 U.S. at 629, so too is it "no answer to say" that hollow point ammunition may be banned simply because other ammunition types remain available. As the Court observed in *Bruen*, whether presumptively protected "Arms" ultimately may be banned is a historical question. *Bruen*, 597 U.S. at 28 ("[W]e use history to determine which modern 'arms' are protected by the Second Amendment...."). But, as explained in Section II(C), *infra*, not even a relevant historical tradition can justify banning ammunition that is now "in common use."

### C.   New Jersey's Ban on the Carry of Commonly Used Hollow Point Ammunition Violates the Second Amendment's Plain Text Without Further Analysis

As the Supreme Court has explained, a ban on "the most popular weapon[s] chosen by Americans for self-defense" is simply "invalid." *Heller*, 554 U.S. at 629. And as *Bruen* later clarified, the Second Amendment protects the "carrying of weapons that are those 'in common use at the time'...." *Bruen*, 597 U.S. at 47. This "common use" protection overrides even a relevant historical tradition of regulation. Indeed, historical laws "provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Id.* In other words, the

24

*people's preferences prevail*.  And, because hollow point ammunition is "in common use" – both by ordinary Americans and law enforcement – its overwhelming popularity obviates the need for any historical analysis here.  The challenged statute is simply "invalid," full stop.

Consider *Caetano*'s finding of constitutional protection for stun guns with evidence of only "'approximately 200,000'" known examples at that time.  *Caetano*, 577 U.S. at 420 (Alito & Thomas, JJ., concurring in the judgment).  Hollow point ammunition is orders of magnitude *more* common than stun guns.  Indeed, hollow point bullets "are the most common bullet" not only "for law enforcement" but also "for civilian self-defense and hunting."  Jesse Leon, *New Jersey's Ammunition Restriction Rings "Hollow*," 48 Seton Hall J. Legis. & Pub. Pol'y 193, 197-98 (2023).  So ubiquitous is the hollow point in the firearms industry that the largest retailers simply label it as *the* "self-defense" option, as opposed to the only other major alternative – "target" ammunition (*i.e.*, full metal jacket).[7]  But this is not simply retail marketing.  The largest ammunition manufacturers in the nation

_____

[7] *See, e.g.*, *Handgun Ammo*, <u>Target Sports USA</u>, https://tinyurl.com/yc4wcx2z (last visited Mar. 11, 2026) (offering "handgun ammunition for target shooting or personal protection"); *Top 5 9mm Defensive Carry Ammo*, <u>MidwayUSA</u>, https://tinyurl.com/27tsvupw (last visited Mar. 11, 2026) ("The combination of penetration, expansion, accuracy, and stopping power make [hollow points] the most popular option for defense rounds."); *Ammunition*, <u>Brownells</u>, https://tinyurl.com/axpm7rjm (last visited Mar. 11, 2026) (offering all manner of hollow point "self-defense" ammunition for sale); *Home and Self Defense Ammo*, <u>Sportsman's Warehouse</u>, https://tinyurl.com/s6aku9a5 (last visited Mar. 11, 2026).

likewise offer "self defense" and "personal defense" options for civilian sale, almost all of which contain hollow point bullets.[8]

Unsurprisingly, hollow point ammunition is ubiquitous not only among ordinary Americans, but also government agencies.[9]   Indeed, as Defendant Hengemuhle's predecessor explained in discovery, hollow points are superior at "eliminat[ing] the threat … as quickly as possible," and "prevent[ing] potential innocent unintended targets by getting struck by a … round that may pass through. SMF ¶¶28, 29.   These benefits are not limited to law enforcement applications. Millions of Americans purchase hollow point ammunition specifically to ensure the best odds at not only surviving a self-defense encounter, but also minimizing collateral damage.  *See id.* ¶8.  Because hollow point ammunition is unquestionably "in common use," the challenged statute is invalid.

### D.   New Jersey's Ban on the Carry of Hollow Point Ammunition Violates *Bruen* Without Further Analysis

Additionally, *Bruen* held that "the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' … and confrontation can surely take place outside the home," thereby repudiating an

---

[8] *See, e.g.*, *Self Defense*, Federal, https://tinyurl.com/yc2bssft (last visited Mar. 11, 2026); *Personal Defense*, Winchester, https://tinyurl.com/7mcyzdyb (last visited Mar. 11, 2026).

[9] *See, e.g.*, Adam Andrzejewski, *Why Are Federal Bureaucrats Buying Guns and Ammo?  $158 Million Spent by Non-Military Agencies*, Forbes (June 30, 2021), https://tinyurl.com/pvpecr5w.

26

argument that "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense...." *Bruen*, 597 U.S. at 33, 31. As described *supra*, even the New Jersey State Police operate under the principle that hollow point ammunition is best for self-defense use by its law enforcement officers, for the same reasons that Plaintiffs wish to use it. SMF ¶¶27-28. Accordingly, because the challenged statute restricts quintessential "self-defense" ammunition, N.J.S.A. § 2C:39-3(f)(1) flatly contravenes the Supreme Court's guidance that "individual self-defense is 'the *central component*' of the Second Amendment right." *Bruen*, 597 U.S. at 29.

### E.    The Second Amendment Presumptively Protects Plaintiffs' Desired Course of Conduct

Even if this Court proceeds to a *Bruen* historical analysis, it will find that Plaintiffs' proposed course of conduct – carrying hollow point ammunition in their firearms in public – is protected by the Second Amendment. Indeed, "[i]t is undisputed that … ordinary, law-abiding, adult citizens" like Plaintiffs "are part of 'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at 31-32. Nor "does any party dispute that handguns are weapons 'in common use' today for self-defense." *Id.* at 32. Next, it is indisputable that ammunition for handguns falls within the plain meaning of "Arms." *See* Section II(B), *supra*. And with respect to Plaintiffs' desire to publicly carry hollow point ammunition in their handguns, "[t]he

27

Second Amendment's plain text … presumptively guarantees … a right to 'bear' arms in public for self-defense." *Id.* at 33.

