# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

HEIDI BERGMANN-SCHOCH,
COALITION OF NEW JERSEY
FIREARM OWNERS, GUN OWNERS OF
AMERICA, INC., and GUN OWNERS
FOUNDATION,

    *Plaintiffs*,

v.

JENNIFER DAVENPORT,[1] in her official
capacity as Attorney General of New Jersey,
JEANNE HENGEMUHLE, in her official
capacity as Acting Superintendent of the
New Jersey State Police, and LACHIA L.
BRADSHAW, in her official capacity as the
Burlington County Prosecutor,

    *Defendants*.

Hon. Christine P. O'Hearn, U.S.D.J.
Hon. Matthew J. Skahill, U.S.M.J.

Docket No.: 1:25-cv-997-CPO-MJS

---

# COMBINED BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

---

[1] The caption has been revised to reflect the present Attorney General of New Jersey Jennifer Davenport, Acting Superintendent of the New Jersey State Police Jeanne Hengemuhle, and Burlington County Prosecutor LaChia L. Bradshaw. *See* Fed. R. Civ. P. 25(d) ("The officer's successor is automatically substituted as a party.").

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 116
Trenton, New Jersey 08625
(609) 376-3202
Jonathan.Mangel@law.njoag.gov
*Attorney for Defendants*

Stephen Ehrlich
  *Deputy Solicitor General*

David E. Leit
  Assistant Attorney General
      Of Counsel

Liza B. Fleming (NJ Bar ID. 441912023)
Jonathan B. Mangel (NJ Bar ID. 281382018)
Amanda I. Morejón (NJ Bar ID. 405942022)
Lucy I. Sprague (NJ Bar ID. 471242024)
Andrew H. Yang (NJ Bar ID. 066382013)
  *Deputy Attorneys General*
      On The Brief

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ................................. 4

    A.  New Jersey's Restrictions on Carrying Hollow Point Bullets. .................... 4

    B.  Procedural History ...................................................................................... 6

STANDARD OF REVIEW ........................................................................................ 7

ARGUMENT .............................................................................................................. 7

   I.   THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON THE MERITS OF PLAINTIFFS' SECOND AMENDMENT CLAIM. ................. 7

    A.  Public carry of HPBs is not protected by the Second Amendment. ............. 9

       1.  HPBs are not "Arms" protected by the Second Amendment. ................. 10

       2.  HPBs are not necessary for a firearm to function. ................................. 11

       3.  HPBs are ill-suited and disproportionate for self-defense. ..................... 14

    B.  The HPB Carry Law is consistent with the principles that underpin our Nation's regulatory tradition of firearms and ammunition regulation. ...... 24

       1.  There is a longstanding national regulatory tradition of restricting particularly dangerous instruments. ...................................................... 28

       2.  The HPB Carry Law is consistent with our regulatory tradition of restricting particularly dangerous instruments. ..................................... 35

       3.  The HBP Carry Law is Consistent with the Principles Underlying Historical Common Law Self-Defense. ................................................. 37

  II.  PLAINTIFF GOF HAS NOT DEMONSTRATED ARTICLE III INJURY AND SHOULD BE DISMISSED FOR LACK OF STANDING ................. 39

CONCLUSION ........................................................................................................ 40

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)..............................................................................................7

*Bevis v. City of Naperville*,
 85 F.4th 1175 (7th Cir. 2023) ...................................................... 14, 16, 24

*Bianchi v. Brown*,
 111 F.4th 438 (4th Cir. 2024) ............................................................ passim

*Capen v. Campbell*,
 708 F. Supp. 3d 65 (D. Mass. 2023)................................................................12

*District of Columbia v. Heller*,
 554 U.S. 570 (2008)............................................................................ passim

*Duncan v. Bonta*,
 133 F.4th 852 (9th Cir. 2025)................................................................ passim

*Gamble v. United States*,
 587 U.S. 678 (2019)................................................................................26

*Hanson v. District of Columbia*,
 120 F.4th 223 (D.C. Cir. 2024)................................................................ 28, 35

*Kaucher v. Cty. of Bucks*,
 455 F.3d 418 (3d Cir. 2006) ........................................................................7

*Kodak v. Holder*,
 342 Fed. App'x 907 (4th Cir. 2009)................................................................12

*Lara v. Comm'r Pa. State Police*,
 125 F.4th 428 (3d Cir. 2025) ......................................................................26

*McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
 140 F.4th 568 (4th Cir. 2025) ................................................................ 26, 38

*McDonald v. City of Chicago*,
 561 U.S. 742 (2010)................................................................................23

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
 597 U.S. 1 (2022)........................................................................ passim

*Nat'l Ass'n for Gun Rts. v. Lamont*,
 153 F.4th 213 (2d Cir. 2025) ................................................................ 28, 35

*Nat'l Rifle Ass'n. v. Bondi*,
 133 F.4th 1108 (11th Cir. 2025)................................................................38

*New Jersey v. Aitken*,
 No. A-0467-10T4, 2012 WL 1057954 (N.J. App. Div. Mar. 30, 2012) .........5

*Ocean State Tactical, LLC v. Rhode Island*,
 646 F. Supp. 3d 368 (D.R.I. 2022) ................................................................9

*Oregon Firearms Fed'n v. Kotek*,

682 F. Supp. 3d 874 (D. Or. 2023) ...................................................................12

*Pena v. Lindley*,
    898 F.3d 969 (9th Cir. 2018) .....................................................................24

*People v. Tomlins*,
    213 N.Y. 240 (1914)....................................................................................23

*Pitsilides v. Barr*,
    128 F.4th 203 (3d Cir. 2025) .....................................................................26

*Schoenthal v. Raoul*,
    150 F.4th 889 (7th Cir. 2025).....................................................................26

*State v. Wells*,
    1 N.J.L. 486 (1790)............................................................................... 20, 22

*Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)....................................................................................39

*Timbs v. Indiana*,
    586 U.S. 146 (2019)....................................................................................26

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025)....................................................................................39

*United States v. Boyd*,
    999 F.3d 171(3d Cir. 2021)........................................................................10

*United States v. Cox*,
    906 F.3d 1170 (10th Cir. 2018) .................................................................10

*United States v. Miller*,
    307 U.S. 174 (1939)....................................................................................11

*United States v. One Palmetto State Armory*,
    822 F.3d 136 (3d Cir. 2016) .......................................................................15

*United States v. Perez-Garcia*,
    96 F.4th 1166 (9th Cir. 2024) ................................................................ 6, 12

*United States v. Quailes*,
    126 F.4th 215 (3d Cir. 2025) .....................................................................33

*United States v. Rahimi*,
    602 U.S. 680 (2024)............................................................................ passim

*United States v. Salerno*,
    481 U.S. 739 (1987)......................................................................................8

*Vt. Fed. Of Sportsmen's Clubs v. Birmingham*,
    741 F. Supp. 3d 172 (D. Vt. 2024) ..............................................................9

*Williams v. Puerto Rico*,
    910 F. Supp. 2d 386 (D.P.R. 2012) ...........................................................24

*Zherka v. Bondi*,
    140 F.4th 68 (2d Cir. 2025) .......................................................................27

**Statutes**

1 W. & M., ch. 2, § 7 ...................................................................................29
20 Rich. 2 c. 1 (1396).................................................................................29
7 Rich. 2 c. 13 (1383)..................................................................................29
N.J. Stat. Ann. § 2C:39-3(f)................................................................ 4, 6, 35
N.J. Stat. Ann. § 2C:39-3(g) ........................................................................4
N.J. Stat. Ann. § 2C:39-6(f).........................................................................4
P.L. 1978, c. 39 ...........................................................................................6
P.L. 1978, ch. 95 .........................................................................................4

**Other Authorities**

Declaration Renouncing the Use, in Time of War, of Explosive Projectiles Under
        400 Grammes Weight, Nov. 12, 1868, https://tinyurl.com/34c5hvmh .........34
Matthew Hale, THE HISTORY OF THE PLEAS OF THE CROWN (1680),
        https://tinyurl.com/hm6crf22 ........................................................................23
N.J. Courts Model Criminal Jury Charge, N.J. Stat. Ann. § 2C:39-3(f) (rev. May
        13, 2013), https://tinyurl.com/2stmr2rf .........................................................5
William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND (1769) ..............14

**Rules**

Fed. R. Civ. P. 56 ........................................................................................7

## **<u>PRELIMINARY STATEMENT</u>**

The Second Amendment protects the right of individuals to keep and bear arms for "the core lawful purpose of self-defense." *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008). Throughout our Nation's history, that individual right has co-existed with States' responsibility to keep their residents safe, including by placing appropriate limitations on the types of arms and ammunition people may lawfully use for self-defense. States thus have long regulated the use of unusually dangerous weapons like machine guns, poison, gunpowder, and Bowie knives. Like these arms, hollow point ammunition is unusually dangerous and unnecessary for individuals' lawful exercise of their Second Amendment right to self-defense.