Accordingly, the challenged statute's flat ban on the carry of hollow point ammunition is *presumed unconstitutional* unless and until Defendants "justify [their] regulation by demonstrating that" prohibiting their residents from carrying self-defense ammunition "is consistent with the Nation's historical tradition...." *Bruen*, 597 U.S. at 24. Defendants will not be able to satisfy their burden.

### F. There Is No Historical Tradition of Prohibiting the Carry or Possession of Hollow Point Ammunition in Public

Plaintiffs are unaware of any Founding-era tradition (or even a Reconstruction-era tradition) of governments prohibiting their citizens from owning or possessing certain types of ammunition, much less ubiquitous "self-defense" ammunition used by tens of millions of Americans across the country in both private and government capacities. Certainly, there is no Founding-era tradition of mandating the use of *less* effective ammunition for self-defense when better options were available. To the contrary, the Founders required citizens to appear for militia duty with *sufficiently military-grade* weaponry and ammunition – "a good Musket or Firelock, a sufficient Bayonet and Belt," "a good, clean musket," "proper accoutrements" and "Twenty-four Cartridges suited to the Bore of his Musket or Firelock, each Cartridge containing a proper Quantity of Powder and Ball...." *United States v. Miller*, 307 U.S. 174, 181 (1939). And when new and modern forms of

28

ammunition were developed that provided increased lethality, accuracy, range, or other enhanced capability, they were quick to adopt it.

Indeed, the progression of firearms technology – and the corresponding dearth of ammunition-type restrictions – confirms that N.J.S.A. § 2C:39-3(f)(1) is ahistorical. At the Founding, the dominant citizen and infantry arm was the single-shot smoothbore musket, which fired a round lead ball.[10] These weapons were slow to reload, and their poor accuracy left much to be desired. Indeed, "[t]he average soldier was expected to release three volleys per minute; four was exceptional. After the first volley, troops usually took from twenty to thirty seconds to reload."[11] And "[e]ven at a distance of about 100 yards, muskets were very inaccurate...."[12]

Technological advancements soon addressed the musket's shortcomings, quickly rendering it obsolete. First, the addition of rifling to barrels – to impart spin on projectiles – greatly increased accuracy. The "rifled musket increased the lethality of ranged combat by providing an effective range of 300 yards, with an extended range of a half-mile."[13] And second, the round lead ammunition balls were

---

[10] David Alan Johnson, *Revolutionary War Weapons: The American Long Rifle*, Warfare Hist. Network (Apr. 2005), https://tinyurl.com/mv6jjw2h.

[11] Harry Schenawolf, *Loading and Firing a Brown Bess Musket in the Eighteenth Century*, Revolutionary War J. (Oct. 1, 2014), https://tinyurl.com/yen5k96k.

[12] Edward St. Germain, *American Revolution Weapons: Muskets, Rifles, Pistols & More*, Am. Revolution, https://tinyurl.com/ywrsb2xb (last visited Mar. 11, 2026).

[13] *Minie Ball: The Civil War Bullet that Changed History*, HistoryNet, https://tinyurl.com/y5vth7nd (last visited Mar. 11, 2026).

replaced with ammunition bearing a conical structure. The Minié ball – so named after one of its codevelopers – "was the world's only conical bullet design at the time.... The revolutionary design changed the history of ammo and resulted in less fouling, increased muzzle velocity, improved ballistics and full engagement of the bore's rifling for improved accuracy."[14]

During the 19th century, ammunition manufacturers began to introduce metallic cartridges, which incorporated a conical bullet *and* its propellant in one structure. The weapons firing these "center-fire" cartridges "have remained in common use since shortly after the Civil War." *Drummond*, 9 F.4th at 227. Indeed, "[w]ith the post-war Westward expansion, the civilian demand was for the new repeating metallic cartridge firearms."[15]

Yet at no point during the rapid progression of this ammunition technology did state or federal governments ever seek to restrict just *what* Americans could carry. To the contrary, the historical record indicates that these advancements were welcomed when they came, and so the challenged statute represents an extreme outlier in America's history with firearms.

---

[14] *A Brief History of Ammo*, Widener's (Feb. 13, 2020), https://tinyurl.com/4yv89j2j.
[15] *A Brief History of Firearms – Self Contained Cartridge and the American West*, Okla. Rifle Ass'n (Jan. 28, 2025), https://tinyurl.com/ysywamzv.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should

be granted.

Dated:        Lake Success, New York
               March 12, 2026

                       HARFENIST KRAUT & PERLSTEIN, LLP

            By:      *Steven J. Harfenist*
                 Steven J. Harfenist
                 *Attorneys for Plaintiffs*
                 3000 Marcus Avenue, Suite 2E1
                 Lake Success, New York 11042
                 T: (516) 355-9600
                 F: (516) 355-9601
                 E: SHarfenist@hkplaw.com

                 Stephen D. Stamboulieh
                 MS Bar No. 102784
                 Stamboulieh Law, PLLC
                 P.O. Box 428
                 Olive Branch, MS  38654
                 T: (601) 852-3440
                 E: stephen@sdslaw.us
                 *Admitted Pro Hac Vice

31

## <u>CERTIFICATE OF SERVICE</u>

I, Steven J. Harfenist, hereby certify that I have filed a true and correct copy of the foregoing document or pleading with this Court's CM/ECF system, which generated a Notice of Electronic Filing, and provided a copy of the above to all counsel of record.

Dated: March 12, 2026

<u>*Steven J. Harfenist*</u>
STEVEN J. HARFENIST