By design, hollow point ammunition is more lethal than other ammunition. It expands upon impact, tearing and crushing tissue and causing greater damage to organs. This greater tissue destruction results in greater hemorrhaging and a higher risk of death. New Jersey has thus prohibited the carry of hollow point ammunition outside the home since the 1970s. Plaintiffs seek to have that prohibition declared unconstitutional under the Second Amendment. But Plaintiffs do not claim New Jersey's restriction on the use of hollow point ammunition has prevented them from bearing fully functional firearms to exercise their lawful right to self-defense. They claim only that their *preference* to use ammunition so lethal that it has been banned under international laws of war is protected by the Second Amendment.

1

Yet the Supreme Court has repeatedly recognized that "'the right secured by the Second Amendment is not unlimited.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 21 (2022) (quoting *Heller*, 554 U.S. at 626). When assessing firearms regulations under the Second Amendment, courts engage in a two-step inquiry. First, courts ask whether the Second Amendment right is implicated—*i.e.*, whether its "plain text covers an individual's conduct." *Id*. at 17. If not, "the regulated activity is categorically unprotected." *Id.* at 18. Second, if the conduct is protected, courts ask if the restriction accords with "this Nation's historical tradition of firearm regulation." *Id.* at 17. New Jersey's prohibition on the public carry of hollow point ammunition can be upheld under either step of the analysis.

First, public carry of hollow point ammunition is not conduct protected by the Second Amendment, because the excessive lethality of such ammunition makes it unsuitable for lawful self-defense. The Second Amendment right to keep and bear arms for self-defense has never been understood as "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. So it follows that the Second Amendment does not protect the right to carry any *ammunition* whatsoever for whatever purpose. Plaintiffs claim that hollow point ammunition is preferable for self-defense because of its greater "stopping power." *See., e.g.*, Compl., ECF 1, ¶¶ 89, 93. That is, the ammunition "stops" people because those shot with hollow point bullets are more likely to be quickly killed or

2

maimed. But the Second Amendment right to self-defense is not a right to use maximal lethal force, nor to have whatever ammunition someone prefers. When the Second Amendment was adopted, principles of self-defense required that the force used be both necessary and proportional to the threatened harm. The lethality of hollow point ammunition makes it disproportionate and unnecessary for self-defense. It thus falls outside the scope of the Second Amendment's self-defense right.

Second, even if the use of hollow point ammunition were within the scope of the Second Amendment, New Jersey's limitation on its use is still "consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). From our Nation's Founding through the 20th century, States have regulated weapons that "pose exceptional dangers to innocent civilians," while leaving open avenues for civilian self-defense. *Bianchi v. Brown*, 111 F.4th 438, 471 (4th Cir. 2024) (en banc), *cert. denied sub nom.*, *Snope v. Brown*, 145 S. Ct. 1534 (2025). Consistent with this historical tradition, New Jersey's law protects "the core right of . . . citizens to defend themselves," *id.* at 464, by allowing its residents to possess and carry many other types of ammunition for self-defense in public.

Because New Jersey's prohibition on carrying firearms loaded with hollow point ammunition is constitutional under either step of the *Bruen* analysis, this Court should deny Plaintiffs' motion and grant summary judgment to Defendants.

3

## STATEMENT OF FACTS AND PROCEDURAL HISTORY[2]

**A.    New Jersey's Restrictions on Carrying Hollow Point Bullets.**

In 1978, the New Jersey Legislature enacted Chapter 39 of the Criminal Code to regulate "dangerous weapons and instruments of crime." *See* P.L. 1978, ch. 95. The law prohibits "[a]ny person, other than a law enforcement officer" from possessing a "hollow nose or dum-dum bullet," in public, with limited exemptions.[3] N.J. Stat. Ann. § 2C:39-3(f)–(g), -6(f). Those found to be in possession of such ammunition, and not subject to an exemption, are "guilty of a crime of the fourth degree." N.J. Stat. Ann. § 2C:39-3(f).

"Dum-dum" or "hollow-nose" bullets—more commonly known as "hollow point bullets" ("HPBs")—were developed for military purposes.[4] *See* SOMF ¶¶ 2, 5. HPBs have a hollow cavity in the tip, as opposed to the solid tip used in most other types of ammunition. *See id.* ¶ 17. The hollow cavity is designed to expand or

---

[2] Defendants incorporate by reference all facts recited and supported by competent record evidence in Defendants' Counter-Statement of Materials Facts ("SOMF").

[3] The exceptions, which are not at issue here, include that such ammunition may be kept on an individual's own property and transported from the place of purchase to such property. N.J. Stat. Ann. §§ 2C:39-3(f), (g)(2)(a).

[4] Although Plaintiffs characterize HPBs as "self-defense ammunition," ECF 41-11 at 1 n.1, that does not change the fact that they were designed for warfare.

"mushroom" upon contact with soft tissue. *See id.* ¶ 18.[5] The mushroom effect disperses more of an HPB's energy into the target, creating a cavity in the body larger than the entrance wound. *Id.* ¶ 19. This expansion makes HPBs less likely to pass through a target and more likely to stop in the body, causing greater tissue damage and making it more likely the person will be killed. *Id.* ¶ 24. The hollow tip enhances the bullet's "ability to transfer its full energy to the intended target," causing "greater tissue, cellular, and organ injury," and making the bullet more likely to stop, knock down, grievously injure, or kill the person shot. *Id.* ¶ 25. These effects—severe wounds that are more likely to result in death—are what Plaintiffs euphemistically laud as "better stopping power." ECF 1 ¶ 89. The purpose of HPBs is to increase injury, suffering, and lethality. This is why, since 1899, HPBs have been considered inhumane and banned in warfare under the Hague Convention. *See* SOMF ¶¶ 6–11.

Despite being prohibited for use in international warfare, domestic law enforcement agencies began using HPBs in the 1970s. *Id.* ¶¶ 8–13. Due to their capacity to cause severe, often fatal, wounds both to intended targets and bystanders,

---

[5] *See also New Jersey v. Aitken*, No. A-0467-10T4, 2012 WL 1057954, at *15 (N.J. App. Div. Mar. 30, 2012) ("'dum-dum' is defined as 'a bullet (as one with a hollow point) that expands more than usual upon hitting an object'"); N.J. Courts Model Criminal Jury Charge, N.J. Stat. Ann. § 2C:39-3(f) (rev. May 13, 2013), https://tinyurl.com/2stmr2rf ("'hollow nose bullet or dum-dum bullet' can be a cartridge of any caliber in which the front portion of the projectile is designed to expand upon entering a target").

HPBs pose significant public safety and health risks.[6] These concerns were well-known in New Jersey in the late 1970s when the New Jersey Legislature restricted the public carry of HPBs. *See* P.L. 1978, c. 39.[7] Although the New Jersey Legislature restricted this particularly dangerous and lethal type of ammunition, along with armor-piercing ammunition,[8] *see* N.J. Stat. Ann. § 2C:39-3(f), it left people free to carry many other types of ammunition for self-defense.

## B.    Procedural History

Plaintiffs filed a one-count Complaint, alleging that New Jersey's restriction on the public carry of HPBs, N.J. Stat. Ann. § 2C:39-3(f)(1) ("HPB Carry Law"), is facially unconstitutional under the Second and Fourteenth Amendments. *See* ECF 1.

---

[6] The 2022 Uvalde school shooter purchased 1,740 rounds of HPBs days before killing 21 people, including 19 school children. SOMF ¶ 31. The 2019 El Paso Walmart gunman who killed 23 people and injured two dozen others specifically purchased 1,000 rounds of HPBs to increase the lethality of his weapon. *See id.* ¶ 32. The 2017 Las Vegas shooter used HPBs to shoot more than 400 people, killing 58 individuals. *Id.* ¶ 33. The 2007 Virginia Tech shooter used HPBs to kill 32 people and wound at least 23 others. *Id.* ¶ 34.

[7] Newspaper coverage from the 1970's shows public concern about the proliferation of HPBs and makes clear the "quick-kill" capacity of HPBs was well-established at the time. SOMF ¶ 14.

[8] *See United States v. Perez-Garcia*, 96 F.4th 1166, 1180 (9th Cir. 2024) (citing *Heller*, 554 U.S. at 627) (noting Second Amendment does not protect the right to possess or carry "dangerous and unusual weapons, which might include . . . armor-piercing ammunition").

Following discovery,[9] Plaintiffs moved for summary judgment. *See* ECF 41. Defendants now oppose Plaintiffs' motion and cross-move for summary judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). A factual dispute is "genuine" "only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and is "material" only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). "Factual disputes that are irrelevant or unnecessary" do not preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

### I.   THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON THE MERITS OF PLAINTIFFS' SECOND AMENDMENT CLAIM.

Courts assessing Second Amendment claims after *Bruen* conduct a two-step inquiry.[10] First, courts ask if the Second Amendment covers the regulated conduct. *Bruen*, 597 U.S. at 17. If it does not, "the analysis can stop there; the regulated

---

[9] Defendants produced four expert reports, while Plaintiffs proffered none.

[10] Because the Second Amendment applies to the States through the Fourteenth Amendment, the Second Amendment arguments here address Plaintiffs' Fourteenth Amendment claim. *See McDonald v. City of Chicago*, 561 U.S. 742, 749–50, 791 (2010).

7

activity is categorically unprotected." *Id.* at 18. Second, if the conduct is protected, the court must determine whether the regulation is consistent with "the principles that underpin our Nation's regulatory tradition." *Rahimi*, 602 U.S. at 692; *see Bruen*, 597 U.S. at 24. To do this, the court must "ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quotation omitted). This inquiry requires assessing both (a) *how* the "modern and historical regulations impose a comparable burden on the right of armed self-defense," and (b) *why* "that burden is comparably justified." *Bruen*, 597 U.S. at 29.

And a facial Second Amendment challenge, as Plaintiffs bring here, "is the 'most difficult challenge to mount successfully,'" because it requires the challengers "to 'establish that no set of circumstances exists under which the [law] would be valid.'" *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Thus, "to prevail, the [State] need only demonstrate that [the HPB Carry Law] is constitutional in some of its applications." *Id.*

Under either step, New Jersey's HPB Carry Law is valid. Plaintiffs cannot meet their threshold burden of showing that their proposed conduct—carrying HPBs outside the home—is protected by the Second Amendment, particularly in this facial posture. So the Court need not proceed past the first step of the *Bruen* analysis. But even if the Second Amendment right is implicated, the challenged law is consistent

8

with this Nation's historical tradition of restricting weapons designed to inflict excessive, or even fatal, injuries and ammunition that endangers public safety.

### A.   Public carry of HPBs is not protected by the Second Amendment.

The Second Amendment is implicated only if its "plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17, 24. The Second Amendment's plain text protects "only" "arms" that are "'in common use' today for self-defense." *Id.* at 32. Plaintiffs bear the burden of establishing that their desired conduct is covered by "the Second Amendment's plain text." *Id.* at 24; *see also, e.g.*, *Bianchi*, 111 F.4th at 445–46 (noting burden-shift framework); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 388 (D.R.I. 2022) (holding that "plaintiffs have failed to meet their burden of establishing that LCMs[11] are 'Arms' within the textual meaning of the Second Amendment"); *Vt. Fed. Of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 187 (D. Vt. 2024) ("according to *Bruen*, a plaintiff must prove that the regulated weapons are in common use in order to qualify for presumptive protection under the Second Amendment.").

Plaintiffs cannot show their desired conduct is protected by the Second Amendment: they can neither show that HPBs are "arms" under the Amendment's plain text, nor that HPBs are in common use for self-defense, both predicates for

---

[11] "LCM" refers to large capacity magazines, generally holding more than ten rounds.

Second Amendment protection. Because the regulated conduct falls outside the scope of the right, the analysis "stop[s] there." *Bruen*, 597 U.S. at 18.

### 1.  HPBs are not "Arms" protected by the Second Amendment.

To start, HPBs are not entitled to threshold Second Amendment protection because Plaintiffs have not established that they are "Arms." The "Second Amendment's definition of 'arms' is fixed according to its historical understanding," which focuses on the word's "'normal and ordinary' meaning." *Id.* at 20, 28 (quoting *Heller*, 554 U.S. at 576–77). As defined at the Founding, "Arms" generally includes "[w]eapons of offence" that are "use[d] in wrath to cast at or strike another," *Heller*, 554 U.S. at 581, and thus includes "nearly all weapons used for armed self-defense," *Duncan v. Bonta*, 133 F.4th 852, 866 (9th Cir. 2025). Plaintiffs bear the burden of establishing that HPBs are "Arms." *United States v. Boyd*, 999 F.3d 171, 185 (3d Cir. 2021) (requiring claimant to show "a burden on conduct falling within the scope of the Second Amendment's guarantee").

HPBs do not fit the definition of Arms. An HPB is not a "weapon[] of offence." *Heller*, 554 U.S. at 581. Instead, like a silencer, an HPB "is a firearm accessory; it's not a weapon in itself." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). So "it can't be a 'bearable arm' protected by the Second Amendment." *Id.* Plaintiffs point to *Heller*'s collective reference to "bows and arrows" as "arms" to argue that "firearms and bullets" are also "arms." ECF 41-11 at 21. But that logic

10

does not establish that ammunition, independently, and detached from a firearm, is itself an "Arm." Unlike an arrow, which a person can "take into his hands, or useth in wrath to cast at or strike another" as a "weapon of offence," an HPB, by itself, is useless. *Cf. Duncan*, 133 F.4th at 867 (holding that an LCM does not fall within the plain text of the Second Amendment because it "is a box that, by itself, is harmless," cannot be "reasonably described, by itself, as a weapon of offence," and is "useless in combat" without an accompanying firearm). HPBs do not meet any definition of "Arms" examined in *Heller*.

### 2. *HPBs are not necessary for a firearm to function.*

Not only are HPBs not "Arms," but they are also not necessary for the operation of a firearm. Some courts have found "an implicit, corollary right to bear the components or accessories necessary for the ordinary functioning of a firearm." *Id.* at 866. But even if such an atextual right exists—a point Defendants do not concede—the ancillary right to have ammunition necessary for armed self-defense has never been understood as the right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Rahimi*, 602 U.S. at 691 (quoting *Heller*, 554 U.S. at 626); *see, e.g.*, *United States v. Miller*, 307 U.S. 174, 178 (1939) (holding that a short-barreled shotgun is not protected under the Second Amendment). For instance, courts have noted that while "*magazines as a general class might be owed constitutional protection, [large-capacity magazines]* as a specific

11

subset of that class are never necessary for a firearm to function." *See Capen v. Campbell*, 708 F. Supp. 3d 65, 89 (D. Mass. 2023), *aff'd* 134 F.4th 660 (1st Cir. 2025); *see also Oregon Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 912–13 (D. Or. 2023) (same); *Duncan*, 133 F.4th at 868 (holding that "the Second Amendment's plain text does not encompass a right to possess" LCMs because "firearms that accept magazines operate as intended when equipped with magazines with ten or fewer rounds"). So "[u]nlike the total handgun ban in *Heller*," a law restricting LCMs "does not restrict 'an entire class of arms,' but merely a subset of an accessory to firearms." *Kotek*, 682 F. Supp. 3d at 913.

So too here. Even if bullets "as a general class" are "necessary" to operate a firearm, HPBs are certainly not.[12] Plaintiffs do not dispute that they can carry fully

---

[12] Plaintiffs claim "the Second Amendment protects ammunition" because "without bullets, the right to bear arms would be meaningless." ECF 41-11 at 22. But even assuming ammunition itself could fall within the Second Amendment, the HPB Carry Law is not a prohibition on all ammunition; it restricts carry of one type of ammunition while leaving Plaintiffs free to use many other types of bullets. So Plaintiffs are not, as they suggest, "without bullets" or left with a "meaningless" right to bear arms. ECF 41-11 at 22–23 (collecting cases). Taken to its logical conclusion, Plaintiffs' argument would mean that every sub-type of ammunition, including armor piercing ammunition (frequently referred to as "cop-killer" ammunition), would be constitutionally protected. *See* N.J. Stat. Ann. § 2C:39-3(f). But courts have been suspect or outright rejected that exact argument. *See Perez-Garcia*, 96 F.4th at 1180 (Second Amendment does not protect "'dangerous and unusual weapons,' which might include . . . armor-piercing ammunition"); *Kodak v. Holder*, 342 Fed. App'x 907, 909 (4th Cir. 2009) (upholding ban on armor piercing ammunition based in part on rejecting plaintiff's argument that "armor-piercing ammunition minimizes the risk of death when used for self-defense").

12

functional firearms for self-defense without HPBs; they simply "prefer" to use HPBs. *See* ECF 1 ¶ 70 (HPBs are "preferred for self-defense"); ¶ 78 ("Bergmann-Schoch does not currently possess [HPBs] in her home," but "routinely carries her firearm outside her home for self-defense"); ¶ 80 ("Bergmann-Schoch prefers to use [HPBs] in the firearm she publicly carries"); ¶¶ 85–93 (various members of institutional plaintiffs stating they would prefer to use HPBs, but none claiming lack of access to HPBs renders them unable to carry a loaded firearm for lawful self-defense purposes); EFC 41-11 at 5 ("Plaintiffs . . . *wish* to publicly carry hollow point ammunition" (emphasis added)). Plaintiffs never allege that their ability to use a firearm for self-defense is impaired by lack of access to HPBs.[13] Although an individual may *prefer* to load her firearm with HPBs for self-defense, ECF 1 ¶ 78, ECF 41-11 at 5, 8, that preference has no bearing on the firearm's ability to function or her ability to exercise her right to lawful self-defense. *See also Duncan*, 133 F.4th at 869 (explaining that a benefit to the shooter does not bring an accessory within the scope of the Second Amendment's text).

---

[13] In fact, the testimony of former New Jersey State Police Superintendent Colonel Patrick Callahan, on which Plaintiffs rely, only states that "ammunition" is "necessary to effectively use a firearm." ECF 41-2 ¶ 30. Colonel Callahan said nothing about whether HPBs are necessary to effectively use a firearm.

### 3.  *HPBs are ill-suited and disproportionate for self-defense.*

Even if HPBs were "Arms" or were somehow wedged into an atextual right for items necessary to a firearm's operation, Plaintiffs' conduct still falls outside the Second Amendment because HPBs are unsuitable for lawful self-defense. The Second Amendment has never protected "any weapon whatsoever;" *Heller*, 554 U.S. at 626–27 (quoting William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148–49 (1769)); the "sorts of weapons protected" by the Second Amendment are those "'in common use at the time' for lawful purposes like self-defense," *id.* at 624–25, 627. The right is concerned with ensuring individuals have arms to protect themselves; it "is not concerned with ensuring citizens have access to military-grade or gangster-style weapons." *Bianchi*, 111 F.4th at 452; *see Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023) (explaining that the Second Amendment focuses on self-defense and does not protect "weapons that are exclusively or predominantly useful in military service"). Put differently, "while the Second Amendment jealously safeguards the right to possess weapons that are most appropriate and typically used for self-defense, it emphatically does not stretch to encompass excessively dangerous weapons ill-suited and disproportionate to such a purpose." *Bianchi*, 111 F.4th at 452. This principle dates back centuries: weapons "not reasonably related or proportional to the end of self-defense" were "understood to fall outside the reach of the right." *Id.* at 450; *see id.* at 450 ("dangerous or unusual" weapons "could be banned

14

without infringing upon the right to bear arms") (citing Blackstone and antebellum decisions).

In determining whether an arm is in proportional to the end of self-defense, courts assess the objective features and actual uses of the weapon. *See Heller*, 554 U.S. at 622–24, 629 ("examin[ing]" handgun's objective "character" and "nature"—such as its ease of usage in one hand, and its ease of storage—that make it "the quintessential self-defense weapon" and entitled to protection); *id.* at 621–22, 624–25, 627 (endorsing bans on short-barreled shotguns and machineguns); *Bianchi*, 111 F.4th at 451 (describing dangerous features of a short-barreled shotgun, including its "more destructive power" making it "desirable to malefactors and crooks"); *United States v. One Palmetto State Armory*, 822 F.3d 136, 142 (3d Cir. 2016) (agreeing machineguns warrant no protection given the "exceedingly dangerous" features that make them "primarily weapons of war" and "gangster-type weapons") (internal citations omitted). For example, the Fourth Circuit held that a Maryland law prohibiting possession of "assault weapons" did not implicate the Second Amendment. *Bianchi*, 111 F.4th at 448–49. The court explained that "some bearable arms deliver force so excessive for self-defense that no reasonable person could posit that the Constitution guarantees civilians access to them." *Id.* at 451. Assault weapons' "phenomenal lethality," designed to generate the "maximum wound effect" placed them outside the Second Amendment's protection. *Id.* at 451, 455, 461; *see*

15

*also Bevis*, 85 F.4th at 1197 (AR-15 is "not protected by the Second Amendment" at *Bruen* step one).

Like assault weapons, the objective features of HPBs demonstrate that they are ill-suited and disproportionate for self-defense.

*History.* HPBs were developed in the late 1800s for military use by the Australian and British forces in India. *See* SOMF ¶ 5. Soldiers fighting in that conflict found that "full metal jacket" ammunition was less lethal because the bullets kept their shape and passed through the body. *See id.* So HPBs were designed specifically to expand and cause greater injuries and more death. *See id.* ¶ 24. Because their use was considered to be inhumane, however, the 1899 Hague Convention outlawed their use in international warfare. *Id.* While the United States is not a party to that declaration on HPBs, it is a party to the Hague Convention IV, which prohibits weapons calculated to cause unnecessary suffering. *Id.* ¶ 9–11. And the U.S. military restricts the use of ammunition "calculated to cause unnecessary suffering." *Id.* ¶¶ 8, 11.

*Design Features.* Like assault weapons, HPBs are specifically designed to generate the "maximum wound effect." *See Bianchi*, 111 F.4th at 455. HPBs "have a hollow cavity in the tip that causes the bullet to flatten and expand when it strikes a target." SOMF ¶¶ 17–18. Because they mushroom upon impact, HPBs are designed to impart greater force upon a target and leave a larger wound cavity than a

typical full metal jacket bullet. *See id.* ¶ 19.[14] HPBs' design is thus "to cause more damage by transferring more of the bullet's energy into its target" through its "expanding features*." Id.* ¶ 26. That damaging effect is similar to the damage created by assault weapons, which fire bullets at higher velocity. *See id.* ¶ 28. So assault weapons achieve a similar result through different mechanics: a high velocity bullet from an assault weapon "typically 'yaws' or turns sideways" upon impact with a human target, which "creates a large, 'temporary cavity' or 'blast wave' that can be 'up to 11–12.5 times larger than the bullet itself.'" *Bianchi*, 111 F.4th at 455. Like a bullet from an assault weapon, an HPB's "larger permanent cavities and more immediate temporary cavity formation, thus causing greater and more immediate damage to the body." SOMF ¶ 20.

*Lethality.* These design features make HPBs "2.7 times more lethal and 1.9 to 2.5 times more injurious than non-hollow point bullets." *Id.* ¶ 29. Because the HPB expands upon impact, it causes "greater tissue, cellular, and organ injury." *Id.* ¶ 27. For instance, "if a person is shot in the liver with" an HPB as compared to a full metal jacket bullet, "the earlier onset of the temporary cavity is disastrous, with direct impact and greater tissue destruction, severing multiple collateral arteries and veins," resulting "in hemorrhage, shock, and a high risk of death." *Id.* ¶ 27. That is

---

[14] Plaintiffs agree: HPBs expand upon impact "causing increased damage." ECF 41-11 at 8. In other words, HPBs allow users to injure and kill more easily.

because the HPB's "mushrooming" creates a larger projectile surface area and larger cavities, "thus causing greater and more immediate damage to the body" than non-hollow point ammunition. *Id.* ¶ 20. So while the mechanisms of an assault rifle are different, the effect is the same: increased soft tissue damage to a target, resulting in "catastrophic" injuries that "often cannot be repaired by trauma surgeons," resulting in greater injury and death. *Bianchi*, 111 F.4th at 445 (citation modified); *accord* SOMF ¶ 20. If all shootings occurring from 2020 to 2024 had been committed with HPBs, the lethality rate would have been 2.7 times greater—"yield[ing] 1,684 additional deaths in New Jersey over this five-year period." SOMF ¶ 30.

"What brings all the weapons beyond the scope of the Second Amendment together, and what separates them from the handgun, is their ability to inflict damage on a scale or in a manner disproportionate to the end of personal protection." *Bianchi*, 111 F.4th at 451. And because HPBs, like assault weapons, are "excessively dangerous" and "better suited for offensive criminal or military purposes," they "fall outside the reach of" the Second Amendment right. *See id.* at 450; *see also Heller*, 554 U.S. at 627 (acknowledging that "weapons that are most useful in military service" are outside the scope of the Second Amendment).

***Proportionality***. The disproportionately lethal character of HPBs also causes them to exceed historical principles of self-defense, and thus confirms they lie outside the scope of the Second Amendment right.

18

Even before the Founding, English common law recognized the right to lawful self-defense. The English Declaration of Rights of 1689, which "has long been understood to be the predecessor to our Second Amendment," only guaranteed individuals "Arms for their Defence . . . as allowed by Law." *Heller*, 554 U.S. at 593 (citation modified). Our common-law tradition has long held that self-defense is only lawful when necessary and proportional. SOMF ¶¶ 35, 37, 45. As early as the 1500s, "consensus had already formed that a person killing in self-defense could go free only if the person reasonably believed the killing was necessary." *Id.* ¶ 40. And throughout the 18th century, "common law treatises regularly underscored the role of necessity." *Id.* ¶ 41. As Blackstone explained, "the law requires that the person, who kills another in his own defence [during a sudden affray], should have retreated as far as he conveniently or safely can, to avoid the violence of the assault before he turns on his assailant." *Id.* ¶ 42.

The requirement of proportionality in self-defense also "existed since before the Founding" and generally "limits permissible defensive force to that which is reasonable in relation to the harm threatened." *Id.* ¶ 45. As early as 1706, in *Cockcroft v. Smith*, Chief Justice Holt explained that the reasonableness or moderation principle was a central component to English self-defense, holding that self-defense was unavailable "where the second assault is *excessive*," because the law only protects what is actually "necessary for a man's defense." *Id.* ¶ 46. Thus, "hitting a man a

19

little blow with a little stick on the shoulder, is not a reason for him to draw a sword and cut and hew the other." *Id.* ¶ 46; *see also id.* ¶ 47.

That common law understanding of the limits of self-defense carried over to America at the Founding. One year after New Jersey ratified the Second Amendment, in *State v. Wells*, the New Jersey Supreme Court of Judicature rejected the defense of self-defense, because "the attack of the deceased was without any kind of weapon"—there, a club—"that might have rendered it necessary for the prisoner to avail himself of the instrument which occasioned the death." *Id.* ¶ 49. The court reasoned that "no man is justified in taking away the life of another, unless the necessity for doing so is apparent as the only means of avoiding his own destruction or some other great injury." *Id. Wells* relied on a 1704 English case, *Reg. v. Nailor*, Foster Crown Cases 278 (Old Bailey 1704), which rejected a plea of self-defense even when the defendant was pinned on the ground "so that he could not escape nor avoid the blows" of his attacker because his use of a penknife to wound and ultimately kill an unarmed attacker was not necessary given the threat he faced. *State v. Wells*, 1 N.J.L. 486, 492 (1790). At the Founding, proportionality also limited permissible defensive force to that which was "reasonable in relation to the harm threatened." SOMF ¶ 45. In *Wells*, the defendant's self-defense claim failed not only because violence was not necessary, but because he reacted disproportionately, responding to a nonlethal threat with lethal force. *Id.* ¶¶ 49, 51.

20

In 1806, these same principles were repeated in *Commonwealth v. Selfridge*, where Judge Isaac Parker instructed the jury on self-defense "[i]f you believe under all the circumstances, the defendant could have escaped his adversary's vengeance, at the time of the attack, without killing him, the defense set up has failed, and the defendant must be convicted." *Id.* ¶ 52; Decl. of Jonathan Mangel Ex. 7, *Commonwealth v. Selfridge*, 2 Am. St. Trials 544 (Mass. 1806), at 697. There, fearing attack, the defendant purchased a pistol and later encountered an enemy, carrying a walking stick, on a Boston street. SOMF ¶ 52. When the defendant was struck over the head with the walking stick, he fired the pistol, killing his adversary. *Id. Selfridge* also links the lawfulness of lethal force to the weapon used by the attacker, with Judge Parker stating, "I doubt whether self-defense could in any case be set up, where the killing happened in consequence of an assault only, unless the assault be made with a weapon which if used at all, would probably produce death." Mangel Decl. Ex. 7 at 696. Together, this history shows that lawful self-defense is limited by the requirements of necessity and proportionality, both of which often depend on the type of weapon utilized.

Modern courts have similarly relied upon the law of self-defense as understood around the time of the Second Amendment's ratification to hold that bearing arms that are excessive (in necessity, proportionality, or both) for self-defense is not protected by the Second Amendment. As the Fourth Circuit explained, "[j]ust as the

21

right to self-defense had limitations at the time of the founding, so too did the right to keep and bear arms that enabled it." *Bianchi*, 111 F.4th at 450. The "Framers aimed to safeguard the right to individual self-preservation, while recognizing appropriate limitations—*including those already inherent in the common law right to self-defense*." *Id.* (citation modified). So arms that "amplify an individual's power to protect himself without empowering him to single-handedly reign terror upon a community" are "generally within the ambit of the Second Amendment," while "excessively dangerous arms were not reasonably related or proportional to the end of self-defense—but rather were better suited for offensive criminal or military purposes—and were thus understood to fall outside the reach of the right." *Id.* Such weapons with the "ability to inflict damage on a scale or in a manner disproportionate to the end of personal protection" such that they are "excessively dangerous weapons ill-suited and disproportionate to" the purpose of lawful self-defense are "beyond the scope of the Second Amendment." *Id.* at 451–52.

These longstanding historical limits on self-defense demonstrate that HPBs are disproportionate "for lawful purposes like self-defense" and therefore incompatible with the Second Amendment right. *Heller*, 554 U.S. at 624. Carrying "phenomenal[ly] lethal[]" ammunition, *Bianchi*, 111 F.4th at 455, without indication it is necessary and proportional to a specific threat, violates those historical limits. *See Wells*, 1 N.J.L. at 430 (self-defense failed where there was no indication the deadly weapon

22

was "necessary" and where "much less would have been sufficient"). . Given their phenomenally lethal nature, Plaintiffs cannot establish that there are "no set of circumstances under which" HPBs would exceed what is necessary and proportional for self-defense. As the Supreme Court has consistently held, "individual self-defense" is the "central component" of the Second Amendment right. *Bruen*, 597 U.S. at 29; *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010); *Heller*, 554 U.S. at 599.[15] But carrying HPBs outside the home "exceed[s] the needs of the typical self-defense situation." *Bianchi*, 111 F.4th at 453; *see* SOMF ¶ 29 (finding HPBs are "2.7 times more lethal and 1.9 to 2.5 times more injurious than non-[HPBs]").

As a result, in this facial posture, New Jersey's HBP Carry Law "is constitutional in at least some of its applications," *Rahimi*, 602 U.S. at 693, because carrying

---

[15] Despite agreeing that "individual self-defense is 'the *central component*' of the Second Amendment right," ECF 41-11 at 27 (quoting *Bruen*, 597 U.S. at 29), Plaintiffs argue that the HPB Carry Law violates their right to self-defense "because Americans hazard greater danger outside the home than in it," *id.* at 5 (quoting *Bruen*, 597 U.S. at 33). But *Heller* itself instructed that the need for self-defense "is most acute" in the home. 554 U.S. at 628. Before and at the Founding, it was only when defending the home that deadly force could be used without meeting necessity and proportionality standards. *See* SOMF ¶ 44; Matthew Hale, THE HISTORY OF THE PLEAS OF THE CROWN 486 (1680), https://tinyurl.com/hm6crf22 (when assailed in their own home, a person "need not fly as far as he can, as in other cases of *se defendendo*, for he hath the protection of his house to excuse him from flying, for that would be to give up the protection of his house to his adversary by flight"). The "castle doctrine" likewise traditionally removes the retreat requirement required for lawful self-defense when an attack occurs in one's home. *See* SOMF ¶ 44; *see also People v. Tomlins*, 213 N.Y. 240, 243 (1914).

"phenomenally lethal" HPBs for self-defense in public will often exceed the scope of permissible self-defense conduct protected by the Second Amendment. The HPB Carry Law thus falls outside the scope of the Second Amendment right at step one of the *Bruen* analysis.[16]

### B. The HPB Carry Law is consistent with the principles that underpin our Nation's regulatory tradition of firearms and ammunition regulation.

Even if "the Second Amendment's plain text" covered the public carry of HPBs, New Jersey's law is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 691–92; *see also id.* at 740 (Barrett, J.,

---

[16] Plaintiffs argue that, because the New Jersey State Police carries HPBs for self-defense, HPBs are also ideal "'self-defense' ammunition" for civilians and thus within the scope of the Second Amendment. *See* ECF 41-11 at 27. This argument incorrectly assumes that civilians have the same training, powers, and duties as a sworn officer of the law. Law enforcement officers are tasked with protection of the public safety and swear an oath to wield the power vested in them for that purpose. As the Seventh Circuit explained, "[b]oth the states and federal government have long contemplated that the military and law enforcement may have access to especially dangerous weapons, and that civilian ownership of those weapons may be restricted." *Bevis*, 85 F.4th at 1201. Furthermore, courts have recognized the principles underpinning the distinction between law enforcement agents and civilians in bearing particularly dangerous weapons. *See, e.g.*, *Pena v. Lindley*, 898 F.3d 969, 987 (9th Cir. 2018) (recognizing that legislatures are reasonable to distinguish between civilians and law enforcement because officers "receive extensive training and are expected to respond to emergencies even when off duty"); *Williams v. Puerto Rico*, 910 F. Supp. 2d 386, 399 (D.P.R. 2012) ("The sensitive nature of many of their jobs—protecting our communities from crime through conducting arrests, prosecuting criminals, presiding over litigation, and creating legislation, for example—subjects them to additional risks of danger"). New Jersey's officers explained this clearly when HPBs became the law enforcement standard, stating that HBPs were "a last resort to save the life of a citizen or police officer." SOMF ¶ 14.

concurring) ("Historical regulations reveal a principle, not a mold."); *id.* at 717 (Kavanaugh, J., concurring) (courts must discern "principles embodied" in a constitutional text). This historical analysis requires courts to consider both "how" and "why" the law burdens the right to keep and bear arms relative to historical "laws that our tradition is understood to permit." *Id.* at 692. Although a modern regulation "must comport with the principles underlying the Second Amendment," the law "need not be a 'dead ringer' or a 'historical twin'" to its predecessors. *Id.* (quoting *Bruen*, 597 U.S. at 30). If modern laws are "relevantly similar" to historical regulations—in that they "impose a comparable burden on the right of armed self-defense" that "is comparably justified"—they are constitutional. *Bruen*, 597 U.S. at 29.[17]

In examining historical analogues, courts need not decide whether to rely on Founding-era or Reconstruction-era evidence where there is no direct conflict between them. *See id.* at 38. Thus, if English law, Founding-era law, and 19th-century

---

[17] Plaintiffs attempt to reduce the *Bruen/Rahimi* test to a simplistic binary: "if a member of the people wishes to keep or bear an arm, then the ability to do so shall not be infringed." ECF 41-11 at 17 (citation modified). According to Plaintiffs, "the *people's preferences prevail*," so HPBs' "overwhelming popularity obviates the need for any historical analysis here." *Id.* at 24–25. That argument ignores the express direction that courts *must* consider at step two of the *Bruen* analysis "[w]hy and how the regulation burdens the right." *See Rahimi*, 602 U.S. at 692. A court cannot determine "whether the modern law is 'analogous enough' to historical precursors," *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 443 (3d Cir. 2025), if, as Plaintiffs argue, "[i]t does not matter" how important the State's interest is or "whether a government restriction 'minimally' versus 'severely' burdens" the right. ECF 41-11 at 17.

law all point in the same direction, this Court can consider them all. *See Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir. 2025); *Schoenthal v. Raoul*, 150 F.4th 889, 913 (7th Cir. 2025) ("[W]e and other circuits concur that evidence stretching into the nineteenth century is useful to a *Bruen* inquiry."); *McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568, 574–75 (4th Cir. 2025). And laws "through the end of the 19th century" can indeed "be a critical tool of constitutional interpretation because they can be evidence of a historical tradition and shed important light on the meaning of the Amendment as it was originally understood." *Lara*, 125 F.4th at 441 (citation modified). In other words, so long as there is no conflict among them, each period of history can provide evidence of the Second Amendment's meaning.

Nor is Founding-era *silence* somehow in any conflict with Reconstruction-era *regulation*. Courts regularly rely on evidence from the Reconstruction if there is little or no Founding-era evidence on point. *See, e.g.*, *Gamble v. United States*, 587 U.S. 678, 685–86 (2019) (citing cases from 1847, 1850, and 1852 to construe the Double Jeopardy Clause); *Timbs v. Indiana*, 586 U.S. 146, 152 (2019) (citing evidence "in 1868 upon ratification of the Fourteenth Amendment" as evidence of understanding the Excessive Fines Clause). And because we cannot "'assume[] that founding-era legislatures maximally exercised their power to regulate' conduct," *Pitsilides v. Barr*, 128 F.4th 203, 209 (3d Cir. 2025) (quoting *Rahimi*, 602 U.S. at 739–40

26

(Barrett, J., concurring)), silence at the Founding does not suggest constitutional doubt, *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) (rejecting "'use it or lose it' view of legislative authority").

Moreover, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," as today's concerns are not "the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27; *see Zherka v. Bondi*, 140 F.4th 68, 79 (2d Cir. 2025) ("[T]he modern concerns that [challenged laws] addressed, and continue to address, diminish the government's burden of drawing a tight historical analogy" to the challenged law). In other words, this Court must consider what restrictions on arms *did* exist historically, and then ask whether the principles that underlie them are relevantly similar to the modern law. *See generally Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring) (emphasizing that, under analogical reasoning, "the Second Amendment allows a 'variety' of gun regulations" (quoting *Heller*, 554 U.S. at 636)). So if the challenged law addresses an unprecedented societal concern or a technological change, a more generalized historical principle will suffice.

The HPB Carry Law warrants such a nuanced approach both because HPBs did not exist at the time the States ratified the Second and Fourteenth Amendments and the HPB Carry Law addresses an unprecedented societal concern: the lethal effects of modern ammunition and mass shootings. But New Jersey's law is

27

nonetheless supported by the principles underpinning our Nation's robust historical tradition of regulating particularly dangerous weaponry that causes excessive injury and ammunition for public safety.

      1. *There is a longstanding national regulatory tradition of restricting particularly dangerous instruments.*

A long historical tradition exists—from pre-Founding English history through the Prohibition era—of restricting particularly dangerous weapons and ammunition once they spread in society and pose a public safety threat, while leaving open other avenues of self-defense. "Our nation has a strong tradition of regulating excessively dangerous weapons once it becomes clear that they are exacting an inordinate toll on public safety and societal wellbeing." *Bianchi*, 111 F.4th at 446. This is the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'"—that is, of regulating unusually dangerous firearms[18]—that a wide range of Founding era sources and *Heller* itself recognize. 554 U.S. at 627.

English and colonial governments identified particular weapons for restriction while leaving room for other tools of self-defense. *See, e.g., Bruen*, 597 U.S. at 41

_____

[18] Courts have concluded that the phrase "dangerous and unusual" is a "hendiadys"—"'two terms,' often with one modifying the other, that are 'separated by a conjunction' (here, 'and') 'that work together as a single complex expression'"—and thus is best understood to mean "unusually dangerous." *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 234, n.19 (2d Cir. 2025); *see Hanson v. District of Columbia*, 120 F.4th 223, 238 n.7 (D.C. Cir. 2024) (similar), *cert. denied*, 145 S. Ct. 2778 (2025).

28

(noting English prohibitions on "wearing of armor" and "such weapons as the 'launcegay,' a 10- to 12-foot-long lightweight lance," which "were generally worn or carried only when one intended to engage in lawful combat or . . . to breach the peace" (citing 7 Rich. 2 c. 13 (1383); 20 Rich. 2 c. 1 (1396)); *id.* (noting prohibitions on "Handguns and Crossbows," "Steelets, Pocket Daggers, Pocket Dagges and Pistols"); *id.* at 47–48 (citing 1686 East New Jersey law prohibiting concealed carry of "unusual or unlawful weapons" including "pocket pistol[s]"). Indeed, the English Bill of Rights, "the predecessor to our Second Amendment," protected the right of the people to "'have Arms for their Defence *suitable to their Conditions*, and *as allowed by Law*.'" *Heller*, 554 U.S. at 593 (quoting 1 W. & M., ch. 2, § 7) (emphasis added). In other words, the foundations of the Second Amendment reflected a period in which governments regulated the types of arms that are "suitable" for self-defense, and restricted those that are not.

That tradition continued in the United States, where a range of governments enacted laws regulating weapons and ammunition that posed threats to public safety because of certain dangerous features from the Founding era into the 20th century. As the State's historical expert explains, all these historical laws shared a common denominator: "the public policy judgment that all posed a unique hazard or threat to public and physical safety." SOMF ¶ 89.

29

*Gunpowder and Ammunition.* Ammunition was regulated in America before the Founding and such regulation continued through today as ammunition evolved. Ammunition generally consists of four parts: (a) the projectile (the bullet); (b) the propellant (the gunpowder that, when ignited, propels the bullet); (c) the primer (the chemical that, when struck, ignites the propellant); and (d) the case (which holds the other components). *See id.* ¶ 53. Gunpowder, an indispensable component for the discharge of firearms, was regulated as early as 1633 in colonial Massachusetts. *Id.* ¶ 55. Such regulations focused on safe storage, transport, and use and existed because gunpowder was inherently dangerous and posed a threat to public safety. *Id.* ¶¶ 58–59. From the 17th century through the start of the 20th century, every state in the country enacted one or more gunpowder regulations. *Id.* ¶ 56. Indeed, "at least seven gunpowder laws were enacted in the colonies in the 1600s, thirty gunpowder laws were passed in the 1700s, 175 laws in the 1800s, and 76 laws in the 1900s up until 1934," for "a total of over 300 laws in 49 states." *Id.* ¶¶ 61–64; *see also* Decl. of Jonathan Mangel Ex. 1, Rpt. of Dr. Robert Spitzer at Exs. C, D, E.

At the Founding, States required that gunpowder be stored safely even when it might have "made it more difficult for people to load their guns quickly to defend themselves against attack" SOMF ¶ 58. In fact, "virtually every jurisdiction heavily regulated the possession, transportation, sale, and manufacture of gunpowder . . . and regulated the shooting of guns both to protect against unintentional shootings

and fires caused by gunshots." *Id.* ¶ 57. For example, "[a] 1783 Massachusetts law restricting firearms and gunpowder in Boston began by noting that 'The depositing of loaded arms in the houses of the town of Boston is dangerous.'" *Id.* ¶ 65. That law "barred bringing gunpowder or gunpowder-loaded firearms into any house or other structure in the city," with the penalty for doing so "that 'such person shall forfeit' the firearm and pay a fine." *Id.* Maine also enacted two related measures in 1821. *Id.* ¶ 66. And an 1857 New Jersey law stated that no more than two pounds of gunpowder could be kept inside any building. *Id.* ¶ 67.[19] Such limitations existed "for the good of public safety." *Id.* Since "the basic idea that gun possession must be balanced with gun safety laws was one that the founders endorsed," *id.* ¶ 58, regulation over gunpowder "was extensive, ubiquitous, and plenary, encompassing and superseding any contemplated private uses of the same as part of government's efforts to protect the public from gunpowder's inherent danger," *id.* ¶ 60.

This regulatory theme persisted as arms and ammunition evolved over time. From colonial America through much of the 19th century, ammunition changed very little and consisted of front-loaded musket balls manually loaded with gunpowder. *See id.* ¶ 70. The cartridge-firing guns with modern ammunition cartridges began to

---

[19] Similar laws limiting gunpowder possession also existed in other states across Colonial America, *see* SOMF ¶¶ 55, 61, and the early Republic, including in Maine, Massachusetts, Michigan, New York, and Vermont, *see id.* ¶ 60.

31

circulate after about 1873 and "represented a dramatically different type of firearm from those of the past." *Id.* ¶ 71. Shortly after enclosed metallic cartridges began to circulate in society around the 1870s, states began to regulate them. *Id.* ¶¶ 71–75. For example, "at least four states enacted sweeping laws to penalize the sale or acquisition of pistol ammunition." *Id.* ¶ 75. An 1881 Arkansas law titled "An Act to Preserve the Public Peace and Prevent Crime" said: "Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person . . . any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor." *Id.* ¶ 76. And an 1883 Tennessee law similarly made it "unlawful for any person or persons to buy or sell or give away any pistol cartridges in this state." *Id.* ¶ 77. Oklahoma and Massachusetts also enacted similar pistol ammunition restrictions around this time. *Id.* ¶ 78.

**Bowie Knife.** The Bowie knife was considered an inherently dangerous "fighting knife" because of its long thin blade, cross guard to protect the wielder's hands, and points designed to make it easier to injure a victim. *See Duncan*, 133 F.4th at 875–76; SOMF ¶¶ 79–80. In the 1830s, the "Bowie knife," a "long-bladed and usually single-edged knife with a hand guard," became widespread in the United States. SOMF ¶ 81. Its distinctive features were "intended for combat" and led to the knives' proliferation. *Id.* ¶¶ 79–82. Unfortunately, the knives were "widely used in fights and duels, especially at a time when single-shot pistols were often unreliable

32

and inaccurate." *Id.* ¶ 82. In response, nearly every state eventually restricted Bowie (or similar longbladed) knives, whether by prohibiting or restricting carry or sale, enhancing criminal penalties, or taxing their ownership. *Id.* ¶ 84; Mangel Decl. Ex. 1 at Ex. H (listing Bowie knife restrictions by manner, state, and year); *see also Duncan*, 133 F.4th at 876. Other States, such as Tennessee, prohibited the carry and sale of bowie knives. *See* SOMF ¶ 85.

These restrictions were approved by contemporaneous decisions. One court, in upholding Tennessee's law, noted that the state had "a right to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens." *Id.* ¶ 86. The court later upheld the knife restriction, stating that, "[t]he design of the statute was to prohibit the wearing of bowie knives and others of a similar description, which . . . had proven to be *extremely dangerous and destructive to human life.*" *Id.* ¶ 87. Texas upheld regulation of Bowie knives because they are "an exceeding[ly] destructive weapon," an "instrument of almost certain death," and "the most deadly of all weapons in common use." *Id.* ¶ 88. Bowie Knife laws are a prime example of, as Plaintiffs say, a "practice into the 19th century provid[ing] confirmation of what the Founding-era law established." ECF 41-11 at 17 (citing *United States v. Quailes*, 126 F.4th 215, 222 (3d Cir. 2025)) (citation modified).

*HPBs.* Efforts to prevent superfluous injury and unnecessary suffering in war and military matters dates back hundreds of years. SOMF ¶¶ 68–69. In 1675,

Germany and France signed the first agreement to bar the use of poisons, including poisoned ammunition. *Id.* ¶ 68. And the Lieber Code of 1863 prohibited the use of poisoned ammunition. *Id.* ¶ 68. Today, there remains a "long-standing customary prohibition against poison" because of "the inevitability of death." *Id.* ¶ 69.

Similarly, for over a century, HPBs have been banned for use in war by various countries because they cause "unnecessary suffering." *Id.* ¶¶ 8–11. In 1899, the Hague Declaration stated that "the contracting parties agree to abstain from the use of bullets which expand or flatten easily in the human body." *Id.* ¶¶ 9–11; Declaration Renouncing the Use, in Time of War, of Explosive Projectiles Under 400 Grammes Weight, Nov. 12, 1868, https://tinyurl.com/34c5hvmh (the use of weapons that render death inevitable is "contrary to the laws of humanity"). This agreement involved 26 countries, including the United States.[20] SOMF ¶ 11. The United States military has also imposed restrictions on certain types of ammunition considered especially lethal, unnecessarily cruel, or that cause excessive injury, prohibiting "the use of ammunition, the primary effect of which is to injure by fragments that in the human body escape detection by X-rays." *Id.* ¶ 12.

---

[20] Although the United States did not sign the treaty, it adheres to the prohibitions of the Hague Convention IV (an agreement distinct from the Hague Declaration), which includes the prohibition against weapons calculated to cause unnecessary suffering. SOMF ¶ 11.

34

2. *The HPB Carry Law is consistent with our regulatory tradition of restricting particularly dangerous instruments.*

New Jersey's prohibition on the public carry of HPBs fits the "how" and "why" of these historical regulations. The HPB Carry Law "impose[s] a comparable burden on the right of armed self-defense." *Bruen*, 597 U.S. at 29. Like many of these historical analogues, New Jersey has prohibited carrying HPBs outside the home. *See* N.J. Stat. Ann. § 2C:39-3(f). New Jersey's law is not flat ban on ammunition, and does not functionally prevent individuals from carrying firearms for self-defense. And New Jersey's law is tailored: only a specific type of ammunition that poses particular risk and is disproportionate for self-defense is banned for public carry. Given that limited scope, prohibiting their use does little to burden the right to self-defense, just like the historical tradition that comes before it. *See Lamont*, 153 F.4th at 226 (holding that "the historical antecedents, like the challenged statutes, preserved alternative avenues for the legal possession of less inherently dangerous arms for self-defense and other lawful purposes"); *Hanson*, 120 F.4th at 240 (similar), *cert. denied*, 145 S. Ct. 2778 (2025) (explaining that because many of the historical analogues are "outright bans on an entire class of weapons, they impose a burden on the right to armed self-defense comparable to (if nor greater than) the burden imposed by" the challenged magazine cap).

And New Jersey's HPB Carry Law "is comparably justified." *Bruen*, 597 U.S. at 29. Like these historical laws, HPBs—ammunition designed for military use but

35

largely banned from international warfare because of the unnecessarily grievous injuries they inflict—are prohibited from public carry because they are unusually dangerous and thus pose a heightened threat to public safety. *See* SOMF ¶¶ 5–7. The hollow tip of an HPB, as noted, causes it to flatten and expand when it strikes a victim, creating a larger projectile surface area. *See id.* ¶ 20. That causes excessive injury by transferring more kinetic energy from the moving bullet into the person's body. This energy radiates into the body, shredding and stretching effected tissue in what is called the "temporary cavity." *See id.* ¶¶ 20–21. The greater surface area and energy imparted by an HPB also result "in a larger permanent cavity," *id*. ¶ 20, which causes "greater and more immediate damage to the body," *id*. The larger projectile surface area means an HPB crushes more tissue as it moves through the body than a non-expanding bullet would. *See id*. ¶¶ 20–22. An HPB is more likely to sever multiple arteries and veins, resulting in hemorrhage, shock, and a high risk of death. *See id.* In fact, if all shootings occurring from 2020 to 2024 had been committed with HPBs, the lethality rate would have been 2.7 times greater—"yield[ing] 1,684 additional deaths in New Jersey over this five-year period." *Id.* ¶ 30. The HPB Carry Law thus shares a comparable justification as the historical laws: protecting the public from harm and possible death caused by this unnecessarily lethal type of ammunition. *See, e.g.*, *Duncan*, 133 F.4th at 877 (comparing historical gunpowder storage laws to modern magazine capacity and explaining that they "share the same

36

justification for burdening the right to armed self-defense: to protect innocent persons from infrequent but devastating harm caused or exacerbated by a component necessary to the firing of a firearm").

HPBs maximize the damage inflicted on a target. As Colonel Callahan testified, the "construction" of HPBs is the reason why: they are "intended to create more trauma, which would then equate to the threat being stopped quicker." ECF 41-5, 36:7–11. The United States has a deeply-rooted tradition of regulating weapons capable of "phenomenal lethality." *See Bianchi*, 111 F.4th at 455. And like carrying Bowie knives, which are "extremely dangerous and destructive to human life," SOMF ¶ 87, carrying HPBs presents the same dangers. Applying the "nuanced approach" required by *Bruen* makes clear that these historical laws are apt analogues for New Jersey's modern restriction on the public carry of HPBs. 597 U.S. at 27.

> 3. *The HBP Carry Law is Consistent with the Principles Underlying Historical Common Law Self-Defense.*

As explained above, *supra* Section I.A.3, the common law doctrine of self-defense, as understood in the Founding and Reconstruction Eras, was rooted in principles of necessity and proportionality. Those principles are part of a "long unbroken

37

line of common-law precedent" that provide an apt historical analogue to the HPB

Carry Law. *See McCoy*, 140 F.4th at 574–75 (quoting *Bruen*, 597 U.S. at 35).[21]

Regulating the civilian carry of HPBs is consistent with the principles of historical common law self-defense, which "tilt in favor of the preservation of human life." SOMF ¶ 36. Plaintiffs argue that their right to self-defense includes a right to use ammunition with maximal "stopping power," but the common law of self-defense only permits the use of the force necessary to proportionally counter the threat. The HBP Carry Law, consistent with those common law principles, only regulates ammunition that is "disproportionate to self-defense," because of their lethality. *See Bianchi*, 111 F.4th at 451; *see also McCoy*, 140 F.4th at 575–77 (relying on common law historical analogues at *Bruen* step two); *Bondi*, 133 F.4th at 1116–18 (same).

---

[21] Courts have relied on common law to determine the "public understanding of the right when the Bill of Rights was adopted in 1791." *See Nat'l Rifle Ass'n. v. Bondi*, 133 F.4th 1108, 1115 (11th Cir. 2025). For example, Circuit Courts of Appeal have relied on the principles underpinning historical common law contract doctrine to justify the "how" and "why" regulations on possession and sale of firearms to people under 21 years of age. *See McCoy*, 140 F.4th at 575–77 ("the infancy doctrine demonstrates that there was an early American tradition of burdening the ability of 18- to 20- year olds to purchase goods, including firearms" and the challenged law "fits comfortably within this tradition because it is analogous in both "how" it burdens their Second Amendment rights and "why."); *see Bondi*, 133 F.4th at 1117 (age restriction on firearms was consistent with history and tradition because the "Founders' generation shared the view that minors lacked the reason and judgment necessary to be trusted with legal rights.").

## II.    PLAINTIFF GOF HAS NOT DEMONSTRATED ARTICLE III INJURY AND SHOULD BE DISMISSED FOR LACK OF STANDING.

The only named individual Plaintiff, Heidi Bergmann-Schoch, likely has standing here. The same is likely true of GOA and CNJFO, which both claim Ms. Schoch as a New Jersey member affected by the HPB Carry Law. *See* ECF 41-2 ¶¶ 3–4, 17–18. But unlike those organizations, Plaintiff Gun Owners Foundation (GOF) alleges no such injury. Instead, GOF gestures at associational standing, arguing that it "hears from [its] members and supporters, some of whom reside in New Jersey," *id.* ¶ 19, but fails to actually identify any such members. *Compare Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023) ("*SFFA*") (Article III standing satisfied where plaintiff "identified members" and "represent[ed] them in good faith"), *with* ECF 41-2 ¶ 19, *and* ECF 41-3 (Ex. B). That is insufficient for Article III standing. So if the Court does not enter judgment for Defendants, any injunction should be limited to only "the particular federal plaintiffs" properly before the Court. *Trump v. CASA, Inc.*, 606 U.S. 831, 843–44 (2025).

## CONCLUSION

The Court should enter summary judgment for Defendants.

Dated: April 9, 2026          Respectfully submitted,

                             JENNIFER DAVENPORT
                             ATTORNEY GENERAL OF NEW JERSEY

                             By:   */s/ Jonathan B. Mangel*
                                   Jonathan B. Mangel
                                   Deputy Attorney General