# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| HEIDI BERGMANN-SCHOCH *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>JENNIFER DAVENPORT[1] *et al.*,<br><br>*Defendants*. | Hon. Christine P. O'Hearn, U.S.D.J.<br>Hon. Matthew J. Skahill, U.S.M.J.<br><br>Docket No.: 1:25-cv-997<br><br><u>Civil Action</u><br><br>**EXPERT REPORT OF<br>DR. ROBERT J. SPITZER** |

The undersigned, Dr. Robert J. Spitzer, Ph.D. hereby declares that the following is true and correct:

I am over the age of eighteen years, competent to testify to the matters contained in this Declaration, and I testify here based on my personal knowledge and information. I have been asked by the New Jersey Office of the Attorney General to prepare an expert report regarding the history of prohibitions on dangerous and unusual armaments, including on hollow-point ammunition, in the United States, as well as traditional restrictions on carrying such armaments in public. If I am called as a witness, I would testify competently to the truth of the matters declared herein.

I am being compensated at a rate of $500/hour and $750/hour for depositions and testimony.

---

[1] The caption has been revised to reflect the present Acting Attorney General Jennifer Davenport. See Fed. R. Civ. P. 25(d) ("The officer's successor is automatically substituted as a party.")

## BACKGROUND AND QUALIFICATIONS

I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland. I was also a visiting professor at Cornell University for thirty years. I am currently an adjunct professor at the College of William & Mary School of Law. I earned my Ph.D. in Government from Cornell University. I reside in Williamsburg, Virginia. A copy of my curriculum vitae is attached to this Declaration as Exhibit A.

I am the author of sixteen books on American politics subjects, including six on gun policy. I have been studying and writing about gun policy for forty years, and I have been studying and writing about historical gun laws for over ten years. My first publication on the subject of gun policy appeared in 1985.[2] Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control*, has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology. The tenth edition of the book was recently published by Routledge Publishers (2026). My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015, 2017) and *The Gun Dilemma* (Oxford University Press, 2023, 2025), both deal extensively with the study of historical gun laws. I am frequently interviewed and quoted in national and international media on gun-related matters. For thirty years, I have been a member of the National Rifle Association and of Brady United Against Gun Violence.

I have provided written testimony as an expert witness in the following cases (in addition to this case): *Worman v. Healey*, No. 17-10107 (D. Mass.); *Hanson v. District of Columbia*, No.

---

[2] Robert J. Spitzer, "Shooting Down Gun Myths," *America* (June 8, 1985), 468–69.

2

22-2256 (D.D.C.); *Brumback v. Ferguson*, No. 22-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 22-5403 (W.D. Wash.); *Miller v. Bonta*, No. 19-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-1017 (S.D. Cal.); *Fouts v. Bonta*, 19-1662 (S.D. Cal.); *Rupp v. Bonta*, 17-746 (C.D. Cal.); *Gates et al. v. Polis*, No. 22-1866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Township*, No. 18-13443 (E.D. Mich.); *State v. Misch*, 256 A.3d 519 (Vt. 2021); *Nat'l Ass'n for Gun Rights, Inc. v. City of Highland Park*, 22-4774 (N.D. Ill.); *Nat'l Ass'n for Gun Rights & Capen v. Campbell*, No. 22-11431 (D. Mass.); *Abbott et al. v. Connor*, No. 20-00360 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Shikada*, No. 22-404 (D. Haw.); *Yukutake v. Shikada*, No. 22-323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 22-404 (D. Haw.); *Abbot v. Lopez*, No. 20-360 (D. Haw.); *Santucci v. City & County of Honolulu*, No. 22-142 (D. Haw.); *Yukutake v. Lopez*, No. 22-323 (D. Haw.); *Baird v. Bonta*, No. 19-617 (E.D. Cal.); *Nichols v. Newsom*, No. 11-9916 (C.D. Cal.); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety and Homeland Sec.*, No. 22-951 (D. Del.); *Mark Fitz, Grayguns, Inc. v. Rosenblum*, No. 22-1859 (D. Ore.); *Harrel v. Raoul*, No. 23-141 (S.D. Ill.); *Mitchell et al. v. Atkins et al.*, No. 19-5106 (W.D. Wash.); *Keneally et al. v. Raoul et al.*, No. 23-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, No. 23-1130 (E.D.N.Y.); *Lane v. James*, No. 22-10989 (S.D.N.Y.); *Rocky Mountain Gun Owners et al. v. The Town of Superior*, No. 22-2680 (D. Colo.); *Wiese v. Bonta*, No. 17-903 (E.D. Cal.); *Harrel v. Raoul*, No. 23-141 (S.D. Ill.); *Langley v. Kelly*, No. 23-192 (S.D. Ill.); *Barnett v. Raoul*, No. 23-209 (S.D. Ill.); *Fed. Firearms Licensees of Illinois v. Pritzker*, No. 23-215 (S.D. Ill.); *Herrera v. Raoul*, No. 23-532 (N.D. Ill.); *Banta v. Ferguson*, No. 23-112 (E.D. Wash.); *Hartford v. Ferguson*, No. 23-5364 (W.D. Wash.); *Koppel v. Bonta*, No. 23-813 (C.D. Cal.); *Jane Doe v. Bonta*, No. 23-1324 (C.D. Cal.); *Calce v. City of New York*, No. 21-8208 (S.D.N.Y.); *D.B. v. Sullivan*, No. 22-282 (N.D.N.Y.); *Richey v. Sullivan*, No. 23-344 (N.D.N.Y.); *Commonwealth of Pennsylvania v. Tomlinson*; *Nat'l Ass'n for Gun Rights et*

*al. v. Polis*, No. 24-1 (D. Colo.).

I have co-authored amicus briefs in numerous cases, including in *Nordyke v. King*, 319 F.3d 1185 (9th Cir. 2003); *Republic of Iraq v. Beaty*, 556 U.S. 848 (2009); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011); *People v. Aguilar,* 2 N.E.3d 321 (Ill. 2012); *O'Neil et al. v. Neronha et al*., No. 23-70 (D.R.I.).

I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., Sep. 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., Oct. 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., Sep. 12, 2017.

## I.   INTRODUCTION

1.   Hollow point bullets are an artifact of the modern era. Dating to the end of the nineteenth century, they did not circulate meaningfully in American society until the latter part of the twentieth century. This fact is key to understanding the relationship between evolving weapons technologies and historic (as well as contemporary) changes in public policy and law.

2.   As I have noted elsewhere,[3] that process has occurred, both historically and in the modern era, through a series of sequential steps. *First*, a new gun or gun technology must be

---

[3] Robert J. Spitzer, *Understanding Gun Law History After Bruen: Moving Forward by Looking Back*, 51 FORDHAM URBAN L. J. 60, 70–71 (Oct. 2023).

invented or developed. *Second*, it is then normally patented, noting that there are many steps between a patent, actual gun production, distribution, and dissemination. As Lewis Winant sardonically observed, "Many patents are granted for arms that die a-borning."[4] Hence, as gun expert Jack O'Connor wrote, "many types of guns were invented, produced and discarded through the early years of the development of the United States."[5] *Third*, weapons development is generally tied historically to military need and military acquisition, not directly to civilian use or self-defense applications. *Fourth*, some military weapons may then spill over into, be marketed to, or adapted to, civilian markets and use. *Fifth*, if such weapons then circulate sufficiently to pose a public safety or criminal problem or threat, precipitating calls for government regulation or restriction, then that may lead to gun policy/law changes. The development of ammunition, including hollow point ammunition, follows this pattern closely.

3.      Historically, social and public safety problems arising from weapons typically appeared first in places where large numbers of people congregated and lived — *i.e.*, cities and towns. These problems multiplied in the nineteenth century as the U.S. transitioned from an overwhelmingly rural nation to a majority urban one which in turn was tied to the rise of industrialization, crowded living conditions, crime, class and ethnic strife. Because localities bore a greater burden of maintaining the public peace, as compared with state governments, municipalities often tried to address these problems early on, until the initial enactment and spread of municipal regulations led to subsequent enactment of similar state-wide regulations, reflecting a "pattern of state institutions following local practice"[6] — a process referred to in political science

---

[4] Lewis Winant, *Firearms Curiosa* (New York: Bonanza Books, 1955), 36.

[5] Jack O'Connor, *Complete Book of Rifles and Shotguns* (NY: Harper & Row, 1961), 42.

[6] Laura F. Edwards, *The People and Their Peace* (Chapel Hill, NC: University of North Carolina Press, 2009), 229.

as "policy diffusion."[7] As historian Laura F. Edwards noted, historically speaking, "state governments were relatively weak and delegated so much authority to local jurisdictions. In fact, the state level was largely dependent on local jurisdictions." Thus, "localism characterized both the theory and practice of law and government throughout the United States . . . ."[8] Hence, historical municipal laws and regulations, as well as the principles underlying historical common law are extremely important for understanding traditional firearms regulations and restrictions.

## II.   HOLLOW POINT AMMUNITION: BACKGROUND

4.      Hollow point ammunition refers to "specialized ammunition designed with a recessed cavity in the tip that causes the bullet to expand upon impact, creating a larger wound channel while reducing the risk of over-penetration."[9] Hollow point ammunition began to be adopted by American police forces in the 1970s,[10] though its adoption was and continued to be controversial.[11] The central trait of hollow point ammunition is its greater lethality, combined with the lower likelihood that such a round would pass through a person, due primarily to its mushrooming effect upon impact.

5.      Hollow point ammunition's introduction is generally traced to its military development and use by Australian and British forces in India in the 1890s. Soldiers fighting in

---

[7] Andrew Karch, *Democratic Laboratories: Policy Diffusion among the American States* (Ann Arbor, MI: University of Michigan Press, 2007).

[8] Edwards, *The People and Their Peace*, 5–6. Edwards added that "The importance of localized law is often overlooked . . . ." (8)

[9] *Types of Hollow Point Bullets*, BERRY'S BULLETS MANUFACTURING, https://tinyurl.com/t5pj5xx2.

[10] Leon, *New Jersey's Ammunition Restriction Rings 'Hollow,'* 201.

[11] Berry, *Hollow Point Bullets*, 133; Kenneth Watkin, "Chemical Agents and "Expanding" Bullets: Limited Law Enforcement Exceptions or Unwarranted Handcuffs?" *International Law Studies* 82 (December 2006): 193-218. https://digital-commons.usnwc.edu/cgi/viewcontent.cgi?article=1232&context=ils

that colonial conflict found that the recently developed "full metal jacket"[12] ammunition rounds they used had less lethality because the bullets kept their shape as they passed through the body instead of expanding and causing greater damage to the person as a soft metal (*i.e.*, lead) bullet would.[13] This led to the production of euphemistically named "dum-dum" rounds (so named because they were manufactured at the Dum Dum arsenal near Calcutta, India),[14] a term applied to soft point rounds with characteristics now associated with hollow point rounds. Their use, however, was considered inhumane, and in 1899 the international Hague Convention outlawed their use.[15] The U.S. accepted this principle as well. While "the United States is not a party to the 1899 Hague Declaration on expanding bullets," it "is a party to the Hague Convention IV, which includes the prohibition against weapons calculated to cause unnecessary suffering . . . ."[16]

6.      Even in a military context, the U.S. military imposed restrictions on certain types of ammunition considered especially lethal, unnecessarily cruel, or that caused "superfluous injury":

> [T]he use of ammunition, the primary effect of which is to injure by fragments that in the human body escape detection by X-rays, is prohibited. In addition, poison must not be added to bullets or other projectiles. As with other weapons, small arms, cannons, and other

---

[12] "Full metal jacket" refers to ammunition whereby "the lead bullet is encased in a separate harder metal," typically copper or an alloy. "Full Metal Jacket Ammo." "FMJ ammunition was designed in the late 1800s for use in military rifles." *Full Metal Jacket Ammo*, AMMO.COM, https://tinyurl.com/njmhrxue.

[13] David Andrew, *Over a Century of Service*, 14 AUSTRALIAN MILITARY MEDICINE 58–59 (Sep. 2005). "The Dum Dum bullet was the first soft-point bullet that allowed for a jacketed bullet to expand or 'mushroom' when it hits soft tissue or bone." Heidi Lyn Rao, *History of the Hollow Point Bullet*, https://tinyurl.com/hxtemd3v.

[14] Joshua F. Berry, *Hollow Point Bullets: How History Has Hijacked Their Use in Combat and Why it is Time to Reexamine the 1899 Hague Declaration Concerning Expanding Bullets*, 206 MILITARY L. REV. 106 (2010).

[15] Jesse Leon, *New Jersey's Ammunition Restriction Rings 'Hollow,'* 48 SETON HALL J. OF LEGIS. AND PUB. POL'Y 200 (2023). Although the United States did not sign the treaty, it adheres to the prohibitions of the Hague Expanding Bullets Declaration. *See also Department of Defense Law of War Manual*, OFFICE OF GENERAL COUNSEL (June 2015) (updated July 2023), 357 n.78, https://tinyurl.com/yxrrzrh7. Modern hollow point ammunition as compared with dum-dum ammunition is a more sophisticated, engineered product.

[16] *Department of Defense Law of War Manual*, OFFICE OF GENERAL COUNSEL (June 2015) (updated July 2023), 357 n.78, https://tinyurl.com/yxrrzrh7. The Hague Convention (IV) was held in 1907.

> guns must not be calculated to cause superfluous injury. For example, modifying guns or ammunition for the purpose of aggravating the harm inflicted upon incapacitated persons would be prohibited (*e.g.*, adding a substance to bullets with the intent to inflame wounds).[17]

7.      Given that hollow point ammunition is a relatively recent technological innovation, it returns us to the broader question of whether or how ammunition has been regulated in the past. Such regulation, as I argue above, is keyed to the evolution of arms-related technologies. In addition, the evolution of ammunition—from the musket ball to the Minie ball to one-piece metallic cartridges—is inextricably linked to the evolution of firearms technologies.[18] Yet with this evolution came continued concern about ammunition that caused unnecessary or superfluous injury or death like the dum-dum bullet. This applied expressly in the military context on the battlefield, and therefore unquestionably to civilian life and civilian behavior, where the rules, standards, and norms for protecting the civilian population from unnecessary, excessive, or avoidable harm (especially at the hands of other civilians, as opposed to domestic law enforcement) was always a preeminent concern and was undoubtedly higher than in a military context. The history of limiting superfluous injury originated through ammunition restrictions pertaining to the use of poison applied to ammunition. After examining poisoned ammunition, this analysis turns to two other relevant examples of historical restrictions on dangerous munitions: first, restrictions on gunpowder; and second, restrictions on "fighting knives," the latter of which is exemplified best by the Bowie knife.

---

[17] *Department of Defense Law of War Manual*, OFFICE OF GENERAL COUNSEL, 354.

[18] "The capabilities of the new ammunition opened the way to rifled muskets and then to rifles that loaded from the breech instead of the muzzle." As Geoffrey S. Stewart further explained, "it was the ammunition that made the gun . . . . The metallic cartridge opened the door to the practical breech-loading rifle." *Arming the World* (Essex, CT: Lyons Press, 2024), 9–10, 97. Breech-loading refers to a gun that is loaded from the rear of the gun barrel, roughly where the trigger is located; a muzzle loaded firearm is one where the ammunition is loaded from the muzzle end — the end of the barrel from which the bullet emerges when the gun is fired.

## III.   HISTORICAL PROHIBITIONS ON CAUSING SUPERFLUOUS INJURY

8.      The effort to prevent superfluous injury and unnecessary suffering dates to historic bars on the use of poisons in war and military matters, which extends back hundreds of years.[19] The first express agreement between nations to bar the use of poisons, including poisoned ammunition, was signed between Germany and France in 1675 (Article 57), which "specifically prohibited the use of poisoned bullets . . . ."[20] In 1863, prodded by the vast expansion of the American military during the Civil War and at the direction of President Abraham Lincoln, the U.S. government pioneered "the earliest official government codification of the laws of war,"[21] referred to as the Lieber Code of 1863, named after its chief author, Columbia College law professor Francis Lieber. Like the historic bars against using poisoned ammunition, the stated goal of the Code was to "limit violence" and minimize suffering in the military context and was soon embraced by other nations.[22]

9.      The 1863 Code condemned the use of poisoned ammunition: "Military necessity does not admit of cruelty . . . . It does not admit of the use of poison in any way . . . ."[23] It went on to reference poisoned ammunition specifically: "The use of poison in any manner, be it to poison wells, or food, *or arms*, is wholly excluded from modern warfare. He that uses it puts himself out of the pale of the law and usages of war."[24] "The Lieber Code influenced subsequent agreements,

---

[19] William H. Boothby, "Poison, Poisoned Weapons, Asphyxiating Gases, Biological and Chemical Weapons," *Weapons and the Law of Armed Conflict*, 2nd ed. (NY: Oxford University Press, 2016), 178-223.

[20] Catherine Jefferson, "Origins of the Norm Against Chemical Weapons," *International Affairs* 90 (May 2014): 648.

[21] Burrus M. Carnahan, "Lincoln, Lieber and the Laws of War: The Origins and Limits of the Principle of Military Necessity," *The American Journal of International Law* 92 (Apr. 1998): 213.

[22] Carnahan, "Lincoln, Lieber and the Laws of War," 213-14.

[23] Francis Lieber, *Instructions for the Government of Armies of the United States in the Field* (Washington, D.C. GPO, 1863, 1898), 8, Sec. 16, https://tinyurl.com/3ts5npkt.

[24] Lieber, *Instructions for the Government of Armies of the United States in the Field,* 23, Sec. 70 (emphasis added).

and the principle of military necessity formed the basis of the law of war for much of the twentieth century," and "the laws of war it codified had far-reaching influence."[25] That influence included the specific admonition against the use of poisoned ammunition at the international Hague Conference agreement of 1899.[26]

10. In short, American military law and policy sought to avoid the deployment or use of ammunition considered unnecessarily cruel, dangerous, injurious, or that inflicted unnecessary harm, which began with prohibitions against using poisoned ammunition and includes what is now known as hollow point ammunition. Without question, these standards are inherently higher for civil society and the country's civilian population relative to the military context.

## IV. THE EVOLUTION AND HISTORICAL REGULATION OF AMMUNITION

11. To put this analysis in broader context, ammunition generally consists of four parts: the case (the thing that holds the other components), the primer (the chemical that when struck ignites the powder), the propellant (the gunpowder that when ignited propels the bullet or projectile forward), and the projectile (the bullet).[27] The familiar flintlocks from colonial America through much of the nineteenth century fired a round or cone-shaped lead projectile propelled by loose gunpowder, measured and poured down the barrel. Inventors labored for decades to develop a single cartridge that combined the necessary elements to make loading easier, faster, safer, and more reliable and also to develop firearms capable of receiving enclosed cartridges with the added goal of producing multi-shot weapons that could fire multiple times before reloading. Still, as one gun history expert noted, "the guns of 1830 were essentially what they had been in 1430: single

---

[25] Jefferson, "Origins of the Norm Against Chemical Weapons," 648.

[26] Jefferson, "Origins of the Norm Against Chemical Weapons," 650.

[27] *Basic Components of Ammunition*, HUNTER-ED, https://tinyurl.com/4apcwtsj.

metal tubes or barrels stuffed with combustible powder and projectiles" where, "after every shot, the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a projectile . . . ; then ignite the gunpowder and send the projectile on its way."[28]

12.    The idea of an available, affordable, reliable multi-shot firearm did not arise until the development of Colt's multi-shot revolver in the 1830s. Indeed, Colt's pistol was the first practical firearm that could shoot more than one bullet without reloading.[29] Even then, Colt could not readily manufacture multi-shot weapons for many years because the technology was still evolving and he could find no market for them, either from the government or the public. The government, in fact, dismissed such firearms as mere "novelties."[30] After an 1837 test of Colt's gun and others, the government concluded that it was "entirely unsuited to the general purposes of the service."[31] The government also rejected the weapon after tests in 1836, 1840, and 1850.[32] Colt's early failure to cultivate either a military or a civilian market in the U.S. drove him to bankruptcy and then to market his guns to European governments starting in the 1840s. The gun made appearances in the pre-Civil War West, yet even during the Civil War, "Colt's revolver was

---

[28] Jim Rasenberger, *Revolver* (NY: Scribner, 2020), 3–4. Indeed, as the United States evolved from an agrarian to an urban/industrial society, the resultant industrial revolution that took hold by the latter part of the nineteenth century resulted in the "acceleration in the processes of technical innovation . . . ." *Industrial Revolution and Technology*, NATIONAL GEOGRAPHIC, https://tinyurl.com/34partca. This was no less true for the development of firearms, which witnessed a similar acceleration in developments by the start of the twentieth century.

[29] Rasenberger, *Revolver*, 3–5, 401.

[30] Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 24.

[31] Rasenberger, *Revolver*, 136.

[32] Berkeley R. Lewis, *Small Arms and Ammunition in the United States Service, 1776-1865* (Washington, D.C.: Smithsonian Institution, 1956), 59–66.

a sideshow through most of the war . . . ."[33] And though the Colt-type revolver "had proved itself, the official sidearm of the United States Army [in the Civil War] remained a single shot pistol."[34]

13.    It took the Colt's limited use during the Civil War to finally spur the post-Civil War proliferation of the Colt-type revolver and similar firearms into society.[35] Similarly, the American military took little interest in lever-action repeating rifles during the Civil War period.[36] Even though some repeating rifles appeared in the Civil War as early as 1863, single-shot muzzle-loaders "remained the principal infantry weapons throughout the war."[37]

14.    Civil War weaponry, including carbines (shorter-barreled rifles), fired various types of enclosed cartridges that were held together with materials including paper, linen, and metal.[38] The firearms and ammunition that began to circulate in society in the late 1800s represented a dramatically different type of firearm from those of the past. These newer weapons were capable of reliable, rapid fire utilizing ammunition cartridges of the sort commonly available now. "The impact of cartridge-firing guns really came after the Civil War with the appearance of firearms like the Colt Peacemaker and the Winchester Model 73. These were truly modern firearms — reliable, simple, fast-firing and accurate. That's when [modern ammunition cartridges] came in, from about 1873 onward."[39] Their circulation in society was impeded in part because of the millions of guns already in circulation that predated and could not accommodate metallic

---

[33] Rasenberger, *Revolver,* 390.

[34] Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 91.

[35] Haag, *The Gunning of America,* 34–37, 46–64. As Haag said, "the Civil War saved" the gun industrialists (65).

[36] Lewis, *Small Arms and Ammunition in the United States Service*, 59–60.

[37] James M. McPherson, *Battle Cry of Freedom* (NY: Oxford University Press, 1988), 475.

[38] Lewis, *Small Arms and Ammunition in the United States Service,* 59–60.

[39] *Bullets*, HISTORY.COM, (Aug. 13, 2003), https://tinyurl.com/2wbjt579. *See also* Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 CAL. L. REV. 25–26, 39–40 (2025).

cartridges, because gun (and ammunition) manufacturers sold their new products almost entirely overseas, and because of patent disputes that delayed the entrance of other manufacturers into the market.[40] As one account noted: "gun industrialists from the mid-1860s to the early and mid-1870s relied on foreign, international markets and consumers to stay alive."[41] The final and "most important invention in the history of the bullet . . . [was] smokeless powder. Without smokeless powder, we would have nowhere near the [bullet] velocity we have today. We would have had nowhere near the rapid-fire potential."[42]

15.    As noted, before the advent and proliferation of metallic enclosed cartridges, the gun firing process utilized gun powder, a lead bullet, and paper. Given that gunpowder was indispensable to firearms discharge—both as primer and propellant—the regulation of gunpowder was inseparable from the regulation of firearms. This continued to be true throughout most of the nineteenth century. Thus, it is logical to consider gunpowder regulation here.

## V.    AMMUNITION REGULATION: FROM GUNPOWDER TO CARTRIDGES

### A.    Gunpowder Restrictions

16.    Lead and paper were readily obtainable and obviously simple materials necessary for weapons firing that were not regulated in isolation, though ammunition regulation dates to the earliest days of America. For example, in 1633, the Massachusetts colony enacted a measure saying: "Nor shall any person sell, give or barter, directly or indirectly, any gun or guns, powder, bullets, shot, lead, to any Indian whatsoever, or to any person inhabiting out of this

---

[40] Stewart, *Arming the World,* 43–45, 175–77; Spitzer, *Understanding Gun Law History After Bruen*, 81–82; DeLay, *The Myth of Continuity in American Gun Culture*, 41–42. As DeLay notes, early metallic cartridges "were notoriously delicate: liable to get wet and ruined and far too fragile to use in any kind of ammunition-feeding device." (40)

[41] Haag, *The Gunning of America,* 112.

[42] "Bullets." Petzal notes that smokeless powder was first developed in the 1880s.

13

jurisdiction . . . ."[43] Several decades later, Massachusetts enacted this revised prohibition: "notwithstanding the ancient law of the country, made in the year 1633, that no person should sell any arms or ammunition to any Indian upon penalty of 10L. for every gun, 5L. for a pound of powder, and 40s. for a pound of shot . . . ."[44] New Hampshire enacted a similar measure in 1689 saying that "no Person whatsoever" shall "presume directly or indirectly to sell Barter give, or by any meanes Supply any Indian or Indians, or the neighbouring French, with Armes or Ammunition of any kind whatsoever without license first obtained from the Governor & Councell . . . ."[45] The point here is not that the colonies/states restricted arms trafficking with Natives, which virtually all of them did, but that these prohibitions typically incorporated both arms and ammunition in the prohibition.

17.     These common restrictions aside, however, gunpowder by itself was widely and ubiquitously regulated in the American colonies and states as it posed an inherent danger to the population. In fact, with one exception, every state in the country enacted one or more gunpowder laws from the seventeenth century through the start of the twentieth century (*see* Exhibits B, C, D, and E). When new or more devastating explosives were invented, they too were subject to similar regulation. The regulation of gunpowder is relevant to this analysis because it was an indispensable component for the discharge of firearms (as primer and propellant) from the earliest days through the latter half of the nineteenth century, when, as noted, improvements in enclosed metallic ammunition cartridges, and the firearms to accommodate them, became widely available in the

---

[43] MASS. GEN. LAWS, ch. 58, § 2 (T. B. Wait & Co. 1814) (1633).

[44] Hutchinson, Thomas. A Collection of Original Papers Relative to the History of the Colony of Massachusetts-Bay. Thomas And John Fleet, 1769. P. 492; provision dated 1676. The Making of Modern Law: Primary Sources *available at* https://tinyurl.com/3bjhs9bt.

[45] New Hampshire Province Laws, 1689, 288–89, [CHAPTER 27.], [NO ARMS OR AMMUNITION TO BE SUPPLIED, TO INDIANS OR FRENCH WITHOUT A LICENSE.]

14

civilian market.[46] As Exhibit B shows, at least seven gunpowder laws were enacted in the colonies in the 1600s, thirty gunpowder laws were passed in the 1700s, 175 laws in the 1800s, and 76 laws in the 1900s up until 1934 (*see* Exhibits C, D, and E for full texts of the laws), yielding a total of over 300 laws in 49 states. In short, the states enacted a blizzard of these laws, demonstrating ubiquitous and plenary governmental authority to regulate gunpowder, extending to all corners of municipalities, including private homes and other buildings.

18.    These regulations existed because of the universal understanding that gunpowder was inherently dangerous and therefore posed a per se threat to public safety. The protection of society was (and is) a preeminent purpose of government. Beyond this, these regulations served several purposes to minimize risk. Early in our history, a primary concern was to accumulate, preserve, and make available gunpowder for defense needs. Non-military public safety imperatives also motivated the enactment of gunpowder laws from the seventeenth through the twentieth centuries. These measures generally focused on safe storage, transport, and use. With respect to the Founding period, "[t]here were laws requiring gunpowder to be stored safely, even though the rules made it more difficult for people to load their guns quickly to defend themselves against attack."[47] Included among these laws were those that specified limits on how much gunpowder individuals could keep, and even what purposes were and were not allowed.

19.    Among the risks, and therefore danger, pertaining to the presence of gunpowder were the devastating effects of fires and explosions, especially in populated areas at a time when

---

[46] *Cartridge Cases*, NATIONAL INSTITUTE OF JUSTICE, https://tinyurl.com/38eepw99; *History of Ammunition from Origin to the Modern Cartridge*, AMMUNITIONSTORE.COM (Mar. 21, 2017), https://tinyurl.com/26a8v226; William Harris, *10 Innovations That Led to the Modern Bullet*, HOWSTUFFWORKS (Apr. 16, 2024), https://tinyurl.com/2darcccs.

[47] Adam Winkler, *Gunfight* (NY: W.W. Norton, 2011), 286. See also 116-17.

15

most structures were made of wood or other highly flammable materials. Fire retardant materials and safety standards in construction were virtually unheard of during this time, and the state of firefighting was primitive.[48] "Historically, virtually every jurisdiction heavily regulated the possession, transportation, sale, and manufacture of gunpowder to prevent fires and explosions and regulated the shooting of guns both to protect against unintentional shootings and fires caused by gunshots."[49] Gunpowder laws were not simply restricted to large cities like Boston, New York, and Philadelphia, but, in the case of Pennsylvania, for example, "appeared within the statutes that provided for the initial incorporation of new towns alongside the provisions that created commons and streets and regulated public nuisances."[50]

20.     Early gunpowder laws were also very specific in stipulating the amount of gunpowder that could be kept, where it could be kept, the types of containers holding the powder, the specific means and circumstances by which it would be transported, and its use, all in the name of reducing the inherent danger arising from the presence of this substance.[51] These laws encompassed gunpowder dealers and sellers, but also private individuals, affecting not only the location but also the amount of gunpowder they could keep. This was significant because, as noted, gunpowder was indispensable for the firing of guns up through the latter part of the nineteenth century.

21.     An important way to gauge the impact of these laws on individuals is by examining

---

[48] Jill Lepore, *New York Burning: Liberty, Slavery and Conspiracy in Eighteenth-Century Manhattan* (NY: Knopf, 2005), 42.

[49] Mark Anthony Frassetto, *Historical Militia Law, Fire Prevention Law, and the Modern Second Amendment*, *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society,* Jacob Charles, Joseph Blocher and Darrell Miller, eds. (NY: Oxford University Press, 2023), 195–212; Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 510 (2004); Winkler, *Gunfight*, 116–17.

[50] Cornell and DeDino, *A Well-Regulated Right*, 511.

[51] Cornell and DeDino, *A Well-Regulated Right*, 511–12; Frassetto, *The Duty to Bear Arms*, 203–08.

those that imposed very strict limits on the amount of gunpowder that could be kept in homes and other structures. Many laws imposed limits by weight of how much gunpowder could be stored or kept, and the circumstances of that storage. The pound weight limits could range from one pound up to fifty. Clearly, these larger limits pertained to commercial dealers and purposes. But far lower limits had a direct bearing on individuals who wanted gunpowder for their own purposes.

22.      For example, laws in Connecticut imposed a limit of no more than one pound to be kept in any building or structure — enough for an individual, but not enough for commercial purposes. An 1827 ordinance for New Haven, Connecticut said that no one could "keep any quantity of gunpowder greater than one pound weight, without having obtained a license for that purpose from said Court of Common Council, in the manner herein prescribed."[52] The limitation was enforced through licensing and stipulated details. A similar ordinance was enacted for Bridgeport, Connecticut in 1874.[53] An 1832 Connecticut state law gave wide discretion to local officials to confiscate gunpowder at their discretion if it was deemed unsafe.[54] Laws in other states that specified a storage limit of one pound included those in Maine (1848),[55] Massachusetts

---

[52] Charter and By-Laws of the City of New Haven, Nov. 1848 Page 48–49, Image 48–49 (1848) available at The Making of Modern Law: Primary Sources.  1827.

[53] Charter and Ordinances of the City of Bridgeport: as Amended and Adopted Page 194 (1874) available at The Making of Modern Law: Primary Sources. 1874.

[54] 1832 Conn. Acts 391, An Act Regulating the Mode of Keeping of Gunpowder, Chap. 25, § 1-2.

[55] The Revised Ordinances of the City of Portland, 1848 Page 22, Image 22 (1848) *available at* The Making of Modern Law: Primary Sources, 1848.

(1870),[56] Michigan (1846),[57] New York (1885),[58] and Vermont (1853).[59] New Jersey set a limit of two pounds in an 1857 law[60] (see Exhibits B and C). In other words, individuals could have and store gunpowder, but not too much, and for the good of public safety.

23.     Some gunpowder laws pertained directly to individual behavior. To examine the earliest of these laws, a colonial Virginia law enacted in 1623 restricted discharging firearms to save gunpowder: "That no commander of any plantation do either himselfe or suffer others to spend powder unnecessarily in drinking or entertainments, &c."[61]

24.     In 1629, Virginia directed that colonists "shall use their best endeavors to preserve and keep in dry and tight houses or casks" the constituent components to make gunpowder, including potash, "saltpeeter," wood ash, and also that they "preserve and keep all their urine"[62] for that purpose. A 1655 Virginia colonial law aimed at wasteful and dangerous use of gunpowder by individuals in firearms discharges when those firing were intoxicated punished any "persons or persons soever shall, after publication hereof, shoot any guns at drinking (marriages and funerals only excepted) . . . ."[63]

25.     A 1675-76 Virginia law penalized anyone found "within any Indian towne" or more

---

[56] Municipal Register of the City of Lawrence. 1870 Page 185, Image 185 (1870) *available at* The Making of Modern Law: Primary Sources, 1870.

[57] Sanford Moon Green, The Revised Statutes of the State of Michigan: Passed and Approved May 18, 1846 Page 200–01, Image 216-217 (1846) *available at* The Making of Modern Law: Primary Sources.

[58] Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 184, Image 185 (1885) *available at* The Making of Modern Law: Primary Sources. 1885.

[59] 1853 Vt. Acts & Resolves 32. No. 35.--AN ACT IN RELATION TO GUNPOWDER.

[60] 1857 N.J. Laws 461.

[61] The Laws of Virginia, Vol. 1, 1623, 127, *available at* https://tinyurl.com/4yanwaae.

[62] 1629 Va. Acts 151, Acts of March 24th, 1629, Act 5, For the better furtherance and advancement of staple commodities . . . ."

[63] 1655 Va. Acts 401, Acts of March 10, 1655, Act XII. Note the amusing exceptions to drunken shooting in the law.

18

than three miles from any English plantation with arms, gunpowder, and shot "except one gunn and tenn charges of powder and shott for his necessary use" was subject to prosecution.[64]

26.     A 1690 New York law united gunpowder regulation with a very specific burden on firearm discharge when it made it unlawful "to burn any powder . . . upon pain of paying for every shot or discharging of gun or pistol" unless for authorized reasons.[65]

27.     Note that, even in this very early period, the colonies could restrict or even bar gunpowder use for gun firing (as opposed to storage restrictions); impose penalties that included the taking of powder from any offending individuals; and restrict gunpowder transport.

28.     These kinds of restrictions, along with many others, lace the gunpowder laws in the centuries to come. These laws sharply and specifically burdened the ability of individuals to keep and use gunpowder for personal purposes.

29.     A 1783 Massachusetts law restricting firearms and gunpowder in Boston began by noting that "The depositing of loaded arms in the houses of the town of Boston is dangerous." It barred bringing gunpowder or gunpowder-loaded firearms into any house or other structure in the city. The penalty for doing so was that "such person shall forfeit" the firearm and pay a fine.[66] Similarly, Maine enacted two related measures in 1821. One provided that officials of towns were to be "empowered to make rules and regulations" regarding "all gun powder which is or may be within such town, shall be kept, had or possessed therein; and no person or persons shall have,

---

[64] Acts of Assembly, Mar. 1675–76, 2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* at 336–37 (1823) *available at* https://tinyurl.com/2r88xrp7.

[65] The State of New-York Page 222-223, Image 228-229 (1849) *available at* The Making of Modern Law: Primary Sources. 1650-1699: 1690.

[66] 1783 Mass. Acts 218, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun-Powder Within the Town of Boston, ch.13.

19

keep, or possess within such town, any gun powder, in any quantity, manner, form or mode. . . ."[67] Local officials were further empowered in the second law "to enter any building, or other place, in such town, to search for gun powder"[68] to enforce these restrictions.

30.    New Jersey enacted a measure in 1857 stipulating that "no person or persons residing within the aforesaid limits, shall be allowed to keep more than two pounds of gunpowder, except in a magazine at least fifty feet distant from any building . . . ."[69] In 1861, the New Jersey State Legislature gave the City of Paterson plenary power to "regulate the keeping and transporting of gunpowder."[70] In fact the State Legislature granted similar regulatory authority to localities in at least twenty-four laws enacted from 1868 to 1900.[71]

31.    Like the example of New Jersey, state and town jurisdictions around the country commonly and widely gave full regulatory authority to local officials, like this one for officials in Boise County, Idaho in 1863, who were given "full power and authority . . . to regulate the storage of gunpowder and other combustible materials"[72] in populated communities. Moreover,

---

[67] Laws of the State of Maine; to Which are Prefixed the Constitution of the U. States and of Said State, in Two Volumes, with an Appendix Page 112-113, Image 183-184 (Vol. 1, 1821) § 1.

[68] 1821 Me. Laws 98-99, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, ch. 25, § 5.

[69] 1857 N.J. Laws 461. This state legislature act pertained to the town of Orange.

[70] 1861 N.J. Laws 335. See also 1863 N.J. Laws

[71] 1868 N.J. Laws 961; 1869 N.J. Laws 719; 1870 N.J. Laws 613; 1870 N.J. Laws 1141; 1870 N.J. Laws 1190; 1871 N.J. Laws 867; 1871 N.J. Laws 1431; 1872 N.J. Laws 489; 1872 N.J. Laws 1051; 1872 N.J. Laws 1213; 1872 N.J. Laws 1320. See also similar laws (up to 1900) enacted in 1873, 1874, 1874, 1875, 1875, 1878, 1884, 1894, 1895, 1895, 1895, 1897, and 1898. https://tinyurl.com/2s4kk6tw.

[72] 1863 Id. Sess. Laws 634, To Incorporate the City of Idaho in Boise County, § 5. For example, see also 1845 Iowa Laws 119, An Act to Incorporate and Establish the City of Dubuque, chap 123, § 12; 1855 Ill. Laws, 25, An Act To Incorporate the Town of Daville, § 16; The Revised Statutes of the State of Indiana, Passed at the Thirty-Sixth Session of the General Assembly; Also, Sundry Acts, Ordinances, and Public Documents Directed to be Printed Along with the Said Statutes: To Which are Prefixed the Constitution of the United States and of the State of Indiana Page 485-486, Image 499-500 (Vol. 1, 1852); 1860 Kan. Sess. Laws 137, An Act to Amend and Consolidate the Several Act Relating to the City of Lawrence, § 35, pt. 7 1860; 1881 Wash. Sess. Laws 121-22, An Act to Incorporate the City of Port Townsend, ch. 2, § 21; 1901 Mich. Pub. Acts 154, Local Acts, An Act to Revise and Amend the Charter of the

gunpowder laws "were not challenged under the Second Amendment or state Second Amendment analogues."[73]

32.     As Adam Winkler concluded, "the basic idea that gun possession must be balanced with gun safety laws was one that the founders endorsed."[74] Gunpowder laws "were clearly crafted to meet the needs of public safety, but they also provided a check on the creation of a private arsenal . . . . The gunpowder storage laws of the eighteenth century thus constituted a significant limit on the right to bear arms."[75]

33.     As the foregoing account demonstrates, state and local regulatory authority over every aspect of gunpowder, including its use for firearms or other purposes, was extensive, ubiquitous, and plenary, encompassing and superseding any contemplated private uses of the same as part of government's efforts to protect the public from gunpowder's inherent danger.

### B.     Cartridge Regulations

34.     As noted earlier, enclosed metallic cartridges began to circulate in society in about the 1870s (along with the guns able to fire them). Regarding one manufacturer, "Colt transitioned away from the laborious cap-and-ball system to faster-loading metallic cartridges in the early 1870s."[76] Regulation of ammunition ensued as part of a much broader effort to restrict weapons carrying, especially concealed weapons carrying, in every state in the country.[77] Some laws

---

City of Muskegon . . . , tit.7, § 24, pt. 11; 1902 N.J. Laws 294, An Act Relating to, Regulating and Providing for the Government of Cities, ch. 107, § 14, pt. 33.

[73] Frassetto, *The Duty to Bear Arms*, 204. Frassetto points out (at 204) that "the limited number of [court] challenges related to whether regulating gunpowder storage fell within the state police power or whether storing gunpowder in cities represented a per se nuisance."

[74] Winkler, *Gunfight,* 117.

[75] Cornell and DeDino, *A Well-Regulated Right*, 512.

[76] DeLay, *The Myth of Continuity in American Gun Culture*, 42 n.223.

[77] Spitzer, *Understanding Gun Law History After Bruen*, 99–100, 105–15.

21

specifically included restrictions on ammunition in the late 1800s and early 1900s. For example, at least thirteen states enacted various regulations, including licensing, dealer or buyer registration, sales or regulatory taxes (*see* Exhibits F and G). At least seven states enacted measures restricting ammunition from named groups including Native Americans, the intoxicated, and the mentally unsound. Minors were often subject to such regulations, with at least eighteen states restricting minor access to ammunition. And at least four states enacted sweeping laws to penalize the sale or acquisition of pistol ammunition. An 1881 Arkansas law said this: "Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person . . . any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor." The law's title explained its purpose: "An Act to Preserve the Public Peace and Prevent Crime."[78] An 1883 Tennessee law did something similar: "[I]t shall be unlawful for any person or persons to buy or sell or give away any pistol cartridges in this state . . . ."[79] Oklahoma[80] and Massachusetts[81] also enacted similar pistol ammunition restrictions.

35.    And finally, in the first national firearm regulation enacted by the U.S. Congress, a 1919 law enacted a ten percent tax on "Firearms, shells, and cartridges,"[82] and then did the same

---

[78] 1881 Ark. Acts 192, An Act to Preserve the Public Peace and Prevent Crime, ch. XCVI (96), § 3.

[79] 1883 Tenn. Pub. Acts 17, A Bill to Be Entitled An Act to Prevent the Sale, Loan or Gift of Pistol Cartridges in This State, ch. 13.

[80] Dorset Carter, Annotated Statutes of the Indian Territory: Embracing All Laws of a General and Permanent Character in Force at the Close of the Second Session of the Fifty-fifth Congress Page 243-244, Image 327-328 (1899) available at The Making of Modern Law: Primary Sources. Carrying Weapons, § 1250.

[81] 1919 Mass. Acts 139, An Act Relative to the Issuance of Search Warrants for the Seizure of Firearms, Weapons and Ammunition Kept for Unlawful Purposes, ch. 179, §§ 1-2.

[82] Statutes at Large of the United States of America, vol. 40, pt. 1, ch. 18, tit. 19, § 900, nos. 10–12 (Government Printing Office 1919).

in a 1932 law.[83] Thus, ammunition was also subject to regulation aside and apart from, or in addition to, firearms.

## VI.  RESTRICTIONS ON INHERENTLY DANGEROUS ARMS: FIGHTING KNIVES

36.     The Bowie knife is the most famous (or infamous) example of the reviled "fighting knife" and is generally credited with having been invented by the brother of adventurer Jim Bowie, Rezin Bowie.  The knife was named after Jim Bowie, who reputedly killed one man and wounded another using a "big knife" given to him by his brother in the alternately notorious or celebrated "Sandbar Duel" in 1827.[84]  Bowie died at the Alamo in 1836.

37.     By its nature, the Bowie knife was considered inherently dangerous, along with other similar knives, and thus singled out in law for restriction. Fighting knives were defined as those with long, thin blades commonly used for nefarious purposes, including fights, brawls, duels, and other criminal activities.[85] The Bowie knife rapidly became known beginning in the 1830s for the distinctive type of long-bladed and usually single-edged knife with a hand guard identified with Bowie, the man after whom the knife was named. While Bowie knives initially "came in a variety of forms — with or without guards, with differently shaped blades," they eventually became more standardized as "a large knife with a cross guard and a blade with a clipped point."[86] The distinctive traits of the Bowie knife are revealed in Robert Abels' book, *Bowie Knives*, which

---

[83] Statutes at Large of the United States of America, vol. 47, pt. 1, ch. 209, tit. 4, § 610 (Government Printing Office 1933) (Law Passed 1932).

[84] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://tinyurl.com/3paxt5cj; William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins, 1998), 207–8.  Davis persuasively dismisses the claim of a blacksmith, James Black, that he invented or styled the distinctive knife for Rezin Bowie (676–77). David Kopel says, erroneously, that "Jim Bowie used a traditional knife at a famous 'sandbar fight' on the lower Mississippi River in 1827." Rezin Bowie had just developed the distinctive knife his brother used in the fight, so it could not have been "traditional." David Kopel, "Bowie knife statutes 1837-1899," *The Volokh Conspiracy*, November 20, 2022, https://tinyurl.com/2ske9kcb.

[85] Norm Flayderman, *The Bowie Knife* (Lincoln, RI: Andrew Mowbray, 2004).

[86] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://tinyurl.com/8e4p89d3.

23

includes pictures of nearly one hundred such knives made between 1835 and 1890.[87] The Bowie

legend, the explosive growth and spread of Bowie-related mythology (only magnified by his death

at the Alamo), and the knife's distinctive features encouraged its proliferation,[88] referred to by one

historian as "the craze for the knives."[89] As was true of other knives with long, thin blades,[90] they

were widely used in fights and duels, especially at a time when single-shot pistols were often

unreliable and inaccurate.[91]   Such knives, known as "fighting knives,"[92] were "intended for

combat."[93]   In the early nineteenth century, "guns and knives accounted for a growing share of the

known weapons that whites used to kill whites."[94]   In 1834, for example, a grand jury in Jasper

County, Georgia deplored

> the practice which is common amongst us with the young the middle
> aged and the aged to arm themselves with Pistols, dirks knives sticks
> & spears under the specious pretence of protecting themselves
> against insult, when in fact being so armed they frequently insult
> others with impunity, or if resistance is made the pistol dirk or club
> is immediately resorted to, hence we so often hear of the stabbing
> shooting & murdering so many of our citizens.[95]

38.    Homicide rates increased in the South in the early nineteenth century, as did laws

restricting concealed weapons carrying.   Dueling also persisted during this time, even as the

---

[87] Robert Abels, *Bowie Knives* (NY: Abels, 1979).

[88] Virgil E. Baugh, *Rendezvous at the Alamo* (Lincoln, NE: University of Nebraska Press, 1985), 39–63.

[89] Davis, *Three Roads to the Alamo*, 583.

[90] Other such long-bladed, thin knives of varying configurations typically named in laws barring their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.

[91] Davis, *Three Roads to the Alamo*, 164, 208; Baugh, *Rendezvous at the Alamo*, 42; Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," *Oldwest*, n.d., https://tinyurl.com/mbja7ca7; Flayderman, *The Bowie Knife*, 485.

[92] Roth, *American Homicide*, 218.

[93] Flayderman, *The Bowie Knife*, 59.

[94] Roth, *American Homicide*, 218.

[95] Quoted in Roth, *American Homicide*, 218–19.

practice was widely deplored by religious and other groups, in newspapers, by anti-dueling societies and political leaders.[96] Bowie knife writer Norm Flayderman provides abundant and prolific evidence of the early criminal use of Bowie knives in the 1830s, quoting from dozens of contemporaneous newspaper and other accounts, and providing references to literally hundreds of additional articles and accounts attesting to the widespread use of Bowie knives in fights, duels, brawls and other criminal activities.[97] Flayderman concludes that, as early as 1836, "most of the American public was well aware of the Bowie knife."[98] (Very much like the allure of contemporary assault weapons to some,[99] the Bowie knife's notorious reputation also, if perversely, fanned its sale and acquisition.[100]) All this contributed to widespread enactment of laws prohibiting dueling in the states. In 1839, Congress passed a measure barring dueling in the District of Columbia.[101] Both pistols and knives were prominently used in such affairs.[102]

39.    At least three state court cases dealt in some manner with fighting knives like the Bowie knife. In the 1840 case of *Aymette v. State,* the Supreme Court of Tennessee upheld the conviction of William Aymette for wearing a Bowie knife concealed under his clothes under a state law of 1837-1838, ch. 137, sec. 2, providing "that, if any person shall wear any bowie-knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble a bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed about his person such

---

[96] Baugh, *Rendezvous at the Alamo*, 51.

[97] Flayderman, *The Bowie Knife*, 25–64; 495–502.

[98] Ibid., 43.

[99] Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 12–15, 65; David Altheide, "The cycle of fear that drives assault weapon sales," *The Guardian* (Mar. 2, 2013), https://tinyurl.com/3a8a2hha; Rukmani Bhatia, "Guns, Lies, and Fear," *American Progress* (Apr. 24, 2019), https://tinyurl.com/4v4nsksm.

[100] Flayderman, *The Bowie Knife*, 46.

[101] H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838, https://tinyurl.com/mwm76m74.

[102] Roth, *American Homicide*, 180–83, 210–17.

person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not less than two hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months."[103]  In its decision, the court concluded that the prohibition against wearing the named weapons was well justified in that they "are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin."[104]  The court continued, "The Legislature, therefore, have a right to prohibit the wearing or keeping *weapons dangerous to the peace and safety of the citizens* . . . ."[105]  Further, the court added that the state law existed "to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms . . . ."[106]

40.    Four years later, the Tennessee Supreme Court again dealt with a Bowie knife law violation and challenge. In the case of *Haynes v. Tennessee* (1844),[107] Stephen Haynes was indicted for carrying a concealed Bowie knife. He was convicted of wearing a knife that resembled a Bowie knife but appealed his conviction on the grounds that he was actually carrying a "Mexican pirate knife," which reputedly had a shorter, narrower blade. (At the trial, witnesses disagreed as to the proper name for the knife in question.) He also argued that the state law, in listing various types of knives including those "similar" to Bowie knives, was "too indefinite" and could therefore lead to "absurd consequences" that "must follow its enforcement. . . ."[108] On appeal, the court

---

[103] *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840).

[104] Ibid., 156.

[105] Ibid., 157 (emphasis added).

[106] Ibid.

[107] *Haynes v. Tennessee*, 24 Tenn. 120 (1844).

[108] Ibid., 122.

26

upheld his conviction and commended the Tennessee state legislature's enactment: "The design of the statute was to prohibit the wearing of bowie knives and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life; the carrying of which by truculent and evil disposed persons but too often ended in assassination."[109] The court continued: "The design, meaning, and intent was to guard against the destruction of human life, by prohibiting the wearing [of] heavy, dangerous, destructive knives, the only use of which is to kill . . . ."[110] The court noted that the state law "wisely provides against bowie knives, Arkansas tooth picks, or any other weapon in form, shape or size, resembling them."[111] Noting the similarity among knives and the possibility of an unjust outcome where, say, a person might be convicted of carrying a mere pocket knife, the court posed this question: "what is to protect against conviction, when the words of the statute cover the charge, and its true spirit and meaning does not?" Their answer: "the judge and jury who try the case."[112] As the author of a book on Bowie knives noted, "the fact that the term 'bowie knife' had never been precisely defined did not help his [Haynes's] case."[113]

41.    One other state court case relevant to the legal status of Bowie knives is *Cockrum v. State* (1859).[114] The *Cockrum* case involved John Cockrum, who was charged with the murder of his brother-in-law, William Self, with a Bowie knife.[115] Under Texas law, "a homicide, which would otherwise be a case of manslaughter, if committed with a bowie-knife or dagger, shall be

---

[109] Ibid., 122.

[110] Ibid., 123.

[111] Ibid., 122.

[112] Ibid., 123.

[113] Paul Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques* (Boulder, CO: Paladin Press, 2010), 43.

[114] *Cockrum v. State,* 24 Tex. 394 (1859), https://tinyurl.com/mr2uzb6n.

[115] https://tinyurl.com/34b26ens.

deemed murder and punished as such . . . ."[116] The court upheld the added penalty provision of the

law relating to use of a Bowie knife, despite the court's very expansive interpretation of the right

to bear arms (though it reversed and remanded the man's conviction because of an error related to

statutory changes and jury instructions). It described Bowie knives as "an exceeding destructive

weapon," an "instrument of almost certain death," and "the most deadly of all weapons in common

use."[117]  Further, the court said: "He who carries such a weapon. . .makes himself more dangerous

to the rights of others, considering the frailties of human nature, than if he carried a less dangerous

weapon."[118]

42.     All of these cases underscore the courts' recognition of the inherently dangerous

nature and nefarious use of Bowie knives not only by their characterizations of them, but by the

fact that they are permissibly treated in the same restrictive and prohibitory manner in law as other

dangerous, deadly weapons including pistols and various named clubs.[119]

43.     The ubiquity of the concern about the criminological consequences of carrying

Bowie knives and other, similar long-bladed "fighting" knives is seen in the widespread adoption

---

[116] *Cockrum v. State*, 394.

[117] Ibid., 403–04.

[118] Ibid., 403.

[119] Among the notorious incidents attached to the Bowie knife was its use by two of the conspirators in the Lincoln assassination in 1865. The plan was to assassinate President Lincoln, Vice President Andrew Johnson, and Secretary of State William Seward. The man assigned to attack Seward, Lewis Powell, entered the Seward home armed with a pistol and a Bowie knife. When one of Seward's sons tried to stop him, Powell tried to shoot him, but his gun misfired, so he used it as a club against the son. When he encountered another son, Powell slashed him with his Bowie knife, the weapon he then used to attack Seward who, thanks to a neck collar, survived. *See* David Morgan, *Lincoln Assassination: The Other Murder Attempt*, CBS NEWS (May 10, 2015), https://tinyurl.com/3xh9accw; *William Seward*, HISTORY (updated Aug. 21, 2018), https://tinyurl.com/48ztzzab. John Wilkes Booth also carried what was later identified as a Bowie knife which he used to slash the man who accompanied Lincoln to the theater and who tried to stop Booth after he shot the president. Booth slashed the man in the arm with his knife to make his escape. *See also* Dave Taylor, *Cloak and Daggers: Cutting Through the Confusion of the Assassination Knives*, LINCOLNCONSPIRATORS.COM (Dec. 31, 2018), https://tinyurl.com/4u76jchb.

28

of laws barring or restricting these weapons.[120] (Note that these laws did not impose any restrictions on ownership of such knives in people's homes, as any such measures would not address the threat posed by public weapons carrying, and in any case would have been beyond the regulatory reach of governments in the nineteenth century.) In the 1830s, at least seven states enacted laws criminalizing the carrying of Bowie knives by name. Four more states had passed laws in the 1830s or before that did not mention Bowie knives by name, but that had language that clearly would have applied to Bowie knives: Indiana (1831),[121] Kentucky (1813),[122] Louisiana (1813),[123] and Massachusetts (1836)[124] in that these laws restricted carrying any "large knife" or "dangerous weapon" or "deadly weapon." From then to the start of the twentieth century, every state plus the District of Columbia restricted Bowie knives with either state-wide restrictions or local legislation. A total of 44 states, plus the District of Columbia, had state or local laws barring or restricting Bowie knives by name; and another 9 states had state or local laws barring the category or type of knife embodied by the Bowie knife but without mentioning them by name totaling 50 states plus the District of Columbia.[125] For example, laws in 19 states effectively banned the possession of Bowie knives outright (by banning both concealed carry and open carry),

---

[120] The near-immediate effort in the states to restrict Bowie knives was noted, for example, in Davis, *Three Roads to the Alamo*, 582, and in Flayderman, *The Bowie Knife*, 53–54.

[121] 1831 Ind. Acts 192, Fifteenth Session, CHAPTER XXVI.

[122] 1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89, § 1.

[123] 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1.

[124] Theron Metcalf, The Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835; to Which are Subjoined, an Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, Both Passed in February 1836; and to Which are Prefixed, the Constitutions of the United States and of the Commonwealth of Massachusetts Page 750, Image 764 (1836) available at The Making of Modern Law: Primary Sources. Of Proceedings to Prevent the Commission of Crimes, § 16.

[125] Reference to state enactments in this document includes legislation passed within territories that would become states, such as laws passed in pre-statehood Alaska, Hawaii, Idaho, and Oklahoma. Bowie law enactment by decade: 1830s: 7 states; 1840s: 4 states; 1850s: 11 states; 1860s: 13 states; 1870s: 19 states; 1880s: 24 states; 1890s: 21 states; 1900s: 8 states. *See* Exhibit H.

while others imposed taxes on the ability for individuals to acquire or possess them (see Exhibit H). The desirability and utility of such restrictions were precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through violence fueled by civilians carrying particularly deadly weaponry.

44.    States were imaginative and persistent in their effort to suppress fighting knives and other weapons in public. For example, an 1881 Arkansas law combined no-carry provisions (whether concealed or openly) applying to any dirk, bowie knife, sword, spear in a cane, brass or metal knuck[le]s, razors, "or any pistol of any kind whatever" with another provision in the same law that made it a misdemeanor to "sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person" the aforementioned weapons, including "any kind of cartridge."[126] Even though the law allowed persons to have the weapons on their own premises, it begs the question of how, exactly, a person could legally obtain such weapons in the first place if they weren't already owned within a family before the 1881 law was enacted.

45.    States relied on a variety of regulatory techniques to suppress Bowie knife carrying: laws in 38 states enacted laws barring concealed carry; laws in 19 states barred carry whether concealed or openly; laws in 9 states enhanced criminal penalties for those who used the knives to commit a crime; laws in 6 states attached regulatory taxes attached to their commercial sale; laws in 5 states imposed a tax for those who owned the knives; laws in 13 states barred their sale to specified groups of people; and laws in 10 states imposed penalties for brandishing the knives (see

---

[126] The law also made exceptions for military weapons, for officers, and legal transport for people on a journey, a common exception in such laws. An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), §§1-3, 1881 Ark. Acts 191.

Exhibit H). (Note that these laws did not prohibit people from having Bowie knives or similar knives on their own premises.)

46. The extensive and ubiquitous nature of these Bowie knife prohibitions raises a further question: given the universal agreement that these knives were dangerous, why didn't more states ban their possession outright? The answer is two-fold. First, America was a developing nation-state in the nineteenth century. The federal and state governments did not yet possess the maturity, powers, tools, or resources to implement and effectively enforce any measure as sweeping as a knife ban, especially since knives are technologically very simple to produce. After all, the front-line administrative entity on which we today rely for law enforcement, the police, barely existed (in the way we think of policing today) in the early nineteenth century. Up to this time policing fell to a haphazard mix of the watch system, constables, militias, and vigilantes. Modern police forces only came into being in a handful of large cities before the Civil War. Second, the chief remedy enacted by the states to address the problem of knife fighting was far more focused and feasible: to bar the carrying of knives, along with other types of measures enacted to curb their circulation and use. All of this returns us to the central point: fighting knives were considered dangerous per se, resulting in the wide-ranging pattern of regulation and restriction described here.

## VII. CONCLUSION

47. In the period from the seventeenth through the early twentieth centuries, ammunition changed little until the advent of the Minie ball in the mid-1800s and metallic cartridges which began to circulate meaningfully in society in the latter part of the nineteenth century. Note that both were developed for military applications. And as noted earlier, the U.S. military's rules of warfare include restrictions on ammunition that is considered unnecessarily

harmful, cruel, or that causes "superfluous injury,"[127] expressly extending to hollow point ammunition and poisoned bullets. This only buttresses the idea that similar rules apply in a civilian context given that the standard for harm avoidance or minimization is far higher for civilian use in civilian life than on the battlefield.

48.    Ammunition technology changed relatively little until the dum-dum bullet came along. Yet it is equally clear that (a) ammunition in general could be and was subject to restrictions throughout American history, and (b) weapons viewed as more dangerous or inimical to public safety were singled out for stricter regulation, especially in public. This extended to explosive materials that were considered similarly or more dangerous than gunpowder when they came along, such as gun cotton, nitroglycerine, dynamite, and dualin (sometimes spelled dualine). Special restrictions imposed on weapons viewed as particularly dangerous or inimical to public safety also extended to implements as technologically simple as fighting knives like the Bowie knife as well as various types of clubs,[128] trap guns,[129] and more exotic weapons like punt/pivot/swivel guns.[130] As this Declaration has demonstrated, the same is true for ammunition. The aforementioned laws, and categories of laws, were found literally everywhere in America in the 1700s and 1800s.[131] Note again that these laws pertained to weapons from the very simple, like knives, to the complex, such as nitroglycerine, and to ammunition. The common denominator they shared was the public policy judgment that all posed a unique hazard or threat to public and

---

[127] *Department of Defense Law of War Manual,* OFFICE OF GENERAL COUNSEL, 354.

[128] Spitzer, *Understanding Gun Law History After Bruen*, 95–98.

[129] Spitzer, *Understanding Gun Law History After Bruen,* 100–02.

[130] Punt guns, pivot guns, and swivel guns were various similar types of large firearms that also included what might be considered small cannons. Punt guns were loosely defined as large bore muzzle-loaded shotguns.

[131] *See, e.g.*, Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMPORARY PROBLEMS 55–83 (2017).

physical safety. That principle applies as well to hollow point ammunition, which was engineered with the express purpose of increasing lethality and usefulness for military personnel in active combat scenarios. All of these are examples of weapons or arms that were considered inherently dangerous and therefore posed a per se (that is, simply by their nature) threat to public safety when carried in public.

49.     This principle, incorporating the long and extensive history of government regulation of ammunition, supports the idea that governments today are well within their authority to restrict hollow point ammunition (leaving aside contemporary policy arguments for or against the regulation) to the civilian population.

## **CERTIFICATION**

I certify that the foregoing statements made by me are true to the best of my knowledge. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_Robert J. Spitzer_
ROBERT J. SPITZER, Ph.D.

Dated:  January 23, 2026

# Exhibit A

**EXHIBIT A**

May 2025

**<u>Curriculum Vitae</u>**

**Robert J. Spitzer**

**Adjunct Professor, College of William & Mary School of Law**

**Distinguished Service Professor, Emeritus
State University New York at Cortland**

<u>Address</u>:    5333 Center St.
Williamsburg, VA  23188
(607) 423-1781
Robert.spitzer@cortland.edu
https://sites.google.com/site/robertspitzercortland/

<u>Education</u>:    A.B. (Political Science), <u>summa cum laude</u>, State University of New York at Fredonia, 1975.
M.A. Cornell University, 1978.
Ph.D. Cornell University, 1980.

<u>Positions Held</u>:

Adjunct Professor, College of William and Mary School of Law, Spring 2023-present.
Affiliated Scholar, Research Scholar of Public Policy, College of William & Mary, 2023-present.
Affiliated Scholar, Government Department, College of William and Mary, 2023-present.
Department Chair, SUNY Cortland, 2008-2020.
Interim Department Chair, SUNY Cortland, 2004-2005.
Distinguished Service Professor, SUNY Cortland, 1997-present.
Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-1990, 1992-2017.
Professor, SUNY Cortland, 1989 to 1997.
Continuing Appointment, SUNY Cortland, 1986.
Associate Professor, SUNY Cortland, 1984 to 1989.
Department Chair, SUNY Cortland, 1983 to 1989.
Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985, 1986, 1988.
Copy Editor, <u>Administrative Science Quarterly</u>, 1982 to 1983.
Adjunct Professor, Tompkins-Cortland Community College, 1982-83.

1

Assistant Professor, SUNY Cortland, 1979 to 1984.
Instructor, Cornell University, 1979.
Instructor, Eisenhower College, 1978-1979.
Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.


Honors:

Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.
Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.
Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.
Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.
Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.
Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.
Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.
Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.
SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.
Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."
Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.
Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.
Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.
Who's Who in the World, 1996.
Dictionary of International Biography, 1995.
Who's Who in the East, 1995-96; 1997-98
Ex officio member, Cortland County Bicentennial Committee, 1987-89.
Chair, SUNY Cortland Bicentennial Committee, 1987-89.
Phi Eta Sigma, SUNY Cortland, 1994.
Phi Kappa Phi, SUNY Cortland, 1990.

2

Men of Achievement (1986)
Contemporary Authors, vol. 112 (1985) and subsequent updates.
International Authors and Writers Who's Who, 1985-present.
International Who's Who in Education, Winter 1985-86.
Herbert H. Lehman Graduate Fellowship, 1975-79.
Who's Who Among Students in American Universities and Colleges, 1974-75.
Phi Beta Kappa Club, SUNY College at Fredonia, 1975.
Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.


Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.


Publications and Papers:

BOOKS:

The Presidency and Public Policy:  The Four Arenas of Presidential Power (University, AL:  The University of Alabama Press, 1983).  A study of the President's relations with Congress in the making of domestic policy.  Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987).  A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

The Presidential Veto:  Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents

3

and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

Editor, The Bicentennial of the U.S. Constitution:  Commemoration and Renewal (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial.  Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert Spitzer.

President and Congress:  Executive Hegemony at the Crossroads of American Government (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, Media and Public Policy (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

The Politics of Gun Control (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021; 9th ed. 2024). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, Politics and Constitutionalism: The Louis Fisher Connection, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

The Right to Bear Arms: Rights and Liberties Under the Law (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

Essentials of American Politics, co-authored with Benjamin Ginsberg, Johns Hopkins;

4

Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

We the People: Essentials Edition, co-authored with Benjamin Ginsberg, Theodore Lowi, Margaret Weir, Caroline Tolbert, Andrea Campbell (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021; 14th ed. 2023).

Gun Control: A Documentary and Reference Guide (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

The Gun Debate: An Encyclopedia of Gun Rights and Gun Control, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

Guns across America: Reconciling Gun Rules and Rights (New York: Oxford University Press, 2015; revised paperback ed. 2017); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

The Gun Dilemma: How History Is Against Expanded Gun Rights (New York: Oxford University Press, 2023; revised paperback ed. 2025). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, Series on American Constitutionalism, SUNY Press, 1996-present. Books include:
    Daniel Hoffman, Our Elusive Constitution, (1997)
    Martin Sheffer, God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment, (1999)

5

Daniel Levin, <u>Representing Popular Sovereignty: The Constitution in American Political Culture</u>, (1999)

Robert Spitzer, ed., <u>Politics and Constitutionalism</u>, (2000)

Laura Langer, <u>Judicial Review in State Supreme Courts</u> (2002)

Ian Brodie, <u>Friends of the Court</u> (2002)

Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination Law and Policy</u> (2002)

Artemus Ward, <u>Deciding to Leave: The Politics of Retirement from the United States Supreme Court</u> (2003)

James T. McHugh, <u>Ex Uno Plura: State Constitutions and Their Political Cultures</u> (2003)

Stephen Newman, ed., <u>Constitutional Politics in Canada and the United States</u> (2004).

Stephen Kershnar, <u>Justice for the Past</u> (2004).

Timothy R. Johnson, <u>Oral Arguments and Decision Making on the U.S. Supreme Court</u> (2004).

Christopher P. Banks, David B. Cohen, and John C. Green, eds., <u>The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics</u> (2005)

Kenneth D. Ward and Cecilia R. Castillo, eds., <u>The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory</u> (2005).

G. Alan Tarr and Robert F. Williams, eds., <u>State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform</u> (2006).

Frank P. Grad and Robert F. Williams, <u>State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments</u> (2006).

G. Alan Tarr and Robert F. Williams, eds., <u>State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform</u>, 3 vols. (2006).

Cary Federman, <u>The Body and the State: Habeas Corpus and American Jurisprudence</u> (2006).

Christopher S. Kelley, ed., <u>Executing the Constitution: Putting the President Back into the Constitution</u> (2006).

David Fagelson, <u>Justice as Integrity: Tolerance and the Moral Momentum of Law</u> (2006).

Christopher Shortell, <u>Rights, Remedies, and the Impact of State Sovereign Immunity</u> (2008).

Robert Blomquist, <u>The Quotable Judge Posner</u> (2010).

Kirk A. Randazzo, <u>Defenders of Liberty or Champions of Security?</u> (2010).

Pamela Corley, <u>Concurring Opinion Writing on the U.S. Supreme Court</u> (2010).

Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination Law and Policy</u> (2nd ed. 2010).

Julia R. Azari, et al., eds., <u>The Presidential Leadership Dilemma</u> (2013).

Stephen A. Simon, <u>Universal Rights and the Constitution</u> (2014).

Kirk A. Randazzo and Richard W. Waterman, <u>Checking the Courts</u> (2014).

6

Anthony Maniscalco, Public Spaces, Marketplaces, and the Constitution (2015).
Goirgi Areshidze et al., eds., Constitutionalism, Executive Power, and the Spirit of Moderation (2016).
Peter J. Galie, et al., eds., New York's Broken Constitution (2016).
Robert J. Hume, Ethics and Accountability on the U.S. Supreme Court (2017).
Michael A. Dichio, The U.S. Supreme Court and the Centralization of Federal Authority (2018).
Clyde H. Ray, John Marshall's Constitutionalism (2019).
Daniel P. Franklin, et al., The Politics of Presidential Impeachment (2020).
Robert M. Howard, et al., Power, Constraint, and Policy Change: Courts and Education Finance Reform (2021).
Mark C. Dillon, The First Chief Justice (2022).
Richard W. Waterman, Constitutional Ambiguity and the Interpretation of Presidential Power (2025).
Eric T. Kasper and JoAnne Sweeny, eds., Free Speech and Incitement in the Twenty-First Century (2025).

Book Series Editor, Presidential Briefing Books, Routledge, 2015-present.
Mary Stuckey, Political Rhetoric (2015)
Michael A. Genovese, Presidential Leadership in an Age of Change (2015)
Christopher Fettweis, Making Foreign Policy Decisions (2016)
Nancy Maveety, Picking Judges (2016)
Richard S. Conley, Presidential Relations with Congress (2017)
Andrew L. Stigler, Governing the Military (2019)
Graham G. Dodds, The Unitary Presidency (2020)

Member, Board of Editors for the Encyclopedia of Guns in American Society, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, Issues: Understanding Controversy and Society, ABC-CLIO, 2011-2016.

BOOK CHAPTERS:

"Third Parties in New York," in Governing New York State (formerly New York State Today), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.:  SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in Social Regulatory Policy: Recent

Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO:  Westview Press, 1988), 111-141.

"The President's Veto Power," in Inventing the American Presidency: Early Decisions and Critical Precedents, ed. by Thomas Cronin (Lawrence, KA:  University Press of Kansas, 1989), 154-179.

"President and Congress," in The CQ Guide to the Presidency, ed. by Michael Nelson (Washington, D.C.:  Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in Encyclopedia of American Political Parties and Elections, ed. by L. Sandy Maisel (New York:  Garland Pub., 1991): American Labor Party, Benjamin Bubar, closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, American Government: Freedom and Power (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in Encyclopedia of the American Legislative System, ed. by Joel Silbey (NY:  Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in The Presidency and the Persian Gulf War, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York:  Praeger, 1993).

"Is the Separation of Powers Obsolete?" in The Presidency Reconsidered, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in Understanding the Presidency, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the Encyclopedia of the American Presidency, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the Encyclopedia of the United States Congress, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

8

"The President, Congress, and the Fulcrum of Foreign Policy," in The Constitution and the Conduct of American Foreign Policy, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in The Executive Office of the President, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the Oxford Historical Guide to American Government (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in Liberty Under Law, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

"Multi-Party Politics in New York," in Multi-Party Politics and American Democracy, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, We the People (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in The Encyclopedia of American Third Parties, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in Prayers in the Precincts, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in The Clinton Scandal and the Future of American Politics, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in Politics and Constitutionalism, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the Encyclopedia of American Political History, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

9

"Article I, Section 7," in The Constitution and Its Amendments, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in The Second Amendment in Law and History, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in The Oxford Companion To United States History ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in The Presidency and the Law: The Clinton Legacy, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

"The Veto King: The 'Dr. No' Presidency of George Bush," in Honor and Loyalty: Inside the Politics of the Bush White House, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the Encyclopedia of Guns in American Society, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; 2nd ed. 2011; 3rd ed. 2023): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the Encyclopedia of the American Presidency, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for The Encyclopedia of New York State, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," Transformed By Crisis: The Presidency of George W. Bush and American Politics, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in Debating the Presidency, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in Thinking About the Presidency, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

10

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Executing the Constitution, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in Social Issues in America: An Encyclopedia, 8 vols., ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," The Presidency and the Challenge of Democracy, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," Encyclopedia of American Civil Liberties, 4 vols., ed. By Paul Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," Gun Violence: Opposing Viewpoints, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," Presidential Power in America, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," Encyclopedia of American Government and Civics ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," Encyclopedia of Political Communication ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in Leadership at the Crossroads, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in Encyclopedia of Issues in U.S. Public Policy, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in Winning the Presidency 2008, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in Debating Reform: Conflicting Perspectives on How to Fix the American Political System, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in

11

Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" You Asked: 20 Questions About America, U.S. Department of State, 2010.

"Liberals and the Presidency," Contending Approaches to the American Presidency, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" The American Presidency in the 21st Century, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in Governing America, ed. By Paul Quirk and William Cunion (New York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for Issues: Understanding Controversy and Society, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," Encyclopedia of Applied Ethics, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" Winning the Presidency 2012, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." American Government. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," American Governance, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," American Presidents and the Constitution, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," The George W. Bush Presidency, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Guns Return to American Elections," <u>US Election Analysis 2016: Media, Voters and the Campaign,</u> Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 2016.

"Stricter Gun Laws are Reasonable and Sensible," <u>Gun Control in the United States: A Reference Handbook</u>, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," <u>Guns: Interdisciplinary Approaches to Politics, Policy, and Practice</u>, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," <u>Presidential Leadership and the Trump Presidency: Executive Power and Democratic Governance</u>, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Guns and the 2020 Elections," <u>US Election Analysis 2020</u>, Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 2020.

"Looking Down the Barrel of the 2020 Elections," <u>The 2020 Presidential Election: Key Issues and Regional Dynamics</u>, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," <u>Developments in American Politics 9</u>, Gillian Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," <u>The Conversation on Guns</u>, James A. Densley, ed. (Baltimore: Johns Hopkins University Press, 2023).

"To Brandish or Not to Brandish: The Consequences of Gun Display," <u>New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society</u>, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, 2023).

"Guns and the 2024 Elections," <u>U.S. Election Analysis 2024</u>, Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 2024.

<u>ARTICLES</u>:

13

"Jamestown:  Anatomy of an All-American City," Sunday Buffalo Courier Express Magazine, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, The Journal of Politics, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," Presidential Studies Quarterly, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," Presidential Studies Quarterly, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," National Civic Review, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," Party Line, 17 (September 1984).

"Shooting Down Gun Myths," America, June 8, 1985, pp. 468-69.  Reprinted in: the Des Moines Register, October 24, 1985; Criminal Justice, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); U.S. News and World Report educational study unit on Gun Control, April/May, 1987; Gun Control, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and The Informed Argument, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY:  Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," America, June 15, 1985.

"The Item Veto Reconsidered," Presidential Studies Quarterly 15(Summer, 1985): 611-17.

"Promoting Policy Theory: Revising the Arenas of Power," Policy Studies Journal, 15 (June 1987), 675-89. Reprinted in Daniel C. McCool, ed. Public Policy Theories, Models, and Concepts (Englewood Cliffs, NJ: Prentice-Hall, 1995); and L.F. Goodchild, et al, Public Policy and Higher Education (Needham Heights, MA: Simon & Schuster, 1997).

"A Course Module: The Politics of Abortion," NEWS for Teachers of Political Science, 53 (Spring, 1987).

"But for A Single Vote...," New York Delegate, July, 1987. Abridged version appeared on editorial page of the Rochester Times Union, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", Election Politics, 5 (Summer, 1988): 14-16.

14

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," Policy Studies Journal, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," Policy Studies Journal, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," PS: Political Science and Politics, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," PS: Political Science and Politics, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," Oklahoma City University Law Review, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," Congress and the Presidency, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," Pace Law Review, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" The Spectator, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," Political Science Quarterly, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," Presidential Studies Quarterly, 28 (Fall 1998): 799-805.

"Clinton's Impeachment Will Have Few Consequences for the Presidency," PS: Political Science and Politics, 32 (September 1999).

"The Gun Dispute," American Educator, 23 (Summer 1999): 10-15.  Reprinted in Annual Editions: Criminal Justice (Dushkin/McGraw-Hill, 2000); and in Criminology (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," Congress Monthly, September/October 2000.

"Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, Silveira v. Lockyer (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

15

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Presidential Studies Quarterly 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the *Emerson C*ase," St. John's Law Review 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," Focus on Law Studies 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," Fordham Law Review 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," PS: Political Science and Politics 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, The PRG Report 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, American Literary History 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, Injury Prevention 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," Albany Government Law Review 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," Presidential Studies Quarterly 38(June 2008): 329-46.

"Still Saving the Constitution from Lawyers: A Response," Gonzaga Law Review 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," Government, Law and Policy Journal 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," Presidential Studies Quarterly 42(September 2012): 637-55.

"Gun Laws," New York State Bar Association Journal 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," Presidents and Executive Politics Report 35(Fall 2012).

"Writing the Gun Debate," Los Angeles Review of Books, February 10, 2013.

"A Historical Look at Gun Control in America," WCNY Magazine, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," PS: Political Science and Politics 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," The Islamic Monthly, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," White House Studies 12(October 2013): 125-46.

"A Look at the 2014 Elections," WNCY Magazine, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," Albany Law Review, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," Social Science Docket, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," The Critique (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," Law and Contemporary Problems 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" Items: Insights from the Social Sciences, Social Science Research Council, October 17, 2018.

"Effective Gun Regulation Can Be Compatible with Gun Rights," The Regulatory Review, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Law and Contemporary Problems 83, 3(2020): 231-55.

"Understanding Gun Law History After Bruen: Moving Forward by Looking Back," Fordham Urban Law Journal 51 (October 2023): 57-115.

"Historical Weapons Restrictions on Minors," Rutgers University Law Review Commentaries 76(Spring 2024): 101-24.

"America's Untold Gun Law History," The Torch: The Magazine of the International Association of Torch Clubs (98) Fall 2024: 20-24.

17

"Historical Firearms Licensing and Permitting Laws," Dickinson Law Review 129 (Spring 2025): 1041-74.

OP-ED ARTICLES:

"Court Rulings on 2nd Amendment: No Individual Right to Keep Arms," Des Moines Register, October 24, 1985.

"Gun Control and Pressure Politics," Syracuse Post-Standard, November 30, 1985.

"Pocket Vetoes and Abuse of Power," Rochester Times Union, January 7, 1987.

"But for One Vote, a Different Nation," Rochester Times Union, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," Rochester Times Union, September 14, 1987.

"The Great Gun Fallacy," Syracuse Post-Standard, March 30, 1989.

"Four Cases on Right to Bear Arms," Syracuse Post-Standard, April 22, 1989.

"Don't Start Line-Item Veto," Syracuse Post-Standard, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," Syracuse Post-Standard, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," Los Angeles Times, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" Christian Science Monitor, September 19, 1997.

"Assault Weapons Ban," Christian Science Monitor, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," Syracuse Post-Standard, February 10, 1999.

"Gun Industry Doesn't Know What's Good for It: Regulation," Syracuse Post-Standard, April 20, 1999.

"The Gun Saga in Congress," Intellectual Capital, 4 (May 13-20, 1999).

18

"Hidden Gun Control or Consumer Protection?" <u>Intellectual Capital</u>, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," <u>Intellectual Capital</u> 5(February 10-17, 2000).

"Gun Control After Columbine," <u>Intellectual Capital</u> 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," <u>The Catholic Review</u>, March 30, 2000.

"Why Would Anyone Want the Job Now?" <u>Chicago Tribune</u>, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," <u>Syracuse Post-Standard</u>, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," <u>Syracuse Post-Standard</u>, June 12, 2001.

"Exposure Erodes Clout of NRA," <u>Columbus Dispatch</u>, April 24, 2003.

"Hazing Scandals," <u>Syracuse Post-Standard</u>, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, <u>Syracuse Post-Standard</u>, February 18, 2004.

"NRA Loses Its Political Firepower," <u>Los Angeles Times</u>, April 12, 2004. Also in the <u>Deseret News</u>.

"A 'Tortured' Interpretation of the President's Vast Powers," <u>Syracuse Post-Standard</u>, June 18, 2004.

"Clearing the Air," <u>Syracuse Post-Standard</u>, August 4, 2004.

"Why Gun Ban Died Quietly," <u>San Jose Mercury News</u>, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," <u>Christian Science Monitor</u>, August 18, 2005. Also published in the <u>Deseret News</u>, <u>Sacramento Bee</u>, the <u>Fresno Bee</u>, the <u>Modesto Bee</u>, the <u>Ithaca Journal</u>, the <u>Johnstown Breeze</u>, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But

19

Static," Syracuse Post-Standard, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network (www.hnn.us), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" Syracuse Post-Standard, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network (www.hnn.us) January 7, 2008.

"The 'Pocket Veto' Peril," Los Angeles Times, January 8, 2008. Reprinted in the St. Louis Post-Dispatch, St. Paul Pioneer Press, Wilmington Star News (NC), News and Observer (NC), The Morning Call (Pa.), Contra Costa Times (CA), the Sun News (FL), The Vindicator, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, Cleveland Plain Dealer, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, Syracuse Post-Standard, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge (www.thefacultylounge.org), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network (www.hnn.us), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us), January 12, 2009.

"Early Voting for New York Elections," Cortland Standard, May 27, 2009.

"A Better Way to Run Our Elections," Syracuse Post Standard, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post (www.huffingtonpost.com), posted December 22, 2009.

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post

20

(www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post (www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com), posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5, 2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard,* January 16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post,* January 3, 2012.

"The Disappearing Faculty," *The Huffington Post,* February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

"Why We've Learned Nothing from Watergate," *The Huffington Post,* June 20, 2012.

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post,* June 29, 2012.

21

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard,* July 4, 2012.

"Aurora Won't Change Anything," *Salon,* July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill,* January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News,* January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News,* January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard,* January 7, 2014.

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

22

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog*, American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine*, June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him." *Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,* January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

23

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post*, June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times,* October 3, 2017.

"An American Standoff," *New York Daily News,* October 8, 2017.

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post,* February 15, 2018.

24

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation,* February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News,* March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard,* March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post,* May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com*, September 13, 2018.

"The Gun Safety Issue is Actually Helping Democrats," *New York Times,* November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard,* December 30, 2018.

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,* August 6, 2019.

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts,* The Center for Firearms Law at Duke University, October 10, 2019.

25

"William Barr's Upside-Down Constitution," *History News Network,* December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network,* January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot,* February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK,* February 19, 2022.

26

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation,* May 25, 2022.

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times,* May 27, 2022.

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs*," *History News Network,* May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation,* June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK,* June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

"Guns at voting sites have long sparked fears of intimidation and violence – yet few states ban their presence," *The Conversation,* November 2, 2022.

"Guns at voting sites have long sparked fears of intimidation, violence," *Syracuse Post-Standard,* November 4, 2022.

"What our past tells us about young people and guns," *The Hill,* March 28, 2023.

"Stand-Your-Ground, the Castle Doctrine, and Public Safety," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 3, 2023.

"For Most of U.S. History We've Had Both Gun Rights and Gun Regulations," *TIME.com,* June 6, 2023.

"Is domestic abuse really protected by the Second Amendment?" *The Hill,* July 14, 2023.

27

"America's Original Gun Control," *The Atlantic Monthly,* August 12, 2023.

"The Unusual Thing About Hunter Biden's Indictment," *CNN.com*, September 15, 2023.

"Minors, Gun, History, and the Second Amendment," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, April 24, 2024.

"The Supreme Court's Gun Rights Decision Deepens the Cracks in Originalism," *The Hill,* June 24, 2024.

"Court's Immunity Ruling Undermines Founders' Intent," *Virginia Daily Press/Virginian-Pilot,* July 17, 2024.

"Historical Context, Weapons Laws, and Early American Governance," *Second Thoughts Blog*, Duke Center for Firearms Law, October 18, 2024.

"The Trump Threat to America's Legal Order," *ArtsForum*, November 12, 2024.

"Newport News Council's Revised Gun Rule has Long Legal Precedent," *Virginia Daily Press/Virginian-Pilot,* December 8, 2024.   170

"A Court Ruling on Minors and Handguns Got the History Wrong," *The Hill*, February 7, 2025.

"Historic Weapons Licensing Laws," *Second Thoughts Blog*, Duke Center for Firearms Law at Duke University, June 4, 2025.


TESTIMONY, BRIEFS, AND REPORTS:

"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting:  Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the

28

New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and Sine Die Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA, February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003).

29

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Healey,* No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26, 2019).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta,* U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.


PAPERS AND PRESENTATIONS (not including those given on the Cortland Campus):

"The President as Policy-Maker:  The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party:  The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic:  Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

31

"Biting the Bullet:  Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power:  Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power:  The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto:  Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete?  An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington, D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day':  The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

32

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the Washington Post, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in The Politics of Gun Control," Gettysburg College, Gettysburg, PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit, the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

33

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November 1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential

Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes:  The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science

35

Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

36

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

38

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"College and Life: Really the Same," SUNY Cortland Commencement Address, May 14, 2017.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America,"

39

Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol Association v. NYC,* November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5, 2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

"The Gun Rights 2.0 Movement: Public Policy Consequences," 2022 National Research Conference on Firearm Injury Prevention, Omni Shoreham Hotel, Washington, D.C., November 29-December 1, 2022.

"Gun Law History in America," OSHER Lifelong Learning Institute at the College of

40

William and Mary, Williamsburg, Va., February 16, 2023.

"The Obama Presidency and Gun Policy," Paper Presented for Hofstra University's 13th Presidential Conference on The Barack Obama Presidency, Hempstead, NY, April 19-21, 2023. Archived with selected conference papers at: https://www.hofstra.edu/cultural-center/obama/; https://www.hofstra.edu/sites/default/files/2024-02/spitzer-paper.pdf

"Gun Law History and Virginia," League of Women Voters, Williamsburg, Va., June 22, 2023.

"Gun Policy in the U.S.: Past, Present, Future," College of William & Mary, Williamsburg, Va., September 21, 2023.

"Historical Gun Laws Pertaining to Minors," 2023 Cooper-Walsh Colloquium, Conference on *Public Health, History, and the Future of Gun Regulation After Bruen,* Fordham University School of Law, New York City, NY, October 12-13, 2023.

"Presidential Impeachment: What It Is, How It Works, Why It Matters," OSHER Lifelong Learning Institute at the College of William & Mary, Williamsburg, Va., October 19, 2023.

"The Politics of Gun Control," TORCH Club of Williamsburg, Va., January 16, 2024.

"Gun Law History in America and Virginia," OSHER Lifelong Learning Institute at the College of William & Mary, Williamsburg, Va., February 21, 2024.

"Law and History Roundtable: The *Rahimi* Supreme Court Case," Center for the Study of Guns and Society, Duke University School of Law, Durham, NC, August 2, 2024.

"The 2024 Presidential Elections," TORCH Club of Williamsburg, Va., October 15, 2024.

"The 2024 Presidential Elections," OSHER Lifelong Learning Institute at the College of William & Mary, Williamsburg, Va., October 18, 2024.

"Gun Law History: Separating Fact from Fiction," SUNY Geneseo, NY, October 22, 2024.

"Gun Law History in America," OSHER Lifelong Learning Institute at the College of William & Mary, Williamsburg, Va., February 28, 2025.

"Historical Gun and Weapons Licensing and Permitting Laws," Conference on the Second Amendment After *Bruen,*" Penn State Dickinson Law School, Carlisle, PA, April

41

4, 2025.


PANEL PARTICIPATION:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans:  An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San

43

Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022 (virtual).

Discussant, "Revisiting Watergate: Crisis, Renewal, and the Presidency," APSA, Philadelphia, Sept. 5-8, 2024.


BOOK REVIEWS:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

PL94-142:  An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative

45

Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the American Political Science Review, December, 1983.

A Case of Third Party Activism, by James Canfield, reviewed in Perspective, July-August, 1984.

Winners and Losers:  Campaigns, Candidates and Congressional Elections, by Stuart Rothenberg, reviewed in the American Political Science Review, December, 1984.

The Political Presidency, by Barbara Kellerman, reviewed in Perspective, January-February, 1985.

Presidents and Promises, by Jeff Fishel, reviewed in the American Political Science Review, December, 1985.

The Elections of 1984, ed. by Michael Nelson, reviewed in Perspective, May/June, 1985.

Economic Conditions and Electoral Outcomes, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in Perspective, May/June, 1986.

Presidential Transitions:  Eisenhower Through Reagan, by Carl M. Brauer, in Perspective, January/February, 1987.

Religion and Politics in the United States, by Kenneth D. Wald, in Journal for the Scientific Study of Religion, September, 1988.

Abortion and Divorce in Western Law, by Mary Ann Glendon, in The Annals of the American Academy of Political and Social Science, September, 1988.

The American Political Economy, by Douglas Hibbs, in Perspective, Spring, 1988.

God in the White House, by Richard G. Hutcheson, Jr., in Perspective, Fall, 1988.

The Reagan Legacy, Charles O. Jones, ed., in Social Science Quarterly, June, 1989.

Dilemmas of Presidential Leadership From Washington Through Lincoln by Richard Ellis and Aaron Wildavsky, in Perspective, September, 1989.

Taming the Prince by Harvey Mansfield, Jr., in Governance, April, 1990.

Public Policy and Transit System Management, ed. by George M. Guess, in Perspective,

Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

47

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives,  Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H. Richard Uviller and William G. Merkel, Journal of American History, March 2004.

Power Without Persuasion: The Politics of Direct Presidential Action, by William G. Howell, Perspectives on Politics, June 2004.

The George W. Bush Presidency: An Early Assessment, ed. By Fred Greenstein, Perspectives, Spring 2004.

The Invention of the United States Senate, by Daniel Wirls and Stephen Wirls, Perspectives, Summer 2004.

The Mythic Meanings of the Second Amendment, by David C. Williams, Law and Politics Book Review, April 2004.

Empowering the White House, by Karen M. Hult and Charles E. Walcott, Rhetoric and Public Affairs, Fall 2005.

Defining Americans:  The Presidency and National Identity, by Mary E. Stuckey, Perspectives, Spring 2005.

Presidential Leadership: Rating the Best and Worst in the White House, ed. By James Taranto and Leonard Leo, Rhetoric and Public Affairs, Summer 2006.

A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, by Saul Cornell, American Journal of Legal History, October 2006.

The Founders' Second Amendment: Origins of the Right to Bear Arms, by Stephen Halbrook, Law and Politics Book Review 18(October 2008).

Out of the Shadow: George H.W. Bush and the End of the Cold War, by Christopher Maynard, Journal of American History (September 2009).

Guns, Democracy, and the Insurrectionist Idea, by Joshua Horwitz, Law and Politics Book Review 19(June 2009).

Talking Together, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

Accidental Presidents, by Philip Abbott, Presidential Studies Quarterly, June 2010.

The Co-Presidency of Bush and Cheney, by Shirley Anne Warshaw, Congress and the Presidency, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The

Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).

Gun Country: Gun Capitalism, Culture and Control in Cold War America by Andrew McKevitt, Perspectives on Politics 22(December 2024).


SELECTED MEDIA APPEARANCES/QUOTATIONS:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN, and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Full Frontal With Samantha Bee," "Ali Velshi"; "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the New York Times, the Washington Post, Time Magazine, Newsweek, Der Spiegel (Germany), USA Today, the Los Angeles Times, the Wall Street Journal, the Christian Science Monitor, the Boston Globe, the Chicago Tribune, the Philadelphia Inquirer, the Miami Herald, Houston Chronicle, the St. Louis Post-Dispatch, San Francisco Chronicle, the Dallas Morning News, the Baltimore Sun, the Detroit Free Press, the Seattle Post-Intelligencer, Newsday, the Denver Post, Kansas City Star, Dallas News, Pittsburgh Post-Gazette, New Orleans Times Picayune, Orlando Sentinel, Columbus Dispatch, Buffalo News, San Jose Mercury News, Albany Times-Union, St. Petersburg Times, Arkansas Democrat-Gazette, Newark Star-Ledger, Bergen Record, Congress Daily, The Hill, CQ

50

Report, Rolling Stone, The Nation, Ladies Home Journal, the National Journal, The Spectator, Legal Times, Financial Times, Toronto Globe, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area universities.

PROFESSIONAL ASSOCIATIONS:

Scholars Strategy Network.
American Political Science Association.
Center for the Study of the Presidency.
Presidents and Executive Politics Section (formerly the Presidency Research Group), APSA; served on Governing Board of PRG, 1991 to 2003.
New York Political Science Association.
Pi Sigma Alpha.
Phi Kappa Phi.

TEACHING AREAS:

American Government:  courses taught include Law and Politics, Introduction to American Government, The Legislative Process, Political Parties and Social Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

Public Policy:  courses taught include Politics and Policy, Introduction to Public Policy, Gun Policy.  Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

TEACHING-RELATED AWARDS:

Three-time recipient of the SUNY Cortland Student Government Association

51

Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students."  (The only faculty member ever to win this award more than once.)


OTHER PROFESSIONAL ACTIVITIES

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, PRG Report, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics,
American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press, University of Chicago Press, University of California Press, Princeton University Press, Cornell University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan, University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge, University of Alabama Press, American Political Science Review, PS, Comparative Politics, American Journal of Political Science, Policy Studies Journal, Policy Studies Review, Political Science Quarterly, the Journal of Politics, Western Political Quarterly, Polity, Social Science Quarterly, Political Behavior, American Politics Quarterly, Political Communication, Legislative Studies Quarterly, Government and Policy, Congress and the Presidency, Social Science Journal, Journal of Policy History, Political Research Quarterly, Presidential Studies Quarterly, Politics and Policy, and the National Science Foundation.

SELECTED COMMUNITY SERVICE

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present; for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County, 2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).
Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's (N.Y.) Odyssey 2010 Project, 1996.

**EXHIBIT B**

## EXHIBIT B

## TABLE OF GUNPOWDER LAWS

| STATE | STORAGE LAWS | MANUFACTURING INSPECTION SALE IGNITE | TRANSPORT LAWS |
|---|---|---|---|
| Alabama | 1848, 1887 | | |
| Alaska | | | 1913 |
| Arizona | 1867,1877 | | 1889 |
| Arkansas | 1887 | 1884 | 1875 |
| California | 1851,1855, 1875 | 1883,1923 | |
| Colorado | 1868,1875, 1886, 1913 | 1911 | |
| Connecticut | 1827,1832, 1832,1859, 1862,1864, 1874, 1901 | 1665,1775, 1836,1923, 1930 | |
| Delaware | 1841,1852, 1865,1885, 1901 | 1845,1911, 1913,1919 | |
| District of Columbia | | | |
| Florida | 1838,1887, 1901 | 1923,1927 | |
| Georgia | 1900 | 1831,1858, 1902 | 1837 |
| Hawaii | 1884,1903, 1933 | | 1933 |
| Idaho | 1863,1897, 1901 | | |
| Illinois | 1855,1869, 1869,1908 | 1851 | |
| Indiana | 1836,1852, 1855,1871, 1879,1895, 1901 | 1847 | |
| Iowa | 1838,1847, 1856,1873, 1907 | 1845 | 1843 |
| Kansas | 1860,1915 | | |
| Kentucky | 1806,1864, 1869,1912 | 1874 | 1898 |
| Louisiana | 1808,1816, 1852,1884, | 1817 | |

|  | 1904 |  |  |
| --- | --- | --- | --- |
| Maine | 1821,1821, 1848,1873, 1874 | 1821,1840 |  |
| Maryland | 1794,1879, 1900 | 1757 | 1776 |
| Massachusetts | 1715,1719, 1783,1783, 1783,1801, 1847,1870, 1882,1904, 1919 | 1651,1814, 1881,1895, 1898 |  |
| Michigan | 1841,1846, 1867,1869, 1879,1901 | 1901 |  |
| Minnesota | 1884,1921 | 1858 |  |
| Mississippi | 1818,1824 |  |  |
| Missouri | 1822,1823, 1873,1881, 1887,1909, 1913 | 1921 |  |
| Montana | 1887,1903 |  |  |
| Nebraska | 1867,1897, 1901 | 1869,1895 |  |
| Nevada | 1877,1901 |  |  |
| New Hampshire | 1786,1793, 1854 | 1820,1825, 1891,1913, 1917 |  |
| New Jersey | 1811,1837, 1857,1863, 1866,1886, 1902 | 1639,1776, 1811,1886, 1903,1927, 1927 | 1874 |
| New Mexico | 1851,1909 | 1923 | 1887 |
| New York | 1763,1784, 1799,1877, 1885,1900 | 1652,1664, 1690,1744, 1788,1890, 1911 | 1645, 1763, 1877 |
| North Carolina | 1901 | 1905,1909 |  |
| North Dakota | 1895,1905 | 1923 |  |
| Ohio | 1832,1833, 1835,1856, 1878,1902 | 1849,1889 |  |
| Oklahoma | 1903 | 1890,1890, 1899 |  |
| Oregon | 1862,1872, | 1903,1913 |  |

|  |  |  |  |
|---|---|---|---|
|  | 1878,1903 |  |  |
| Pennsylvania | 1725,1783, 1787,1791, 1816,1847, 1868,1887, 1896,1919 | 1682,1721, 1750,1794, 1795 | 1874 |
| Rhode Island | 1762,1798, 1902 | 1762,1776, 1821,1858, 1885 |  |
| South Carolina | 1802,1823 | 1802,1890, 1903 | 1901 |
| South Dakota | 1890,1907 | 1913 |  |
| Tennessee | 1850,1855, 1895,1901 | 1867,1899 | 1899 |
| Texas | 1839,1899, 1876,1901 |  |  |
| Utah | 1864,1875, 1888,1901 | 1901 |  |
| Vermont | 1876,1882, 1891,1894, 1895,1900 | 1865,1882, 1919 |  |
| Virginia | 1629,1879, 1901 | 1623 | 1887 |
| Washington | 1861,1862, 1867,1881, 1881,1883, 1886,1907 | 1896 |  |
| West Virginia | 1875,1899, 1901,1909 | 1925 |  |
| Wisconsin | 1883,1883, 1919 | 1888,1911, 1911 |  |
| Wyoming | 1884,1893, 1900,1907, 1919 |  |  |
| TOTAL STATES | 49 | 39 | 15 |
| TOTAL LAWS | 195 | 92 | 17 |

SOURCE: Duke Center for Firearms Law, https://firearmslaw.duke.edu/repository/search-the-repository/; HeinOnline. Note that the unit of analysis here is the law, not the state, though they are arrayed by state for the sake of clarity.

**EXHIBIT C**

# EXHIBIT C

# GUNPOWDER STORAGE/USE LAWS

## ALABAMA

1848 Ala. Acts 121–22, An Act To Prevent the Storage of Gun-powder in Larger Quantities Than One Hundred Pounds Within the City of Mobile, § 1.
It shall not be lawful for the Corporation of the City of Mobile, or any person or persons, to receive or keep, or have on storage in any building of any kind within three miles of the Mobile River, or Bay, gun-powder or gun-cotton or any explosive material, in larger quantities than one hundred pounds, unless the same be kept on one of the islands in the Mobile river or bay, in the neighborhood of the city of Mobile, but then the same shall not be kept at any point within the distance of one mile of the eastern bank of said river.

Robert C. Brickell, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly Approved February 28, 1887; with Such Statutes Passed at the Session of 1886-87, as are Required to Be Incorporated Therein by Act Approved February 21, 1887; and with Citations of the Decisions of the Supreme Court of the State Construing the Statutes Page 93, Image 103 (Vol. 2, 1887) available at The Making of Modern Law: Primary Sources.  1887
Storing Gunpowder in Town Limits, § 4093. Storing Gunpowder in city or town. – Any person who keeps on hand, at any one time, within the limits of any incorporated city or town, for sale or for use, more than fifty pounds of gunpowder, must, on conviction, be fined not less than one hundred dollars.

## ALASKA

Alaska - Territorial Legislature, First Regular Session 1, 1913, 157-59
CHAPTER 63.
(S. B. No. 41.)
AN ACT to prohibit the transportation of explosives and other dangerous articles on vessels or vehicles carrying passengers for hire.
Be it enacted by the Legislature of the Territory of Alaska:
Section 1. That on and after the passage of this act it shall be unlawful to transport, carry or convey any dynamite, gunpowder, nitro-glycerine, naptha, benzine, gasoline, crude or refined petroleum, or other like explosive burning fluids, or like dangerous articles on any vessel or vehicle of any description operating in the Territory of Alaska, or on the rivers or other waters thereof, when such vessel or vehicle is carrying passengers for hire: Provided, that refined petroleum may be carried on said vessels or vehicles when the same is put in good iron-bound casks, barrels, or boxes, in metallic cans, or vessels carefully packed in boxes, the said casks, barrels, or boxes being plainly marked upon the heads thereof with the name of the manufacturer, the name of the article, and the temperature at which the same will ignite, which must not be less than one hundred and ten (110) degrees Fahrenheit, and the empty barrels, casks, boxes in which said refined oil was carried may be returned to place of shipment by the vessels or vehicles upon which it was originally transported.

2

Sec. 2. Every package containing explosives or other marked dangerous articles when presented to the master, conductor, or proprietor of any vessel or vehicle for shipment shall have plainly marked on the outside thereof the contents thereof, and it shall be unlawful for any person to deliver, or cause to be delivered, to any vessel or vehicle engaged in commerce by land or water in the Territory of Alaska, or to carry upon any such vessel or vehicle any explosives or other dangerous articles under any false or deceptive marking, description, invoice, shipping order, or other declaration, or' without informing the agent of such carrier of the true character thereof at or before the time such delivery or carriage is made. Whoever shall knowingly violate, or cause to be violated, any provision of this section, or the preceding section, shall be deemed guilty of a misdemeanor and punished by a fine not exceeding two thousand ($2,000) dollars or imprisonment not exceeding eighteen (18) months or both.

Sec. 3. When the death or bodily injury of any perjury son is caused by the explosion of any article named in this act while the same is being placed on any vessel or vehicle to be transported in violation thereof, or while the same is being transported, or while the same is being removed from such vessel or vehicle, the person knowingly placing, or aiding, or permitting the placing of such articles upon any such vessel or vehicle to be transported, shall be imprisoned not more than ten (10) years.

Sec. 4. That nothing in the provisions of this act shall prohibit the transportation of gasoline or any of motive power the products of petroleum on any motor-boat or vessel for use as a source of motive power on such motor-boat or vessel.

Approved, April 29, 1913.


**ARKANSAS**

E.W. Rector, Digester, Digest of the Laws and Ordinances of the City of Hot Springs, with the Constitution of the State of Arkansas, General Incorporation Laws of the State and Amendments Thereto, Applicable to the Cities of the First-Class, and in Force on the 1st of January, 1887 Page 61, Image 258 (1887) available at The Making of Modern Law: Primary Sources. 1886 [Ordinances of the] City of Hot Springs, §131. That no person shall carry gun powder, giant powder, dynamite, nitro-glycerine or blasting powder on any vehicle in any part of the city, unless the same shall be secured in kegs, boxes or canisters, sufficiently close to prevent the grains thereof from falling out, and be laid upon or covered over with sheets of canvas or other cloth, and such vehicles shall not be allowed to remain on the streets or sidewalks for more than one hour while containing such gun powder or explosives above mentioned. § 132. That it shall be unlawful to erect or build a powder magazine, or a magazine for any of the explosives mentioned in this ordinance, in the city, within three hundred yards of any other building; and, Provided, That in no case shall it be lawful to build or erect any such magazine in the city unless the same be erected in a safe and secure way, and under permission of the council of the city.


**CALIFORNIA**

1851 Cal. Stat. 360–61, An Act to Reincorporate the City of San Francisco, § 13.
To regulate the location of slaughter-houses, markets, stables, and houses for the storage of gun-powder and other combustibles.

3

1855 Cal. Stat. 27, Laws of the State of California, pt. 10.
To provide for the prevention and extinguishment of fires and to organize and establish fire companies.

1875 Cal. Stat. 628, Statutes of California.
[T]o prohibit the establishment and maintenance of such slaughter-houses, or the storage of gunpowder and other combustibles and explosive substances within the incorporated limits of the city.

## COLORADO

The Revised Statutes of Colorado: as Passed at the Seventh Session of the Legislative Assembly, Convened on the Second Day of December, A.D. 1867. Also, the Acts of a Public Nature Passed at the Same Session, and the Prior Laws Still in: Together with the Declaration of Independence, the Constitution of the United States, the Organic Act, and the Amendments Thereto Page 606, Image 606 (1868) available at The Making of Modern Law: Primary Sources.  1868
Towns and Cities: Article III. General Powers of Trustees, §1. The board of trustees of every such town shall have control of the finances, and all the property, real and personal, belonging to the corporation; and shall likewise have power within the limits of the town: . . . Seventh, To provide regulations for the prevention and extinguishment of fires; to prevent the erection of wooden buildings within prescribed limits; to regulate the construction of chimneys, furnaces and fire-places; to regulate the storage of gunpowder, gun-cotton, nitro-glycerine, tar, pitch, resin, and other combustible or inflammable materials, and to prescribe the places the places and manner of storing the same.

Thomas M. Patterson, The Charter and Ordinances of the City of Denver, as Adopted Since the Incorporation of the City and Its Organization, November, 1861, to the First Day of February, A.D., 1875, Revised and Amended, Together with an Act of the Legislature of the Territory of Colorado, in Relation to Municipal Corporations Page 135, Image 135 (1875) available at The Making of Modern Law: Primary Sources. 1875
[Ordinances] of the City of Denver, § 12. No person shall keep at his place of business or elsewhere within this city a greater quantity of gunpowder or gun-cotton than twenty-five pounds at one time, and the same shall be kept in tin or copper canisters or cases containing not to exceed five pounds in each and in a situation remote from fires, lighted lamps and candles, and from which they may easily be removed in case of fire; and no person or persons shall sell or weigh any gunpowder or guncotton after the lighting of lamps in the evening unless in sealed canisters or cases; and no person shall be allowed to keep nitro-glycerine in any part of said city. A violation of any of the provisions of this section shall subject the offender to a fine not less than ten dollars nor exceeding one hundred dollars. § 13. It shall be lawful for the Mayor or any member of the City Council, the Chief of Police or police officers or Chief or Assistant Chief Engineer, when any of them shall have cause to suspect that any gunpowder, gun-cotton or nitro glycerine is concealed or kept within the city, in violation of the provisions of this ordinance, to search any place in said city for the purpose of determining whether any gunpowder, gun-cotton or nitro-glycerine is concealed or kept as aforesaid. Any person who shall obstruct or hinder any such officer, making search in the execution of his duties under this section, shall forfeit and pay to said city for each offense a sum not less than ten dollars nor more than one hundred dollars.

4

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 355, Image 355 (1886) available at The Making of Modern Law: Primary Sources. 1886
Vehicles for Transporting Powder, Sec. 14. No wagon, dray, cart or other vehicle loaded, in whole or in part, with gunpowder or gun-cotton, shall be permitted to stand or remain on any street, alley, highway or place in said city, except when unavoidably detained, and every magazine, safe, box or keg used for storing or transporting, and all vehicles employed in hauling gunpowder or gun-cotton within the city, shall have the word "Powder" painted upon both sides of the same in large letters.

1913 Colo. Sess. Laws 156, To Amend . . . the Revised Statutes of Colorado for 1908, Concerning Powers of Incorporated Towns and Cities, ch. 53, §1.
The city council, or board of trustees in towns, shall have power to regulate or prevent the storage and transportation of gunpowder, tar, pitch . . . or any of the products thereof, and other combustible or explosive material, within the corporate limits, and prescribe the limits within which any such regulations shall apply. Also to regulate the use of lights in stables, shops and other places, and to prevent the building of bonfires; and also to regulate or prevent the storage of gunpowder and other high explosives within the corporate limits and other high explosives within the corporate limits, or within one mile of the outer boundaries thereof. Also, to regulate and restrain the use of fireworks, fire crackers, torpedos, Roman candles, sky-rockets and other pyrotechnic displays.

## **CONNECTICUT**

Charter and By-Laws of the City of New Haven, November, 1848 Page 48-49, Image 48-49 (1848) available at The Making of Modern Law: Primary Sources.  1827
A By-Law Relative to the Storage and Sale of Gunpowder. Be it ordained by the Mayor, Aldermen, and Common Council of the city of New Haven, in Court of Common Council assembled, 1st. That hereafter no person or persons shall, within the limits hereafter described, either directly or indirectly, sell and deliver any gunpowder, or have, store, or keep any quantity of gunpowder greater than one pound weight, without having obtained a license for that purpose from said Court of Common Council, in the manner herein prescribed. Provided, that nothing in this by-law contained shall be construed to prevent any person or persons from having or keeping in his or their possession, a greater quantity of powder than one pound weight, during any military occasion or public celebration, while acting under any military commander, and in obedience to his orders, or under permission and authority therefor, first had and obtained of the Mayor or some one of the Aldermen of said city. Provided also, That any person or persons purchasing gunpowder, shall be allowed between the rising and setting of the sun, sufficient time to transport the same from any place without said limits, through said limits to any place without the same. 2d. The Court of Common Council aforesaid, shall have power, on application to them made, to grant and give any meet person or persons a license to sell gunpowder, and for that purpose to have, store, and keep gunpowder in quantity not exceeding at any one time seven pounds weight, and that well secured in a tin canister or canisters, and at such place or places within said limits and for such term of time, not exceeding one year, as said Court shall deem fit; which license shall be signed by the Clerk of said Court, and shall be in the form following, viz — Whereas the Mayor, Aldermen, and Common Council of the City of New Haven, in Court of

5

Common Council convened, have approved of ___, as a suitable and proper person to keep, store, and sell gunpowder within the City of New Haven: We do therefore give license to said ____, to sell gunpowder at (describe the place) and for the purpose aforesaid, to have, keep, and store in said building any quantity of gunpowder not exceeding at any one time seven pounds weight, until the ___ day of ___. Dated, Signed per order, A.B., Clerk. For which license the person receiving the same shall pay the City Clerk twenty-five cents; and the same shall be by said Clerk recorded at full length. And before any license shall be given as aforesaid, the person or persons receiving the same shall pay to the Clerk aforementioned, for the use of said city, a sum after the rate of five dollars per annum. 3d. Before any shall proceed to sell or to store or keep gun-powder by virtue of any such license so given as aforesaid, such person shall put in a conspicuous place upon the front part of the building in which such powder is to be stored or sold, a sign, with the following words plainly and legibly inscribed thereon, viz., "Licensed to keep Powder," and shall continue the same during the time he shall keep, store, or sell gunpowder in said building. 4th section repealed. 5th. That no person or persons shall put or receive or have any quantity of gunpowder on board of any steamboat, for transportation therein in any of the waters within the limits of said city. 6th. If any person shall sell, keep, or store any gunpowder within the limits aforesaid, contrary to the true intent and spirit of this by-law, or without complying with all the pre-requisites enjoined thereby; or if any person or persons shall put or receive, or have on board of any steamboat for transportation on any of the waters within the limits of said city, any quantity of gunpowder, such person or persons shall forfeit and pay the sum of thirty-four dollars, one half to him who shall give information, and the other half to the use of the city.

Simeon Eben Baldwin, Revision of 1875. The General Statutes of the State of Connecticut, with the Declaration of Independence, the Constitution of the United States, and the Constitution of Connecticut Page 539, Image 590 (1874) available at The Making of Modern Law: Primary Sources. 1832
Qui-Tam Suits and Forfeitures, § 27. Every person, who shall refuse to remove any gun-powder in his charge, when legally requested by the selectmen of the town in which the same is deposited or kept, or who shall not deposit and keep it at the place legally designated by them, shall forfeit fifty dollars.

1832 Conn. Acts 391, An Act Regulating the Mode Of Keeping Of Gunpowder, Chap. 25, § 1-2. § 1 . . . [I]t shall be lawful for the select-men of each and every town within this State, or a majority of them, by their order, in writing, directed to the owners or persons having charge of the same, to cause to be removed to some safe and convenient place within said town, and within such time, as in said order may be prescribed, and quantity of gunpowder so deposited or kept, within the limits of said town, as in the opinion of said select-men, or a majority of them, may endanger the persons or dwellings of any individuals whatsoever. Whereupon it shall become the duty of the persons thus notified, to remove the said gunpowder within the time, and to the place specified in said order. § 2. That in case the said gun powder shall not be removed pursuant to said order, as is hereinbefore prescribed the said select-men, or a majority of them, may remove or cause the same to be removed to such place within said town, as in their opinion shall be deemed safe and convenient. And they shall have and retain a lien upon the said powder for all necessary expenses in removing and keeping the same.

6

1859 Conn. Acts 62, An Act In Addition To And In Alteration Of "An Act For Forming And Conducting The Military Force," chap. 82, § 7.
It shall be the duty of the quarter-master general, annually, to inspect the armories and gun houses of the several companies, and also the rooms occupied by the regimental bands; and, on or before the first day of November, to make to the adjutant-general a full report of the condition of the same, and what companies are entitled to the allowance for armory rent; for which services he shall be allowed the sum of nine cents for every mile of necessary travel.

1862 Conn. Acts 76, An Act In Addition To "An Act to Provide For the Organization And Equipment Of A Volunteer Militia, And To Provide For the Public Defense," chap. 68, § 34.
It shall be the duty of the brigade inspectors of the respective brigades, annually, in the month of October or November, to carefully inspect the armories and gun houses of the companies belonging to their brigades, and also the rooms occupied by regimental bands; and, on or before the first day of December, to make a full report to the quartermaster general of the condition of the same, and of the number of arms and equipments of the state, deposited in such armories and gun-houses . . . .

1864 Conn. Acts 95, An Act In Addition To And In Alteration Of "An Act Relating To The Militia," chap. 73, § 8.
It shall be the duty of the quartermaster general to provide a suitable armory for each company of active militia, upon a certificate from the adjutant general, that such company has organized according to law, and has made requisition for an armory, through the commanding officer of said company, as a drill room and place to preserve its arms and equipments; and also to provide for the expenses of cleaning and keeping in good repair the said arms and equipments, in such manner as he may prescribe.

Charter and Ordinances of the City of Bridgeport: as Amended and Adopted Page 194 (1874) available at The Making of Modern Law: Primary Sources. 1874
An Ordinance Relative to Gunpowder and Explosive Substances. Be it ordained by the Common Council of the City of Bridgeport, § 1. No person shall have, or keep for sale or for any other purpose, within the limits of this city, any quantity of gunpowder or gun-cotton, exceeding one pound in weight; no person shall have, keep for sale, use, or other purpose, within the city limits, any quantity of nitro-glycerine, or other explosive substances or compounds exceeding six ounces, without special license thereof from the common council. No person shall transport any gunpowder through said city without a permit first had and obtained from the fire marshal, and in accordance with such rules and regulations as may be established by said fire marshal. No person shall, within said city, place, receive, or have any gunpowder on board of any steamboat used for the carrying of passengers, with intent to transport the same therein.

1901 Conn. Pub. Acts 602, § 20.
The warden and burgesses, when assembled according to law, shall have power to make, alter, repeal, and enforce such bylaws, orders, ordinances, and enactments as they deem suitable and proper, not inconsistent with this resolution or contrary to the laws of this state or of the United States, for the following purposes: . . . to license, regulate, or prohibit the manufacture, keeping for sale, or use of fireworks, torpedoes, firecrackers, gunpowder, petrolemn, dynamite, or other

explosive or inflammable substance, and the conveyance thereof through any portion of the borough . . . .

## DELAWARE

1841 Del. Laws 198, A Supplement to the Act Entitled "An Act for Establishing the Boundaries of the Town of Dover, and for Other Purposes Therein Mentioned, § 2.
And be it enacted, That it shall be the duty of the said commissioners, justices and constable to suppress, extinguish and prevent all bonfires from being lighted or kept up on the public square of the said town: and to suppress and prevent the firing of guns, crackers or squibs, by boys or others, within the limits of the said town.

1852 Del. Laws 216, § 27.
to regulate the storage of gunpowder, or any other dangerously combustible matter.

1865 Del. Laws 930, An Act to Prevent the Loading of Gunpowder Within Certain Distances of Railroads, chap. 554, § 1.
That it shall be unlawful for any person or persons to load gunpowder of any kind into cars on any railroad in this State, within one hundred yards of the bed of the regular track used in carrying passengers, and upon conviction of any person engaged in participating in any way in loading or putting gunpowder of any kind into cars standing within one hundred standing within one hundred yards of the regular bed of the railroad engaged in carrying passengers in this State, he shall forfeit and pay to the State a fine of one thousand dollars and be imprisoned for the term of six months, at the discretion of the Court.

W.B. Hvland, Wilmington City Code. The Ordinances of the City of Wilmington, Delaware. Also, the Original Borough Charter, the Charter of the City of Wilmington, and the Acts of the Legislature, Now in Force Relating to the City Page 689, Image 689 (1885) available at The Making of Modern Law: Primary Sources. 1885
[Wilmington] City Ordinances, § 2. For the purpose of supplying retailers of gunpowder within the City of Wilmington, it shall and may be lawful to introduce the same in kegs, containing not more than twenty-five pounds each, carefully enclosed in good bags, or by putting a sheet of canvas under and around the said kegs, sufficient to prevent the gunpowder from scattering from the said carriage, wagon or other vehicle in which it is conveyed, and no one carriage or other vehicle shall contain, at any one time, more than ten of the above described kegs of gunpowder, and if any gunpowder shall be brought into this city, except in the manner and in the quantity herein set forth, and contrary to the provisions of this ordinance, the person or persons owing the said gunpowder, and the person or persons, so conveying the same shall, for each and every such offense, forfeit and pay the sum of five hundred dollars, one moiety to be paid into the city treasury and the other moiety to the person informing and prosecuting the offender to conviction. Provided, That this section shall not extend to that part of the Christiana river included within the city limits; vessels loaded with powder being free to pass in said river along the city front.

1901 Del. Laws 399, Of Ciries and Towns, § 8.

8

. . . The council may also pass ordinances to . . . regulate the storage of gunpowder or any other dangerous or combustible materials . . . .

## FLORIDA

1838 Fla. Laws 70, An Act To Incorporate the City of Key West, § 8.
Be it further enacted, That the common council of said city shall have power and authority to prevent and remove nuisances . . . to provide safe storage of gunpowder . . . .

1887 Fla. Laws 164-165, An Act to Establish the Municipality of Jacksonville Provide for its Government and Prescribe its Jurisdiction and Powers, chap. 3775, § 4.
The Mayor and City Council shall within the limitations of this act have power by ordinance to . . . regulate the storage of gun-powder, tar, pitch, resin, saltpetre, gun cotton, coat oil, and other combustible, explosive and inflammable material . . . .

1901 Fla. Laws 262, § 33.
That the Council shall have power to prohibit and suppress all gambling houses, bawdy houses and disorderly houses; any exhibition, show, circus, parade or amusement contrary to good morals, and all obscene pictures and literature; to regulate, restrain or prevent the carrying on of manufactories dangerous in increasing or producing fires; to regulate the storage of gunpowder, tar, pitch, rosin, saltpetre, gun-cotton, coal-oil and all other combustibles, explosives and inflammable material . . . .

## GEORGIA

1900 Ga. Laws 201, § 15.
Be it further enacted, That the town council of said town shall have power and authority . . . to regulate the keeping and selling of dynamite, gunpowder, kerosene and all other hazardous articles of merchandise.

## HAWAII

Lawrence McCully, Compiled Laws of the Hawaiian Kingdom Page 86-87, Image 93 (1884) available at The Making of Modern Law: Primary Sources.  1884
Of the Safe Keeping of Gunpowder, § 354. The Minister of the Interior may make such regulations for the storing, keeping and transportation of gunpowder, in any town of the kingdom, as he may think the public safety requires; and no person shall store, keep, or transport any gunpowder, in any other quantity or manner than is prescribed in such regulations. § 355. Whoever shall violate any such regulations, shall be fined for each offense, not less than twenty, nor more than one hundred dollars. § 356. All gunpowder introduced into, or kept in any town contrary to said regulations, may be seized by any sheriff, or any other officer of police, and the same shall be forfeited for the benefit of the public treasury. § 357. Any person injured by the explosion of any gunpowder, in the possession of any person contrary to the regulations prescribed by the Minister of the Interior, may have an action for damages against the person having custody or possession of the same, at the time of the explosion, or against the owner of the same, if cognizant of such neglect. § 358. All sheriffs, and other officers of police, shall have

9

authority to enter any building, or place, to search for gunpowder supposed to be concealed there contrary to law; and any Police or District Justice, may grant a search warrant for that purpose. § 359. No regulations for the safe keeping of gunpowder shall take effect until they have been published three weeks successively in some newspaper in the town, or by posting up attested copies of them in three conspicuous places in such town.

1903 Haw. Sess. Laws 55, ch. 8, § 25.
To adopt such rules and regulations within the County with regard to the keeping and storing of gun powder, Hercules powder, giant powder, kerosene or coal oil, benzoin, naptha or other explosive or combustible material, as the safety and protection of the lives and property of individuals may require.

1933 Haw. Sess. Laws 38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 6.
The possession of all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn, or to carriage as merchandise in a wrapper from the place of purchase to the purchaser's home, place of business or place of sojourn, or between these places and a place of repair, or upon change of place of business, abode, or sojourn, except as provided in Sections 5 and 8; provided, however, that no person who has been convicted in this Territory or elsewhere, of having committed or attempted a crime of violence, shall own or have in his possession or under his control a pistol or revolver or ammunition therefor. Any person violating any provision of this section shall be punished by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one year, or by both.

## IDAHO

1863 Id. Sess. Laws 634, To Incorporate the City of Idaho in Boise County, § 5.
Said mayor and common council shall have full power and authority . . . to regulate the storage of gunpowder and other combustible materials . . . .

1897 Id. Sess. Laws 89, § 2, pt. 18.
To regulate the storage and sale of gun powder, or other combustible material, and to prevent by all possible and proper means, danger or risk of injury or damage by fire arising from carelessness, negligence or otherwise.

1901 Id. Sess. Laws 117, 120, § 37.
The Council of Boise City has full power and authority within Boise City . . . To regulate the storage and sale of gunpowder, dynamite, giant powder, nitro-glycerine, oil and other combustible material, and prevent their manufacture in the city, and to prevent by all possible and proper means, danger or risks of injury or damage by fire arising from carelessness, negligence or otherwise.

## ILLINOIS

1855 Ill. Laws, 25, An Act To Incorporate the Town of Daville, § 16.

10

[The town council shall have the power] To regulate the storage of tar, pitch, rosin, gun-powder and other combustible materials.

1869 Ill. Laws 17, § 10.
[The Town council shall have power and authority] to regulate the storage of gunpowder and other combustible materials.

Revised Ordinances of the City of Galesburg, the Charter and Amendments, State Laws Relating to the Government of Cities and Appendix Page 122-123, Image 127-128 (1869) available at The Making of Modern Law: Primary Sources. 1869
Revised Ordinances [of Galesburg, Ill.], Gunpowder-Fires, Fire-Arms, § 1. The keeping for sale or selling gunpowder, without a license therefor, is prohibited, and no license shall be issued allowing the keeping in store more than twenty-five pounds of gun powder at any one time, unless kept in some secure magazine or fire-proof powder house, located at least one hundred feet from any other occupied building, and when kept in a store or place for retail it shall be kept in tin or other metallic canisters or cases, and in a part of the building remote from any fire, lamp, candle or burning matter liable to produce explosion, and whoever shall violate this section, or any provision of it, shall be subject to a penalty of twenty dollars. § 2. Each person licensed to sell gunpowder shall keep a sign, with the words "Gunpowder for Sale," in plain letters, in some conspicuous place in the front of the building where such powder is kept. And no sales of gunpowder, except in unopened cans shall be sold after night, and any person convicted of violation of any of the provisions of this section shall be subject to a penalty of ten dollars. § 3. Whoever shall bring or cause to be brought into the city any gunpowder concealed in any box or other package, or in any package marked as containing other articles, in which such powder is contained, shall be subject to a penalty of twenty-five dollars. §4. The carrying gunpowder through the streets or other public places, in a careless or negligent manner, or the remaining with such powder in any place longer than necessary for the transportation of the same from one place to another, shall subject the party offending to a penalty of not less than five dollars. . .

1908 Ill. Laws 40-41, Regulate Storage of Combustibles–Fireworks, ¶1334, pt. 65.
To regulate and prevent storage of gunpowder, tar, pitch, resin, coal oil, benzine, turpentine, hemp, cotton, nitro-glycerine, petroleum, or any of the products thereof, and other combustible or explosive material, and the use of lights in stables, shops and other places, and the building of bon-fires; also to regulate and restrain the use of fireworks, fire crackers, torpedoes, Roman Candles, sky rockets and other pyrotechnic displays.

## **INDIANA**

1836 Ind. Acts 77, An Act to Prevent Disasters on Steam Boats, § 7. 1836
That when gunpowder is shipped on board a steam boat, which shall at all times by stowed away at as great a distance as possible from the furnace, and written notification thereof shall be placed in three conspicuous parts of the boat; and in the event of such notification not being so exhibited, then for any loss of property or life for which the powder may be deemed the cause, the owner shall be liable . . . .

11

The Revised Statutes of the State of Indiana, Passed at the Thirty-Sixth Session of the General Assembly; Also, Sundry Acts, Ordinances, and Public Documents Directed to be Printed Along with the Said Statutes: To Which are Prefixed the Constitution of the United States and of the State of Indiana Page 485-486, Image 499-500 (Vol. 1, 1852) available at The Making of Modern Law: Primary Sources. 1852
Towns, § 22. The board of trustees shall have the following powers, viz: . . .Third. . . to regulate the storage of gun-powder, and other dangerous materials;

W.G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855
Ordinances [of Jeffersonville], § 3, pt. 10. It shall also be a nuisance and unlawful: . . . To keep in any one building more than twenty five pounds of gun powder, except in a powder house or Magazine, or to keep any quantity of gun powder for sale except in some metallic vessel and having the words "gun powder" in letters at least three inches long always affixed in some conspicuous place on the house in which it is kept.

The Charter, General Ordinances, &c., of the City of Evansville Page 230, Image 230 (1871) available at The Making of Modern Law: Primary Sources. 1871
General Ordinances [of the City of Evansville], § 23. It shall not be lawful for any person to keep within the limits of the city any gun or blasting powder, in any quantity greater than twenty-five pounds at one time; and it shall not be lawful to keep twenty-five pounds of such powder, or any less quantity, in any other vessel than a tin canister, with a proper cover or stopper, and labelled with the words "gunpowder;" nor shall it be lawful for any person to sell any such powder after twilight, or by candle or gas light.

1879 Ind. Acts 210, An Act To Amend the Thirtieth Section of an Act Entitled "An Act Granting The Citizens Of The Town Of Evansville, In The County Of Vanderburgh," pt. 9.
To regulate the keeping and conveying of gunpowder, and all other combustible and dangerous materials, and the use of candles and lights in barns and stables.

The General Ordinances of the City of Indianapolis. Containing also, Acts of the Indiana General Assembly so far as they Control Said City, to which Prefixed a Chronological Roster of Officers fro, 1832 to 1895 and Rules Governing the Common Council. Revision of 1895 Page 230, Image 312 (1895) available at The Making of Modern Law: Primary Sources. 1895
Laws and Ordinances [of the City of Indianapolis], § 12. The Chief Fire Engineer is hereby required to search any building standing in a compact portion of the city, and in which there shall be cause to suspect the keeping of gun-powder in a quantity greater than twenty-five pounds; and in case of discovery of the same, in such quantity, it shall be seized by such Engineer and removed to some safe place; and it shall be his duty to prosecute the owner or occupant of the building before the Mayor [Police Judge]; and the defendant, upon being convicted of having committed the offense, shall be fined in any sum not exceeding fifty dollars nor less than five dollars, and he shall also be adjudged to pay the costs of the removal of the powder. § 13. Any person who shall keep, or knowingly suffer to be kept, in any building, any quantity of gun-powder greater than twenty-five pounds, or shall aid in or have knowledge of, such keeping, without giving immediate notice thereof to said Engineer or Marshal [Superintendent of Police], or to some member of said Council on conviction of such offense before the Mayor [Police

12

Judge], shall be fined in any sum not less than one dollar nor more than ten dollars, for every day during which gunpowder shall be stored or kept. § 14. All gunpowder, kept for retail, in quantities less than twenty-five pounds, shall, at all times, be kept in a canister of tin or other metal, securely covered from danger of fire; or, if the same be kept in a cask or other combustible vessel, such cask or vessel shall be enveloped in a close leather bag. Whoever shall keep any gunpowder for retail in said city in any other manner than as prescribed in this section, on conviction of such offense before said Mayor [Police Judge], shall be fined in any sum not less than one dollar nor more than ten dollars, for every day during which the same shall have been so kept. § 15. If any person shall transport gunpowder through the compact portion of said city in a greater quantity than one hundred pounds, or without having the casks containing the same either enveloped in close leather bags or conveyed in a close-covered carriage, on conviction of such offense before the Mayor [Police Judge], he shall be fined in any sum not less than twenty dollars nor more than fifty dollars.

1901 Ind. Acts 206, Public Comfort and Health, § 4077.
For the purpose of this paragraph jurisdiction is given such city four miles form the corporate limits . . . To regulate or prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzene, turpentine, hemp, cotton, nitroglycerine, dynamite, giant powder, petroleum, gasoline or gas, or any product thereof or any other explosive or combustible material or any material which may seem dangerous.

**IOWA**

1838 Iowa Acts 449, An Act to Prevent Disasters on Steam Boats, Navigating the Waters Within the Jurisdiction of the Territory of Iowa, §§ 11-12.
§ 11. It shall be the duty of the master, and officers, of any steam boat carrying gunpowder, as freight, to store the same in the safest part of the vessel, and separate and apart from articles liable to spontaneous combustion, and where, in discharging the cargo, it will not be necessary to carry any lighted lamp, torch, or candle, and the master and officers failing to comply with the provisions of this section, shall forfeit one hundred dollars each . . . . § 12. It shall not be lawful for any person, or persons, to put, or keep any gun powder on any steam boat, without first giving the master, or officers, notice thereof, and any person, or persons, so offending, shall be liable to pay the sum of one hundred dollars . . . .

Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 72-73, Image 72-73 (1856) available at The Making of Modern Law: Primary Sources.  1847
Burlington City Ordinances, An Ordinance to Regulate the Storage and Sale of Gunpowder in the City of Burlington, § 1. Be it ordained by the city Council of the city of Burlington, That it shall not be lawful for any merchant, trader, or other person, to retail or deliver gun-powder in said city in the night time, under a fine of five dollars. §2. It shall not be lawful for any such person to keep for sale or other purposes in said city, in his place of business, more than twenty-five pounds of gun-powder at any one time, and then only in a safe canister. § 3. It shall not be lawful for any person whatsoever to store away gun-powder for safe keeping, in any quantity whatever, in any ware-house, dwelling house, cellar, or other building or place, within the limits of said city, unless such house or place shall have first been designated by the city Council of

13

said city and by them approbated as a suitable place for that purpose, and then only so long as the same shall from time to time be deemed suitable by the said city Council. § 4. If any person shall violate any of the provisions of the third section of this ordinance he shall forfeit for the use of the corporation all the gun-powder which the person so violating the same may have on hand, and on conviction thereof, shall also pay a fine of one hundred dollars, and the city Marshal shall seize and remove such powder to a secure place and dispose of it by sale, and pay the proceeds, reserving costs and charges, into the city treasury.

Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 159, Image 159 (1856) available at The Making of Modern Law: Primary Sources. 1856
Burlington City Ordinances, [To Prevent Fires,] § 9. The Mayor, wharf master, or either fire warden may give such directions as either of them may think proper, relative to the location of any boat having on board gunpowder, gun cotton, hay or other combustible materials; each of said officers are hereby respectively empowered to put in force any order or direction given under this section. Any person refusing or neglecting to obey such orders or directions shall be liable to the penalty provided in the last section of this Ordinance.

The Code: Containing All the Statutes of the State of Iowa, of a General Nature, Passed at the Adjourned Session of the Fourteenth General Assembly Page 76-77, Image 88-89 (1873) available at The Making of Modern Law: Primary Sources. 1873
Cities and Incorporated Towns, Powers, § 456. They shall have power to prevent injury or annoyance from anything dangerous offensive or unhealthy, and to cause any nuisance to be abated; to regulate the transportation and keeping of gunpowder or other combustible, and to provide or license magazines for the same; to prevent and punish fast or immoderate riding through the streets; to regulated the speed of trains and locomotives on railways running over the streets or through the limits of the city or incorporated town by ordinance, and enforce the same by a fine not exceeding one hundred dollars: to establish and regulate markets; to provide for the measuring or weighing of hay, coal, or any other article of sale; to prevent any riots, noise, disturbance, or disorderly assemblages; to suppress and restrain disorderly houses, houses of ill fame, billiard tables, nine or ten pin alleys, or tables and ball alleys, and to authorize the destruction of all instruments or devices used for purposes of gaming, and to protect the property of the corporation and its inhabitants and to preserve peace and order therein.

1907 Iowa Acts 81, ch. 76, § V(e).
If there be kept, used or allowed on the within described premises benzine, benzole, dynamite, ether, fireworks, gasoline, Greek fire, gunpowder, exceeding twenty-five pounds in quantity, naptha, nitroglycerine, or other explosives, phosphorous, calcium carbide, petroleum or any of its products of greater inflammability than kerosene of lawful standard, which last named article may be used for lights and kept for sale according to law, in quantities not exceeding five barrels.

**KANSAS**

1860 Kan. Sess. Laws 137, An Act to Amend and Consolidate the Several Act Relating to the City of Lawrence, § 35, pt. 7 1860

14

To regulate the keeping and conveying of gun powder and other combustible and dangerous materials, and the use of candles and lights in barns and stables.

1915 Kan. Sess. Laws 347, An Act providing for Public Safety by Regulating the Storage Handling and Disposition of Dynamite, Giant Powder, Nitro-glycerine, Gun Cotton and Other Detonating Explosives, Providing Penalties for Violation of this Act and Repealing all Acts in Conflict Herewith, § 1.

Any person, firm or corporation, in this state, who shall sell, give away or otherwise dispose of, any dynamite, giant powder, nitro-glycerine, gun cotton or other detonating explosive, shall keep a record, in a substantially bound book, which record shall set forth the kind and amount of explosives delivered, the time of delivery, the uses and purposes for which same are delivered and the place at which it is to be used . . . .

## KENTUCKY

1806 Ky. Acts 122, An Act to Amend the Several Acts for the Better Regulation of the Town of Lexington, § 3.

Be it further enacted, That said trustees are herby authorised [sic] to make such regulations as they may deem necessary and proper, relative to the keeping of gun-powder in the said town of Lexington, and if necessary may prohibit any inhabitants of said town, from keeping in the settled parts thereof, any quantity of gun powder which might in case of fire be dangerous . . . .

Charter of the City of Covington, and Amendments Thereto up to the Year 1864, and Ordinances of Said City, and Amendments Thereto, up to the Same Date Page 148-149, Image 148-149 (1864) available at The Making of Modern Law: Primary Sources. 1864

Ordinances of the City of Covington, An Ordinance Regulating the Sale of Powder in the City of Covington, § 1. Be it ordained by the City Council of Covington, That it shall not be lawful for any person or persons to erect, within the limits of the corporation, any powder magazine, or any other building for the purpose of storing gun powder in greater quantities than is hereinafter specified; and any person violating the provision of this section, shall, on conviction before the Mayor, forfeit and pay a fine of one hundred dollars, and ten dollars for every twenty-four hours said building shall be used or occupied for the storage of more than twenty-five pounds of powder. § 2. Be it further ordained, That it shall not be lawful for any person to keep, in storage or for sale, more than one hundred pounds of powder in any one house in said city, at any one time: and that amount, or any part thereof, shall be securely and carefully kept, and closed up in a good and sufficient safe, so that it can not by any means be exposed. A violation of this section shall subject the person to a fine, on conviction, of five dollars for every offense. § 3. Be it further ordained, That no person or persons shall sell, or keep for sale, in said city, any gun powder without having first obtained a permission so to do from the Mayor of said city, who shall, before said license is granted, be fully assured and satisfied that the applicant has good and sufficient safes to keep powder in, in conformity with the second section of this ordinance; and when the Mayor is satisfied that the license may be granted, without too much risk to the community at large, he shall issue said license to the applicant, upon his paying into the City Treasury the sum of twenty dollars for one year's license, and to the Mayor fifty cents, and to the City Clerk twenty-five cents, for their certificates. Any person who shall sell any gun powder in said city from and after the passage of this ordinance, without having first obtained a license

15

therefor, shall, for each and every offense, forfeit, pay, on conviction, the sum of five dollars and costs.

1869 Ky. Acts 481, An Act to Amend and Reduce into One the Several Acts in Reference to the Town of Princeton, art. V, pt. 14.
To regulate the keeping and conveying of gun-powder and other combustible and dangerous materials.

1912 Ky. Acts 593, Regulate Storage of Explosives and Provide Against Fires, § 17.
To regulate the storage of gunpowder, rosin, tar, pitch, cotton, oil and all other explosives and combustible material, and to appoint some suitable person or persons, at seasonable times, to enter and examine such houses as they may designate, in order to ascertain whether any of such houses are in a dangerous condition with reference to fires, and to cause such as are in a dangerous condition to be immediately put in safe order and condition.

## LOUISIANA

Police Code, or Collection of the Ordinances of Police Made by the City Council of New-Orleans. To Which is Prefixed the Act for Incorporating Said City with the Acts Supplementary Thereto Page 114-116, Image 112-114 (1808) available at The Making of Modern Law: Primary Sources. 1808
[Ordinances of the City of New Orleans, An Ordinance for Preventing Fires,] Art. 15. Captains of vessels are obliged, within twenty four hours from their arrival in this port, to deposit the gun-powder they may have on board, in the powder-magazine situate on the right bank of the river, the owner paying to the keeper of the magazine a suitable compensation. All citizens are strictly forbidden to keep in their houses, or elsewhere within the city or suburbs, more than one hundred pounds of gun-powder at a time, and in case of fire, such as live near the place where it is, if they have powder in their houses, shall be obliged to throw into their wells the barrels containing the same. These dispositions must be complied with, under the penalty of a fine, not exceeding fifty dollars, to be levied on every delinquent, who shall moreover be liable to the damage that may result.

1816 La. Acts 92, An Act to Amend the Act Entitled "An Act to Incorporate the city of New Orleans" and the Act Entitled "An act to determine the mode of election of the mayor, recorder and other public officers necessary for the administartion and police of the city of New Orleans and for Other Purposes [sic], § 1.
. . . [T]he mayor and city council of the city of New Orleans shall have full power and authority . . . [T]o prevent gun powder being stowed within the walls and suburbs in such quantity as to endanger the public safety . . . .

Levi Peirce, Commissioner, The Consolidation and Revision of the Statutes of the State, of a General Nature Page 185, Image 193 (1852) available at The Making of Modern Law: Primary Sources. 1852
Crimes and Offences, Manslaughter. § 5. When gunpowder is shipped on board of a steamboat, which shall at all times be stowed away at as great a distance as possible from the furnace, a written notification of the fact shall be placed in three conspicuous parts of the boat; and in the

16

event of such notification not being so exhibited , then for any loss of property, or life, for which the powder shall be deemed the cause, the owner shall be liable to the shipper for the full amount of said loss or damage; and the captain, in the event of loss of life being the result of such accident, shall be adjudged guilty of manslaughter. § 6. Any person or persons who shall ship or put on board, or cause to be shipped or put on board of any steamboat, within this State, any gunpowder, without giving notice thereof a the time of making the shipment to the master clerk of said boat, shall be liable to a penalty of two hundred dollars, which may be sued for and recovered before any court of competent jurisdiction by the owner, captain or clerk of said boat, for his or her own use and benefit; and in case of any loss of property in consequence of gunpowder being on board of said boat, the shipper that shall have failed to give due notice, as herein required, shall be liable for all losses of property or damage done thereto, or for any injury done to any person or to their family; and in case of the loss of the life of an individual on board, in consequence of gunpowder being on board, the person of persons who shall have shipped the same, without giving due notice thereof, shall, on conviction thereof, be adjudged guilty of manslaughter, and punished accordingly.

Albert Voorhies, Ex-Justice, Revised Laws of Louisiana, Approved March 14th, 1870, with Copious References to the Acts of the Legislature from and Including the Sessions of 1870, up to and Including the Session of 1882. Second Edition Page 161, Image 171 (1884) available at The Making of Modern Law: Primary Sources. 1884

Crimes and Offences, § 949. When gunpowder is shipped on board of a steamboat it shall be stored away at as great a distance as possible from the furnace, and a written notification of the fact shall be placed in three conspicuous parts of the boat; and in the event of such notification not being so exhibited, then for any loss of property or life for which the powder may be deemed the cause, the owner and captain shall be liable to the penalty provided in the proceeding section. § 950. Any person who shall ship or put on board, or cause to be shipped or put on board of any steamboat within this State, any gunpowder, without giving notice thereof, at the time of making the shipment, to the master or clerk of said boat, shall be liable to a penalty of two hundred dollars , which may be sued for and recovered by the owner, captain or clerk of said boat, for his own use and benefit; and in case of any loss of property in consequence of gunpowder being on board of said boat, the shipper that shall have failed to give due notice as herein required, shall be liable therefor, or for any injury done to any person or to his family; and in the case of loss of life the person who shall have shipped the same without giving due notice thereof, shall, on conviction be adjudged guilty of manslaughter.

1904 La. Acts 20, § 5.

That all forfeitures and fines be imposed by the Board of Fire Commissioners, from time to time, upon any member or members of the fire department force by way of discipline, shall be paid into said pension and relief fund. That all fines imposed by the courts for infractions of City ordinances relative to fire escape, fire wells and hydrants, open hatches, oils, gunpowder, right of way of the fire apparatus through the streets, and all other laws relative to the fire department, be paid over by the City Treasurer to said pension and relief fund.

**MAINE**

17

Laws of the State of Maine; to Which are Prefixed the Constitution of the U. States and of Said State, in Two Volumes, with an Appendix Page 112-113, Image 183-184 (Vol. 1, 1821) available at The Making of Modern Law: Primary Sources. 1821
An Act for the prevention of damage by Fire, and the safe keeping of Gun Powder. § 1. Be it enacted by the Senate and House of Representatives, in Legislature assembled, That the Selectmen of each town within this State, containing not less than fifteen hundred inhabitants, be, and they hereby, are authorized and empowered to make rules and regulations, from time to time, in conformity with which, all gun powder which is or may be within such town, shall be kept, had or possessed therein; and no person or persons shall have, keep, or possess within such town, any gun powder, in any quantity, manner, form or mode, other than may be prescribed by the rules and regulations aforesaid. § 2. Be it further enacted, That any person or persons who shall keep, have or possess any gun powder, within any town, contrary to the rules and regulations which shall be established by the Selectmen of such town, according to the provisions of this Act, shall forfeit and pay a fine of not less than twenty dollars, and not exceeding one hundred dollars, for each and every offence, to be recovered by action of debt in any Court proper to try the same. § 3. Be it further enacted, That all gun powder which shall be had, kept or possessed, within any town, contrary to the rules and regulations which shall be established by the Selectmen of such town, according to the provisions of this Act, may be seized by any one or more of the Selectmen of such town, and shall within twenty days next after the seizure thereof, be libelled, by filing with any Justice of the Peace in such town, a libel, stating the time, place and cause of seizure, and the time and place when and where trial shall be had before said Justice, and a copy of said libel shall be served by the Sheriff, or his deputy, on the person or persons, in whose possession the said gun powder shall have been seized. . .

1821 Me. Laws 98-99, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, ch. 25, § 5. 1821
Be it further enacted, That it shall, and may be lawful for any one or more of the Selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefor according to law.

The Revised Ordinances of the City of Portland, 1848 Page 22, Image 22 (1848) available at The Making of Modern Law: Primary Sources. 1848
[Ordinances of the City of Portland,] Of Gunpowder, § 1. No person not licensed to keep and sell gunpowder shall keep or have in his shop, store, dwelling house or other tenement, at any one time, a larger quantity of gunpowder than one pound. § 2. No person licensed to keep and sell gunpowder shall have or keep in his store, shop, dwelling house or in any other tenement or place whatever at any one time, a larger quantity of gunpowder then twenty-five pounds. § 3. Every person licensed to keep and sell gunpowder shall provide himself with a strongly made copper chest or box with a copper cover well secured, with hinges and a lock of the same material, and the keg or canister in which said powder may be, shall be kept in said copper chest or box, which shall at all times be placed near the outer door of the building in which it is kept, in convenient place to remove in case of fire. § 4. No person shall haul unto, or lay at any wharf in the city, any vessel having on board a quantity of gunpowder exceeding twenty-five pounds, or receive gunpowder on board exceeding twenty-five pounds, without first having obtained a

18

permit from the mayor and aldermen, and said permit shall designate the wharf at which said powder may be landed, or received on board.

The Charter, Amendments, and Acts of the Legislature Relating to the Municipal Court, and the Ordinances of the City of Lewiston, Together with the Boundaries of the Several Wards, Regulations Respecting Gunpowder, and an Abstract of the Laws Relating to the Powers and Duties of Cities and Towns Page 43, Image 43 (1873) available at The Making of Modern Law: Primary Sources. 1873
Regulations Relating to Gunpowder, § 1. No person shall keep or have in any shop, store, dwelling house or tenement, in the city of Lewiston, at any one time a larger quantity of gunpowder than one pound, unless he is licensed by the mayor and aldermen to keep and sell gunpowder, or except as hereinafter provided. § 2. It shall not be lawful for any person or persons to sell any gunpowder which may at the time be within said city, in any quantity, by wholesale or retail, without having first obtained from the mayor and aldermen a license to sell gunpowder, and every license shall be written or printed, and duly signed by the mayor, on a paper upon which shall be written or printed a copy of the rules and regulations established by the city relative to keeping, selling and transporting gunpowder within said city; and every such license shall be in force one year from the date thereof, unless revoked by the mayor and aldermen; but such license may, prior to its expiration, be renewed by an endorsement thereon by the mayor, for the further term of one year, and so from year to year, provided, always, that it may at any time be rescinded or revoked by the mayor and aldermen, for good and sufficient reasons. § 3. Every person who shall receive a license to sell gunpowder, as aforesaid, shall pay for the same to the treasurer of the city the sum of three dollars, and for each renewal of the same, the sum of one dollar.

A.G. Davis, City Clerk, Charter and Ordinances, and Rules and Orders of the City Council. Revised February 1874 Page 52, Image 53 (1874) available at The Making of Modern Law: Primary Sources. 1874
City Ordinances, § 4. No person shall haul unto, or lay at any wharf in the city, any vessel having on board more than twenty-five pounds of gun-powder, nor discharge or receive on board exceeding that quantity, without having first obtained from the Mayor a permit therefor, designating the wharf at which said powder may be landed or received on board.

## MARYLAND

The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 246, Image 239 (1811) available at The Making of Modern Law: Primary Sources. 1794
1794 Md. Laws 246, Art. 32. That if any member of society shall suffer any damage by storing gunpowder in town, or breaming ships or other vessels at the wharfs, occasioned by the act, assent or direction, of such member, the insurance of such member so suffering damage, shall thereupon become void.

John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force

on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-1892, and of 1892-1893, up to the Summer Recess of 1893 Page 589, Image 598 (1893) available at The Making of Modern Law: Primary Sources. 1879

Fire – Ordinances [of Baltimore], (City Code, (1879,) Art. 20, sec. 53) § 63. All gunpowder brought within the limits of the city by land, or into the port or harbor, in any ship or vessel, other than a ship or vessel of war, shall be stored in the said magazine as aforesaid; if brought by land as aforesaid, within seventeen hours thereafter; if brought into the port or harbor as aforesaid, within forty-eight hours after the ship or other vessel thus bringing it shall have broken bulk; proved the quantity thus brought in shall exceed the weight of one quarter barrel as above defined; or being of such weight and no more, shall be well secured in tin canisters; nor shall it be lawful for any ship or vessel, other than a ship or vessel of war, bringing gunpowder into the port or harbor of Baltimore, or having gunpowder on board, in a greater quantity than the weight of the quarter barrel as aforesaid; or being of such weight and no more, not secured as above provided, to approach, lie at anchor, or moor nearer than two hundred yards to any wharf, or land within the limits of said city, or discharge, land or deliver gunpowder in a greater quantity or otherwise secured than aforesaid, at any place within the said city, than at the wharf of the magazine aforesaid. . .

1900 Md. Laws 287-88, General Powers, § 181.
The Common Council shall have power to pass all such ordinances, not contrary to the Constitution and laws of this State, as it may deem necessary to the good government of the town . . . to regulate or prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzene, turpentine, hemp, cotton, nitro-glycerine, dynamite, giant powder, petroleum, gasoline or gas, or any product thereof, or any other explosive or combustible material or any material which may seem to be dangerous.

## MASSACHUSETTS

1715 Mass. Acts 311, An Act in Addition to an Act for Erecting of a Powder-house In Boston.
…That, from and after the publication hereof, any person within the town of Boston, that shall presume to keep, in his house or Warehouse, any powder, above what is by law allowed, shall forfeit and pay, for every half-barrel, the sum of five pounds . . . That any person or persons whosoever, that shall throw any squibs, serpents, or rockets, or perform any other fireworks within the streets, . . (shall be fined).

1719 Mass. Acts 348, An Act In Further Addition To An Act For Erecting A Powder House In Boston, ch. III, § 1
… That, from and after the publication of this Act, no gunpowder shall be kept on board any ship, or other vessel, lying to or grounded at any wharf within the port of Boston. And if any gunpowder shall be found on board such ship or vessel lying aground, as aforesaid, such powder shall be liable to confiscation, and under the same penalty, as if it were found lying in any house or warehouse. And be it further enacted by the authority aforesaid, that no powder be carried through any town upon trucks, under the penalty of ten shillings per barrel for every barrel of powder so conveyed, and so proportionally for smaller cask.

20

1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent
Storage of Gun Powder within the Town of Boston, § 2
"That all cannon, swivels, mortars, howitzers, cohorns, fire arms, bombs, grenades, and iron
shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-
house, shop, or other building, charged with, or having in them any gun-powder, shall be liable
to be seized by either of the Firewards of the said Town: And upon complaint made by the said
Firewards to the Court of Common Pleas, of such cannon, swivels, mortar, or howitzers, being so
found, the Court shall proceed to try the merits of such complaint by a jury; and if the jury shall
find such complaint supported, such cannon, swivel, mortar, or howitzer, shall be adjudged
forfeit, and be sold at public auction.

1783 Mass. Acts 218, An Act in Addition to the Several Acts Already Made for the Prudent
Storage of Gun-Powder Within the Town of Boston, ch.13
The depositing of loaded arms in the houses of the town of Boston is dangerous…That if any
person shall take into any dwelling-house, stable, barn, out-house, ware-house, store, shop or
other building, within the Town of Boston, any cannon, swivel, mortar, howitzer, or cohorn, or
fire-arm, loaded with, or having gun powder in the same, or shall receive into any dwelling-
house, stable, barn, outhouse, store, warehouse, shop, or other building, within the said town, any
bomb, grenade, or other iron shell, charged with, or having gun-powder in the same, such person
shall forfeit and pay the sum of ten pounds…

Act of March 1, 1783, ch. 13, 1783 Mass. Acts, p. 218; Thomas Wetmore, Commissioner, The
Charter and Ordinances of the City of Boston: Together with the Acts of the Legislature Relating
to the City Page 142-143, Image 142 (1834) available at The Making of Modern Law: Primary
Sources. 1783
An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder
within the Town of Boston. Whereas the depositing of loaded arms in the houses of the town of
Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire
happens to break out in said town. § 1. Be it enacted by the Senate and House of Representatives
in General Court assembled and by the authority of the same, That if any person shall take into
any dwelling house, stable, barn, out house, ware house, store, shop or other building within the
town of Boston, any cannon, swivel, mortar, howitzer, cohorn, or fire arm, loaded with or having
gunpowder in the same, or shall receive into any dwelling house, stable, barn, out house, store,
ware house, shop, or other building within said town, any bomb, grenade, or other iron shell,
charged with, or having gun powder in the same, such person shall forfeit and pay the sum of ten
pounds, to be recovered at the suit of the firewards [duties of Firewards transferred to
Engineers,] of the said towns, in an action of debt before any court proper to try the same; one
moiety thereof, to the use of said Firewards, and the other moiety to the support of the poor of
said town of Boston. § 2. Be it further enacted, That all cannons, swivels, mortars, howitzers,
cohorns, fire arms, bombs, grenades, and iron shells of any kind, that shall be found in any
dwelling house, out house, stable, barn, store, warehouse, shop or other building, charged with or
having in them any gunpowder, shall be liable to be seized by either of the Firewards of said
town; and upon complaint made by the said Firewards to the Court of Common Pleas, of such
cannon, swivels, mortars, or howitzers, being so found, the Court shall proceed to try the merits
of such complaint by a jury; and if the jury shall find such complaint supported, such cannon,

21

swivel, mortar or howitzer, shall be adjudged forfeit, and sold at public auction; one half of the proceeds thereof shall be disposed of to the Firewards, and the other half to the use of the poor of the town of Boston. And when any fire arms, or any bomb, grenade, or other shell, shall be found in any house, out house, barn, stable, store, ware house, shop or other building, so charged, or having gun powder in the same, the same shall be liable to be seized in manner aforesaid; and on complaint thereof, made and supported before a Justice of the Peace, shall be sold and disposed of, as is above provided for cannon.

1801 Mass. Acts 507, An Act to Provide for the Storing and Safe Keeping of Gun Powder in the Town of Boston, and to Prevent Damage from the Same, ch. XX
§1… That all Gun Powder imported and landed at the port of Boston, shall be brought to and lodged in the Powder House or Magazine in said town, and not elsewhere, on pain of confiscation of all Powder put or kept in any other house or place…

Joseph Barlow Felt Osgood, The Charter and Ordinances of the City of Salem, Together with the Acts of the Legislature Relating to the City: Collated and Revised Pursuant to an Order of the City Council Page 67-68, Image 77-78 (1853) available at The Making of Modern Law: Primary 1847
[Ordinances of Salem,] Fire, § 18. By an act passed March, 6 1847, the inhabitants of any town, and the government of any city in this Commonwealth, may order than no gun-cotton, or other substance prepared, like it, for explosion, shall be kept within the limits of such town or city, excepting under the regulations and penalties that were then applicable by law to gunpowder; and if it shall be considered necessary for public safety, they may restrict the quantity to be so kept to one-fifth of the weight of gunpowder allowed by law in each case provided for. . . § 22. The inhabitants of every town may order, that no gunpowder shall be kept in any place, within the limits of such town, unless the same shall be well secured in tight casks or canisters; and that no gunpowder above the quantity of fifty pounds, shall be kept or deposited in any shop, store, or other building, or in any ship or vessel which shall be within the distance of twenty-five rods from any other building or wharf; that no gunpowder, above the quantity of twenty-five pounds, shall be kept or deposited in any shop, store, or other building, within ten rods of any other building; and that no gunpowder, above the quantity of one pound, shall be kept or deposited in any shop, store, or other building, within ten rods of any other building in such town, unless the same be well secured in copper, tin, or brass canisters, holding not exceeding five pounds each, and closely covered with copper, brass or tin covers.

Municipal Register of the City of Lawrence. 1870 Page 185, Image 185 (1870) available at The Making of Modern Law: Primary Sources. 1870
[Ordinances of Lawrence,] Concerning Fires, § 4. The city council may order that no gunpowder shall be kept within the city, except in tight casks or canisters; that not more than fifty pounds thereof shall be kept in any building within twenty-five rods of any other building, or if within ten rods, then not more than twenty-five pounds; nor more than one pound in any place, unless in copper, tin or brass canisters holding not more than five pounds each, and closely covered.

Simeon Eben Baldwin, The Public Statutes of the Commonwealth of Massachusetts, Enacted November 19, 1881; to take effect February 1, 1882. with the Constitutions of the United States and the Commonwealth, A Schedule of Acts and Resolves and Parts of Acts and Resolves

22

Expressly Repealed, Tables Showing the Disposition of the General Statutes and of Statutes Passed since the General Statutes, Glossary, and Index Page 381, Image 425 (1882) available at The Making of Modern Law: Primary Sources. 1882

Gunpowder, § 29. Gunpowder manufactured in this commonwealth shall be put into strong and tight casks containing twenty-five pounds, fifty pounds, or one hundred pounds each, or well secured in copper, tin, or brass canisters holding not more than five pounds each, and closely covered with copper, brass, or tin covers. § 30. Each cask containing gunpowder manufactured within this commonwealth, or brought into the same by land or by water and landed, shall be marked on the head with black paint in legible characters with the word gunpowder, the name of the manufacturer, the weight of the cask, and the year in which the powder was manufactured; and each canister of gunpowder shall be marked with the word gunpowder. § 31. Whoever knowingly marks a cask of gunpowder with the name of any person other than the manufacturer of the same, or changes gunpowder from a cask marked with the name of one manufacturer into a cask marked with the name of another manufacturer, shall for each offence forfeit a sum not exceeding twenty dollars.

1904 Mass. Acts 310-11, An Act to Authorize the Fire Marshal's Department of the District Police to Make Regulations Relative to Explosives and Inflammable Fluids, ch. 370, §§ 1-2
§ 1. The powers conferred on city councils of cities and selectmen of towns by chapter one hundred and two of the Revised Laws, to regulate the keeping, storage, use, manufacture or sale of gunpowder, dynamite or other explosives and inflammable fluids, shall hereafter be exercised by the fire marshal's department of the district police. § 2. The fire marshal's department of the district police may make regulations for the keeping, storage, use, manufacture or sale of gunpowder, dynamite or other explosives, crude petroleum or any of its products, or other inflammable fluids; and may prescribe the materials and construction of buildings to be used for any of the said purposes.

1919 Mass. Acts 139, An Act Relative to the Issuance of Search Warrants for the Seizure of Firearms, Weapons and Ammunition Kept for Unlawful Purposes, ch. 179, §§ 1-2
§ 1. A court or justice authorized to issue warrants in criminal cases may, upon complaint under oath that the complainant believes that an unreasonable number of rifles, shot guns, pistols, revolvers or other dangerous weapons, or that an unnecessary quantity of ammunition, is kept or concealed for any unlawful purpose in a particular house or place, if satisfied that there is a reasonable cause for such belief, issue a warrant to search such property. § 2. If the court or justice finds that such property is kept for an unlawful purpose, it shall be forfeited and disposed of as the court or justice may by order direct.

## MICHIGAN

1841 Mich. Pub. Acts 30, An Act To Amend An Act Entitled "An Act To Incorporate The Village of Ypsilanti, And The Acts Or Acts Amendatory Thereof," §14.
And the said common council shall have power . . . relative to the keeping and sale of gunpowder in said village[.]

23

Sanford Moon Green, The Revised Statutes of the State of Michigan: Passed and Approved May 18, 1846 Page 200-201, Image 216-217 (1846) available at The Making of Modern Law: Primary Sources.

Municipal Regulations of Police, Gunpowder, § 3. The inhabitants of every township or incorporated village may, at any regular meeting, order that no gunpowder shall be kept in any place within the limits of such township or village, unless the same shall be kept in tight casks or canisters; and that no gunpowder above the quantity of fifty pounds, shall be kept or deposited in any shop, store or other building, or in any ship or vessel, which shall be within the distance of twenty-five rods from any other building, or from any wharf; that no gunpowder above the quantity of twenty-five pounds, shall be kept or deposited in any shop, store or other building, within ten rods of any other building; and that no gunpowder above the quantity of one pound, shall be kept or deposited in any shop, store or other building, within ten rods of any other building, unless the same shall be well secured in copper, tin or brass canisters, holding not exceeding five pounds each, and closely covered with copper, brass or tin covers. § 4. Upon complaint being made on oath to any justice of the peace, by any township or village officer, that he has probable cause to suspect that gunpowder is deposited or kept within the limits of the township or village, contrary to any such order, such justice may issue his warrant, directed to any constable of such township, or the marshal of such village, ordering him to enter any shop, store or other building, or vessel specified in said warrant, and there to make diligent search for the gunpowder suspected to have been deposited or kept as aforesaid, and to make return of his doings to such justice forthwith. § 5. If any person shall commit either of the offences mentioned in the two preceding sections, he shall forfeit a sum not exceeding twenty dollars; but the two preceding sections shall not extend to any manufactory of gunpowder, nor in any case prevent the transportation thereof through any township, or from one part of any township to another part thereof.

1867 Mich. Pub. Acts 2d Reg. Sess. 68, An Act To Revise The Charter Of The Village Of Hudson, § 31, pt. 12.
To regulate the buying, selling, and using of gunpowder, fire-crackers and fire-works, and other combustible materials, to regulate and prohibit the exhibition of fire-works, and the discharge of fire-crackers and fire-arms, and to restrain the making or lighting of fires in the streets and other open spaces in said village.

1869 Mich. Pub. Acts 2d Reg. Sess. 158, A Act to Amend An Act Entitled "An Act To Incorporate The Village Of Howell," § 15.
[T]he common council shall have full power and authority to make by laws and ordinances . . . relative to keeping and sale of gunpowder, nitroglycerine, and all other dangerous and explosive articles, or burning fluids.

1879 Mich. Pub. Acts 43-44, Local Acts, An Act To Amend . . . An Act To Incorporate The Village Of Constantine, § 12
The common council shall have full power and authority to . . . regulate the keeping and sale of gunpowder in said village[.]

24

1901 Mich. Pub. Acts Session Laws 154, Local Acts, An Act to Revise and Amend the Charter of the City of Muskegon . . . , tit. 7, § 24, pt. 10.
[T]o direct the location of slaughter houses, markets and buildings for the storing of gunpowder and other combustible and explosive substances[.]

## MINNESOTA

W.P. Murray, City Attorney, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 40, Image 46 (1884) available at The Making of Modern Law: Primary Sources. 1884
[Ordinances of the City of Saint Paul, The Common Council – Its General Powers and Duties § 19. To provide for the receipt, storage, transportation, safe keeping and dealing and traffic in gun powder, gun cotton, petroleum, kerosene or other dangerous, explosive or inflammable oils or substances within said city, or within one mile of the corporate limits thereof, and to provide for the summary condemnation or destruction of any of said articles as may be kept, stored, dealt in, transported through or received in said city, contrary to such ordinance s said city may enact for the safety of life and property therein.]

1921 Minn. Laws 742, An Act to Provide for the Incorporation, Organization and Government of Cities of Ten Thousand (10,000) Inhabitants or Less, (Cities of the Fourth Class), ch. 462, § 41, pt. 37.
To regulate and prevent the storage of gunpowder, dry pitch, resin, coal oil, benzene, naptha, gasoline, turpentine, hemp, cotton, nitroglycerine or any products thereof, and other combustible or explosive materials within the city, and the use thereof[.]

## MISSISSIPPI

1817-18 Miss. Laws 220, Supplemental To An Act To Erect The Town Of Netchez Into A City To Incorporate The Same, § 2. 1818
That said president and select men, shall and may, from time to time, pass ordinances to regulate the keeping, carting and transporting gun powder or other combustible or dangerous materials[.]

George Poindexter, The Revised Code of the Laws of Mississippi: In Which are Comprised All Such Acts of the General Assembly, of a Public Nature, as were in Force at the End of the Year 1823: with a General Index Page 608, Image 612 (1824) available at The Making of Modern Law: Primary Sources.  1824
Summary of Private and Local Acts[, Port Gibson] . . . . Said president and selectmen may pass ordinances to regulate the keeping, carting and transporting gunpowder, or other combustible or dangerous materials, and, the use of lights in stables, to remove or prevent the construction of any fireplace, hearth or chimney, stoves, ovens, boilers, kettles or apparatus used in any house, building, manufactory or business which may be dangerous in causing or promoting fires; to appoint one or more officers, at reasonable times, to enter into and examine all dwelling houses, lots, yards and buildings, in order to discover whether any of them are in a dangerous state. . .

25

1884 Miss. Laws 412, An Act To Amend And Reduce One Act The Act Incorporating The City Of Columbus And The Several Acts Amendatory Thereto, ch. 390, § 24, pt. 16.
To regulate and prevent the storage of cotton, hay, gun powder, oil or any other combustible, explosive or inflammable [sic] material or substance; or of any material or substance offensive to public comfort or injurious to health.

## MISSOURI

1822 Mo. Laws 41-42, An Act To Incorporate Inhabitants Of The Town Of St. Louis, § 12.
The Mayor and Board of Aldermen, shall have power by ordinance, to . . . regulate . . . the storage of gun powder, tar, pitch, rosin, hemp, cotton and other combustible materials[.]

The Acts of Assembly Incorporating the City of St. Louis, and the Ordinances of the City, Which are Now in Force Page 35, Image 35 (1828) available at The Making of Modern Law: Primary Sources.  1823
[Ordinances of the City of St. Louis,] An Ordinance Containing Regulations as to Gun Powder, § 1. Be it ordained by the Mayor and board of Aldermen of the city of St. Louis, That no store or shopkeeper, or other person or persons, shall keep, at the same time, in any house, shop, store, cellar or warehouse, or in any boat, more than thirty pounds of gunpowder, within the limits of the City. § 2. And be it further ordained, That the aforesaid quantity of powder allowed to be kept within the limits of the city, shall be kept in close kegs or canisters, and be kept in a good and safe place. § 3. And be it further ordained, That if any person or persons shall offend against, or violate this ordinance, he, she, or they, so offending, shall, upon conviction thereof, pay a fine of twenty dollars. § 4. And be it further ordained, That no boat owner, shall be allowed to keep more than one keg of powder on board his boat, within three days of his arrival, and shall be liable to the same fine as if the powder had been kept in any store or ware-house. § 5. And be it further ordained, That the Mayor or any Alderman, is hereby authorized, as often as he shall be informed, upon oath, of probable cause to suspect any person or persons whomsoever, of concealing or keeping within the said city, any quantity of gunpowder over and above thirty pounds, as aforesaid, to issue a search warrant to examine into the truth of such allegation or suspicion, and search any place whatever therein.

1873 Mo. Laws 215, An Act To Amend The Charter Of The Town Of Canton . . . , § 10.
The Board of Trustees shall have power and authority to . . . regulate the storage of gunpowder, tar pitch, rosin and other combustible materials[.]

J.H. Johnston, The Revised Charter and Ordinances of the City of Boonville, Mo. Revised and Collated, A.D. 1881 Page 44, Image 44 (1881) available at The Making of Modern Law: Primary Sources. 1881
Ordinances of the City of Boonville, General Powers of the Mayor and Board of Councilmen, § 13. To regulate the storage of gun powder and other combustible materials; and generally provide for the prevention of fires within the city.

M.J. Sullivan, The Revised Ordinance of the City of St. Louis, 1887. To Which are Prefixed the Constitution of the United States, Constitution of the State of Missouri, a Digest of Acts of the General Assembly Relating to the City, the Scheme for the Separation of the Governments of the

26

City and County of St. Louis and the Charter of the City Page 689-690, Image 698-699 (1887) available at The Making of Modern Law: Primary Sources. 1887
Revised Ordinances [of the City of St. Louis], Gunpowder, § 688. Not exceeding five pounds of gunpowder shall be allowed to be kept by any person or persons in any store, dwelling, building, or other place within the city, except that retailers or venders of gunpowder in small quantities may for that purpose keep any quantity not exceeding thirty pounds; provided, that the same shall also be kept in tin or metal canisters or stone jars, with good and closely fitted and well secured covers thereon; provided, also, that those parties now having magazines within the limits of the city are hereby allowed to store in such magazines such quantities of gunpowder as may be necessary for their business; provided, further, that giant powder, dynamite and nitro-glycerine shall not be stored in any place within the limits of the city, except in magazines as now located. § 689. Every retailer of gunpowder, giant powder, dynamite, nitro-glycerine or blasting powder, shall place on the building containing the same, over, or at the side of the front door thereof, a sign with the words "Powder for sale," printed thereon, in letters at least three inches in height, and shall notify the commissioner of public buildings in which portion of said store the said powder or powders are placed, which notice shall be kept of record in the said commissioner's office.

1909 Mo. Laws 165, Cities, Towns and Villages: Cities of the First Class, § 55, pt. 50 (L).
To direct and prohibit the management of houses for the storing of gunpowder and other combustibles and dangerous materials within the city; to regulate the keeping and conveying the same; and the use of candles and other lights in stables and other like houses.

1913 Mo. Laws 437, Municipal Corporations: Cities of the Second Class, § 8, pt. 61.
To regulate the use and storage of explosives – To regulate, restrain and prevent the discharge of firearms, fireworks, rockets or other explosive materials and substances in the city and to regulate the keeping, storage and use of powder, dynamite, guns, guncotton, nitroglycerine, fireworks and other explosive materials and substances in the city, or within two miles of the limits thereof.

**MONTANA**

1887 Mont. Laws 68, Extraordinary Session, An Act to Amend an Act Entitled An Act Concerning the Storage of Gunpowder, § 2.
No person, company, or corporation shall store, deposit or keep within the limits of any city, town or village, gunpowder, nitroglycerine, guncotton, dynamite, and other dangerous or powerful explosives exceeding fifty pounds, and no magazine or storehouse where such explosives are stored or kept, shall hereafter be located nearer than one-half mile from such city, town or village; Provided, That this act shall not be construed to prevent the keeping of a reasonable supply of powder in any safe place at a mine.

1903 Mont. Laws 135-36, An Act to Amend Section 908 of Chapter I Title VIII Part IV Division I of the Civil Code of Montana, and to Repeal Section 689 of the Penal Code, ch. 66, § 1.
If any railroad corporation within this State shall . . . transport within this State on any of its passenger cars, any oil of vitrol, gun powder, Lucifer matches, nitro glycerine, glynon oil, nytroleum or blasting oil, or nitrates oil, or powder mixed with any such oil, or fiber saturated

27

therewith, or duolin or giant powder, or blasting powder, or any other goods in a dangerous nature . . . shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined for the first offense in the sum of one thousand dollars, and for the second violation of the same provision, two thousand dollars, and for every other and further violation of any provision of which it has been twice before found guilty, a sum not less than five nor more than ten thousand dollars.

## NEBRASKA

1867 Neb. Laws 68, An Act to Incorporate Nebraska City, § 25.
The city council shall regulate the keeping and sale of gun-powder within the city[.]

1897 Neb. Laws 162, An Act To Amend . . . Compiled Statutes of 1895 for the Government of Cities, ch. 14, § 24, pt. 38.
To . . . regulate and prevent the transportation of gun powder or other explosives or combustible articles, tar, pitch, rosin, coal, oil, benzine [sic], turpentine, hemp, cotton, nitroglycerine, dynamite, petroleum, or any other productions thereof and other materials of like nature[.]

1901 Neb.Laws 154, An Act, to Incorporate Cities of the First Class, Having Less Than Forty Thousand and More Than Twenty-Five Thousand Inhabitants and Regulating Their Duties, Powers and Governments, ch. 17, § 33.
To regulate or prohibit the transportation and keeping of gun powder, oils or other combustible and explosive articles.

## NEVADA

1877 Nev. Stat. 87-88, An Act to Amend an Act Entitled "An Act Entitled An Act To Incorporate The Town Of Gold Hill," Approved February Twenty-one, Eighteen Hundred and Seventy Three, ch 48, § 1, pt. 5.
The Board of Trustees shall have power . . . [t]o regulate the storage of gunpowder and other explosive or other combustible material.

1901 Nev. Stat. 102-03, An Act to Incorporate the Town of Reno, ch. 97, § 17, pt. 6.
The City Council Shall have power . . . [t]o regulate or prohibit the storage of gunpowder and other explosives or combustible materials within the city.

## NEW HAMPSHIRE

1786 N.H. Laws 383-84, An Act to Prevent the Keeping of Large Quantities of Gun-Powder in Private Houses in Portsmouth, and for Appointing a Keeper of the Magazine Belonging to Said Town.
That if any person or persons, shall keep in any dwelling-house, store or other buildings, on land, within the limits of said Portsmouth, except the magazine aforesaid, more than ten pounds of gun-powder at any one time, which ten pounds shall be kept in a tin canister properly secured for that purpose, such person or persons shall forfeit the powder so kept, to the firewards of said Portsmouth to be laid out by them in purchasing such utensils as they may judge proper for the

28

extinguishing of the fire; and the said firewards are hereby directed and empowered to seize, and cause the same to be condemned in any Court of Law or Record proper to hear and try the same, to be disposed of for the purchase aforesaid. And the offender shall also forfeit and pay a fine for the use of the poor of said Portsmouth, equal to the value of the powder so kept in any store, dwelling-house, or building; which fine, shall be sued for and recovered by the overseers of the poor of said Portsmouth, for the use of said poor, in any Court of Law proper to try the same.

1793 N.H. Laws 464-65, An Act to Prevent the Keeping of Large Quantities of Gun-Powder in Private Houses in Portsmouth, and for Appointing a Keeper of the Magazine Belonging to Said Town.
That if any person or persons, shall keep in any dwelling-house, store or other building on land, within the limits of said Portsmouth, except the magazine aforesaid, more than ten pounds of gun-powder at any one time, which ten pounds shall be kept in a tin canister, properly secured for the purpose, such person or persons shall forfeit the powder so kept to the firewards of said Portsmouth to be laid out by them in purchasing such utensils as they may judge proper for the extinguishing of the fire; and the said firewards are hereby directed and empowered to seize, and cause the same to be condemned in any court of record proper to hear and try the same, to be disposed of for the purchase aforesaid. And the offender shall also forfeit and pay a fine for the use of the poor of said Portsmouth, equal to the value of the powder so kept in any store, dwelling-house, or building; which fine, shall be sued for and recovered by the overseers of the poor of said Portsmouth, for the use of said poor, in any ourt of law proper to try the same.

Asa Fowler, The General Statutes of the State of New-Hampshire; to Which are Prefixed the Constitutions of the United States and of the State. With a Glossary and Digested Index Page 206, Image 227 (1867) available at The Making of Modern Law: Primary Sources. 1854 Safe-Keeping of Gunpowder, § 1. The board of firewards, if any, or the selectmen of any town, may establish rules and regulations from time to time relative to the times and places at which gunpowder may be brought to or carried from such town, by land or water, and the time when and the manner in which the same may be transported through the same. § 2. Any two firewards, police officers, or selectmen may search any building in the compact part of any town, and any vessel lying in any port, in which they have cause to suspect that gunpowder in a greater quantity than twenty-five pounds is kept or stored; and in case a greater quantity shall be found, shall seize the same as forfeited. § 3. Any person who shall keep or knowingly suffer any quantity of gunpowder greater than twenty-five pounds to be kept or stored in any such building or vessel, or aid or assist in keeping or storing the same, or shall know that the same is so stored or kept, and shall not forthwith inform one of the firewards, police officers, or selectmen thereof, shall forfeit a sum not more than five dollars nor less than one dollar, for every day the same shall be so stored or kept.

## **NEW JERSEY**

Charles Nettleton, Laws of the State of New-Jersey Page 549, Image 576 (1821) available at The Making of Modern Law: Primary Sources. 1811
An Act to Regulate Gun-Powder Manufactories and Magazines within this State. §1. Be it enacted by the Council and General Assembly of this state, and it is hereby enacted by the authority of the same, That from and after the first day of May next, no person or persons

29

whatsoever, shall be permitted within this state to erect or establish, or cause to be erected or established, any manufactory which shall be actually employed in manufacturing gun-powder, either by himself or any other person, either on his own land or the land of another, within the distance of a quarter of a mile from any town or village, or house of public worship; or within the distance of a quarter of a mile from any dwelling-house, barn or out-house, without the consent, under hand and seal, of all and every the owner or owners of such dwelling-house, barn or outhouse, as aforesaid; and any person so offending shall be guilty of a misdemeanor, and on conviction thereof shall be fined any sum not exceeding two thousand dollars: Provided, That nothing in this section shall be so construed as to prevent the completing, rebuilding or repairing any powder-mill now erected or erecting in this state on the site on which the same shall be now erected or erecting. § 2. And be it enacted, That no person or persons hereafter shall be permitted to erect or cause to be erected any powder magazine within this state, either upon his own land or the land of any other person, and actually deposit gun-powder therein, within the distance of half a mile from any town or village, house of public worship, dwelling-house or out-house. And any person so offending shall be guilty of a misdemeanor, and on conviction thereof shall be fined not exceeding the sum of two thousand dollars.

1837 N.J. Laws 373, An Act to Incorporate the City of Trenton, § 24. 1837
That it shall and may be lawful for the common council of the said city, in common council convened, to pass such ordinances as to them shall seem meet . . . for regulating the keeping and transporting of gunpowder or other combustible or dangerous materials.

1857 N.J. Laws 461, Incorporate the Township of Orange
18. And be it enacted, That no person or persons residing within the aforesaid limits, shall be allowed to keep more than two pounds of gunpowder, except in a magazine at least fifty feet distant from any building, under a penalty of five dollars for every violation of this section, collectable with costs before any justice of the peace of the county; and all fines arising under this, and the preceding section, shall go one-half to the informant and one-half to the treasurer of the corporation.
Approved March 20, 1857.

1886 N.J. Laws 358, An Act to Regulate the Manufacture and Storage of Gun Powder, Dynamite and Other Explosives, § 1. 1886
. . . nothing in this act shall be so construed as to prevent any person or persons from storing in any fire-proof magazines any quantity of gun powder or blasting powder not exceeding in quantity two thousand pounds, within the said distance of one thousand feet of a public road; and provided, further, that the prohibition in this act contained shall not apply to any establishment, storehouse or building heretofore erected and used for the manufacturing, storing or keeping of any of said explosives.

1902 N.J. Laws 294, An Act Relating to, Regulating and Providing for the Government of Cities, ch. 107, § 14, pt. 33.
. . . [T]o regulate or prohibit the manufacture, sale, storage or use of fireworks and the use of firearms in such city; to regulate or prohibit the manufacture, sale, storage, keeping, or conveying of gunpowder, kerosene, benzine [sic], gasoline, burning fluid, nitro-glycerine,

30

dynamite, camphene, coal oil, spirit gas, petroleum and other dangerous or explosive materials, and the use of candles and lights in barns, stables and other buildings[.]

## NEW MEXICO

1851 N.M. Laws 114, An Act Incorporating the City of Santa Fe, § 7.
The board of common councilors shall have power to pass By-Laws and Ordinances . . . to prohibit the firing of fire-arms . . . to regulate and prescribe the quantities and places in which gun-powder or other dangerous combustible[s] may be kept[.]

1909 N.M. Laws 333-34, An Act Providing for the Incorporation of Villages in the Territory of New Mexico, ch. 117, § 8.
That villages incorporated under this act shall have the power by ordinance, to prevent the presence within their limits of anything dangerous, offensive, unhealthy or indecent and to cause any nuisance to be abated; to regulate the transportation, storage and keeping of gun-powder and other combustibles and explosives, oils, gasoline and other articles which may endanger the property of such village[.]

## NEW YORK

Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City Page 39, Image 40 (1763) available at The Making of Modern Law: Primary Sources.  1763
A Law for the Better Securing of the City of New York from the Danger of Gun Powder. Be it therefore ordained by the Mayor, Aldermen and Commonality of the City of New York, convened in Common Council, and it is hereby ordained by the authority of the same, the from and after the publication hereof, no person or persons whatsoever inhabiting within the said city, within two miles of the city-hall of the said city, shall presume to keep in any house, shop, cellar, store-house, or other place within the said city (his majesty's garrison and magazine only excepted) any more or greater quantity of gunpowder at one time, than twenty-eight pounds weight (except in the magazines or powder house aforesaid) under the penalty of ten pounds current money of New York, for every offense.

1784 N.Y. Laws 627, An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York, or on Board of Vessels within the Harbour Thereof, ch. 28.
. . . [F]rom and after the passing of this act, it shall not be lawfull [sic] for any merchant, shopkeeper, or retailer, or any other person, or persons whatsoever, to have or keep any quantity of gun powder exceeding twenty-eight pounds weight, in any one place, less than one mile to the northward of the city hall of the said city, except in the public magazine at the Fresh-water, and the said quantity of twenty-eight pounds weight, which shall be lawfull [sic] for any person to have and keep at any place within this city, shall be seperated [sic] into four stone jugs or tine canisters, which shall not contain more than seven pounds each, on pain of forfeiting all such gunpowder, and the sum of fifty pounds for every hundred weight, and in that proportion for a greater or lesser quantity, and upon pain of forfeiting such quantity which any person may

31

lawfully keep as aforesaid, and which shall not be seperated [sic] as above directed, with full costs of suit to any person or persons, who will inform and sue for the same . . . as well for the recovery of the value of such gun powder in specie, as for the penalty aforesaid, besides costs, and to award, effectual execution thereon . . .

Meinrad Greiner, Laws and Ordinances, Ordained and Established by the Mayor, Aldermen, and Commonalty, of the City of New-York, in Common Council Convened for the Good Rule and Government of the Inhabitants and Residents of the Said City Second Edition Page 25-26, Image 25-26 (1799) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of New York, To Regulate the Keeping of Gun-powder in the City of New York: Whereas the better to secure the inhabitants of the city of New York from the dangers they have been exposed to by large quantities of gun powder being kept in houses, shops and stores within the said city, a suitable and convenient magazine or powder house is erected and built at Inclemberg in the seventh ward for the reception of all the gunpowder which is or shall be imported into the said city: Therefore, Be it ordained by the Mayor, Aldermen and Commonality of the City of New York in Common council convened, That no person or persons shall keep in any house, shop store house or other place within two miles of the city hall of the said city (Magazines of powder of the United States or of this state only excepted) any more or greater quantity of gun powder at one time than twenty-eight pounds, and that in four separate stone jugs or in tin canisters, each of which shall not contain more than seven pounds weight of gun-powder, under the penalty of twelve dollars and fifty cents for every offense.

William G. Bishop, Charter of the City of Brooklyn, Passed June 28, 1873. As Subsequently Amended. With the Charter of April 17, 1854, and the Amendments Thereto, and Other Laws Relating to Said City. Also, the Ordinances of the Common Council of the City of Brooklyn, as Codified and Revised and Adopted Dec.10, 1877 Page 192, Image 196 (1877) available at The Making of Modern Law: Primary Sources. 1877
[Ordinances of the City of Brooklyn, Miscellaneous Provisions,] § 15. It shall not be lawful for any person to have kegs of gunpowder, or cause to be kept in any store, storehouse, manufactory or other building within the city of Brooklyn, any quantity of gunpowder exceeding twenty-five pounds in weight, under the penalty of the forfeiture of the gun-powder and an additional penalty of fifty dollars; and all gunpowder which may be kept in any building within said city shall be kept in tin canisters, and said canisters shall, at all times, be kept securely closed, except when necessary for its delivery on sale.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 184, Image 185 (1885) available at The Making of Modern Law: Primary Sources. 1885
Ordinances of [the City of Syracuse,] Gunpowder, Etc. § 1. No person except when on military duty in the public service of the United States, or of this State, or in case of public celebration with permission of the mayor or common council, shall have, keep or possess in any building, or carriage, or on any dock, or in any boat or other vessel, or in any other place within the city limits, gun-powder, giant- powder, nitro-glycerine, dynamite or other explosive material, in quantity exceeding one pound, without written permission from the chief engineer of the fire department. Any person violating any of the provisions of this section shall be liable to a fine of

32

not less than ten nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor more than three months, for each offense.

1900 N.Y. Laws 1174, An Act to Amend the Penal Code, Relative to the Manufacture of Gunpowder and Other Explosives, ch. 494, § 1.  1900
Keeping gunpowder unlawfully. – A person who makes or keeps gunpowder, nitro-glycerine, or any other explosive or combustible material, within a city or village, or carries such materials through the streets thereof, in a quantity or manner prohibited by law or by ordinance of the city or village, is guilty of a misdemeanor. A person who manufactures gunpowder, dynamite, nitro-glycerine, liquid or compressed air or gases, except acetylene gas and other gases used for illuminating purposes, naptha, gasoline, benzine [sic] or any explosive articles or compounds or manufactures ammunition, fireworks or other articles of which such substance are component parts in a cellar, room or apartment of a tenement or dwelling house or any building occupied in whole or in party by persons or families for living purposes, is guilty of a misdemeanor. And a person who, by the careless, negligent, or unauthorized use or management of gunpowder or other explosive substance, injures or occasions the injury of the person or property of another, is punishable by imprisonment for not more than two years. Any person or persons who shall knowingly present, attempt to present, or cause to be presented or offered for shipment to any railroad, steamboat, steamship, express or other company engaged as common carrier of passengers or freight, dynamite, nitro-glycerine, powder or other explosives dangerous to life or limb, without revealing the true nature of said explosives or substance so offered or attempted to be offered to the company or carrier to which it shall be presented, shall be guilty of a felony, and upon conviction, shall be fined in any sum not exceeding one thousand dollars and not less than three hundred dollars, or imprisonment in a state prison for not less than one nor more than five years, or be subject to both such fine and imprisonment.

## NORTH CAROLINA

1901 N.C. Sess. Laws 338-39, Priv. Laws, An Act to Amend the Charter of the Town of Laurinburg, ch. 124, § 14.
That among the powers conferred upon the Commissioners are the following: . . . to control the manner in which dynamite, blasting powder, gunpowder and other explosives and highly inflammable and dangerous substances may be stored and sold[.]

## NORTH DAKOTA

The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto Page 1289, Image 1323 (1895) available at The Making of Modern Law: Primary Sources. 1895
Keeping Explosives, § 7290. Every person who makes or keeps gunpowder, saltpeter, gun-cotton, nitroglycerine or dynamite or any compound of the same, or any fulminate or substance which is intended to be used by exploding or igniting the same, in order to produce a force to propel missiles or to rend apart substances, within any city, town or village, and any person who carries any of such explosives through the streets thereof, in any quantity or manner prohibited

33

by law or by any ordinance, by law or regulation of said city, town or village, is guilty of a misdemeanor.

1905 N.D. Laws 103, An Act for the Organization and Government of Cities, and to Provide for the Limitation of Actions to Vacate Special Assessments Heretofore Made, ch. 62, art. 4, § 47, pt. 50.
To regulate and prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzine [sic], turpentine, hemp, cotton, nitroglycerine, petroleum or any of the products thereof, and other combustible or explosive material[.]

## OHIO

1832 Ohio Laws 194-95, Local Acts vol. 31, An Act to Regulate the Keeping of Gunpowder in the City of Cincinnati, § 1.
It shall not be lawful for any person or persons to deposit or keep in any store, ware house [sic] or other building in the city of Cincinnati any greater quantity than twenty eight pounds of gunpowder at any one time, and all gunpowder which shall be deposited or kept in said city contrary to the provisions of this act or contrary to the provisions of any of the ordinances of said city shall be forfeited to the said city of Cincinnati, and may be seized and disposed of in such a manner as the city council of said city shall by ordinance prescribe.

1833 Ohio Laws 118, Local Acts vol. 32, An Act to Regulate the Keeping of Gunpowder in the County of Hamilton, § 1.
That it shall be the duty of the commissioners of the county of Hamilton, to examine on or before the first day of May next, all buildings wherein any gunpowder may be kept or stored by a greater quantity than one keg within said county and without the corporate limits of the city of Cincinnati[.]

An Act Incorporating the City of Cincinnati: And a Digest of the Ordinances of Said City, of a General Nature, Now in Force, with an Appendix Page 57-58, Image 58-59 (1835) available at The Making of Modern Law: Primary Sources. 1835
Ordinances of the City of Cincinnati, An Ordinance to Regulate the Keeping of Gunpowder, § 1. Be it ordained by the City Council of the City of Cincinnati, That no person or persons in the city of Cincinnati, shall keep, have, or possess, in any house, warehouse, shop, shed, or other building, nor in any street, side walk, lane, alley, passage, way, or yard, nor in any cellar, wagon, cary, or carriage, of any kind whatever; nor in any other place, within said city, Gun Powder, in any way or manner, other than as provided for by this ordinance; nor in any quantity exceeding twenty-five pounds, to be divided into six equal parts. § 2. Be it further ordained, That it shall not be lawful for any person or persons to sell gun powder by retail within said city, without having first obtained a license from the city council for that purpose; and every person obtaining a grant for a license to sell gun powder, shall receive a certificate of such grant from the city clerk, and pay into the city treasury, a sum not exceeding one hundred dollars, nor less than ten dollars; besides fifty cents to the Mayor for issuing the same; Provided that license be granted to not more than four persons in any one ward, and so that they be separated from each other, by at least two entire blocks or squares; and all applications for such license, shall be in writing, stating the situation where such gunpowder is to be kept. § 3. Be it further ordained, That every

34

person who obtains a license as aforesaid to retail gun powder, shall keep the same in tin canisters, well secured with good and sufficient covers; and shall place on the store or building containing the same, a sign with the words, LICENSED TO SELL GUN POWDER, Provided that nothing in this ordinance shall be so construed to prevent any person from carrying gun powder through the streets in its exportation, or to some place of deposit, without the limits of the corporation, if the same be put up in tight and well secured kegs or vessels. § 4. Be it further ordained, That it shall be the duty of the city marshal and his deputies, and any of the fire wardens, on any day, (Sundays excepted) between sun rising and setting, to enter into any house or building, or any other place within said city, where gun powder is kept or suspected to be kept, and examine the premises, and if they or either of them shall find any gun powder, contrary to the provisions of this ordinance, they or either of them shall seize such powder, together with the vessel containing the same, in the name of the city of Cincinnati; and the officer making such seizure, if he be other than the marshal, shall forthwith report such seizure to the marshal, who shall immediately take charge of the gun powder so seized, as if in case of seizure by himself; and in either case he shall immediately take charge of the gun powder so seized; to be conveyed to some safe place of deposit without the limits of the city. And the marshal shall, moreover, forthwith report such seizure to the mayor, with the name of the person in whose possession such gun powder was seized, or with the name of the owner, if his name be known, whereupon the mayor shall issue a citation against the owner, if known and within his jurisdiction, and if not, then against the person whose possession such gunpowder was seized, citing the defendant to appear on a day to be named in such citation, and show cause, if any he have, why the gun powder so seized should not be forfeited to the city, and a fine imposed agreeably to the provisions of this ordinance; upon which citation proceedings shall be had as in other cases upon the city ordinances, and if a final judgment of forfeiture be pronounced against the gun powder so seized, the marshal shall proceed to sell and dispose of the same for the benefit of said city, after having given three days notice of such sale, by advertisement in at least three public places in the city, and at one of the market houses on market day, to the highest bidder; and the net proceeds thereof shall be credited on the execution against the person fined for keeping the same contrary to the provisions of this ordinance: Provided, that, of any lot of powder seized according to the provisions of this ordinance, not more shall be sold by the marshal than will pay the fine and costs of suit and expense attending the seizure.

W.H. Gaylord, Standing Rules of Order of the Cleveland City Council: With a Catalogue of the Mayors and Councils of the City of Cleveland, from Its Organization, April, 1836, to April, 1871, and Officers of the City Government for 1872 Page 128, Image 152 (1872) available at The Making of Modern Law: Primary Sources.  1856
[Ordinances of the City of Cleveland,] Gunpowder, An Ordinance to Establish a Magazine, and Regulate the Sale of Powder. Be it ordained by the City Council of the city of Cleveland… § 3. No person shall keep within the city, any quantity of gunpowder exceeding twenty-five pounds, or of gun cotton exceeding five pounds, for a longer period than twenty-four hours, except in the powder magazine; and said twenty-five pounds shall be kept in tin or copper canisters, neither of which shall contain over seven pounds and shall be labelled "gunpowder," and be kept near the front or rear entrance of every building in which it is contained. § 4. Any person violating the provisions of this ordinance shall, on conviction thereof, be fined in any sum not exceeding twenty dollars.

35

1878 Ohio Laws 199, An Act to Amend, Revise, and Consolidate the Statutes Relating to Municipal Corporations, to Be Known as Title Twelve, Part One, of the Act to Revise and Consolidate the General Statutes of Ohio, div. 3, ch. 3, § 1, pt. 14.
To regulate the transportation and keeping of gunpowder, and other explosive and dangerous combustibles, and to provide or license magazines for the same.

1902 Ohio Laws 23, Extraordinary Sess.,  An Act to Provide for the Organization of Cities and Incorporated Villages . . . and to Repeal All Sections of the Revised Statutes Inconsistent Herewith, § 7, pt. 11.
To regulate the transportation, keeping and sale of gunpowder and other explosives or dangerous combustibles and materials and to provide or license magazines for the same.

**OKLAHOMA**

1903 Okla. Sess. Laws 107, An Act to Amend Sections . . . of the Statutes of Oklahoma, 1893, Relating to Cities[,] Towns and Villages, and for Other Purposes, ch. 7, art. 1, § 4.
The board of trustees shall have the following powers. . . to regulate the storage of gunpowder and other materials[.]

**OREGON**

1862 Or. Laws 9, An Act to Incorporate the City of Albany, § 6.
[To] regulate the storage of gun powder and other combustible materials, and the use of candles, lamps and other lights in shops, stables and other places[.]

Charter of the City of Portland, Street and Fire Department Laws, Ordinances, Regulations &C. Page 225-227, Image 226-228 (1872) available at The Making of Modern Law: Primary Sources. 1872
Ordinances of the City of Portland, To Regulate the Storage and Sale of Gunpowder, and Other Explosive Materials, § 1. No person shall keep for sale any gunpowder in any building, store or place in the City of Portland, without having first obtained a license therefor. § 2. The license for selling gunpowder shall be five dollars per quarter, to be issued as other licenses are issued under the provisions of Ordinance 984, entitled "An Ordinance to impose and regulate licenses in the City of Portland." § 3. No person shall receive, keep or store, or aid or assist any person in receiving, keeping or storing gunpowder in a larger quantity than five pounds, in or into any building, or upon any premises, unless the person receiving, keeping or storing the same is duly licensed to sell gunpowder. § 4. No person or persons duly authorized to sell gunpowder, as hereinbefore provided, shall keep, store, or have in any one place more than twenty five pounds of powder, which shall be kept in any air-tight metallic vessel marked with the word "Gunpowder," in plain Roman letters, not less than three inches in height, and of proportionate width, which vessel shall be placed or kept at all times, conspicuously in view near the entrance of the premises where kept, and convenient for removal therefrom. § 5. Upon the front of every building or premises where powder is kept in a conspicuous place a sign with the word "gunpowder" painted thereon in Roman letters, not less than three inches in height. § 6. No person shall convey, cause to be conveyed, or assist in conveying in any vehicle and gunpowder, unless the same shall be securely packed in close packages, nor unless such packages shall be

36

securely covered while on the vehicle. § 7. No vessel shall be allowed to remain at any wharf more than twenty-four hours with gunpowder on board, except such as may be kept for ship's use, and if such vessel shall be at the wharf overnight, a watchman shall be kept on duty on board all night. All gunpowder landed or placed on a wharf, sidewalk, street or public way for forwarding or shipment shall be forwarded or shipped immediately after it shall be so landed or placed. § 8. The provisions of this Ordinance shall be deemed to apply to "giant powder" "gun cotton" or any other explosive substance having an explosive power equal to that of ordinary gunpowder. § 9. Any person or persons violating any of the provisions of this ordinance, shall be deemed guilty of a misdemeanor, and on conviction before the Police Judge, shall be fined not less than ten nor more than one hundred dollars, or by imprisonment in the city jail not less than two nor more than twenty days, or both, at the discretion of the Police Judge. § 10. The officers of the Fire Department and Police are directed to see that the provisions of this Ordinance are enforced, and to make complaint before the Police Judge for the violation of its provisions.

1878 Or. Laws 136, An Act to Incorporate the Town of Independence, in the County of Polk, and State of Oregon, § 4.
[T]o regulate the storage of gunpowder and other combustible material, and the use of candles, lamps and other lights in shops, halls and other places[.]

1903 Or. Laws 31, Reg. Sess., Spec. Laws, An Act to Incorporate the City of Portland . . . , art. 4, § 73, pt. 36.
To regulate or prevent the storage, manufacture, and sale of dangerous, explosive, or combustible materials, including gunpowder, dynamite, giant powder, calcium carbide, nitroglycerine, oil, and gas, and to provide for the inspection of the same; to prevent, by all proper means, all risks of injury or damage by fire arising from negligence, or otherwise[.]

**PENNSYLVANIA**

1725 Pa. Laws 31, An Act For The Better Securing Of The City Of Philadelphia From The Danger Of Gunpowder, § 2.
No person whatever within the precincts of the city of Philadelphia aforesaid, nor within Two Miles thereof, shall, from and after the Time the Powder Store aforesaid is so erected and finished presume to keep in any House, Shop, Cellar, Store, or Place of the said City, nor within Two Miles thereof, other than the Powder Store aforesaid, any more or greater Quantity, at any one Time, than Twelve Pounds of Gun-powder, under the Penalty of Ten Pounds for every such Offence.

"An Act for the better securing the city of Philadelphia and its liberties from danger of gunpowder" Act of Dec. 6, 1783, chap. 1059, 11 Pa. Stat. 209 (Sections I and II, P.L.) 1783 (Section I, P.L.) Whereas by an act, entitled "An act for the better securing the city of Philadelphia from danger of gunpowder," passed in the year one thousand seven hundred and twenty-four, and a supplement thereto, passed in the year one thousand seven hundred and forty-seven, continuing the said act in force until altered by a future assembly, it was directed that all gun-powder brought into the port of Philadelphia should be deposited in a certain powder house therein described, under the penalty of ten pounds for every offense: And Whereas another powder house or magazine hath been erected in the said city in the public square on the south

37

side of Vine street, between the Sixth and Seventh streets from Delaware at the public expense: And whereas the said penalty of ten pounds is not deemed sufficient to deter persons from storing large quantities of gunpowder in private houses and stores, to the great danger of the inhabitants: [Section I.] (Section II, P.L) Be it therefore enacted and it is hereby enacted by the Representatives of the Freemen of the Commonwealth of Pennsylvania in General Assembly met, and by the authority of the same, That no person whatsoever, within the precincts of Philadelphia, nor within two miles thereof, shall, from and after the passing of this act, presume to keep in any house, shop or cellar, store or place whatsoever, in the said city, nor within two miles thereof, other than in the said public magazine, any more or greater quantity at any one time than thirty pounds weight of gun-powder, under the penalty of forfeiture of the whole quantity so over and above stored, together with a fine of twenty pounds for every such offense.

A Digest of the Acts of Assembly, and the Ordinances, of the Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Government of that District Page 45-47, Image 48-50 (1832) available at The Making of Modern Law: Primary Sources. 1787 [Ordinances of Kensington, Northern Liberties, An Act for Securing the City of Philadelphia and the Neighborhood Thereof from Damage by Gunpowder (1774), § 2. No person shall keep in any house, store, shop, cellar or other place within the city of Philadelphia, nor the country adjacent, within two miles of the said city, any greater quantity of gunpowder, at one time, than thirty pounds weight thereof, under the penalty of forfeiture of the whole quantity so over and above stored or kept, together with the sum of twenty pounds for every such offense. . . § 5. All gunpowder brought by land into the said city, or the adjacent country, within two miles of the said city, if above thirty pounds weight at one time, shall be immediately carried to the said magazine, and delivered to the superintendent thereof, or his deputy, within the hours hereinafter prescribed for his attendance at the said magazine, under the same penalties as if brought by water, and not delivered, as in such case is herein directed, at the said magazines. . . § 12. Any justice of the peace within the limits of the said city, and the adjacent country within two miles of the said city, on demand made by such superintendent or keeps of the said magazine, showing a reasonable cause, on oath or affirmation, may issue his warrant under his hand and seal empowering such superintendent or keeper of the said magazine to search, in the day time, any house, store, shop, cellar or other place, or any boat, ship or other vessels, for any quantity of gunpowder forbidden by this act to be kept in any place or places, and for that purpose to break open, in the day time, and such house, store, shop, cellar or other places aforesaid, or any boat, ship or other vessel, if there be occasion; and the said superintendent or keeper of the said magazine, on finding such gunpowder, may seize and remove the same, in twelve hours, from any such place or places, boats, ships or vessels, to the said magazine, and therein detain the same, until it be determined in the proper court, whether it be forfeited or not by virtue of this act; and the said superintendent or keeper of the said magazine shall not in the mean time be sued for seizing, keeping and detaining the same, nor shall any writ of replevin issue therefor, until such determination as aforesaid be made, but all such suits are hereby declared to be illegal, erroneous and abated.]

1791 Pa. Laws 105, A Supplement to the Act, Entitled "An Act for Securing the City of Philadelphia and the Neighborhood Thereof from Damage by Gun-powder, § 1.
That it shall and may be lawful for the owners of gun-powder not deposited , or to be deposited, in the said magazine, the square to the south of Vine street, to remove and deposit the same in

38

the said new magazine; and all gun-powder brought into the city of Philadelphia, from and after the first day of July next, shall be deposited and kept in the said new magazine subject to the regulation contained in the said first recited act.

By-Laws and Ordinances of the City of Pittsburgh, and the Acts of Assembly Relating Thereto; with Notes and References to Judicial Decisions Thereon, and an Appendix, Relating to Several Subjects Connected with the Laws and Police of the City Corporation Page 73, Image 75 (1828) available at The Making of Modern Law: Primary Sources. 1816
[Ordinances of the City of Pittsburgh,] An Ordinance Containing Regulations as to Gun-Powder, § 1. That no shop-keeper or other person or persons, shall keep, at the same time, in any house, shop, cellar or warehouse, or other apartment, or in any boat within the said city, more than thirty pounds weight of gun-powder. § 2. That the aforesaid quantity of gun-powder allowed to be kept within the city, shall be deposited in a place by itself, separate from other goods and commodities, and shall be secured by lock and key, or in some other safe manner. § 3. That no person shall carry or convey in any dray, cart, wagon or other carriage, any greater quantity of gun-powder than thirty pounds weight, at any one time, in or through the city, without securing the same in a good bag or bags, or within a canvas or other safe covering completely around the said powder, sufficient to prevent the same from scattering from the said carriage. §4. That if any person or persons shall offend against or violate any of the sections contained in this ordinance, he, she or they, so offending, shall, upon conviction thereof, pay a fine of fifty dollars.

A Digest of Acts of Assembly, Relating to the Incorporated District of the Northern Liberties; and of the Ordinances for the Government of the District Page 101-102, Image 101-102 (1847) available at The Making of Modern Law: Primary Sources. 1847
Ordinances of the Northern Liberties, Act of March 16, 1847. Whereas an article called gun cotton, with properties of ignition and explosion similar to those of gunpowder, and equally if not more dangerous in towns and cities, has been introduced. Therefore, § 1. That no gun-cotton shall be introduced in Philadelphia, nor placed in storage therein, in greater bulk or quantity in any one place, than is permitted by existing laws, with regard to gunpowder; and that all the fines, penalties and forfeitures imposed by an act entitled "An act for securing the city of Philadelphia, and the neighborhood thereof, from damage by gunpowder," passed on the twenty-eighth day of March, seventeen hundred and eighty seven, and a supplement thereto, passed on the fourteenth day of March, eighteeen hundred and eighteen, shall apply and be extended to gun-cotton in the same manner, and with the same effect, as if the word gun-cotton were inserted in the said act.

1868 Pa. Laws 321, An Act Supplementary to an Act to Incorporate the City of Corry . . . , § 2, pt. 6.
To regulate, by ordinances . . . the storage, sale of gun powder, fire works and other inflammable or dangerous articles, and the location of refineries.

A Revised Edition of Acts of Assembly and Ordinances Relating to the Borough of Gettysburg, Together with a Brief History of the Town from Its Foundation to the Present Time, 1887. Revised Edition Page 62-63, Image 63-64 (1887) available at The Making of Modern Law: Primary Sources. 1887

Ordinances of the City of Gettysburg, Keeping Powder or Gun Cotton for Sale, § 9. That no person shall keep or have in their possession or cause to be kept within said borough, rock or gun powder, gun or explosive cotton, or other combustible matter likely to prove dangerous, unless the same is preserved carefully and without danger to the citizens in a safe magazine constructed and used solely for that purpose and at a distance of at least 500 feet from any dwelling, and the person offending against this section shall, upon conviction before the burgess or any Justice of the Peace, pay a fine and penalty of twenty dollars. To be collected as all such fines are now by law collectible.

Ordinances of the Borough of Shamokin, Pa. Page 71-72, Image 78-79 (1896) available at The Making of Modern Law: Primary Sources. 1896
Ordinances of the Borough of Shamokin, PA, An Ordinance Regulating the Storage of Coal, Oil, Benzene and Other Inflammable Oils and Regulating the Hauling and Storage of Gun Powder and other Explosives in the Borough of Shamokin, § 3. That no person shall convey or cause to be conveyed through any of the streets, lanes or alleys of the Borough in any cart, wagon or other vehicle, at any one time, any greater quantity of gun powder, blasting powder, or other explosives than twenty five pounds without a sheet of canvass under, around and over the same sufficient to prevent it from being scattered from the said cart, wagon or vehicle, or being ignited by sparks or otherwise under the penalty of forfeiture of the said gun powder, blasting powder or other explosive, and for every such offense the person so offending upon conviction thereof before the Chief Burgess or any Justice of the Peace within the Borough shall pay a fine of not less than One Dollar nor more than Ten Dollars to be collected as penalties of like amount are not by law collectible. § 4. No person or persons, firm or corporation, shall keep, in any house, store, cellar, shop, shed, yard or other place within the borough a greater quantity of gun powder, blasting powder or other explosive at any one time than two kegs thereof under a penalty of not less than One Dollar nor more than Ten Dollars for every keg of powder or other explosive so kept over and above two kegs as above mentioned except in stone buildings erected for that purpose not less than two hundred yards from any other building or public road.

1919 Pa. Laws 710, An Act relating to fires and fire prevention. . .
The department may adopt and enforce rules and regulations governing the having, using, storage, sale and keeping of gasoline, naptha, kerosene, or other substance of like character, blasting powder, gun powder, dynamite, or any other inflammable or combustible chemical products or substances or materials. The department may also adopt and enforce rules and regulations requiring the placing of fire extinguishers in buildings.

**RHODE ISLAND**

1762 R.I. Pub. Laws 132, An Act of June 1762.
And be it further Enacted by the Authority Aforesaid, That every person who shall import gunpowder into the town of Newport aforesaid shall cause the same to be conveyed immediately to the powder house at the North Easterly part of town, before the vessel in which the said Powder shall be imported, be brought to any Wharf; upon the penalty of paying into the Town-Treasury of the said Town of Newport, a Fine of Ten Shillings Lawful Money, for every cask which shall not be conveyed to the Powder House as aforesaid. That every other person who shall have Gun-powder in his or her Possession and shall neglect or refuse to cause the whole of

40

the same to be conveyed to the said Powder-House immediately excepting 25lb. which shall be kept in a Tin Powder-Flask, shall pay as a fine into the Town Treasury aforesaid, the Sum of Ten Shillings Lawful Money, for every Cask he or she shall neglect or refuse to cause to be conveyed to the Powder-House as aforesaid, and in Proportion for any less Quantity. That no Vessel of War or other Vessel shall take on board any Powder before they go from the Wharf, upon the Penalty of paying a Fine of Ten Shillings Lawful Money, for every Cask so taken on board. And that the Keeper of the Powder-House be allowed the same Fees as heretofore hath been allowed by Law, for delivering out every Hundred Weight of Powder, and in Proportion for a greater of less quantity.

1798-1813 R.I. Pub. Laws 85, An Act Relative To The Keeping Gun-Powder In The Town Of Providence, §2.  1798
§ 1. Be it therefore enacted by the General Assembly, and by the authority thereof it is hereby enacted, That no person or persons shall hereafter keep or deposit gunpowder, in a greater quantity than twenty-eight pounds, in any shop, building or other place, in the town of Providence, except such place or places as the Town Council of said town shall allow and designate for that purpose. § 2. And be it further enacted, That all and every person and persons whomsoever, who shall hereafter keep or depsoit gunpowder, in a greater quantity than twenty eight pounds, in any shop or shops, building or buildings, or in any other place or places in said town, except only such place or places as the Town-Council of said town shall allow and designate for that purpose, shall forfeit and pay the sume of twenty dollars, for each and every such offence, to be recovered by bill, plaint or information, before one or more of the Justices of the Peace for said town, and for the use of the poor of said town. 3. And be it further enacted, That the said quantity of twenty-eight pounds of gun-powder, shall be kept in tin canisters, and in no other vessels; and if any person or persons, whomsoever, shall keep the same in any vessl or thing, except said tin canisters, the person or persons guilty thereof, shall, for each and every such offence, forfeit and pay the sum of twenty dollars, to be recovered and appropriated as aforesaid.

1902 R.I. Pub. Laws 67, An Act in addition to chapter 40 of the General Laws, Entitled "Of the Town Council": § 1.
Town councils and city councils may from time to time make and ordain all ordinances and regulations for their respective towns, not repugnant to law, which they may deem necessary for the safety of their inhabitants from the manufacture, storage, keeping, having in possession, transportation, sale, or use of gunpowder, gun-cotton, dynamite, nitro-glycerine, nitro-gelatine, lyddite, chlorate of potash, picric acid, sodium calcium carbide, acetylene gas, gasoline gas, and any and all other explosives and explosive chemicals; and may prohibit the manufacture, storage, keeping having in possession, transportation , sale , or use by any and all persons or persons of any or all said substances and gases in their respective towns, unless a license for the same shall be first obtained from the town council or board of aldermen, which license shall be for the term of one years from the date thereof unless sooner revoked by order of said town council or board of aldermen. Any person violating any provision of any such ordinance or regulation, or any such prohibition, shall be fined not less than twenty dollars nor more than one hundred dollars for each such offense.

**SOUTH CAROLINA**

41

Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 153, Image 156 (1802) available at The Making of Modern Law: Primary Sources. 1802

Ordinances of Charleston, An Ordinance to Revise and Amend an Ordinance Respecting Fires in the City of Charleston, and for other Purposes Therein Mentioned, § 5. And be it further Ordained by the Authority Aforesaid, That it shall and may be lawful for the fire-masters to enter into the houses, out-houses, stables and yards of every owner or tenant of the same in Charleston, wherever they shall see occasion and enquire, search, and examine if any quantities of gun-powder ,hay, straw, fodder, pitch, tar, rosin, turpentine, hemp, oil, tallow, or other combustible matter, are lodged in any such place within the said city, which may be in danger of taking fire; and if the said fire-masters shall find there is apparent danger that fire may be communicated by such combustibles, they shall admonish the owner or the tenant of such house or houses, to remove the same, and in case such person or persons shall refuse or neglect to remove the same, within twelve hours from such notice being given, the said fire masters are hereby empowered, and directed, to cause the same to be removed and lodged in some more secure place, at the charge of such owner or tenant, and shall issue a warrant, under the hands and seals of any three, or more of them, and levy the expenses of the same and fine of thirty dollars for every such offense.

Ordinances, of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto Page 75-76, Image 75-76 (1823) available at The Making of Modern Law: Primary Sources. 1823

Ordinances of the Town of Columbia, An Ordinance to Prohibit the Keeping of more gun powder in the town of Columbia than a certain quantity, and for other purposes therein mentioned (1820). Be it ordained by the Intendant and Wardens of the town of Columbia, and it is hereby ordained by the authority of the same, That from and after the first day of July next, no merchant, retailer, dealer in powder, or any person or persons whatever, within the said town, shall retain, keep or have in his, her or their possession, at any time, a greater quantity of gunpowder than fifty pounds weight. And be it further ordained by the authority aforesaid, That it shall be the duty , and lawful for the fire-masters, or any two of them, as also for the town marshal, on information given to them, or the same coming to their knowledge, by any means whatever, of a greater quantity of gunpowder than fifty pounds weight, being in the possession of, or within the enclosure of any person or persons whatsoever, to enter into the enclosures of any person or persons whatsoever, to enter into the enclosures house or houses, out-houses, stables, and yards f every owner or tenant of the same within the town of Columbia, and enquire, search and examine if any greater quantity than fifty pounds weight are lodged or contained in any such place within the said town; and, if upon such information, examination or search, the said fire-masters or town marshal shall have just grounds to suspect, or be satisfied that a greater quantity of gunpowder than is allowed by this ordinance, is lodged or contained in any such place or places aforesaid, they are hereby required, immediately thereupon, to give information thereof to the intendant and wardens of the said town. And be it further ordained by the authority aforesaid, That all and every owner or tenant of such house or houses, places or enclosures, after being duly summoned to appear before the intendant and wardens, and upon a conviction of each

42

and every such offence, as is prohibited by this ordinance, shall be subject to a fine not exceeding twenty dollars. Provided nevertheless, That if any person or persons shall erect or build such a building or buildings within the limits of the said town, in which gunpowder may be lodged or deposited, without endangering the said town, or the property of any of the citizens thereof, and to be approved by the said fire-masters and the intendant and wardens, that then such building or buildings shall exempt the proprietors or owners who have gun-powder deposited therein, form the fines by this ordinance imposed, except as before excepted.

## SOUTH DAKOTA

1890 S.D. Sess. Laws 72, An Act to Provide for the Incorporation of Cities and Their Classification According to Population, art. 5, § 1, pt. 53.
To regulate and prevent the storage of gun powder, tar, pitch, resin, coal, oil, benzine [sic], turpentine, hemp, cotton, nitro-glycerine, petroleum, or any of the products thereof, and other combustible or explosive material, and the use of lights in stables, shops and other places, and the building of bonfires; also to regulate and restrain the use of fire works, fire crackers, torpedoes, roman candles, sky rockets, and other pyrotechnic displays.

1907 S.D. Sess. Laws 113-14, An Act Entitled an Act to Provide for the Incorporation of Cities under Commission, ch. 86, § 54, pt. 53.
To regulate and prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzine [sic], turpentine, hemp, cotton, nitro-glycerine, petroleum, or any of the products thereof, and other combustible or explosive material, and the use of lights in stables, shops and other places, and the building of bonfires, also to regulate and restrain the use of fireworks, fire crackers, torpedoes, roman candles, skyrockets, and other pyrotechnic displays.

## TENNESSEE

John M. Lea, The Revised Laws of the City of Nashville, with the Various Acts of Incorporation and Laws Applicable to the Town and City of Nashville, and a List of the Different Boards of Mayor and Aldermen, and Other Officers of Said City from the Year 1806 to 1850, Inclusive Page 49, Image 50 (1850) available at The Making of Modern Law: Primary Sources. 1850 [An Act to Reduce the Several Acts Incorporating the Town of Nashville in one act, and to Amend the Same, § 6. The Mayor and Aldermen shall have power, by ordinance within the city – ]25th. To regulate the storage of gun-powder, tar, pitch, rosin, salt-petre, gun-cotton, and all other combustible material, and the use of lights, candles and stove-pipes in all stables, shops, and other places.

1855-1856 Tenn. Pub. Acts 34, An Act to Amend and Reduce into One, the Acts Relating to the Charter of the Town of Clarkeville, ch. 32, § 2, pt. 20. 1855
To provide for the prevention and extinguishment of fires; to organize, establish and equip fire companies, hose companies, and hook and ladder companies; to regulate, restrain or prohibit the erection of wooden or combustible buildings in any part of the city; to regulate and to prevent the carrying on of manufactories dangerous in causing or producing fires; to regulate the storage of gun powder, tar, pitch, rosin, saltpetre [sic], gun cotton and all other combustible or explosive material[.]

43

1895 Tenn. Pub. Acts 129-30, An Act to Incorporate the City of South Fulton, in Obion County Tennessee . . . , ch. 85, § 3, pt. 14.
To regulate the storage of gunpowder, tar, pitch, resin, saltpeter, gun cotton, coal oil, and all other combustibles, explosive or inflammable material, and the use of lights, candles, lamps, stove pipes, steam pipes, and chimneys in all storehouses, dwellings, outhouses, shops, stables, and other places, and to regulate and suppress the use and sale of fire crackers or fireworks of all kinds, toy pistols, air guns, or target guns.

1901 Tenn. Pub. Acts. 406, An Act to Incorporate the Town of Carthage, in Smith County, Tennessee, and Conferring and Defining the Corporate Powers Thereof, ch. 186, § 10.
Be it further enacted, That the Council shall have power by ordinance to . . . regulate the storage of gunpowder and other explosives, and noisome or offensive substances. . .

## TEXAS

1839 Tex. Gen. Laws 214, An Act To Incorporate The City Of Austin, § 7
That the Mayor and Counsel shall have full power and authority … to prevent gunpowder being stored within the city and suburbs in such quantities as to endanger the public safety. . .

Revised Code of Ordinances of the City of Mckinney. Revised Page 40, Image 41 (1899) available at The Making of Modern Law: Primary Sources. 1899
[Ordinances of the City of McKinney,] Storing of Gun Powder and Other Explosives. Be it ordained by the city council of the city of McKinney: That it shall be unlawful for any person, firm or corporation to have or keep stored within the limits of the city of McKinney, at any one time, more than four kegs either of blasting powder or gun powder nor a greater amount of any other high explosive than is reasonably necessary for one day's business and none of the same shall be kept within the corporate limits of the city of McKinney for wholesale purposes at all. § 2. That any person guilty of a violation of this ordinance shall on conviction be fined in any sum not less than ten dollars nor more than twenty-five dollars for each offense. And further, That each day any person, firm or corporation shall have or keep any amount of such material as is mentioned in section No. 1 stored within the city limits of the city of McKinney in excess of the amounts designated in this ordinance shall constitute a separate offense.

1876 Tex. Gen. Laws 29, An Act To Incorporate The City Of Galveston And to Grant A New Charter, Tit. 7, Art. II, § 108
To direct, control and prohibit the keeping and management of houses, or any building for the storing of gun-powder and other combustible, explosive or dangerous materials, within the city; to regulate the keeping and conveying of the same, and the use of candles and other lights in stables and other like houses.

1901 Texas Gen. Laws 41: §98.
The city council may also regulate or prohibit and prevent the carrying on of work and manufactures that are dangerous in promoting or causing fires, and may prohibit the building or erection of cotton presses and sheds, or may restrict the same to such limits as are prescribed by

44

ordinance; and may regulate or prohibit and prevent the use of fireworks and firearms, or the keeping and management of houses or other structures or places for storing gunpowder, dynamite, or other combustible, explosive, or dangerous material or substances within the city, and may regulate the keeping and conveying of the same.

## UTAH

1864-65 Utah Laws 47, To Incorporate The City Of Payson, § 27 1864
To direct or prohibit the location and management of houses for the storing of gunpowder, tar, pitch, resin or other combustible and dangerous materials within the city, and to regulate the conveying of gunpowder.

Revised Ordinances and Resolutions of the City Council of Salt Lake City, in the Territory of Utah, with Congressional and Territorial Laws on Townsites and Great Salt Lake City Charter, and Amendments Page 161-162, Image 196-197 (1875) available at The Making of Modern Law: Primary Sources. 1875
Ordinances of Salt Lake City, Relating to Gunpowder, Gun Cotton and Nitro-Glycerine, § 1. Be it ordained, by the City Council of Salt Lake City, that it shall not be lawful for any person or persons to keep, sell or give away, gunpowder, gun-cotton, or nitro-glycerine, in any quantity without permission of the City Council; Provided, any person may keep, for his own use, not exceeding five pounds of gun powder, one pound of gun cotton, or one ounce of nitro-glycerine. § 2. All permits , when issued , shall be registered by the Recorder, and shall state the name and place of business, and date of permit, and the same shall not be granted for a longer time than one year; and no person to whom any permits may be issued, shall have or keep, at his place of business or elsewhere, within the city, (except in such places as may be approved by the City Council), a greater quantity of gunpowder or guncotton than twenty-five pounds, and the same shall be kept in tin canisters or cases, and nitro-glycerine not to exceed five ounces, and in a situation remote from fires lighted lamps or candles. Nor shall any person sell or weigh gunpowder, gun cotton, or nitro-glycerine, after the lighting of lamps or gas in the evening , unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word gunpowder painted or printed thereon in large letters. § 3. No person shall convey or carry any gunpowder exceeding one pound in quantity through any street or alley in the city, unless the said gunpowder is secured in tight cans, kegs or cases, sufficient to prevent the same from being spilled or scattered , and in no quantity exceeding one hundred pounds, except under the direction of a police officer. § 4. A violation of any clause of this ordinance shall subject the offender to a fine, for each offence, in any sum not exceeding one hundred dollars.

1888 Utah Laws 166, An Act to Establish a Uniform System of County Governments, ch. 50, § 19, pt. 31.
To adopt such rules and regulations within their respective counties, except within municipal corporations, with regard to the keeping and storing of every kind of gun powder, [H]ercules powder, giant powder, or other combustible material, as the safety and protection of the lives and property of individuals may require.

1901 Utah Laws 139: 60.

45

To regulate or prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzene, turpentine, nitroglycerine, petroleum, or any of the products thereof, and other combustible or explosive material, and the use of lights in stables, shops and other places, and the building of bonfires.

## VERMONT

1876 Vt. Acts & Resolves 357, An Act in Amendment of An Act to Incorporate the Village of St. Albans, Approved November 18, 1859, and of the Several Amendments Thereof Heretofore Enacted, § 10, pt. 8.
To regulate the manufacture and keeping of gunpowder, ashes and all other dangerous and combustible material.

Barber, Orion M. The Vermont Statutes, 1894: Including the Public Acts of 1894, with the Declaration of Independence, the Articles of Confederation, and the Constitutions of the United States, and the State of Vermont Page 918, Image 935 (1895) available at The Making of Modern Law: Primary Sources. 1882
A person who has in his possession a toy pistol for the explosion of percussion caps or blank cartridges, with intent to sell or give away the same, or sells or gives away, or offers to sell or give away the same, shall be fined not more than ten nor less than five dollars; and shall be liable for all damages resulting from such selling or giving away, to be recovered in an action on the case.

Act of Incorporation and By-Laws of the Village of Bradford. 1890 Page 12-13, Image 13-14 (1891) available at The Making of Modern Law: Primary Sources. 1891
Ordinances of the Village of Bradford, § 11. The Trustees may grant licenses, for one year or less, to keep gun powder or gun cotton or other explosives for sale, if in their opinion the public safety is not endangered thereby. Said gun powder or gun cotton or other explosive shall be kept in close tin canisters which shall only be opened in the day time. § 12. The license shall specify the quantity allowed and the place where such gun powder or gun cotton and other explosives shall be kept, and on every building in which such gunpowder or gun cotton or other explosives is kept for sale shall be placed in a conspicuous position a sign with the words, "Licensed to sell Powder," printed or painted thereon. § 13. The Trustees may also grant licenses to store gun powder and other explosives in larger quantities in places used for no other purpose which they consider at a safe distance from other buildings. § 14. The Trustees may at any time inspect the premises where gun powder, gun cotton and other explosives are kept, in order to satisfy themselves that the regulations are complied with. § 15. Any person who shall without license keep in any building in the Village any nitro-glycerine, or more than half a pound of gun powder or two ounces of gun cotton, which shall be only for his own use, shall be fined five dollars for every day so offending. § 16. All licenses granted by the Trustees by virtue of these by-laws shall be signed by a majority of the Trustees and recorded in the office of the Clerk of the Corporation at the expense of the person licensed and shall not become valid until so recorded. § 17. The Trustees are authorized to revoke any license mentioned in these by-laws, whether granted by themselves or their predecessors in office, whenever in their opinion the public good requires it. Such revocation shall be recorded in the Clerk's office, and shall become operative whenever the Trustees shall deliver a written notice thereof to the person whose license is revoked.

46

Act of Incorporation and By-Laws of the Village of Northfield Page 19-20, Image 19-20 (1894) available at The Making of Modern Law: Primary Sources. 1894

Regulations for Handling Explosives, Artcle XV., § 1. No person shall at any time keep within the limits of said Village, any powder, or guncotton, without a written license, signed by a majority of the trustees, who shall have discretionary power to grant the same for retailing purposes ; not, however, exceeding twenty pounds shall be kept in any one building at a time, and that to be kept in close metal cans, or flasks, which are not to be opened except in the day time, Said license specify the building, or place where said powder or guncotton shall or may be kept, the quantity such person may keep, and shall be conditional that any Trustee may at any time make inspection of the quantity of powder or gun-cotton kept, and the manner of keeping the same; said license to be in force until revoked by a majority of the Trustees. And it shall be the duty of the person or persons so licensed to procure said license to be recorded in the records of said Village, and to put up, in some conspicuous place on every building within the limits of the Village in which he has powder or guncotton stored, a sign with the words "LICENSED TO SELL GUNPOWDER." Provided, that a majority of the Trustees may grant license for storing or keeping larger quantities, and that any person may keep not over two pounds which shall be kept in a metallic flask or a powder horn. Article XVI. PENALTY FOR VIOLATION OF ABOVE ARTICLE. § 1. If any person shall keep, without a license therefore, or as provided in the XVth article, any powder, or gun cotton, or either of said articles, or shall keep either of said articles in any buildings or places except those mentioned in his license, he shall forfeit and pay to the treasurer of said Village Five dollars for each day said powder or guncotton shall be suffered to remain within the limits of said village.

Quoted in Brief of Amicus Curiae Patrick J. Charles at App. 13, N.Y. State Rifle & Pistol Ass'n, v. City of New York (Ordinances of the City of Barre, Vermont) 1895

CHAPTER 16, SEC. 18. No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.

CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any weapon concealed on his person without permission of the mayor or chief of police in writing.

1900 Vt. Acts and Resolves 145, An Act to Amend the Charter of the City of Montpelier, § 42. Said board of fire wardens may inspect the manner of manufacturing and keeping gun powder, lime, ashes, matches, lights, fireworks or combustibles[.]

## VIRGINIA

1629 Va. Acts 151, Acts of March 24th, 1629, Act 5,
For the better furtherance and advancement of staple commodities, and more especially that of potashes and saltpeeter, it is thought fit that every master of a family within the several

47

plantations of this colony shall use their best endeavors to preserve and keep in dry and tight houses or casks all those ashes that shall proceed and be made by the woo[d] that is burned in clearing their grounds . . . And that every master of a family shall have a special care, after a notice thereof given, to preserve and keep all their urine which shall be made in their several plantations. . .
Available at https://archive.org/details/statutesatlargeb01virg

1879 Va. Acts 104, City Council – Powers, Duties, etc., ch. V, § 19
To direct the location of all buildings for storing gun-powder or other combustible substances; to regulate the sale and use of gunpowder, fire-crackers, fire-works, kerosene oil, nitroglycerine . . . the discharge of firearms . . .

1901 Va. Acts 203, An Act to Incorporate the Town of La Crosse, Mecklenburg County, Virginia, ch. 189, § 13.
The council shall have, subject to the provisions of this act, the control and management of the fiscal and municipal affairs of the town; of all property, real and personal, belonging to said town; and may make such ordinances, orders, and by-laws and regulations as it may deem necessary to carry out the following powers, which are hereby conferred on it . . . to regulate or prevent the storing of gunpowder . . .

**WASHINGTON STATE**

1861-1862 Wash. Sess. Laws 22, An Act to Incorporate the City of Walla Walla, art. 5, § 3, pt. 22. 1861
To regulate the storage of gunpowder, pitch, tar, rosin and all other combustible materials, . . . in shops, stables and other places. To prevent, remove or secure any fire-place, stove, chimney, oven, boiler, or other apparatus which may be dangerous in causing fire.

1862 Wash. Sess. Laws 48, Local and Priv. Laws, An Act to Incorporate the City of Lewiston, art. 5, § 3, pt. 22.
To regulate the storage of gunpowder, pitch, tar, rosin, and all other combustible materials, and the use of candles, lamps, or other lights in shops, stables and other places. To prevent, remove or secure any fire-place, stove, chimney, oven, boiler, or other apparatus which may be dangerous in causing fire.

1867 Wash. Sess. Laws 116, An Act to Incorporate the City of Vancouver, ch. 1, § 32, pt. 16.
To regulate the storage and sale of gunpowder, or other combustible material, and to provide, by all possible and proper means, against danger or risk of damage by fire arising from carelessness, negligence or otherwise.

1881 Wash. Sess. Laws 121-22, An Act to Incorporate the City of Port Townsend, ch. 2, § 21.
The City of Port Townsend has power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy, and . . . to regulate the transportation and keeping of gunpowder, or other combustibles, and to provide or license magazines for the same[.]

1881 Wash. Sess. Laws 93, An Act to Incorporate the City of Dayton, chap. 2, § 20.

48

The city of Dayton shall have power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy, and . . . to regulate the transportation, storing and keeping of gunpowder and other combustibles and to provide or license magazines for the same[.]

1883 Wash. Sess. Laws 161, An Act to Incorporate the City of Ellensburgh, ch. 2, § 20. The city of Ellensburg shall have power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy . . . to regulate the transportation storing and keeping of gunpowder and other combustibles and to provide or license magazines for the same[.]

E.W. Rector, Digester, Digest of the Laws and Ordinances of the City of Hot Springs, with the Constitution of the State of Arkansas, General Incorporation Laws of the State and Amendments Thereto, Applicable to the Cities of the First-Class, and in Force on the 1st of January, 1887 Page 61, Image 258 (1887) available at The Making of Modern Law: Primary Sources. 1886 [Ordinances of the] City of Hot Springs, §131. That no person shall carry gun powder, giant powder, dynamite, nitro-glycerine or blasting powder on any vehicle in any part of the city, unless the same shall be secured in kegs, boxes or canisters, sufficiently close to prevent the grains thereof from falling out, and be laid upon or covered over with sheets of canvas or other cloth, and such vehicles shall not be allowed to remain on the streets or sidewalks for more than one hour while containing such gun powder or explosives above mentioned. § 132. That it shall be unlawful to erect or build a powder magazine, or a magazine for any of the explosives mentioned in this ordinance, in the city, within three hundred yards of any other building; and, Provided, That in no case shall it be lawful to build or erect any such magazine in the city unless the same be erected in a safe and secure way, and under permission of the council of the city.

1907 Wash. Sess. Laws 634-636, An Act Relating to Cities of the Second Class and Providing for the Government of Such Cities . . . , ch. 241, § 29, pt. 21. Powers of Council Enumerated. The city council of such city shall have power and authority: . . . 21. Combustibles; To regulate or prohibit the loading or storage of gunpowder and combustible or explosive materials in the city, or transporting the same through its streets or over its waters.

## WEST VIRGINIA

J. Nelson Wisner, Ordinances and By-Laws of the Corporation of Martinsburg: Berkeley Co., West Virginia, Including the Act of Incorporation and All Other Acts of a Special or General Nature Page 26, Image 26 (1875) available at The Making of Modern Law: Primary Sources. 1875 [Ordinances of Martinsburg, An Ordinance to Prevent Certain Improper Practices Therein Specified,] § 12. It shall not be lawful for any person to keep in any shop, store, warehouse or other house or building within this town, without the special permission or authority from the Council, a greater quantity of gun or rock powder at any one time than twenty-five pounds; and every person offending against the provision of this section shall forfeit and pay to the town a fine of not less than five nor more than ten dollars.

1899 W.Va. Acts 24, An Act to Amend and Re-Enact and to Reduce into One Act, the Several Acts Incorporating the Town of Sisterville, in the County of Tyler; Defining the Powers Thereof,

49

and Describing the Limits of Said Town; and Incorporating the City of Sisterville, in Said Tyler County, ch. 4, § 28.
[T]o regulate the keeping of gunpowder and other inflammable or dangerous substances[.]

1901 W.Va. Acts 321, An Act to Create the Municipal Corporation of "The City of Morgantown" . . . , ch. 144, § 18.
[T]o regulate the keeping of gun powder and other inflammable or dangerous substances[.]

1909 W.Va. Acts 59, An Act . . . Granting a Charter to the City of Charleston, ch. 2, art. 4, § 7.
[T]o regulate or prohibit the keeping of gun powder and other combustible or dangerous articles[.]

## WISCONSIN

1883 Wis. Sess. Laws 315, vol. 2, An Act to Revise, Consolidate and Amend the Charter of the City Of Wausau, ch. 151, tit. 5, § 38.
The powers conferred upon the said council to provide for the abatement or removal of nuisances, shall not bar or hinder suits, prosecutions or proceedings in the courts according of law. Depots, houses or buildings of any kind, wherein more than twenty-five pounds of gun powder are deposited, stored or kept at any one time . . . within the limits of said city are hereby declared and shall be deemed public or common nuisances.

1883 Wis. Sess. Laws 369-70, vol. 2, An Act to Revise, Consolidate and Amend the City Charter of the City of Fond du Lac, ch. 152, ch. [sic] 6, § 8, pt. 16.
To prevent and prohibit the manufacture, keeping or storing of nitro-glycerine, and to regulate the keeping and storing of gunpowder, gun cotton, burning fluids, coal oils and other dangerous explosive materials, in said city, and to provide for the inspection of illuminating oils and fluids.

1919 Wis. Sess. Laws 282, An Act . . . Relating to Powers of Town Meetings, ch. 261, § 1.
To regulate the storage of gunpowder and other dangerous materials[.]

## WYOMING

1884 Wyo. Sess. Laws 134, An Act Entitled an Act to Incorporate the Town of Sheridan, ch. 85, § 28, pt. 1.
[T]o regulate the storage of gun-powder, kerosene and other dangerous material[.]

A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 96-97, Image 97-98 (1893) available at The Making of Modern Law: Primary Sources. 1893
Revised Ordinances of the City of Rawlins, [Precautionary Regulations,] § 13. That no person shall keep at his place of business or elsewhere within the city a greater quantity of gun powder or gun cotton than fifty pounds at one time, and the same shall be kept in tin or copper canisters or cases, containing not to exceed five pounds each, and in a situation remote from fires, lighted lamps and candles; and no person shall sell or weigh any gun powder or gun cotton after the

50

lighting of lamps in the evening, unless in sealed canisters or cases. Any violation of the provisions of this section shall be subject to a fine of not less than ten dollars nor more than one hundred dollars. § 14. It shall be lawful for the mayor, City Trustee, city marshal, police officers or fire-wardens, when any of them shall suspect that any gun powder or gun cotton is concealed or kept within the city in violation of the provisions of this Ordinance, to search any place in said city for the purpose of determining whether any gun powder or gun cotton is kept as aforesaid. Any person who shall obstruct or hinder any such officer making search in the execution of his duties under this section, shall forfeit and pay to said city for each offense a sum not less than ten dollars nor more than one hundred dollars.

Revised Ordinances and Charter of the City of Laramie, Wyo., with Constitutional Provisions and Legislative Enactments Governing the Same Page 200-201, Image 206-207 (1900) available at The Making of Modern Law: Primary Sources. 1900
[Ordinances of Laramie, Gunpowder and Explosives, § 12. No person shall keep at his place of business or elsewhere within this city, a greater quantity of gunpowder, gun-cotton, nitro-glycerine, dynamite, giant powder or other explosives than twenty-five pounds at one time; and the same shall be kept in tin or copper canisters or cases not exceeding five pounds in each, and in a position remote from fires, lighted lamps and candles, and from which they may be easily removed in case of fire; and no person or persons shall weigh or sell any gunpowder or gun cotton on after the lighting of lamps in the evening, unless in sealed canisters or cases; and no person shall be allowed to keep nitro-glycerine in any part of said city. A violation of any of the provisions of this section shall subject the offended to a fine of not less than ten nor exceeding fifty dollars. § 13. It shall be lawful for the chief of the fire department, when he shall have cause to suspect that any gunpowder, gun cotton, nitro-glycerine, dynamite, giant powder or other explosives is concealed or kept within the city, in violation of the provisions of this ordinance, to search any place in said city for the purpose of determining whether any gunpowder, gun-cotton, nitro-glycerine, dynamite, giant powder or other explosives are concealed or kept as aforesaid. Any person who shall obstruct or hinder such officer making search in the execution of his duties under this section, shall forfeit and pay to said city for each offense a sum no tless than ten dollars, nor more than fifty dollars.]

1907 Wyo. Sess. Laws 96, An Act Prescribing Additional Duties and Powers for the Regulation and Government of Cities of the First Class . . . , ch. 71, § 14, pt. 41.
To regulate and prevent the transportation and storage of gunpowder or other explosive or combustible articles. . .

1919 Wyo. Sess. Laws 17, An Act . . . Relating to the Storage of Explosives, ch. 17, § 1.
. . . It shall be unlawful for any person or company to store any gunpowder or any other explosive material at a less distance than one thousand feet from any house or habitation, when more than fifty pounds are at the same place; but it shall be unlawful to place or to keep any powder or other explosive material, in any house or building occupied as a residence, or in any outbuilding pertaining thereto.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

**EXHIBIT D**

# EXHIBIT D

# GUNPOWDER/GUN MANUFACTURING/INSPECTION/SALE/IGNITE

## ARKANSAS

William W. Mansfield, A Digest of the Statutes of Arkansas: Embracing All Laws of a General and Permanent Character in Force at the Close of the Session of the General Assembly of One Thousand Eight Hundred and Eighty-three Page 490, Image 506 (Vol. 1, 1884) available at The Making of Modern Law: Primary Sources. 1884
Carrying Weapons, § 1909. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person, any dirk or bowie knife, or a sword or spear in a cane, brass or metal knucks, or any pistol of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol or any kind of cartridges for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

## CALIFORNIA

1883 Cal. Stat. 156, § 153.
The Municipal Council shall provide by ordinance, for the payment into a "Fireman's Charitable Fund" of such city, or city and county, of all moneys received for licenses for the storage, manufacture, or sale of gunpowder, blasting powder, gun cotton, fireworks, nitro-glycerine, dualine, or any explosive oils or compounds, or as a municipal tax upon the same; also all fines collected in the police court for violations of fire ordinances.

1923 Cal. Stat. 695, 696-97, 701
Sec. 9. Every person in the business of selling, leasing or otherwise transferring a pistol, revolver or other firearm, of a size capable of being concealed upon the person, whether such seller, lessor or transferrer is a retail dealer, pawnbroker or otherwise, except as hereinafter provided, shall keep a register in which shall be entered the time of sale, the date of sale, the name of the salesman making the sale, the place where sold, the make, model, manufacturer's number, caliber or other marks of identification on such pistol, revolver or other firearm. Such register shall be prepared by and obtained from the state printer and shall be furnished by the state printer to said dealers on application tit a cost of three dollars per one hundred leaves in duplicate and shall be in the form hereinafter provided. The purchaser of any firearm, capable of being concealed upon the person shall sign, and the dealer shall require him to sign his name and affix his address to said register in duplicate and the salesman shall affix his signature in duplicate as a witness to the signatures of the purchaser. Any person signing a fictitious name or address is guilty of a misdemeanor. The duplicate sheet of such register shall on the evening of the day of sale, be placed in he mail. postage prepaid and properly addressed to the board of police commissioners, chief of police, city marshal, town marshal or other head of the police department of the city, city and county, town or other municipal corporation wherein the sale was made: provided, that where the sale is made in a district where there is no municipal police department, said duplicate sheet shall be mailed to the county clerk of the county wherein the

sale is made. A violation of any of the provisions or this section by any person engaged in the business of selling, leasing or otherwise transferring such firearm is a misdemeanor. This section shall not apply to wholesale dealers in their business intercourse with retail dealers, nor to wholesale or retail dealers in the regular or ordinary transportation of unloaded firearms as merchandise by mail, expres4 or other mode of shipment, to points outside of the city, city and county, town or municipal corporation wherein they are situated. The register provided for in this act shall be substantially in the following form:  [Form of Register included]

## COLORADO

1911 Colo. Sess. Laws 408
Section 3. Every individual, firm or corporation engaged, within this commonwealth, in the-retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and., if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record- book shall be open at all times to the inspection of any duly authorized police officer.
Section 4. Every individual, firm or corporation failing to keep the record provided for in the first section of this act, or who shall refuse to exhibit such record when requested by a police officer, and any purchaser, lessee or exchanger of a pistol or revolver, who shall, in connection with the making of such record, give false information, shall be guilty of a Misdemeanor, and shall, upon conviction, be punished by a fine of not less than twenty-five, nor more than one hundred dollars, or by imprisonment in the county jail for a term not exceeding one year, or by both such fine and imprisonment.

## CONNECTICUT

The Public Records Of The Colony Of Connecticut, Prior To The Union With New Haven Colony, May, 1665 Page 79, Image 91 (1850) available at The Making of Modern Law: Primary Sources.
It is ordered, that no man within this Jurisdiction shall directly or indirectly amend, repair, or cause to be amended or repaired, any gun small or great belonging to any Indian, nor shall endure the same, nor shall sell or give to any Indian, directly or indirectly, any such gun or gunpowder, or shot, or lead, or mold, or military weapons, or armor, nor shall make any arrow heads, upon pain of a ten pound fine for every offense at least, nor sell nor barter any guns, powder, bullets or lead, whereby this order might be evaded, to any person inhabiting out of this Jurisdiction, without license of this or the particular court, or some two magistrates, upon pain of ten pound for every gun, five pound for every pound of powder, 40s for every pound of bullets or lead, and so proportionately for any greater or lesser quantity.

The Public Records Of The Colony Of Connecticut. Hartford, 1890 Page 190-192, Image 194-196, available at The Making of Modern Law: Primary Sources. 1775

An Act for Encouraging the Manufacture of Salt Petre and Gun Powder. . .Be it enacted, That no salt petre, nitre or gun-powder made and manufactured, or that shall be made and manufactured in this Colony, shall be exported out of the same by land or water without the license of the General Assembly or his Honor the Governor and Committee of Safety, under the penalty of twenty pounds for every hundred weight of such salt petre, ntire or gun-powder, and proportionately for a greater or lesser quantity so without license exported; to be recovered by bill, plaint, or information, in any court of record in this Colony by law proper to take cognizance thereof. . . Be it further enacted by the authority aforesaid, That no powder-mill shall be erected in this Colony for the manufacture of gun-powder without the license of the general assembly, or in their recess the Governor and Council, first had and obtained under the penalty of thirty pounds for every such offence; to be recovered as the other forgoing personalities in this act are above directed to be recovered.

1836 Conn. Acts 105, An Act Incorporating The Cities of Hartford, New Haven, New London, Norwich and Middletown, chap. 1, § 20.
. . . relative to prohibiting and regulating the bringing in, and conveying out, or storing of gunpowder in said cities . . . .

1923 Conn. Pub. Acts 3707, 3707-10
Sec. 5. No sale of any pistol or revolver shall be made except in the room, store or place described in the permit for the sale of pistols and revolvers, and such permit or a copy thereof certified by the authority issuing the same shall be exposed to view within the room, store or place where pistols or revolvers shall be sold or offered or exposed for sale, and no sale or delivery of any pistol or revolver shall be made unless the purchaser or person to whom the same is to be delivered shall be personally known to the vendor of such pistol or revolver or the person making delivery thereof or unless the person making such purchase or to whom delivery thereof is to lic made shall provide evidence of his identity. The vendor of any pistol or revolver shall keep a record of every pistol or revolver sold in a book kept for that purpose, which record shall be in such form as shall be prescribed by the superintendent, of state police and shall include the date of the sale, the caliber, make, model and manufacturer's number of such pistol or revolver and the name, address and occupation of the purchaser thereof, which record shall be signed by the purchaser and by the person making the sale, each in the presence of the other, and shall be preserved by the vendor of such pistol or revolver for a period of at least six years.
Sec. 7. No person, firm or corporation shall sell at retail, deliver or otherwise transfer any pistol or revolver to any alien, nor shall any person deliver any pistol or revolver at retail except upon written application therefor and no sale or delivery of any pistol or revolver shall be mode upon the date of the filing or receipt of any written application for the purchase thereof, and when any pistol or revolver shall b delivered in connection with the sale or purchase, such pistol or revolver shall be enclosed in a package, the paper or wrapping of which shall be securely fastened, and no pistol or revolver when delivered on tiny sale or purchase shall be loaded or contain therein any gunpowder or other explosive or any bullet, ball or shell. Upon the delivery of any pistol or revolver the purchaser shall sign in triplicate a receipt for such pistol or revolver which shall contain the name, address and occupation of such purchaser, the date of sale, caliber, make, model and manufacturer's number and a general description thereof. One of such triplicate receipts shall, within twenty-four hours thereafter, be forwarded by the vendor of such pistol or

revolver to the superintendent of state police and one to the authority issuing the permit for the sale of such pistol or revolver and the other shall be retained by such vendor for at least six years. Sec. 8. No person shall make any false statement or give any false information connected with any purchase, sale or delivery of any pistol or revolver, and no person shall sell, barter, hire, lend, give or deliver to any minor under the age of eighteen years any pistol or revolver.

1930 Conn. Stat. 903, Dealing in Explosives; License., ch. 147, § 2644. 1909
No person shall manufacture, store, sell, or deal in gunpowder or any material or compound . . . unless he shall first obtain from the commissioner of state police or the fire marshal of the town where such business is conducted a written license therefor . . . which license shall specify the building where such business is to be carried on or such material deposited or used.


## DELAWARE

1845 Del. Laws 10, A Supplement To The Act Entitled "An Act To Survey, Lay Out And Regulate the Streets Of Smyrna and for Other Purposes," ch. 12, § 2.
That it shall be the duty of the said commissioners, justice of the peace and constable to suppress, extinguish and prevent all bonfires from being lighted or kept up in any of the streets, lanes or alleys of the said town, and to suppress and prevent the firing of guns, pistols crackers or squibs, or the making or throwing of fire-balls by boys or others within the limits of said town.

Vol. 26 Del. Laws 28, 28- 29 (1911)
Section 1. That from and after the first day of June, in the year of our Lord, one thousand nine hundred and eleven, it shall be unlawful for any person or persons, firm, company or corporation, to sell, or expose to sale, any pistol or revolver, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made especially for the defense of one's person, without first having obtained a license therefor, which license shall be known as "Special License to Sell Deadly Weapons;" provided, however, that this provision shall not relate to toy pistols, pocket knives, or knives used in the domestic household, or surgical instruments or tools of any kind.
Section 2. Any person or persons, firm, company or corporation, desiring to engage in the business of selling revolvers, pistols, or revolver or pistol cartridges, stilettos, steel or brass knuckles, or other weapons made for the defense of one's person, shall, after the above mentioned date, apply to the Clerk of the Peace of the County in which it is desired to conduct such business and shall obtain a license therefor, for which he, they, or it shall pay the sum of twenty-five dollars, which said license shall entitle the holder thereof to conduct said business for the term of one year from its date.
Section 3. It shall be unlawful for any person or per- sons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons, made especially for the defense of one's person.
section 4. It shall be the duty of any person or persons, firm, company or corporation, desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times, a book which shall be furnished him by the Clerk of the Peace of the County wherein he does business in which said book he shall enter the date of the sale, the name and address of the

person purchasing any such deadly weapon, the number and kind of deadly weapon so pur-chased, the color of the person so purchasing the same, and the apparent age of the purchaser; and no sale shall be made weapon, etc. until the purchaser has been positively identified. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.

1913 Del. Laws 439, § 18.
No child under the age of fifteen years shall be employed, permitted or suffered to work . . . in or about establishments wherein nitroglycerine, dynamite, dualin, guncotton, gunpowder or other high or dangerous explosives are manufactured, compounded or stored; unless said establishment are insured under the approval of the board of insurance underwriters of the district where said establishment is situated.

Vol. 30 Del. Laws 55, 55-56 (1919)
Section 222. It shall be unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made for the defense of one's person.
It shall be the duty of any person or persons, firm, company or corporation desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times a book which shall be furnished him by the Clerk of the Peace of the County wherein he does business, in which said book lie shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so purchased, the color of the person so purchasing the same, and the apparent age of the purchaser, and the names and addresses of at least two freeholders resident in the County wherein the sale is made, who shall positively identify the purchaser before the sale can be made; Provided, that no clerk, employee or other person associated with the seller shall act as one of the identifying freeholders. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.


**FLORIDA**

1923 Fla. Laws 431-32, An Act for the Protection of Person Who Use Shot-guns in the Pursuit of Game and for Sport . . ., ch. 9340, § 1.
That from and after the passage of this Act it shall be unlawful for any person, firm or corporation to offer for sale or sell in the state of Florida any loaded shot-gun shells which have been divested of their interstate character unless such loaded shot-gun shell shall be plainly printed on the box or carton in which they are sold, and also printed plainly, or stamped, on the top and outside with words and figures plainly indicating the character, quality and quantity of powder contained in such shell.

1927 (vol II) Fla. Laws 212, pt. 15.
The City Council shall have the power to pass ordinances on the following subjects as it deems necessary . . to prohibit or regulate the sale of firearms, cartridges, gun shells or other ammunition for firearms.

## GEORGIA

Oliver H. Prince, A Digest of the Laws of the State of Georgia: Containing all Statutes and the Substance of all Resolutions of a General and Public Nature, and now in Force, which have been Passed in this State, Previous to the Session of the General Assembly of Dec. 1837 Page 619, Image 619 (1837) available at The Making of Modern Law: Primary Sources.  1831
An Act to Regulate the transportation of gunpowder and to authorize the forfeiture of such as shall be transported in violation of the provisions of this act (1831) #20, § 1. From and after the passage of this act, it shall be the duty of all owners, agents and others, who may or shall have any gunpowder, exceeding in quantity five pounds, transported upon the waters or within the limits of this State, to have the word gunpowder marked in large letters upon each and every package which may or shall be transported. § 2. All gunpowder exceeding five pounds in quantity which shall hereafter be transported or engaged for transportation upon any of the waters or within the limits of this State, without being marked as directed in the first section of this act, shall be liable to seizure and forfeiture – one half to the informer, the other for the use of the volunteer companies most convenient or contiguous to the place of seizure or forfeiture.

A Compilation of the Acts of the Legislature Incorporating the City of Macon, Georgia, and of the Ordinances, Passed by the City Council of Macon, to the 14th February, 1858, Now of Force Page 48, Image 48 (1858) available at The Making of Modern Law: Primary Sources. 1858 Ordinances. § 5. It shall not be lawful for any person to fire a gun, pistol, or any other fire arms, within three hundred yards of any house, except in cases of military parade; nor shall any person burn rockets, crackers, or any kind of fireworks within the limits of the city. Any person so offending shall be fined in a sum not exceeding twenty dollars.

1902 Ga. Laws 434-35, § 16.
Be it further enacted by the authority aforesaid, That the mayor and aldermen of the said city of Forsyth shall have full power to license, regulate and control by ordinance all . . . gun shops, dealers in guns or pistols . . . .

## ILLINOIS

George Manierre, The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois Page 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources.  1851
Ordinances of the City of Chicago: Regulating the Keeping and Conveying Gun Powder and Gun Cotton; § I. (Be it ordained by the Common Council of the city of Chicago) That no person shall keep, sell, or give away gun powder or gun cotton in any quantity without permission of the common council or mayor in writing, signed by the mayor and clerk and sealed with the corporate seal, under a penalty of twenty-five dollars for every offence. § II. All applications for permits shall be addressed to the common council or mayor in writing, signed by the applicant. Not exceeding four permits shall be granted in any block. When the number of applications in any block shall at any time exceed the number to be granted, the requisite number shall be chosen by ballot. When issued the clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business and date of permit.

Persons to whom permits may be issued shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gun powder or gun cotton than fifty pounds at one time, and the same shall be kept in tin canisters or cases containing not to exceed thirteen pounds each, and in a situation remote from fires or lighted lamps, candles or gas from which they may be easily removed in case of fire. Nor shall any person sell or weigh any gun powder or gun cotton after the lighting of lamps in the evening, unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business with the words "gun powder and gun cotton" painted or printed theron in large letters. A violation of any clause of this section shall subject the offender to a fine of not less than ten dollars nor exceeding one hundred dollars. § III. No person shall convey or carry any gun or carry any gun powder or gun cotton, (exceeding one pound in quantity), through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the gun powder or gun cotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a leather bag or case, sufficient to prevent such gun powder or gun cotton from being spilled or scattered under a penalty of one hundred dollars. IV. No vessel, laden in whole or in part with gun powder or gun cotton, shall land at, or make fast to any dock or wharf upon the Chicago river, or either branch thereof, between the south line of the school section and Chicago avenue, or to discharge such gun powder or gun cotton within said limits. If any master, or owner of any vessel, or other person shall violate any provision of this section, he shall be subject to a fine of not less then twenty-five dollars and not exceeding one hundred dollars. § V. The mayor shall have power to cause any vessel to be removed form the limits mentioned in the previous section, to any place beyond the same, by a written order, which shall be executed by the marshal or some other member of the police. If any person shall neglect or refuse to obey such order, or shall resist any officer in the execution of the same, he shall be subject to a penalty of one hundred dollars. § VI. Al permissions granted under this ordinance shall expire on the tenth day of June each year. And no permit shall be granted to any retailer of intoxicating liquors or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit so issued. § VII. It shall be the duty of the officers of the police department, fire-wardens, and firemen, to report all violations of this ordinance which may come to the knowledge of the city attorney for prosecution.

Egbert Jamieson, The Municipal Code of Chicago: Comprising the Laws of Illinois Relating to the City of Chicago, and the Ordinances of the City Council; Codified and Revised Page 301-304, Image 309-312 (1881) available at The Making of Modern Law: Primary Sources. 1881 Ordinances of Chicago, § 1264. No person shall keep, sell or give away any gunpowder or gun-cotton in any quantity, without permission in writing, signed by the mayor and city clerk, and sealed with the corporate seal, under a penalty of twenty-five dollars for every offense: Provided, any person may keep for his own use a quantity of gunpowder or guncotton not exceeding one pound. . . § 1271. It shall be unlawful for any person or persons to carry or convey any gunpowder or guncotton (exceeding fifty pounds in quantity) through any street, alley, highway or road in the city, or within one miles of the limits thereof, in any cart, carriage, wagon, dray or wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a good tight and substantial leather bag sufficient to prevent the same from being spilled or scattered or unless the same is put into a well covered and perfectly water tight box, the bottom and sides which shall be completely covered with zinc, or unless such gunpowder or guncotton be secured in water tight

patent metallic cases or kegs. . . § 1275. Any person or persons, corporation or corporations, violating any of the provisions of sections (storage, manufacturing and sale §§) shall be subject to a fine of not less than fifty dollars, and not exceeding two hundred dollars, for each and every offense, and each and every day that gunpowder or guncotton shall be kept in any place contrary to any provision of this article shall constitute a violation thereof. § 1276. No vessel laden in whole or in part with gunpowder or guncotton shall land or make fast to any dock or wharf upon the Chicago river, or either branch thereof between the south line of the school section and Chicago avenue, or discharge such gunpowder or guncotton within said limits. If any master or owner of any vessel or other person shall violate any provision of this section he shall be subject to a fine of not less than twenty dollars, and not exceeding one hundred dollars.

## INDIANA

1847 Ind. Acts 93, An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory Thereto Into One Act, and to Amend the Same, chap 61, § 8, pt. 4.
To regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder and other explosive compounds . . . .

## IOWA

1845 Iowa Laws 119, An Act to Incorporate and Establish the City of Dubuque, chap 123, § 12
That the said city council shall have power, and it is hereby made their duty to make and publish from time to time, all such ordinances as shall be necessary to secure said city and the inhabitants thereof . . . to impose fines, forfeitures and penalties on all persons offending against the laws and ordinances of said city, and provide for the prosecution, recovery and collection thereof, and shall have power to regulate by ordinance the keeping and sale of gun-powder within the city.

## KENTUCKY

1874 Ky. Acts 327, An Act to Revise and Amend the Charter of the City of Newport, § 6.
To prohibit the manufacture of gunpowder or other explosive, dangerous, or noxious compounds or substances in said city, and to regulate their sale and storage by license.

## LOUISIANA

Ordinances Ordained and Established by the Mayor & City Council of the City of New Orleans. New Orleans, 1817.The Making of Modern Law: Primary Sources. Web. 24 October 2019. 1817 Art. 10. It shall not be lawful for any person to have or keep within the city and suburbs, or within two miles of the same (except the public magazine, or place of depot appointed for that purpose) any quantity of gunpowder, at any one time, exceeding one hundred pounds weight, in any one place, house, store or out-house, which said quantity of one hundred pounds shall be separated in several stone jugs or tin canisters, each of which shall not contain more than ten pounds of powder, and shall be provided with a safe and sufficient stopple; and if any person or person shall keep any greater quantity of gunpowder at any one time than one hundred pounds, in any one place, house, store or out-house, or if the same gunpowder, so kept as aforesaid, shall not be separated in the manner herein above directed, he, she, or they shall forfeit all such

gunpowder so kept contrary to the true intent and meaning of this ordinance, or so permitted to be kept, and which shall not be separated as aforesaid, and shall also forfeit and pay a fine not less than twenty-five, nor more than one hundred dollars, to be recovered with costs of suit, by the Mayor or any other competent magistrate; one half to the informer, and the other half for the use of the city

## MAINE

Laws of the State of Maine; to Which are Prefixed the Constitution of the U. States and of Said State, in Two Volumes, with an Appendix Page 685-686; Image 272-273 (Vol. 2, 1821) available at The Making of Modern Law: Primary Sources.  1821
An Act to Provide for the Proof of Firearms, § 1. Be it enacted by the Senate and House of Representatives, in Legislature assembled, That the Governor, by and with the consent of the Council, be, and he hereby is empowered to appoint suitable persons, to be provers of barrels of all new, or unused fire arms; and it shall be the duty of each person so appointed, to prove and try the strength of the barrels of all fire arms which shall be offered him for that purpose, and in such manner as to satisfy himself of the strength of the same; and shall in a permanent manner, mark and number every barrel by him so proved, and make and deliver to the person applying to have the same proved, a certificate for each barrel proved and found good in the form following: I certify that on this ___ day f ___ A.D. 18___ I proved for ____, a musket, pistol, or rifle barrel, (as the case may be) and which is numbered and marked as in the margin, and that the same is good and strong. A.B. Prover of fire arms. § 2. Be it further enacted, That each prover shall be entitled to receive from the person applying to have such barrel proved, twenty five cents, in addition to the expense of the powder necessary for that purpose for each barrel so proved; whether the same shall stand the proof and be marked or not. § 3. Be it further enacted, That if any person shall sell or offer for sale within this State, any new, or unused musket, rifle, or pistol barrel, without having the same first proved, marked, and certified according to the provisions of this Act, he shall forfeit for each barrel so sold the sum of ten dollars, to be recovered by an action of debt before any Court proper to try the same; to the use of any person who shall sue for and recover the same, or by indictment to the use of the state. § 4. Be it further enacted, That if any person shall falsely alter the stamp or mark on the certificate of any prover of fire arms, appointed as aforesaid, and be convicted thereof before any Court proper to try the same, he shall forfeit and pay a fine of not more than one hundred dollars, nor less than twenty dollars according to the nature and aggravation of the offence, for the use of the State.

The Revised Statutes of the State of Maine Passed October 22, 1840 to Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix Page 697, Image 713 (1841) available at The Making of Modern Law: Primary Sources.  1834
Section 4. If any person shall carry on the business of manufacturing gun powder, or of mixing or grinding the composition therefor, in any building within eighty rods from any valuable building, erected at the time when such business may be commenced the building, in which such business may be carried on as aforesaid, shall be deemed a public nuisance; and such person shall be liable to be prosecuted and indicted accordingly.

## MARYLAND

1757-68 Md. Acts 53, An Act for Prohibiting all Trade with the Indians, for the Time Therein Mentioned, ch. 4, § 3.  1760-1769
That it shall not be lawful for any Person or Persons within this Province, to sell or give to any Indian Woman or Child, any Gun-powder, Shot, or Lead, whatsoever, nor to any Indian Man within this Province, more than the Quantity of one Pound of Gun-powder, and Six Pounds of Shot or Lead, at any one Time, and not those, or lesser Quantities of Powder or Lead oftener than once in Six Months, under the Penalty of Five Pounds Current Money, for every pound of gunpowder. . .

## MASSACHUSETTS

William Henry Whitmore, The Colonial Laws of Massachusetts: Reprinted From the Edition of 1672, with the Supplements Through 1686: Containing Also, a Bibliographical Preface and Introduction, Treating of All the Printed Laws From 1649 to 1686: Together with the Body of Liberties of 1641, and the Records of the Court of Assistants, 1641-1644 Page 126, Image 330 (1890) available at The Making of Modern Law: Primary Sources.  1651
Prescriptions, (1651) § 2. And it is further ordered; that no person (except for the defence of themselves and their vessels at Sea) shall transport any gunpowder out of this jurisdiction, without license first obtained from some two of the Magistrates, upon penalty of forfeiting all such powder as shall be transporting or transported, or the value thereof.

1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1.
…from and after the passing of this act, all musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . with a charge of powder equal in weight to the ball which fits the bore of the barrel to be proved . . . § 2. That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act to which this is an addition . . .

Charles Allen, Report of the Commissioners on the Revision of the Statutes Page 333, Image 30 (Vol. 2, 1881) available at The Making of Modern Law: Primary Sources.  1881
Fire Arms, § 18. There shall be in each county, where the manufacture of fire-arms is carried on, provers of fire-arms, not more than six in number, appointed by the governor with the advice and consent of the council, who shall prove all musket barrels and pistol barrels which, being sufficiently ground, bored and breeched, are offered to them to be proved. § 19. All musket barrels and pistol barrels manufactured in this commonwealth shall, before they are sold or stocked, be proved by one of the provers with a ball suited to the bore of the barrel and with a charge of powder equal in weight to the ball. The powder used in such proof shall be such that one ounce thereof in a howitzer of four and a half inch caliber at elevation of forty-five degrees shall be of sufficient power to carry a twelve-pound shot one hundred and thirty yards; or that

one ounce therof in a howitzer of five and a half inch caliber at an elevation of forty-five degrees shall be sufficient to carry a twenty-four pound shot eighty yards.

Revised Ordinances of 1892, of the City of Boston, and the Revised Regulations of 1892, of the Board of Aldermen of the City of Boston, Being the Eleventh Revision, Third Edition, Containing All Ordinances Passed Between March 3, 1892, and February 1, 1895, and All Regulations of the Board of Aldermen Passed Between July 22, 1892, and February 1, 1895 Page 115, Image 129 (1895) available at The Making of Modern Law: Primary Sources. 1895 Ordinances of Boston, Prohibitions and Penalties, § 91. No person shall manufacture or sell, or expose for sale, any guncotton, nitro-glycerine, or any compounds of the same, nor any fulminate or substance, except gunpowder, intended to be used by exploding or igniting it, in order to produce a force to propel missiles, or to rend substances apart, except in accordance with a permit from the board of fire commissioners; nor shall any person send or carry through the public streets any such substance, except in the manner and in the quantities allowed by statute or ordinance.

Revised Ordinances of the City of Woburn. Revised Woburn, Massachusetts Page 91 Image 91 (1898) available at The Making of Modern Law: Primary Sources.  1898
License to Sell Gunpowder in the City of Woburn. No person shall sell any gunpowder within the city, without such license. Every license shall be in force one year from the date thereof; provided, that any license may be rescinded by the City Council, at their discretion. § 3. Every person so licensed shall keep a sign over and outside of the principal entrance from the street of the building in which the powder is kept, in which shall be printed in capitals the words: "License to keep and sell gunpowder" § 4. The city clerk shall keep a record of all licenses, and of the places designated therein, which places shall not be changed, unless by consent of the City Council, in writing. Every person who receives a license shall sign his name to a copy of the rules prescribed in this chapter, as evidence of his assent thereto. §5. The provisions of the foregoing four sections shall not apply or extend to the keeping or storing of metallic cartridges in fire proof magazines, nor to cartridge manufacturers, so long as they shall keep their powder in canisters, as prescribed in section one, and in fire proof magazines, located and built to the satisfaction of the City Council so long as such manufacturers allow no more than one hundred pounds of gunpowder in any magazine, or five pounds of gunpowder not made into cartrdiges, in any workshop at any one time.

## MICHIGAN

1901 Mich. Pub. Acts 154, Local Acts, An Act to Revise and Amend the Charter of the City of Muskegon . . . , tit.7, § 24, pt. 11.
To regulate, restrain and prohibit the buying, carrying and selling gunpowder, fire crackers [sic] or fireworks manufactured and prepared therefrom, or other combustible materials, the exhibition of fireworks and the discharge of firearms, and lights in barns, stables and other buildings, and to restrain the making of bonfires in streets, yards and public grounds[.]

## MINNESOTA

The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City. Page 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858

Ordinances of the City of St. Paul, An Ordinance to Regulate the Sale of Gunpowder, § 1. No person shall keep, sell or give away gunpowder or guncotton in any quantity without first having paid into the City Treasurer the sum of five dollars, and obtain from the Common Council a permission in writing, signed by the Mayor and Clerk, and sealed with the corporate seal, under a penalty not exceeding fifty dollars, for every offence, provided any person may keep for his own use not exceeding one pound of powder or one pound of gun cotton, at one and the same time. § 2. All applications for permits shall be addressed to the Common Council, in writing, signed by the applicant. Not exceeding four permits shall be granted in any one block; when the number of applications in any block shall at any time exceed the numbers to be granted, the requisite number shall by chosen by ballot. When issued, the Clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business, and date of permits. Persons to whom permits may be issued, shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gunpowder or guncotton than fifty pounds at one time, and the same shall be kept in tin canisters or cans, or kegs securely looped and headed, containing not to exceed twenty-five pounds each and in a situation remote from fires or lighted lamps, candles or gas, from which they may be easily removed in case of fire. Nor Nor shall any person sell or weigh any gunpowder or guncotton, after the lighting of lamps in the evening, unless in sealed canisters or cans. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word "gunpowder" painted or printed thereon in large letters. Any person violating any clause of this section, shall, upon conviction therof be punished by a fine of not less than ten, nor more than one hundred dollars. § 3. No person shall convey or carry any gunpowder or guncotton, exceeding (one pound in quantity) through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cans or kegs well headed and hooped, sufficient to prevent such gunpowder or guncotton from being spilled or scattered, under a penalty of fifty dollars. § 4. All permissions granted under this ordinance shall expire on the second Tuesday of May in each year; and no permit shall be granted to any retailer of intoxicating liquors, or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit which may be issued.

## **MISSOURI**

1921 Mo. Laws 691, 692

Section 1. Pistol, revolver or firearms to be plainly marked. No wholesaler or dealer therein shall have in his possession for the purpose of sale, or shall sell, any pistol, revolver, or other firearm of a size which may be concealed upon the person, which does not have plainly and permanently stamped ,upon the metallic portion thereof, the trademark or name of the maker, the model and the serial factory number thereof, which number shall not be the same as that of any other such weapon of the same model made by the same maker, and the maker, and no wholesale or retail dealer therein shall have in his possession for the purpose of sale, or shall sell, any such weapon unless he keep a full and complete record of such description of such weapon, the name and address of the person from whom purchased and to whom sold, the date of such purchase or sale, and in the' case of retailers the date of the permit and the name of the circuit clerk granting the

same, which record shall be open to inspection at all times by any police officer or other peace officer of this state.

Sec. 2. Shall secure permit to acquire weapon.-No person, other than a manufacturer or wholesaler thereof to or from a wholesale or retail dealer therein, for the purposes of commerce, shall directly or indirectly buy, sell, borrow, loan, give away, trade, barter; deliver or receive, in this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, unless the buyer, borrower or person receiving such weapon shall first obtain and deliver to, and the same be demanded and received by, the seller, loaner, or person delivering such weapon, within thirty days after the issuance thereof, a permit authorizing such person to acquire such weapon. Such permit shall be issued by the circuit clerk of the county in which the applicant for a permit resides in this state, if the sheriff be satisfied that the person applying for the same is of good moral character and of lawful age, and that the granting of the same will not endanger the public safety. The permit shall recite the date of the issuance thereof and that the same is invalid after thirty days after the said date, the -name and address of the person to whom granted and of the person from whom such weapon is to be acquired, the nature of the transaction, and a full description of such weapon, and shall be countersigned by the person to whom granted in the presence of the circuit clerk. The circuit clerk shall receive therefor a fee of $0.50. If the permit be used, the person receiving the same shall return it to the circuit clerk within thirty days after its expiration, with a notation thereon showing the date and manner of the disposition of such weapon. The circuit clerk shall keep a record of all applications for such permits and his action thereon, and shall preserve all returned permits. No person shall in any manner transfer, alter or change any such permit or make a false notation thereon or obtain the same upon any false representation to the circuit clerk granting the same, or use or attempt to use a permit granted to another.

Sec. 3. Weapons must be stamped.-No person within this state shall lease, buy or in anywise procure the possession from any person, firm or corporation within or without the state, of any pistol, revolver or other firearm of a size which may be concealed upon the person, that is not stamped as required by section 1 of this act; and no person shall buy or otherwise acquire the possession of any such article unless he shall have first procured a written permit so to do from the circuit clerk of the county in which such person resides, in the manner as provided in section 2 of this act.

Sec. 4. Manufacture not prohibited.-Nothing herein contained shall be considered or construed as forbidding or making it unlawful for a dealer in or manufacturer of pistols, revolvers or other firearms of a size which may be concealed upon the person, located in this state, to ship into other states or foreign countries, any such articles whether stamped as required by this act or not so stamped.

## **NEBRASKA**

1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.
The City Council shall have power to license all . . . vendors of gunpowder[.]

1895 Neb. Laws 233, Laws of Nebraska Relating to the City of Lincoln, An Ordinance Regulating and Prohibiting the Use of Fire-arms, Fire-works and Cannon in the City of Lincoln .

. . Prescribing Penalties for Violation of the Provisions of This Ordinance, and Repealing Ordinances in Conflict Herewith, Art. XXV, § 17.

No person shall keep, sell, or give away any gunpowder or guncotton in any quantity without permission in writing signed by the Chief of Fire Department and City Clerk, and sealed with the corporate seal, under a penalty of twenty-five dollars for every offense: Provided, any person may keep for his own defense a quantity of gunpowder or guncotton not exceeding one pound.

## NEW HAMPSHIRE

1820 N.H. Laws 274-76, An Act to Provide for the Appointment of Inspectors and Regulating the Manufacture of Gunpowder, ch. 25, §§ 1-9.

§ 1. [T]he Governor . . . is hereby authorized to appoint an inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state, and such other places as may by him thought to be necessary[.] § 2. [F]rom and after the first day of July next, all gunpowder which shall be manufactured within this state shall be composed of the following proportions and quality of materials . . . § 3. It shall be the duty of each of said inspectors to inspect, examine and prove all gunpowder which after the first day of July shall not be deposited at any publick [sic] powder magazine, or manufactory of this state . . . § 4. [N]o gunpowder within this state shall be considered to be of proof unless one ounce thereof, placed in a chamber of a four and an half inch howitzer, with the howitzer elevated so as to form an angle of forty-five degrees with the horizon, will, upon being fired throw a twelve pound shot seventy-five yards at the least. § 5. [W]henever any of said inspectors shall discover any gunpowder, deposited at any public powder magazine, or any other place within this state, which is not well manufactured or which is composed of impure materials . . . the inspector in such case, shall mark each cask containing such impure, ill manufactured, or deficient gunpowder, with the word "Condemned" on both heads of the cask . . . § 6. [I]f any person shall knowingly sell any condemned gunpowder . . . every such person, so offending, shall forfeit and pay not less than two hundred nor more than five hundred dollars . . . § 7. [E]ach inspector . . . be sworn to the faithful and impartial discharge of the duties of his office, and each inspector shall be allowed one cent for each pound of gunpowder, by him examined, inspected and proved . . . to be paid by the owner or owners of the gunpowder. § 8. [I]f any manufacturer of gunpowder shall sell or dispose of, or shall cause or permit to be sold or disposed of, or shall export or cause to be exported withou the limits of this state, any powder of his manufacture, before the same has been inspected and marked agreeably to the provisions of this act, he shall forfeit and pay the sum of fifty cents for every pound of powder so sold, disposed of, or exported, to be recovered in the manner provided in the sixth section of this act. § 9. [I]f any person with within this state . . shall knowingly sell, expose, or offer for sale, within this state, any gunpowder which is not well manufactured, or which is composed of impure materials, and which shall not be composed of the proof herein before required, shall forfeit and pay not less than five dollars nor more than fifty dollars for each and every offence, to be recovered in the manner provided in the sixth section of this act.

1825 N.H. Laws 74, An Act to Regulate the Keeping and Selling and Transporting of Gunpowder, ch. 61, § 5.

[I]f any person or persons shall sell or offer for sale by retail any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common, such person so offending

shall forfeit and pay for each and every offence a sum not more than five dollars nor less than one dollar, to be recovered and applied as aforesaid.

1891 N.H. Laws 332, Safe-keeping of Gunpowder and Other Explosives, ch. 117, § 7.
If any person shall carry from town to town, or from place to place, any gunpowder for the purpose of peddling or selling it by retail in quantities less than twenty-five pounds, or shall sell, or offer to sell, by retail, any gunpowder in any highway or street, or on any wharf, parade, or common, or if any person shall sell or deal out any gunpowder in the night time, between sunset and sunrise, he shall forfeit for each offense a sum not more than five dollars.

1913 N.H. Laws 639, An Act to Regulate the Transportation of Dynamite, Gunpowder and Explosives, ch. 128, § 1.
It shall be unlawful to transport, carry, or convey from one place in this state to another place in this state, any dynamite, gunpowder, or other explosive on any vessel or vehicle of any description operated by a common carrier, which vessel or vehicle is carrying passengers for hire: Provided, that it shall be lawful to transport on any such vessel or vehicle small arms ammunition in any quantity, and such fuses, torpedoes, rockets, or other signal devices, as may be essential to promote safety in operation; and properly packed and marked samples of explosives for laboratory examination, not exceeding a net weight of one-half pound each, and not exceeding twenty samples at one time in a single vessel or vehicle; but such samples shall not be carried in that part of a vessel or vehicle which is intended for transportation of passengers for hire: Provided further, that nothing in this section shall be construed to prevent the transportation of military or naval forces with their accompanying munitions of war on passenger equipment vessels or vehicles.

1917 N.H. Laws 727-28, An Act for the Regulation of the Sale and Use of Explosives and Firearms, ch. 185, §§ 1-3.
§ 1. No person shall manufacture, sell, or deal in firearms or in gunpowder, dynamite, nitro-glycerine, or other form of high explosive, unless he shall first obtain, from the selectmen of the town or the chief of police of the city where such business is to be conducted, a written license therefor, and no person shall conduct such business within the state but outside the limits of any organized town or city, unless he shall first obtain such license from the county commissioners of the county in which such business is to be conducted; which license shall specify the building where such business is to be carried on or material deposited or used. § 2. No such licensed person shall sell or deliver firearms to any person not a citizen of the United States, unless he shall have legally declared his intention of becoming a citizen, or any such explosive material or compound to any person, except upon presentation of a permit such as is hereinafter provided for, nor unless satisfied that the same is to be used for a lawful purpose. § 3. Every person so licensed shall keep, on blanks to be furnished by the secretary of state, a record of the names and residences of all persons to whom he shall sell or deliver firearms or any such explosive material or compound, the purpose of which the same is to be used¸ the date of sale, the amount paid, the date of the purchaser's permit, the name and title of the person by whom the permit was issued, and, within five days after such sale or delivery, shall file such record thereof with the clerk of the city or town wherein he sale or delivery was made, or with the county commissioners in case of sales or deliveries within the state, but outside the limits of any organized city or town. The records thus filed shall at all times be open to the inspection of the police departments, or other

public authorities. He shall also affix to the receptacle containing such explosive material or compound a label with the name of the compound, his own name, and the date of sale.

## NEW JERSEY

1639 N.J. Laws 18, Ordinance of the Director and Council of New Netherland, Prohibiting the Sale of Firearms, etc. to Indians . . .
Whereas the Director General and Council of New Netherland have observed that many persons, both Servants of the Company and Inhabitants, have contrary to the orders and commands of their High Mightiness the Lords States General and the Incorporated West India Company, presumed to sell to the Indians in these parts, Guns, Powder and Lead, which hath already caused much mischief, and if no means be adopted by Us here to prevent the same would hereafter entail nothing else than greater evil; Therefore every inhabitant of New Netherland, be his state, quality or condition what it may, is most expressly forbidden to sell any Guns, Powder or Lead to the Indians on pain of being punished by Death, and if any one shall inform against any person who shall violate this law, he shall receive a reward of Fifty guilders. . .

1776-1777 N.J. Laws 6, An Act for the Inspection of Gunpowder, ch. 6, § 1. 1776
That any Person who, from and after the Publication of this Act, shall offer any Gun-Powder for Sale, without being previously inspected and marked as is herein after directed, shall forfeit, for every such Offence, the Sum of Five Shillings a Pound for every Pound weight so offered for Sale, and so in Proportion for greater or lesser quantity[.]

1811 N.J. Laws 300, An Act to Regulate Gun Powder Manufactories and Magazines within this State, § 1.
. . . [N]o person or persons whatsoever, shall be permitted within this state to erect or establish, or cause to be erected or established, any manufactory which shall be actually employed in manufacturing gun-powder, either by himself or any other person, either on his own land or another, within the distance of a quarter of a mile from any town or village or house of public worship; or within the distance of a quarter of a mile from any dwelling house, barn or out house, without the consent under hand and seal of all and every the owner or owners of such dwelling house, barn, or out house as aforesaid; and any person so offending shall be guilty of a misdemeanor, and on conviction thereof shall be fined any sum not exceeding two thousand dollars: Provided, that nothing in this section shall be so construed as to prevent the completing, rebuilding or repairing any powder mill now erected or erecting in this state on the site on which the same shall be now erected or erecting.

1886 N.J. Laws 358, An Act to Regulate the Manufacture and Storage of Gun Powder, Dynamite and Other Explosive, ch. 250, § 1.
That no person or persons or corporations shall after the passage of this act, be permitted within this state to erect, have or maintain, or cause to be erected, had or maintained any establishment, storehouse or building in which in which shall be manufactured, stored or kept any gun powder, blasting powder, dualin, dynamite, forcite, giant powder, nitro-glycerine, or any powder or materials of which nitro-glycerine is an essential ingredient or forms a component part, or any other explosive within the distance of one thousand feet from any public road; and every person

or corporation offending against the provisions of this act shall be guilty of a misdemeanor, and, on conviction thereof, shall be liable to a fine not exceeding two thousand dollars[.]

1903 N.J. Laws 671, An Act Concerning Railroads, ch. 257, § 49.
No person shall be entitled to carry or require any company to carry on any railroad any aqua fortis, oil or vitriol, gunpowder, nitro-glycerine, matches, or other goods of a dangerous nature¸ and if any person sends by the railway any such goods without distinctly marking their nature on the outside of the package containing the same, or otherwise giving notice in writing to the agent of the company with whom the same are left at the time of so sending, he shall forfeit to the company twenty dollars for every such offense, and be besides liable to all damage that may occur therefrom, and the company may refuse to take any parcel that they may suspect to contain goods of a dangerous nature or may require the same to be opened to ascertain the fact.

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.
1. No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

1927 N.J. Laws 742
   No retail dealer shall sell or expose for sale, or have in his possession with intent to use, any of the firearms or instruments enumerated in section one hereof without being licensed as hereafter provided. The Common Pleas judge of any court of this State, by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political-division, pistols or revolvers, subject to the follow-ing conditions, for breach of any of which the license shall be subject to forfeiture:
1. The business shall be carried on only in the building or buildings designated in the license.
2. The license or a copy thereof certified by the issuing authority shall be displayed in a conspicuous place on the premises where it can be easily read.
3. No pistol or revolver, or imitation thereof, or placard advertising the sale thereof, shall be placed in any window or in any part of said premises where it can be readily seen from the outside.
4. No pistol or revolver shall be delivered (a) unless the purchaser shall hve obtained a permit to purchase days shall have elapsed after the application for the permit; (c) unless the purchaser either is personally known to the seller or shall present evidence of his identity; (d) unless the pistol or revolver shall be unloaded and securely wrapped; provided, however, a permit to cover a pistol or revolver shall, for the purposes of this section and of section nine of this act, be equivalent to a permit to purchase a pistol or revolver. 5. A true record of every pistol shall be made in a book kept for the purpose, the form of which shall be prescribed by the Secretary of State and shall be personally signed by the person effecting the sale, and shall contain the date of the sale, the calibre, make, model, and manufacturer's number of the weapon, and the name, address and permit number of the purchaser.
   Any person who shall knowingly sell any of the firearms or instruments enumerated in section one here- of to a minor under the age of eighteen years, or to a person not of sound mind, or to a

drug addict, or to a person who has been convicted of committing or attempting to commit any of the crimes enumerated in section two hereof when armed with any of the firearms or instruments enumerated in section one hereof, shall he guilty of misdemeanor.

No person shall sell a pistol or revolver to another person unless the purchaser has first secured a permit to purchase or carry a pistol or revolver. No person of good character and who is of good repute in the community in which he lives, and who is not subject to any of the disabilities set forth in other sections of this act, shall be denied a permit to purchase a pistol or revolver. The judge of any court within this State (except, however, justices of the peace), the sheriff of a county or the chief of police of a city, town or municipality shall upon application issue-to any person qualified under the provisions of this section a permit to purchase a pistol or revolver, and the Secretary of State shall have concurrent jurisdiction to issue such permit in any case, notwithstanding it has been refused by any other licensing official, if in his opinion the applicant is qualified.

Applications for such permits shall be in form as prescribed by the Secretary of State and shall set forth the name, residence, place of business, age, occupation, sex, color, and physical description of the applicant, and shall state whether the applicant is a citizen, and whether he has ever been convicted of any of the crimes enumerated in section two hereof as defined in this act. Such application shall he signed by the applicant and shall contain as reference the names and addresses of two reputable citizens personally acquainted with him. Application blanks shall be obtainable from the Secretary of State and from any other officers authorized to grant such permit.. and may be obtained from licensed retail dealers. The application, together with a fee of fifty cents. shall be delivered or forwarded to the licensing authority who shall investigate the same, and unless food cause for the denial thereof shall appear, shall rant said permit within seven days from the date of the receipt of the application. The permit shall be in form prescribed by the Secretary of State and shall be issued to the applicant in triplicate. The applicant shall deliver to the seller the permit in triplicate and the seller shall indorse on the back of each copy the make, model, calibre and serial number of the pistol or revolver, sold tinder the permit. One copy shall then be returned to the purchaser with the pistol or revolver, one copy shall be kept by the seller as a permanent record, and the third copy shall be forwarded by the seller within three days to the Secretary of State. If the permit is not granted, the fee shall be returned to the applicant.

All fees for permits shall be paid into the general fund of the State if the permit be issued by the Secretary of State; to the municipality if the permit be issued by a municipal officer; in all other instances to the general fund of the county wherein the officer acts or the licensee resides or does business.

A person shall not be restricted as to the number of pistols or revolvers he may purchase, if he applies for and obtains permits to purchase the same, but only one pistol or revolver shall be purchased or delivered on each permit.

## **NEW MEXICO**

1923 N.M. Laws 179, An Act Making It a Felony to Transport or Place a Bomb, Dynamite or Other High Explosive in or upon Any Public Service Passenger Coach or Passenger Train, or to Maliciously Use or Handle Dynamite or Other Explosive, ch. 115, § 1.

Any person who knowingly transports or takes into or upon any public service passenger car or passenger coach in the State of New Mexico, any bomb, dynamite, nitro-glycerine, vigorite,

Giant or Hercules powder, gunpowder or other chemical compound or explosive shall be guilty of a felony and upon conviction thereof shall be punished by imprisonment for a term of not less than three years nor more than five years.

## NEW YORK

1652 N.Y. Laws 128 Ordinance of the Director and Council of New Netherland Against Illegal Trade In Powder, Lead And Guns In New Netherland By Private Persons
An act prohibited the Illegal Trade in Powder, Lead and Guns, however the exact text has been lost to history.

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 40-41, Image 62-63 (1896) available at The Making of Modern Law: Primary Sources. 1650-1699 Laws of the Colony of New York, Indians. No person shall sell, give or barter directly or indirectly any gun or guns, powder, bullet, shot, lead nor any vessel or burthen, or row boat, canoes only excepted without license first had and obtained under the governors hand and seal to any Indian whatsoever, nor to any person inhabiting out of this Government, nor shall amend or repair any gun belonging to any Indian, nor shall sell any armor or weapons, upon penalty of ten pounds for every gun, armor, weapon, vessel, or boat so sold given or bartered, five pounds for every for every pound of powder, and forty shillings for every pound of shot or lead and proportionately for any greater or lesser quantity.

The Documentary History Of The State Of New – York Page 222-223, Image 228-229 (1849) available at The Making of Modern Law: Primary Sources. 1650-1699: 1690
[By the Court of Albany, etc. (1690) Whereas diverse persons daily waste powder which is of such necessary use for defense of this City and County of Albany, and although many have been advertised thereof yet persist in the same: These are in his majesty's name to prohibit all persons whatsoever within the same city and county to burn any powder unless to kill provision, or for his majesty's service and benefit of the place aforesaid, upon pain of paying for every shot or discharging of gun or pistol (contrary to the intent of this order) six shillings current money of this province of New York, or corporal punishment at discretion.]

Documents Relative To The Colonial History Of The State Of New-York Page 254-255, Image 274-275 (1855) available at The Making of Modern Law: Primary Sources.  1744
A letter from Governor Clinton to the Lords of Trade. . . . I have taken every other precaution in my power to guard against my surprise by sending circular orders to the respective Colonels of Militia and to the Captains of his Majesty's Companies posted in this province to inspect the Arms and Accoutrements of their men, and see that they are in good order and fit for immediate service, and that as often as conveniently may be they do exercise the men in arms keeping strict discipline, whereby they may be able not only to repel the French Forces , if this Province should be attacked by them, but to be also in condition if necessary, to attack them, pursuant to Mr. Stones letter to me of 3rd September last by order of their Excellency's the Lords Justices, for

which end I have issued the enclosed proclamation to forbid the exportation of gun powder, or the applying the French with any kind of provisions warlike stores, or merchandise.

N.Y., N.Y. Ordinance Ordained and Established by the Mayor, Aldermen and Commonality of the City of New-York, image 118-119 (1793). 1788
(IV) And be it further enacted by the authority aforesaid, that it shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever, within the limits aforesaid, or in any ship or other vessel, within forty-eight hours after her arrival in the harbor, or at any time after such ship or other vessal shall and may have hauled along side any wharf, pier or key, within the limits aforesaid: And that upon any such search it shall be lawful for the persons finding any such gun powder, immediately to sieze, and at any time within twelve hours after such seizure, to convey the same to one of the magazines aforesaid; and the same gun powder so removed, to detain and keep, until it shall be determined by the Mayor or Recorder and any two Aldermen of the said city, whether the same is forfeited by virtue of this Act: And the person or persons so detaining the same, shall not be subject or liable to any action or suit for the detention thereof. Provided always, that nothing in this clause of this Act contained, shall be construed to authorize any person having such warrant to take advantage of the same for serving any civil process of any kind whatsoever. Provided also, that nothing in this Act contained shall extend to ships of war, or packets in the service of the United States or any of them, or of any foreign Prince or State; nor to authorise the searching for gun powder on board of any such ship or vessel while laying in the stream, and upwards of one hundred yards from the wharf or shore.

Mark Ash, The New York City Consolidation Act, as in Force in 1891: With Notes Indicating the Statutory Sources, References to Judicial Decisions, and All Laws Relating to New York City, Passed Since January 1, 1882, Together with an Appendix of the Royal English Colonial Charters of New York City Page 209, Image 233 (Vol. 1, 1891) available at The Making of Modern Law: Primary Sources.  1890
Ordinances of the City of New York, § 455. No person shall manufacture, have, keep, sell, or give away any gunpowder, blasting powder, gun-cotton, niro-glycerine, dualin, or any explosive oils or compounds, within the corporate limits of the city of New York, except in the quantities limited, in the manner, and upon the conditions herein provided, and under such regulations as the board of fire commissioners shall prescribe : and said board shall make suitable provision for the storage and safe keeping of gunpowder and other dangerous and explosive compounds or articles enumerated under this title, beyond the interior line of low water-mark in the city and county of New York. The said board may issue licenses to persons desiring to sell gunpowder or any of the articles mentioned under this section at retail, at a particular place in said city to be named in said license (provided that the same shall not be in a building used in any part thereof as a dwelling unless specially authorized by said license), and persons so licensed may on their premises, if actually kept for sale, persons so licensed may have on their premises, if actually kept for sale, a quantity not exceeding at any one time, of nitro-glycerine, five pounds; of gun-cotton, five pounds of gunpowder, fourteen pounds; blasting powder, twenty-five pounds. . .

1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.

Such chapter is hereby amended . . . § 1914. Sale of pistols, revolvers and other firearms. Every person selling a pistol, revolver or other firearm of a size which may be concealed upon the person whether such seller is a retail dealer, pawnbroker or otherwise, shall keep a register in which shall be entered at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre [sic], make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm. Such person shall also, before delivering the same to the purchaser, require such purchaser to produce a permit for possessing or carrying the same as required by law, and shall also enter in such register the date of such permit, the number thereon, if any, and the name of the magistrate or other officer by whom the same was issued. Every person who shall fail to kep a register and enter therein the facts required by this section, or who shall fail to exact the production of a permit to possess or carry such pistol, revolver or other firearm, if such permit is required by law, shall be guilty of a misdemeanor. Such register shall be open at all reasonable hours for the inspection of any peace officer. Every person becoming the lawful possessor of such pistol, revolver or other firearm, who shall sell, give or transfer the same to another person without first notifying the police authorities, shall be guilty of a misdemeanor. This section shall not apply to wholesale dealers.

**<u>NORTH CAROLINA</u>**

1905 N.C. Sess. Laws 547, Priv. Laws, An Act to Amend the Charter of the Town of Pine Bluff, in Moore County, ch. 188, § 6.

That the commissioners of said town shall have authority to pass all necessary by-laws and ordinances for the proper government of the town, and to enforce the same by means of suitable fines and penalties. Among the powers specifically conferred upon the commissioners are the following: . . . to prescribe conditions under which may be sold and used fire-arms of all kinds including toy guns and pistols and air-guns, brass knuckles, loaded canes, dirks, bowie and other knives used as weapons, ammunition and fire-works, not inconsistent with the general laws of the State[.]

1909 N.C. Sess. Laws 777, Priv. Laws, An Act for a New Charter for the City of Southport, North Carolina, ch. 345, § 23, pt. 14.

[O]n dealers in pistols, guns, dirks, bowie knives, sling shots, brass or metal knuckles or other like deadly weapons, in addition to all other taxes, a license tax not exceeding fifty dollars; on dealers in firecrackers, Roman candles, skyrockets, toy pistols or fireworks of any kind, a tax not exceeding fifty dollars.

**<u>NORTH DAKOTA</u>**

1923 N.D. Laws 379, 380-82

Sec. 10. SALES REGULATED. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who he has reasonable cause to believe either is an unnaturalized foreign

born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof, nor in any event shall he deliver a pistol or revolver on the day of the application for the purchase thereof, and when delivered, said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward by registered mail one copy thereof to the Secretary of State, and one copy thereof to the chief of police of the city or town, or the sheriff of the county of which the seller is a resident, and shall retain the other copy for six years. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not less than $100 or imprisonment for not less than one year, or by both such fine and imprisonment.

Sec. 11. DEALERS TO BE LICENSED. Whoever, without being licensed as hereinafter provided, sells, or otherwise transfers, advertises, or exposes for sale, or transfers or has in his possession with intent to sell, or otherwise transfer, pistols or revolvers, shall be punished by imprisonment for not less than two years.

Sec. 12. DEALERS' LICENSES: By WHOM GRANTED, AND CONDmoNs THEREOF.) The duly constituted licensing authorities of any city, town or subdivision of this state, may grant licenses in form prescribed by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political subdivision, pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

The business shall be carried on only in the building designated in the license.

The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

No pistol or revolver shall be delivered-

(a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor

(b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity; nor

(c) If the seller has reasonable cause to believe that the purchaser either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof.

A true record, in triplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Secretary of State, and shall be personally signed by the purchaser and by the person affecting the sale, each in the presence of the other, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, occupation, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded by registered mail to the Secretary of State and one copy thereof to the chief of police of the city or town or the sheriff of the county of which the seller is a resident, and the other copy retained for six years.

No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

**OHIO**

1849 Ohio Laws 407-08, Local Acts vol. 48, An Act to Incorporate the Town of Ripley in the County of Brown, § 4.
That the said town council of Ripley shall have power to ordain and establish laws and ordinances . . . to regulate the sale of gunpowder therein[.]

1889 Ohio Laws 164, An Act to Amend Section 2669 of the Revised Statutes, as Amended April 22, 1885, § 1.
The council of the city or village may provide by ordinance for licensing all exhibiters of shows or performances of any kind, not prohibited by law, hawkers, peddlers, auctioneers of horses and other animals on the highways or public grounds of the corporation, venders [sic] of gun powder and other explosives, taverns and houses of public entertainment, and hucksters in the public streets or markets, and in granting such license, may extract and receive such sum of money as it may think reasonable[.]

**OKLAHOMA**

1890 Okla. Sess. Laws 447-48, Crime and Punishment: Homicide, ch. 25, art. 17, § 24.
Every person guilty of making or keeping gunpowder or saltpeter within any city or village, in any quantity of manner such as is prohibited by law or by any ordinance of said city or village, in consequence whereof any explosion occurs whereby any human being is killed, is guilty of manslaughter in the second degree.

1890 Okla. Sess. Laws 474, Crime and Punishment: Of Crimes against the Public Health and Safety, ch. 25, art. 38, § 4.
Every person who makes or keeps gunpowder or saltpeter within any city or village, and every person who carries gunpowder through the streets thereof, in any quantity or manner such as is prohibited by law, or by any ordinance of such city or village, is guilty of a misdemeanor.


Dorset Carter, Annotated Statutes of the Indian Territory: Embracing All Laws of a General and Permanent Character in Force at the Close of the Second Session of the Fifty-fifth Congress Page 757, Image 841 (1899) available at The Making of Modern Law: Primary Sources. 1899 Indian Territory, § 4345 Every person other than an Indian, who within the Indian country, purchases or receives of any Indian in the way of barter, trade or pledge, a gun, trap or other article commonly used in hunting, any instrument of husbandry, or cooking utensils of the kind commonly obtained by the Indians in the intercourse with the white people, or any article of clothing except skins or furs, shall be liable to penalty of fifty dollars.

**OREGON**

1903 Or. Laws 106, Spec. Sess., An Act to Incorporate the City of North Bend, and to Provide a Charter Therefor . . . , § 27, pt. 23.

To regulate the transfer of gunpowder, dynamite, nitro-glycerine, and other combustibles and explosives through the streets  or alleys of the city[.]

1913 Or. Laws 497

Section 1. It shall be unlawful for any person, firm or corporation to display for sale at retail any pocket pistol or revolver or to sell at retail, barter, give away or dispose of the same to any person whomsoever, excepting a policeman, member of the militia or peace officer of the State of Oregon, unless the purchaser or person attempting to procure the same shall have a permit for the purpose of procuring such pocket pistol or revolver signed by the municipal judge or city recorder of the city or county judge or a justice of the peace of the county wherein such person resides.

Section 2. Provided, that no judge, city recorder or justice of the peace shall issue such permit until said applicant has furnished him with an affidavit from at least two reputable freeholders as to the applicant's good moral character.

Section 3. All persons, firms or corporations engaged in the retail sale of pocket pistols or revolvers shall keep a record of the sale of such pocket pistols or revolvers by registering the name of the person or persons and the number of the pocket pistol or revolver and shall transmit same to the sheriff of the county in which purchase is made on the 1st and 15th day of each calendar month.

## **PENNSYLVANIA**

Charter To William Penn, And Laws Of The Province Of Pennsylvania, Passed Between The Years 1682 And 1700 Page 32, Image 37 (1879) available at The Making of Modern Law: Primary Sources.  1650-1699

Laws of the Duke of York, Indians (1676). No person shall sell give or barter directly or indirectly any gun or guns powder, bullet, shot, lead nor any vessel of burthen, or row boat canoes only excepted without license first had and obtained under the Governor's hand and Seal, to any Indian whatsoever, nor to any person inhabiting out of this government nor shall amend or repair any gun belonging to any Indian, nor shall sell any armor or weapons, upon penalty of ten pounds for every gun, armor, weapons, vessel or boat, so sold given or bartered, five pounds for every pound of shot or lead and proportionally for any greater or lesser quantity.

Act of 26th August 1721

1700-1729

[An Act of 9th of February, 1750-51, § 1. If any person or persons whatsoever, within any county, town or within any other town or borough in this province, already built and settled, or hereafter to be built and settled , not hitherto restricted nor provided for by our laws, shall set on fire their chimneys to cleanse them, or shall suffer them or any of them to take fire, and blaze out at the top, or shall fire any gun or other fire arm, or shall make or cause to be made, or sell or utter, or offer to expose to sale, and squibs, rockets, or other fire works, or shall cast, throw or fire any squibs, rockets, or other fire works within any of the said towns or boroughs without the governor's special license for the same, every such person or persons so offending shall be subject to the like penalties and forfeitures, and be recovered in like manner, as in and by an act, passed in the eighth year of the reign of king George the first, entitled 'An act for preventing accidents that may happen by fire are directed to be levied and recovered.]

John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources.  1700-1729
[An Act for Preventing Accidents that may Happen by Fire, § IV. And whereas much mischief may happen by shooting of guns, throwing casting and firing of squibs, serpents, rockets, and other fire-works, within the city of Philadelphia, if not speedily prevented: Be it therefore enacted, That if any person or persons, of what sex, age, degree or quality soever, from and after publication hereof, shall fire any gun or other fire-arms, or shall make, or cause to be made, or sell or utter, or offer to expose to sale, any squibs, rockets or other fire works, or shall cast, throw or or fire, any squibs, rockets, or other fire works, within the city of Philadelphia, without the governor's special license for the same, of which license due notice shall first be given to the mayor of the said city, such person or persons so offending, and being thereof convicted before any one justice of the peace of the said city, either by confession of the party so offending, or by the view of any of the said justices, or by the oath or affirmation of one or more witnesses, shall for every such offence forfeit and pay the sum of five shillings; one half to the use of the poor of the said city, and the other half to the use of him or them who shall prosecute, and cause such offender to be as aforesaid convicted; which forfeitures shall be levied by distress and sale of the offenders goods as aforesaid; and for want of such distress, if the offender refuse to pay the said forfeiture, he shall be committed to prison, for every such offence the space of two days without bail or main-prize; Provided, that such conviction be made within ten days after such offence committed [ and if such offender be a negro or Indian slave, he shall instead of imprisonment be publically whipped, at the discretion of the magistrate.]

1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries
That if any persons or persons whatsoever, within any county town, or within any other town or borough, in this province, already built and settled, or hereafter to be built and settled . .. shall fire any gun or other fire-arm, or shall make or cause to be made, or sell or utter, or offer or expose for sale, any squibs, rockets or other fire-works, … within any of the said towns or boroughs without the Governor's special license for the same, every such person or persons, so offending shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of King George the first, entitled, An act for preventing accidents that may happen by fire, are directed to be levied and recovered.

1794 Pa. Laws 764, An Act Providing For The Inspection Of Gunpowder chap. 337
Whereas gun-powder imported from abroad, and manufactured within this state, have frequently been found to vary much in its strength, and sometimes of inferior qualities, and its defects not discovered until brought into actual use: And whereas the modes heretofore used to prove the force thereof have been found uncertain and variable; and whereas Joseph Leacock, of the city of Philadelphia, hath invented an engine, called a pendulum powder proof, with a graduated arch and catch-pall, by which it is conceived that the force of gunpowder may be proved by

experiment, and the article reduced to certain and uniform standards of strength, whereby the manufacture may be advanced towards ultimate perfection, and the purchaser and consumer protected against fraud and imposition. § 1. . . That from and after the first day of October next, all gun-powder manufactured within this state, with intent to sell the same within the city or county of Philadelphia, shall be put in good and tight kegs or casks of twenty-five, fifty, or one hundred pounds neat weight, each made of well seasoned timber, bound together with at least twelve hoops, and having a hole bored in each head, of the diameter of one fourth part of an inch, well stopped with corks, and having the tare weight to each cask marked thereon, and that all such gun powder, and all other gun-powder, wheresoever manufactured, imorted into the port of Philadelphia, or brought into the city or county of Philadelphia for sale, shall be deposited forthwith on such importation or bringing by land or by water, in the public magazine in the said city, and delivered to the care of the keeper of the same, who shall give his receipt for the same, deliverable to the order of him or them who shall so deposit the same. § 2. And be it further enacted by the authority aforesaid, That David Rittenhouse, Francis Gurney and Thomas Procter be, and they are hereby, appointed Commissioners, to procure at least two pendulum powder proofs, upon the construction invented by the said Joseph Leacock, as nearly uniform in the length of the radius and weight of the pendulum, and in length of caliber and weight of the pistol, as they can procure the same, and therewith make experiments of the respective strenght or force of of the several species of gun-power imported from abroad, and manufactured within this state, sufficient in number to assertain the quality and force of three different degrees of strength in explosion, and marking the number of degrees on the graduated arch of the said engine, to which equal quantities be weight of the said three species of gun-powder, rammed with equal force into the pistol, shall elevate the said pendulum; and the powder which shall be barely capable of raising the said pendulum to the lowest rate of elevation, shall be standard for the state of Pennsylvania for gun powder of the first or lowest proof; and the powder which shall be capable of raising the said pendulum to the highest rate of elevation, shall be the standard of gun-powder for the State of Pennsylvania for the third or highest proof; and the middle or second proof standard of gun-powder shall be ascertained by the number of degrees of the said graduated arch, to which the same quantity of weight in equal moieties of the first and third proof powder shall be capable of raising the said pendulum; and the said standard being fixed and ascertained, the said Commissioners shall make report thereof in writing, by indentures under their hands and seals, on part thereof, together with one of the said pendulum powder proofs, and as accurate a draft and description thereof as can be made shall be returned to the Governor, to be filed and remain in the office of the Secretary of the Commonwealth, on other part shall be returned to the master of the Rolls, to be recorded in his office, and filied among the laws of the state and the otehr part together with the other pendulum powder proofs, shall be delivered to the first inspector of gun powder to be appointed in pursuance of this act, and by him, and his successors in office, to his and their succesors, as often as another officer shall be appointed.

Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred, to the Twentieth Day of March, One Thousand Eight Hundred and Ten Page 240-244, Image 284-288 (1810) available at The Making of Modern Law: Primary Sources.  1795
An Act providing for the inspection of Gun-powder. Whereas gun-powder imported from abroad and manufactured within this state, hath frequently been found to vary much in its strength, and sometimes of inferior qualities, and its defects not discovered until brought into actual use: and

whereas the modes heretofore used to prove the force thereof have been found uncertain and variable: and whereas Joseph Leacock, of the city of Philadelphia, hath invented an engine, called a pendulum powder proof, with a graduated arch and catch-pall, by which it is conceived that the force of gun-powder may be proved by experiment and the article reduced to certain and uniform standards of strength, whereby the manufacture may be advanced towards ultimate perfection , and the purchaser and consumer protected against fraud and imposition: § 1. Be it enacted by the Senate and House of Representatives of the commonwealth of Pennsylvania, in General Assembly met, and it is hereby enacted by the authority of the same, That from and after the first day of October next, all gun-powder manufactured within this state, with intent to sell the same within the city or county of Philadelphia, shall be put in good and tight kegs or casks of twenty-five, fifty, or one hundred pounds neat weight , each made of well seasoned timber, bound together with at least twelve loops, and having a hole bored in each head with the diameter of one fourth part of an inch, well stopped with corks and having the tare weight (weight of the actual keg or cask) of each cask marked thereon, and that all such gun-powder, and all other gun-powder, wheresoever manufactured imported into the port of Philadelphia, or brought into the city or county of Philadelphia for sale, shall be deposited, forthwith on such importation or bringing by land or by water, in the public magazine in in the said city, and delivered to the care of the keeper the same, who shall give his receipt for the same, deliverable to the order of him or them who shall deposit the same. § 2. And be it further enacted by the authority aforesaid, That David Rittenhouse, Francis Gurney, and Thomas Procter be, and they are hereby, appointed commissioners, to procure at least two pendulum powder proofs, upon the construction invented by the said Joseph Leacock, as nearly uniform in length and radius and weight of pendulum, and in length of caliber and weight of the pistol, as they can procure the same, and therewith make experiments of the respective strength or force of the several species of gun-powder imported from abroad and manufactured within this state, sufficient in number to ascertain the quality and force of three different degrees of strength in explosion, and marking the number of degrees on the graduated arch of the said engine, to which equal quantities of weight of the said three species of gunpowder, rammed with equal force into the pistol, shall elevate the said pendulum; and the power which shall be barely capable of raising the said pendulum to the lowest rate of elevation, shall be the standard for the state of Pennsylvania for gun-powder of the first or lowest proof; and the powder which shall be capable of raising the said pendulum to the highest rate of elevation, shall be the standard of gunpowder for the state of Pennsylvania of the third or highest proof; and the middle or second proof standard of gun-powder shall be ascertained by the number of degrees on the said graduated arch, to which the same quantity by weight in equal moieties of the first and third proof powder shall be capable of raising the said pendulum; and ht said standard being so fixed and ascertained, the said commissioners shall make report thereof in writing, by indentures under their hands and seals, one part thereof, together with one of the said two pendulum powder proofs, as accurate a draft and description thereof as can be made shall be returned to the Governor, to be file and remain the office of the Secretary of the commonwealth; and one other part shall be returned to the Master of Rolls, to be recorded in his office, and filed among the laws of the state; and the other part, together with the other pendulum powder proofs, shall be delivered to the first Inspector of gun-powder to be appointed in pursuance of this act, and by him, and his successors in office, to his and their successors, as often as another officer shall be appointed. . . § 6. And by it further enacted by the authority aforesaid, That it shall be the duty of the inspector of gunpowder so to be appointed, for the time being, to attend at the aid public magazine, and his office so to be

built, as often as shall be necessary, to inspect and examine all gunpowder there to be deposited, to draw samples form each cask of powder which shall be so as aforesaid bored, and to open or otherwise get samples of casks of powder not bored as aforesaid, and removing such samples to his office, there to prove the same b the pendulum proof aforesaid, and note the standard quality of each cask, to provide himself with cedar plugs stamped on the outer end with the letters S.P. and the figures number one, number two, and number three, so designate the first, second and third proofs of standard gunpowder of the state of Pennsylvania, and another stamped with letters S.P. to designate condemned gun-powder, and therewith carefully to plug up the holes opened or made for the purpose with such marked plugs, as the proof quality of the powder in each cask respectively contained, and occasionally to weight the said casks; and if upon weighing the same suspicion shall arise that he casks are false tared, or do not contain the quantity herein above mentioned for each cask, to empty the same, and weigh the cask and powder separately, to ascertain the deficiency, if any, in the neath weight, and to fill the same to its due weight out of the other cask belonging to the same person, marking the weight taken on the ullage casks , and keeping an exact account in the books thereof, and of the names of the owners and persons bringing and depositing the same. . . §10. And be it further enacted by the authority aforesaid That if any person, from and after the first day of October next, importing or bringing into the port or city, or county of Philadelphia, any quantity of gun-powder exceeding twenty-five pounds, with intent to sell the same, shall neglect to deposit the same for inspection in the magazine aforesaid, or shall sell the same before it be inspected and marked as aforesaid, or shall sell any gun-powder that shall be condemned as aforesaid as and for merchantable gun-powder every person so offending shall forfeit all such gunpowder as aforesaid. § 11. And be it further enacted by the authority aforesaid, That the inspector shall be entitled to demand and receive of and from the owner and possessor of all gun-powder deposited in the said magazine, and by him or his Deputy examine, proved and plugged, as aforesaid, the following sums or rates, whether the same be approved or condemned, paid or secured before the same shall be removed from the magazine; if the Inspector shall so require; for every cask of powder, manufactured in this state, or any of the United States, bored, and stopped with corks by the manufacturer, containing twenty-five pounds neat weight, seven cents; for every like cask containing fifty pounds, eight cents; for every like cask containing one hundred pounds, nine cents; and fore very cask of foreign powder, or powder manufactured in the United States, not bored and stopped with corks as aforesaid, double the said price or rates; and for every cask which shall find deficient one per cent. In weight and shall fill up, fifty cents. § 12. And be it further enacted by the authority aforesaid, that if any dispute should arise between the owner, possessor or consignee of any such powder and the Inspector, touching the proof or condemnation thereof, or the goodness of the materials and manner in which the casks are made, upon application by the owner, possessor or consignee of such powder to one of the Magistrates of the city or county of Philadelphia, where the dispute shall arise, the said Magistrate shall issue this warrant to three indifferent judicious persons to be triers thereof, one of them to be named by the said owner, possessor or consignee, of by the said Inspector, and the third of the said Magistrate shall thereupon give his judgment agreeably to the report of the said triers, or any two of them; ad in case the said Magistrate shall on such reports adjudge the powder not to be merchantable, he shall award the owner, possessor or consignee thereof, to pay all costs; but in the case the said powder shall be found merchantable, the Inspector shall be adjudged to pay all costs, which may have accrued, and shall thereupon cause the powder to be marked as the standard to eb directed by the said triers.

**RHODE ISLAND**

1762 R.I. Pub. Laws 132
And be it further Enacted by the Authority aforesaid, That no person whatsoever shall fire a gun or other fireworks within one hundred yards of the said powder house, upon the penalty of paying a fine of ten shillings lawful money, for every such offence, to be recovered by the Town Treasurer, for the use of the said Town.

Records Of The State Of Rhode Island And Providence Plantations In New England.Providence Page 18-19, Image 20-21 (1863) available at The Making of Modern Law: Primary Sources. 1776
An Act for the Inspection of Gunpowder, Manufactured within this State (1776). Be it enacted by this General Assembly, and by the authority thereof, it is enacted, that if any person or persons, within this state, shall vend or expose to sale any gunpowder, manufactured within the same, unless said gunpowder be packed in a good dry cask, marked with the two first letters of the manufacturer's name, and hath been examined and approved by the inspector of gunpowder, for said state, and by him marked with the letters U.S.A., and such other marks as are necessary to distinguish the several sorts of gunpowder: the person or persons so offending shall forfeit and pay £6 lawful money, for every cask so exposed to sale; to be recovered by bill, plaint or information, upon conviction before any court of record within this state; which forfeiture shall one moiety thereof be given to the informer, and the other be paid in to the general treasury of the state. And be it further enacted by the authority, aforesaid, that the said inspector be paid out of the general treasury nine-pence, lawful money, for every cask so marked and inspected by him.

The Charter and Ordinances of the City of Providence, Together with the Acts of the General Assembly Relating to the City Page 89-96, Image 89-96 (1854) Available at The Making of Modern Law: Primary Sources. 1821
An Act Regulating the Storage, Safe Keeping and Transportation of Gunpowder in the Town of Providence, (1821) § 2. And be it further enacted, That is shall not be lawful for any person or persons to sell any gunpowder which may at the time be within the town of Providence in any quantity, by wholesale or retail, without first having obtained from the town council of said town a license to sell gunpowder; and every such license shall be written or printed, and signed by the president of said council or their clerk, on a paper upon which shall be written or printed a copy of this act; and every such license shall be in force for one year from the date thereof, unless annulled by said council, and no longer; but such license may, prior to the expiration of that time, be renewed, by endorsement thereon, for a further term of one year, and so from year to year: provided, always, that the said town council may annul any such license, if in their opinion the person or persons licensed have forfeited the right of using the same by any violation of the law relative thereto; and every person who shall receive a license as aforesaid shall pay therefor the sum of five dollars, and on having the same renewed shall pay therefor the sum of one dollar, which shall be paid to the clerk of said council, for their use, for the purpose of defraying the expense of carrying this act into execution. § 3. And be it further enacted, That any person or persons who shall keep, have, possess or transport any gunpowder within the town of Providence, contrary to the provisions of this act, or who shall sell any gunpowder therein,

without having a license therefor, then in force, shall forfeit and pay a fine of not less than twenty dollars, and not exceeding five hundred dollars, for each and every offence; and if any gunpowder kept contrary to the provisions of this act shall explode in any shop, store, dwelling-house, ware-house or other building, or in any place in said town, the occupant, tenant or owner of which has not a license in force to keep and sell gunpowder therein, or which gunpowder shall have been kept in a manner contrary to the terms and conditions of such license, such occupant tenant or owner shall forfeit and pay a fine of not less than twenty dollars nor more than five hundred dollars. . . § 6. And be it further enacted, That the said firewards, or any of them, may enter the store or place of any person or persons licensed to sell gunpowder, to examine and ascertain whether the laws relating thereto are strictly observed; and also whenever there may be an alarm or fire; and in such last case may cause the powder there deposited to be removed to a place of safety, or to be destroyed by wetting or otherwise, as the exigency of the case may require; and it shall be lawful for any one or more of the firewards aforesaid to enter any dwelling house, store, building or other place in said town to search for gunpowder which they may have reason to suspect to be concealed or unlawfully kept therein; first having obtained from some justice of the peace of said town a search warrant therefor; which warrant any one of the justices of said town is hereby respectively authorized to issue, upon the complaint of such fireward or firewards, supported by his or their oath or affirmation. . . And be it further enacted, That all persons who wish have a license to keep and sell gunpowder within the town shall make application to the town council in writing, stating the place of business and whether they wish to sell by wholesale or retail, or both; and to each person or firm who may be approbated, a certificate of license shall be granted, on payment of the fee established by law. § 14. And be it further enacted, That every person or firm who may be licensed to sell gunpowder by retail, shall be allowed to keep in the place or building designated in the license, twenty-five pounds of gunpowder, and no more, at one time, which shall always be kept in tin or copper canisters, capable of containing no more than twelve and a half pounds each with a small aperture at the top, and a tin or copper cover thereto. § 15. And be it further enacted, That every person or firm who may be licensed to sell gunpowder by wholesale, shall provide and keep a tine or copper chest, with two handles and a tight cover, furnished with a hinge, and secured with a padlock, all of tin or copper chest, with two handles and a tight cover furnished with a hinge and secured padlock, all of tin or copper; such chest shall always be kept on the lower floor, on the right side of and close to the principal door or entrance from the street into the building so licensed, except when otherwise designated by the council and shall always be kept locked, except when powder is put in or taken out; and such person or firm, so licensed shall be allowed to deposit and keep, in such tin or copper chest, a quantity of gunpowder not exceeding four casks of twenty-five pounds each; the heads of each cask not to be opened, and each cask to be kept in a strong leather bag, closely tied and marked as aforesaid. § 16. And be it further enacted, that every person or firm licensed to keep and sell gunpowder as aforesaid, by wholesale or retail, shall have and keep a signboard placed over the door or building in which such powder is kept, on which shall be painted in Roman capitals the words "Licensed to sell Gunpowder"

Newport (R.I.). Charter of the City of Newport, R.I., And the Special State Laws Relating Thereto, Together With the Ordinances for the Government of the City. Newport, 1858. Newport RI 1858 Sec. 11. And be it further enacted, That no person whosoever shall fire a gun or other fire-works within one hundred yards of the said powder-house, upon the penalty of two dollars for every such offense, to be recovered by the town treasurer for the use of said town.

Sec. 12. And be it further enacted, That no ship or vessel having more than five barrels of gunpowder on board, shall come to anchor in the harbor of Newport, anywhere to the eastward of Goat Island, and lie there more than twenty-four hours, after notice and warning shall be given by the president of the town council . . .

1885 R.I. Pub. Laws 6, An Act In Amendment Of And in Addition To Chapter 242 Of The Public Statutes, Entitles "Of Offenses Against Private Property." § 1
§ 1. Every person who shall knowingly deliver or cause to be delivered to any person or carrier any box, can or other package of nitro-glycerine, gunpowder, naptha or other equally explosive material, not marked with a plain and legible label describing its contents, or who shall remove or cause to be removed any such label or mark shall be fined not more than ten thousand dollars or imprisoned not more than five years.

## SOUTH CAROLINA

Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802
[Ordinances of the City of Charleston, An Ordinance for Appointing Commissioners of the Streets, Defining their Powers, and for other Purposes therein Mentioned, § 8. And be it further ordained by the authority aforesaid, That no person or persons, shall fire any squibs, crackers, or other fireworks, except at times of public rejoicing, and at such places as the intendant for the time being may permit, by license under his hand; nor burn any chips, shavings, or other combustible matters, in any of the streets, lanes, wharves, alleys, or open or enclosed lots of the city, nor fire any gun, pistol, or fire arms, within the limits of the city, except on occasion of some military parade, and then by the order of some officer having the command, under the penalty of ten dollars, for every such offense; nor shall any person or persons, raise or fly any paper or other kite, within the said city, under the said penalty of ten dollars.]

John E. Breazeale, The Revised Statutes of South Carolina, Containing the Code of Civil Procedure, and the Criminal Statutes. Also The Constitutions of the United States and of the State, and the Rules of the Supreme and of the Circuit Courts of the State Page 431, Image 529 (Vol. 2, 1894) available at The Making of Modern Law: Primary Sources. 1890
Chapter XXVIII Violations of the License Laws by Insurance and Other Companies, Emigrant Agents, owners or shows, etc., Persons Selling Pistols, etc. §490. No person or corporation within the limits of this State shall sell or offer for sale any pistol, rifle, cartridge or pistol cartridge less than .45 caliber, or metal knuckles, without first obtaining a license from the county in which such person or corporation is doing business so to do. The County Board of Commissioners of the several Counties of this State are authorized to issue licenses in their respective Counties for the sale of pistols and pistol and rifle cartridges of less than .45 caliber, and metal knuckles, upon the payment to the County Treasurer by the person or corporation so applying for said license of the sum of twenty-five dollars annually; and any person who shall sell or offer for sale any pistol, or pistol or rifle cartridge of less than .45 caliber, or metal knuckles, without having obtained the license provided in this Section shall be deemed guilty of

a misdemeanor, and on conviction shall be punished by a fine not exceeding five hundred dollars, or by imprisonment not exceeding one year, or both, at the discretion of the court.

1903 S.C. Acts 124, An Act to Protect Fish by the Regulation of the Sale of Dynamite and Other Similar Explosives: § 1.
§ 1. Be it enacted by the General Assembly of the State of South Carolina, That no person shall sell, deliver or dispose of dynamite or similar powerful explosives, except ordinary gunpowder, unless such person knows the purchaser or the party to receive the same and is satisfied that the explosive is not to be used for killing fish, and then only upon a written application from party desiring to purchase, stating the purpose for which he desires to use the said explosives; and a person selling, delivering or disposing of such explosives, shall keep a book in which shall be recorded the name of the purchaser or party to whom the explosive is delivered, the quantity so sold or delivered, and the date of such sale or delivery.

## SOUTH DAKOTA

1913 S.D. Sess. Laws 292, An Act to Regulate the Sale of Dynamite or Other High Explosives, and to Provide a Penalty for the Violation Thereof, § 1.
No person, firm, or corporation shall sell any dynamite or other high explosive, except ordinary gun powder in the state of South Dakota, to any person unknown to the seller, unless introduced by some person known to the seller, and on every sale the seller shall before delivery, make entry on a book kept for that purpose stating the date of sale, the name and address of the purchaser, the name and quantity of the article sold, the purpose for which it is required and the name of the person, if any, who introduced them. Any person failing to comply with the requirements of this section shall be deemed guilty of a misdemeanor.

## TENNESSEE

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 52, Image 52 (1867) available at The Making of Modern Law: Primary Sources. 1867
Ordinances of the City of Memphis, Nuisance and Abatement Thereof, It is a public nuisance. —
§ 5 To carry on the business of manufacturing gun-powder or of mixing or grinding the materials therefor, in any building within eighty rods of any valuable building erected at the time such business may be commenced.

1899 Tenn. Pub. Acts 327, An Act to Repeal the Charter of the Town of Waverly, in Humphreys County, and to Incorporate Said Town and Define Its Rights, Powers, etc.,  ch. 174, § 11, pt. 10.
[The Town has power] To regulate, restrain, or prevent the carrying on of manufactories dangerous in causing or producing fires, and to prevent and suppress the sale of firearms, fireworks, Roman candles, crackers, sky rockets, etc., and toy pistols.

## UTAH

1901 Utah Laws 76, An Act Relating to the Marketing of Explosives, Inflammable Substances or Dangerous Acids, Chemicals and Compounds for Storage or Transportation, and Providing Penalties for the Violation of This Act, ch. 77, § 1.
Penalty for delivering dangerous explosive for storage or transportation. That every person who knowingly leave with or delivers to another, or to any express or railway company or other common carrier, or to any warehouse or storehouse any package containing nitro-glycerine, dynamite, guncotton, gunpowder, or other highly explosive compound, or any benzine [sic], gasoline, phosphorus, or other highly inflammable substance or any vitriol, . . . or other dangerous acid . . . to be handled, stored, shipped or transported, without plainly marking and indicating on such package the name and nature of the contents thereof, is guilty of a misdemeanor, and punishable by a fine not exceeding three hundred dollars, or by imprisonment in the county jail not exceeding six months.

**VERMONT**

1865 Vt. Acts & Resolves 213, An Act to Amend an Act Entitled "An Act to Incorporate the Village of Rutland," Approved November 15, 1847, § 10.
. . . and said fire wardens may inspect the manner of manufacturing and keeping gun-powder, lime, ashes, matches, lights, fire-works of all kinds, and other combustibles, . . . and a majority of said fire-wardens may, if they deem the same to be dangerous, order the persons manufacturing and keeping such gun powder . . . in what manner to manufacture and keep the same[.]

Barber, Orion M. The Vermont Statutes, 1894: Including the Public Acts of 1894, with the Declaration of Independence, the Articles of Confederation, and the Constitutions of the United States, and the State of Vermont Page 918, Image 935 (1895) available at The Making of Modern Law: Primary Sources. 1882
A person who has in his possession a toy pistol for the explosion of percussion caps or blank cartridges, with intent to sell or give away the same, or sells or gives away, or offers to sell or give away the same, shall be fined not more than ten nor less than five dollars; and shall be liable for all damages resulting from such selling or giving away, to be recovered in an action on the case.

1919 Vt. Acts and Resolves 136, An Act to Regulate the Transportation of Dynamite, Gunpowder and Other Explosives by Common Carriers, § 1.
It shall be unlawful to transport, carry or convey from one place in this state to another place in this state, any dynamite, gunpowder, or other explosive on any vessel or vehicle of any description operated by a common carrier, which vessel or vehicle is carrying passengers for hire[.]

**VIRGINIA**

That no commander of any plantation do either himselfe or suffer others to spend powder unnecessarily in drinking or entertainments, &c.
The Laws of Virginia, Vol. 1, 1623, 127.
https://archive.org/details/statutesatlargeb01virg/page/126/mode/2up?view=theater

## WASHINGTON STATE

Edward D. McLaughlin, The Revised Statutes and Codes of the State of Washington Page 686, Image 738 (1896) available at the Making of Modern Law: Primary Sources.  1896
Public Nuisance, § 3910 – Certain Defined. It is a public nuisance—5. To carry on the business of manufacturing gun powder, nitroglycerine or other highly explosive substance, or mixing or grinding the materials therefor, in any building within fifty rods of any valuable building, erected at the time such business may be commenced.

## WEST VIRGINIA

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b.
It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

## WISCONSIN

Charter and Ordinances of the City of La Crosse, with the Rules of the Common Council Page 239-242, Image 242-245 (1888) available at The Making of Modern Law: Primary Sources. Ordinances of La Crosse, An Ordinance to Provide for Licensing Vendors of Gunpowder and Other Explosive Substances and to Regulate the Storing, Keeping and Conveying of all Dangerous and Explosive Materials and Substances within the City of La Crosse, and in relation to the Storage and Sale of Lime Therein, § 1. It shall be unlawful for any person to keep for sale, sell or give away any gunpowder, giant powder, nitro-glycerine, gun-cotton, dynamite or any other explosive substance of like nature or use without having first obtained a license therefor from the city of La Crosse in the manner hereinafter provided. Any person convicted of a violation of this section shall be punished by a fine of twenty-five dollars for each offense. . . § 3. It shall be unlawful for any person licensed pursuant to the foregoing sections of this ordinance to have or keep at his or her place of business an amount of gunpowder or other explosive material greater in the aggregate than fifty pounds at any one time, or to keep the same in any other than cases or canisters made of tin, or other metal holding not to exceed ten pounds each. Such gunpowder or other explosive materials shall be kept in places remote from fires and lighted lamps or candles, and where the same may be easily accessible so as to be removed in case of fire. No person shall sell any gunpowder or other explosive material after the lighting of lamps in the evening unless in sealed canisters or cases; and all places where business is carried on under any such license shall have a sign put up in a conspicuous place at or near the front door thereof with the word "gunpowder" painted thereon in large letters. Any person violating any provision of this section shall, upon conviction, be punished by a fine of not less than five

dollars nor more than fifty dollars for each offense; and upon any such conviction the common council may at its discretion by resolution duly passed revoke the license of the person so convicted. This ordinance shall not be construed as to prevent persons who are not vendors of the articles mentioned in the title thereof from keeping gunpowder in quantities not exceeding one pound for their own use.

1911 Wis. Sess. Laws 227-28, An Act . . . Relating to the Regulation of the Manufacture and Storage of Gunpowder and Black Blasting Powder, and Providing a Penalty, ch. 223, § 1.
§ 1. . . § 4393a-1. It shall be unlawful for any person, firm, or corporation to manufacture gunpowder or black blasting powder in any quantity whatsoever within the corporate limits of any city or village or within one hundred rods of any occupied dwelling house or any church, schoolhouse, town hall, depot or other place in which people are accustomed to assemble. § 4393a-2. It shall be unlawful for any person, firm or corporation engaged in the manufacture of gunpowder or black blasting powder to store, or permit to be stored on the land or premises where gunpowder or black blasting powder is manufactured, any dynamite or explosive other than that manufactured at such gunpowder or black blasting powder manufacturing plant or within one mile of any plant where gunpowder of black blasting powder is manufactured. § 4393a-3. It shall be unlawful for any person, firm, or corporation engaged in the manufacture of gunpowder or black blasting powder, to store or to keep in storage or permit to be stored or kept in storage, at any plant where gunpowder or black blasting powder is manufactured, more than one hundred twenty-five thousand pounds of gunpowder or black blasting powder in any building or storage magazine at such plant[.]

1911 Wis. Sess. Laws 572, An Act . . . Relating to Child Labor, ch 479, §4.
§ 1728f. 1. No child under the age of eighteen years shall be employed . . . in or about establishments where nitroglycerine, dynamite, dualin, guncotton, gunpowder or other high or dangerous explosive is manufactured, compounded or stored[.]


SOURCE: Duke Center for Firearms Law, https://firearmslaw.duke.edu/repository/search-the-repository/

# EXHIBIT E

# EXHIBIT E

# GUNPOWDER/GUN TRANSPORTATION LAWS

ARIZONA

Act of Mar. 18, 1889, 1889 Ariz. Sess. Laws 16–17.  1889
Sec. 1. If any person within any settlement, town, village or city within the Territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which he is convicted, the weapon or weapons so carried.
Sec. 2. The preceding article shall not apply to a person in actual service as a militiaman, nor as a peace officer or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process.
Sec. 3. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sol for the purposes of offense or defense, he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person.
Sec. 4. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.. . .
Sec. 6. Persons traveling may be permitted to carry arms within settlements or towns of the Territory for one-half hour after arriving in such settlements or town, and while going out of such towns or settlements; and Sheriffs and Constables of the various Counties of this Territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties of their respective offices.


ARKANSAS

Act of Feb. 16, 1875,1874-75 Ark. Acts 156. 1875
Sec. 1. That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which said offense shall have been committed, shall be fined in any sum not less than twenty-

give nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; Provided, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of any legal process, or any private person legally authorized to execute any legal process to him directed.

GEORGIA

Oliver H. Prince, A Digest of the Laws of the State of Georgia: Containing all Statutes and the Substance of all Resolutions of a General and Public Nature, and now in Force, which have been Passed in this State, Previous to the Session of the General Assembly of Dec. 1837 Page 619, Image 619 (1837) available at The Making of Modern Law: Primary Sources. 1837
An Act to Regulate the transportation of gunpowder and to authorize the forfeiture of such as shall be transported in violation of the provisions of this act (1831) #20, § 1. From and after the passage of this act, it shall be the duty of all owners, agents and others, who may or shall have any gunpowder, exceeding in quantity five pounds, transported upon the waters or within the limits of this State, to have the word gunpowder marked in large letters upon each and every package which may or shall be transported. § 2. All gunpowder exceeding five pounds in quantity which shall hereafter be transported or engaged for transportation upon any of the waters or within the limits of this State, without being marked as directed in the first section of this act, shall be liable to seizure and forfeiture – one half to the informer, the other for the use of the volunteer companies most convenient or contiguous to the place of seizure or forfeiture.

HAWAII

1933 Haw. Sess. Laws 38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 6.
The possession of all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn, or to carriage as merchandise in a wrapper from the place of purchase to the purchaser's home, place of business or place of sojourn, or between these places and a place of repair, or upon change of place of business, abode, or sojourn, except as provided in Sections 5 and 8; provided, however, that no person who has been convicted in this Territory or elsewhere, of having committed or attempted a crime of violence, shall own or have in his possession or under his control a pistol or revolver or ammunition therefor. Any person violating any provision of this section shall be punished by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one year, or by both.

IOWA

An Act Defining Crime and Punishments, Ch. 49, Sec. 72, in Revised Statutes of the Territory of Iowa (Reprint 1911)  1843
SEC. 72. If any person shall aid or assist a prisoner, lawfully committed or detained in any jail, for any offense against this territory, or who shall be lawfully confined by virue of any civil process, to make his or her escape from jail, though no escape be actually made, or if an), person shall convey or cause to be delivered to such prisoner any disguise, instrument or arms, proper to facilitate the escape of such prisoner, any person so offending, although no escape or attempt to escape be actually made, shall, on conviction, be punished by fine not exceeding five hundred dollars nor les than one hundred dollars, and imprisonment in the penitentiary, at hard labor, for a term not exceeding two years.


KENTUCKY

Kentucky Statutes Containing All General Laws including Those Passed at Session of 1898, p. 547 Sec. 1259. 1898
Hunting or fishing on another's land. Any person who shall enter upon the inclosed lands of another for the purpose of shooting, hunting, or fishing, without the consent of the owner or occupant of said lands, shall be fined not less than five nor more than twenty-five dollars. (See further, sec. 1252.)

MARYLAND

Proceedings of the Conventions of the Province of Maryland Held at the City of Annapolis, in 1774, 1775, & 1776 Page 147, Image 147 (1836) available at The Making of Modern Law: Primary Sources.  1776
[1776 Md. Laws 146.Resolved, that no muskets or rifles, except by the owner thereof on his removal to reside out of this province, or any gun barrels, gun locks, or bayonets, be carried out of his province, without the leave of the council of safety for the time being.]


NEW JERSEY

Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871 Page 263, Image 309 (1877) available at The Making of Modern Law: Primary Sources. 1874
Crimes, An Act Relating to the Transportation of Explosive and Dangerous Material, § 1. That if any person shall deliver, or cause to be delivered, to any canal, railroad, steamboat, or other transportation company, or to any persons, firm, or corporation engaged in the business of transportation, any nitroglycerine, dualin, dynamite, gunpowder, mining or blasting powder, gun-cotton, phosphorous, friction matches, or other explosive or dangerous material of any nature whatsoever, under any false or deceptive invoice or description, or without previously informing such person, firm or corporation, in writing, of the true nature of such article, and without having the box, keg, barrel, can or package containing the same plainly marked with the name of the explosive or dangerous material therein contained, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to imprisonment for thirty days, and to pay a fine

of one hundred dollars, and shall be responsible for all damages to persons or property directly or indirectly resulting from the explosion of any such article. § 2. That it shall and may be lawful for any officer or agent of any person, firm, or corporation, engaged in the business of transportation to require any package tendered for transportation, believed to contain explosive material, to be opened by the person delivering the same, and to refuse to receive any such package unless such requirements be complied with; and if such package be opened and found to contain such explosive or dangerous material, the said package and its contents shall be forthwith removed to any lawful place for the storing of gun-powder, and after conviction of the offender, or after three months from such removal, the said package, with its contents, shall be sold at public sale, after the expiration of ten days from notice of the time and place of such sale, published in one newspaper in the county where such seizure shall have been made; and the proceeds of such sale, after deducting therefrom the expenses of removal, storage, advertisement, and sale, shall be paid into the treasury of the said county; provided, however, that nothing in this act contained shall be construed to require common carriers to transport any such explosive or dangerous articles against their consent, nor to transport them otherwise than at such times, and under such regulations for safety to persons and property, as they may from time to time prescribe in relation thereto


NEW MEXICO

An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887).  1887

Sec. 1. That any person who shall hereafter carry a deadly weapon, either concealed or otherwise, on or about the settlements of this territory, except it be in his or her residence, or on his or her landed estate, and in the lawful defense of his or her person, family or property, the same being then and there threatened with danger, or except such carrying be done by legal authority, upon conviction thereof shall be punished by a fine of not less than fifty dollars, nor more than three hundred, or by imprisonment not less than sixty days, nor more than six months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.

Sec. 2. Any person who shall draw a deadly weapon or another, or who shall handle a deadly weapon in a threatening manner, at or towards another, in any part of this territory, except it be in the lawful defense of himself, his family or his property, or under legal authority, upon conviction thereof, shall be fined in any sum not less than one hundred dollars, nor more than five hundred dollars, or by imprisonment at hard labor in the county fail or territorial penitentiary not less than three months nor more than eighteen months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.

Sec. 3. Any person who shall unlawfully assault or strike at another with a deadly weapon, upon conviction thereof shall be punished by a fine not exceeding one thousand dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary, not exceeding three years, in the discretion of the court or jury trying the same.

Sec. 4. Any person who shall unlawfully draw, flourish or discharge a rifle, gun or pistol within the limits of any settlement in this territory, or within any saloon, store, public hall, dance hall or hotel, in this territory, except the same be done by lawful authority, or in the lawful defense of himself, his family or his property, upon conviction thereof shall be punished by a fine of not

more than one thousand dollars, or by imprisonment for a term of not more than three years, or by both such fine and imprisonment, in the discretion of the court or jury trying the same. The word "settlement," as used in this act, shall be construed to mean any point within three hundred yards of any inhabited house, in the territory of New Mexico.

Sec. 5. Any person being armed with a deadly weapon, who shall, by words, or in any other manner, insult or assault another, upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, not more than three hundred dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary for not less than three months, nor more than one year, or by both such fine and imprisonment, in the discretion of the court or jury trying the same. . . .

Sec. 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted.

Sec. 9. Persons traveling may carry arms for their own protection while actually prosecuting their journey and may pass through settlements on their road without disarming; but if such travelers shall stop at any settlement for a longer time than fifteen minutes they shall remove all arms from their person or persons, and not resume the same until upon eve of departure.

Sec. 10. Sheriffs and constables of the various counties, and marshals and police of cities and towns, in this territory, and their lawfully appointed deputies, may carry weapons, in the legal discharge of the duties of their respective offices, when the same may be necessary, but it shall be for the court or the jury to decide from the evidence whether such carrying of weapons was necessary or not, and for an improper carrying or using deadly weapons by an officer, he shall be punished as other persons as punished, for the violation of the preceding sections of this act.


NEW YORK

1645 N.Y. Laws 47, By The Director And council Of New Netherland Further Prohibiting The Sale Of Firearms, etc., To Indians

Whereas the Director General and Council of New Netherland having long ere this noticed the dangerous practice of selling Guns, Powder and Lead to the Indians, and moreover published at the time an Ordinance prohibiting the same on pain of Death, notwithstanding which some persons have yet undertaken to barter all sorts of ammunition among the Heathen, purchasing the same secretly here and then transporting it up the River and elsewhere, to the serious injury of this Country, the strengthening of the Indians and the destruction of the Christians, as We are now, also, informed with certainty, that our enemies are better provided with Powder than we, which they contrive to obtain through other Barbarians, our friends. . .There, we must expressly forbid, as we hereby do, all persons from this time forth from daring to trade any munitions of War with the Indians, or under any pretense whatsoever, to transport them from here without express permission, on pain of being punished by Death, and having the vessel confiscated in which the same shall be found laden or to have been put on board. Let everyone be warned hereby and save himself from difficulty.

Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City Page 20, Image 21 (1763) available at The Making of Modern Law: Primary Sources. 1763
§ XVI. And whereas the present store-keeper of the magazine with the consent of the corporation, for the more safe conveying of gun-powder to and from the said magazine, hath provided leather bags, or covers, in order to cover all casks of gun powder to and form the said magazine, be it ordained by the authority aforesaid that from and after the publication hereof, no cart-man, or other person whatsoever, do presume to carry any gun powder to or from the said Magazine, or through any part of this city, but what shall be covered with leather bags as aforesaid, under the penalty of forty shillings, for every offense; the one half thereof to the informer, and the other half to the church wardens of this city for the time being, for the use of the poor thereof.

William G. Bishop, Charter of the City of Brooklyn, Passed June 28, 1873. As Subsequently Amended. With the Charter of April 17, 1854, and the Amendments Thereto, and Other Laws Relating to Said City. Also, the Ordinances of the Common Council of the City of Brooklyn, as Codified and Revised and Adopted Dec.10, 1877 Page 192, Image 196 (1877) available at The Making of Modern Law: Primary Sources. 1877
Ordinances of the [City of Brooklyn, Miscellaneous Provisions,] § 16. No person shall carry, or cause to be carried, any gunpowder through any street, lane or alley in the city, unless the same be secured in tight casks, kegs or cases, well headed and hooped; and said casks, kegs or cases shall be put into and entirely covered with a bag or case sufficiently to prevent any said gunpowder from being spilled or scattered, under the penalty of forfeiture of the gunpowder and a fine of fifty dollars for every violation of the provisions of this act.

PENNSYLVANIA

Frederick Charles Brightly, Brightly's Annual Digest for 1873 to 1878. Annual Digest of the Laws of Pennsylvania for the Years 1873 to 1878 Together with Some laws of Older Date Inadvertently Omitted in Purdon's Digest Completing Brightly Purdon's Digest to the Present Date Page 1835, Image 65 (1878) available at The Making of Modern Law: Primary Sources. 1874
[Digested Laws 1873-78,] Common Carriers, 1. Carriers of explosive materials regulated. Penalties. 2. Power to open packages. Removal and sale. § 1. If any person shall knowingly deliver, or cause to be delivered to any canal, railroad, steamboat or other transportation company, or to any person, firm or corporation engaged in the business of transportation, any nitro-glycerine, dualin, dynamite, gunpowder, mining or blasting powder, gun-cotton, phosphorus, or other explosive material adapted for blasting, or for any other purpose for which the articles before mentioned, or any of them, may be used, under any false or deceptive invoice or description, or without informing such person, firm or corporation, in writing, at or before the time when such delivery is made, of the true nature of such, and without having the keg, barrel, can or package containing the same plainly marked with the name of the explosive material therein contained, together with the word "dangerous" article, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to imprisonment for thirty days, and to pay a fine of one hundred dollars; and shall be responsible for all damages to persons or

property, directly or indirectly resulting from the explosion or combustion of any such article. § 2. It shall and may be lawful for any officer or agent of any person, firm or corporation engaged in the business of transportation, upon affidavit made of the fact that any package tendered for transportation, not in compliance with the provisions of the first section hereof, is believed to contain explosive material such as aforesaid, to require such package to be opened, and to refuse to receive any such package unless such requirement be complied with; and if such package be opened, and found to contain any explosive material, the said package and its contents shall be forthwith removed to any lawful place for the storing of gunpowder; and after conviction of the offender, or after three months from such removal, the said package, with its contents, shall be sold at public sale, after the expiration of ten days from notice of the time and place of such sale, published in one newspaper in the county where such seizure shall have been made; and the proceeds of such sale, after deducting therefrom the expenses of removal, storage, advertisement and sale, shall be paid into the treasury of the said county.


SOUTH CAROLINA

Act of Feb. 20, 1901, ch. 435, §1, 1901 S.C. Acts 748. 1901
Sec. 1. Be it enacted by the General Assembly of the State of South Carolina: That from and after the first day of July 1902 it shall be unlawful for any one to carry about the person whether concealed or not any pistol less than 20 inches long and 3 pounds in weight. And it shall be unlawful for any person, firm or corporation to manufacture, sell or offer for sale, or transport for sale or use into this State, any pistol of less length and weight. Any violation of this Section shall be punished by a fine of not more than one hundred dollars, or imprisonment for not more than thirty days and in case of a violation by a firm or corporation it shall forfeit the sum of one hundred dollars to and for the use of the school fund of the County wherein the violation takes place to be recovered as other fines and forfeitures: Provided, this Act shall not apply to peace officers in the actual discharge of their duties, or to persons while on their own premises. . . . Sec. 3. In case it shall appear to the satisfaction of the presiding Judge or Magistrate before whom such offender is tried that the defendant had good reason to fear injury to the person or property and carried said weapon to protect himself or property he may in his discretion suspend sentence.

TENNESSEE

1899 Tenn. Session Laws 780
Provided however, That it shall be lawful for any person to hunt quail or partridges in said counties with a gun, between the first day of November and the first day of January of each year. But it is further provided, that it shall not be lawful to hunt upon the inclosed lands of another with a gun, as above mentioned, until written permission is first obtained from the owner or owners of such inclosed lands.

VIRGINIA

Thomas D. Davis, The Code of the City of Lynchburg, Va., Containing the Charter of 1880, with the Amendments of 1884, 1886 and 1887, and the General Ordinances in Force July 1st, 1887,

Also a Digest of Acts of Assembly and of Ordinances Affecting the Rights and Interests of the City of Lynchburg and its Citizens, Together with a Brief Sketch, Historical and Statistical Page 117, Image 128 (1887) available at The Making of Modern Law: Primary Sources. 1887 [Ordinances of Lynchburg,] Public Safety, § 19. No person shall carry gunpowder, blasting powder, dynamite or other explosives on a vehicle in any part of the city unless the same shall be secured in kegs, boxes, or canisters, so that no part thereof can fall out or escape.

SOURCE: Duke Center for Firearms Law, https://firearmslaw.duke.edu/repository/search-the-repository/

**EXHIBIT F**

**EXHIBIT F**

**AMMUNITION REGULATIONS, 1865-1933\***

| STATE | Minors | Regis/tax/ License/sale | Bar Indians, Intoxicated, unsound | Bar sale/ purchase |
|---|---|---|---|---|
| Alabama | | 1892,1898, 1900 | | |
| Alaska | | | | |
| Arizona | | | 1901 | |
| Arkansas | | | | 1881,1884, 1899 |
| California | 1882,1890, 1891 | | | |
| Colorado | | | | |
| Connecticut | 1881 | | | |
| Delaware | 1919 | 1911 | | |
| District of Columbia | | | | |
| Florida | | 1927,1927 | | |
| Georgia | | | | |
| Hawaii | | 1933 | | |
| Idaho | | | | |
| Illinois | | 1900 | | |
| Indiana | 1875,1881, 1905 | | | |
| Iowa | | | | |
| Kansas | 1883 | | 1883 | |
| Kentucky | | | | |
| Louisiana | | 1904 | | |
| Maine | | | | |
| Maryland | | 1869 | | |
| Massachusetts | 1882,1885 | | 1769 | 1919 |
| Michigan | 1883 | | | |
| Minnesota | 1916 | | 1916 | |
| Mississippi | 1878,1880, 1905,1908 | 1896,1898, 1906 | 1878,1905, 1908 | |
| Missouri | 1887 | | | |
| Montana | | | | |
| Nebraska | | | | |
| Nevada | | | | |

| | | | | |
|---|---|---|---|---|
| New Hampshire | | | 1689 | |
| New Jersey | 1912 | | | |
| New Mexico | | | | |
| New York | | | | |
| North Carolina | 1893 | 1905,1919 | 1899 | |
| North Dakota | | | | |
| Ohio | 1913 | | | |
| Oklahoma | | | | 1899 |
| Oregon | | | | |
| Pennsylvania | 1881,1883 | | | |
| Rhode Island | 1883 | | | |
| South Carolina | 1923 | 1890,1893, 1923 | | |
| South Dakota | | | | |
| Tennessee | | | | 1883 |
| Texas | | | | |
| Utah | | | | |
| Vermont | | | | |
| Virginia | 1899 | 1896,1899, 1926 | | |
| Washington | | 1917 | | |
| West Virginia | | | | |
| Wisconsin | | | | |
| Wyoming | 1890,1899 | | | |
| U.S. Government | | 1919,1932 | | |
| NUMBER OF STATES | 18 | 13 | 7 | 4 |
| NUMBER OF LAWS | 28 | 24 | 9 | 6 |

* Source: https://firearmslaw.duke.edu/repository/search-the-repository/ Note that the unit of analysis is the law, not the state; the laws are organized by state for the sake of clarity. Ammunition regulations existed since the 1600s, but this table summarizes laws beginning with the end of the Civil War because that is when self-contained metallic cartridges began to circulate meaningfully in society.

**EXHIBIT G**

1

# EXHIBIT G

# AMMUNITION REGULATIONS

**ALABAMA**

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources. 1892.

[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

1898 Ala. Acts 190, An Act To Amend The Revenue Laws Of The State Of Alabama, pt. 66-67. 66th. For dealers in pistol, bowie or dirk knives, whether principal stock in trade or not, one hundred dollars. 67th. For wholesale dealers in pistol or rifle cartridges in towns or cities of twenty thousand or more inhabitants, ten dollars. In all other places, five dollars: Provided, That the wholesale dealers license shall entitle them to sell at retail.

Annual License Ordinance, § 1, THE AGE-HERALD, Dec. 13, 1899, at 8 (Birmingham, Alabama).
"ANNUAL LICENSE ORDINANCE.
An Ordinance to Prescribe and Fix Licenses for the Businesses, Occupations and Professions in Birmingham, Alabama, for the Year 1900.
    Section 1. Be it ordained by the mayor and aldermen of Birmingham, That the following be, and the same is, hereby declared to be the schedule of licenses for the year 1900 for the divers businesses, vocations, occupations and professions carried on or engaged in in the city of Birmingham, Ala., and each and every person, firm, company or corporation engaging in any of the businesses, vocations, occupations or professions herein provided for shall pay for and take out such license and in such sums as are herein provided, to-wit…
…168—Pistol or rifle cartridges, dealers in, each .....[2] 10.00
169—Pistol or bowie knives, dirk knives, dealers in, whether principal stock in trade or not, each .....100.00
170—Playing cards, dealers in ..... 5.00...
...171—Plumbers or gas or steam fitters, each ..... 25.00
172—Powder, dynamite or other explosives, dealers in or agents for, each, retail ..... 25.00
173—Same, each, wholesale dealers ..... 50.00…
…188—Shooting galleries, each ….. 25.00"

2

"Annual License Ordinance." The Age-Herald, December 13, 1899, p. 8. Volume 26; Number 178.  An Ordinance to Prescribe and Fix Licenses for the Businesses, Occupations and Professions in Birmingham, Alabama, for the Year 1900, § 1. Adopted December 8, 1899.

## ARIZONA

Laws regulating the sale of firearms to minors and Native Americans, Title 10, §§ 342 & 362 of AZ Penal Code in The Revised Statutes of Arizona Territory (1901).
"Sec. 342. Any person who shall sell or give to any minor under the age of fourteen years, or to any person for the use of such minor, any firearms, or toy pistols from which dangerous and explosive substances may be discharged, shall be deemed guilty of a misdemeanor."
"Sec. 362. Any person who sells, gives, rents, barters or furnishes any rifles, carbines, pistols or revolvers, or any ammunition or cartridges for rifles, carbines, pistols or revolvers, or any shot larger in size than standard number six (6) shot, or any spirit, malt or vinous liquor, to Indians, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be punished by imprisonment in the county jail not less than one or more than six months, or by a fine not less than fifty dollars or more than three hundred dollars, or by both such imprisonment and fine."
1901, AZ, Title 10, §§ 342 & 362 of the AZ Penal Code
The Revised Statutes of Arizona Territory: Containing Also the Laws Passed by the Twenty-First Legislative Assembly, the Constitution of the United States, the Organic Law of Arizona and the Amendments of Congress Relating Thereto (Columbia, MO: Press of E. W. Stephens, 1901),1244-1245 & 1248. Penal Code, Part One of Crimes and Punishments: Title 10—Of Offenses Against the Public Health and Safety, §§ 342 & 362. Undated.

## ARKANSAS

1881 Ark. Acts 192, An Act to Preserve the Public Peace and Prevent Crime, ch. XCVI (96), § 3. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

William W. Mansfield, A Digest of the Statutes of Arkansas: Embracing All Laws of a General and Permanent Character in Force at the Close of the Session of the General Assembly of One Thousand Eight Hundred and Eighty-three Page 490, Image 506 (Vol. 1, 1884) available at The Making of Modern Law: Primary Sources.
Carrying Weapons, § 1909. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person, any dirk or bowie knife, or a sword or spear in a cane, brass or metal knucks, or any pistol of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol or any kind of cartridges for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

Ordinance 21, GREEN FOREST TRIBUNE, May 11, 1899, at 1. (Green Forest, Arkansas).

3

Entitled an Ordinance making it a misdemeanor to carry weapons within the corporate limits of Green Forest, prescribing penalty.

Be it ordained by the town council of the Incorporated town of Green Forest, Arkansas:

Section 1. Any person who shall wear or carry in any manner whatever as a weapon any dirk or bowie knife, or sword, or spear in a cane, brass or metal knucks, razor or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. Provided, officers whose duties require them to make arrests, or to keep and guard persons, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this ordinance. Provided further, nothing in this ordinance be so construed as to prohibit any person from carrying any weapon when upon a journey or upon his own premises.

Sec. 2. Any person, excepting such officers or persons on a jounrey and on their premises, as are mentioned in Section 1 of this ordinance, who shall wear or carry any such pistol as is used in the army or navy of the United States, in any manner except uncovered and in his hand, shall be guilty of a misdemeanor.

Sec. 3. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person any dirk or bowie knife, or sword or spear in any cane, brass or metal knucks, or any pistol of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any cartridge for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

Sec. 4. Any person convicted of a violation of any of the provisions of this ordinance shall be punished by fine of not less than fifty dollars nor more than two hundred dollars.

Sec. 5. Any officer within and for the corporation whose duties it is to make arrest, who may have personal knowledge of any person carrying arms contrary to the provisions of this ordinance, and shall fail or refuse to arrest such person and bring him to trial, shall be punished as provided in section four.

Sec. 6. This ordinance shall take effect and be in force from and after its passage, approval and publication.

"Ordinance 21." The Green Forest Tribune, May 11, 1899, p. 1. Ordinance 21—An Ordinance making it a misdemeanor to carry weapons within the corporate limits of Green Forest, prescribing penalty, §§ 1-6. Approved May 3, 1899. Volume 10, Number 3. (Green Forest, Arkansas).

**<u>CALIFORNIA</u>**

An Ordinance to Preserve the Peace and Good Order of the City of San Jose, §§ 2-4, Revised Ordinances of the City of San Jose (1882).

"Sec. 2. No person shall—. . .

4. Make use of, or have in his possession any slung shot, rubber sling or other instrument or device, by means of which missiles of kind or description are hurled or projected;

5. Wear or carry any slung shot, or knuckles, or instruments of a similar character.

Sec. 3. It shall be unlawful for any person to sell, or give to any minor under the age of twelve years, any revolver, or pistol of any kind, from or by means of which any bullet, shot or other missile of any kind is or may be fired or projected by means of percussion caps, cartridges, or any explosive substance whatever.

4

Sec. 4. It shall be unlawful for any person not being a public officer, to wear or carry concealed in this city any pistol, dirk, or other dangerous weapon."

1882, CA, Revised Ordinances of the City of San Jose, An Ordinance to Preserve the Peace and Good Order of the City of San Jose, § 2 (subsections 4-5) and §§ 3-4

Charter and Revised Ordinances of the City of San Jose (San Jose, CA: Cottle & Wright, 1882), 91. An Ordinance to Preserve the Peace and Good Order of the City of San Jose, § 2 (subsections 4-5) and §§ 3-4. To Preserve the Peace and Good Order of the City of San Jose. Passed May 22, 1882.

Ordinance no. 148, §§ 10-14, 48, 61, & 84, ALAMEDA, CHARTER AND GENERAL ORDINANCES (Argus 1894) (Passed 1890).

Firing Weapons, Categorical Bans, Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible, Sensitive Places and Times, Shooting Galleries and Ranges, Registration or Licensure, Purchase or Sale of Weapons

Jurisdiction:

"…Discharge of Firearms.

SEC. 10. No person shall discharge any musket, rifle, pistol, shotgun, or other firearm in the City of Alameda, without permission or license from the Board of Trustees.

Spring Guns.

SEC. 11.        1. No person shall discharge upon any public street or place in the City of Alameda any gun, by means of which any missile is projected by a spring, bow, or compressed air, or use any implement whereby stones, beans, shot, pebbles, or other substances are projected.

Sling Shots.

2. No person shall, in the City of Alameda, hurl or throw any stone or other missile by means of any sling.

Prohibits Selling or Giving Firearms to Minors.

SEC. 12. No person shall, in the City of Alameda, sell or give to any minor child, under the age of twelve years, nor allow any such child to use, handle, or discharge any gun or pistol, or other similar instrument, from or by means of which any bullet, shot, or other missile of any kind is or may be projected by means of cartridges, caps, powder, or other explosive.

Concealed Weapons.

SEC. 13. It shall be unlawful for any person not being a public officer or traveler, or not having a permit from the City Marshal, approved by the President of the Board of Trustees, to wear or carry, concealed, any pistol, dirk, brass or iron knuckles, sand club, slung shot, or other dangerous or deadly weapon.

Prohibiting Discharge of Fireworks.

SEC. 14. No person shall fire or discharge, or cause to be fired or discharged, within the fire limits of the City of Alameda, any Chinese or other firecrackers, bomb, fireworks, or explosive preparation of similar nature, loaded or charged with gunpowder, or any other explosive material…

...Shooting Galleries.

SEC. 48.        1. It shall be unlawful for any person or persons owning, conducting or managing a shooting gallery or galleries, in the City of Alameda, to keep open the same, or to discharge or permit to be discharged any cartridge or cartridges therein, between the hours of ten o'clock P. M. and daylight of the following morning…

...No Manufactories of Gunpowder, Etc.

5

SEC. 61. No person, firm, or corporation shall manufacture, within the fire limits of the City of Alameda, any gunpowder, acids or other combustible or explosive chemicals or mixtures or matches…

...Penalty.

SEC. 84. Any person who violates any of the provisions of this ordinance shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not exceeding three hundred dollars, or by imprisonment in the jail of Alameda County not exceeding three months, or by both such fine and imprisonment…"

Edw. K. Taylor & J. E. Bland, eds., Charter and General Ordinances in Force February 1, 1894; Rules of the Board of Education, Board of Health, and Trustees of Free Library and Reading Room; Regulations of the School Department, Police Department, and Fire Department of the City of Alameda (Alameda, CA: Argus Publishing Co., 1894), 64-84. Ordinance No. 148— Defining Certain Misdemeanors and Providing Penalties for Violation, §§ 10-14, 48, 61, & 84. Passed by the Board of Trustees of the City of Alameda August 25, 1890.

Ordinance no. 1143, §§ 1-4, OAKLAND, GENERAL MUNICIPAL ORDINANCES OF THE CITY (Enquirer Publishing Company 1895) (Law Passed 1891).

"ORDINANCE No. 1143.

AN ORDINANCE TO PROHIBIT THE USE OF GUNS AND PISTOLS BY CERTAIN MINORS.

Be it Ordained by the Council of the City of Oakland as follows:

Section 1. No person shall, in the City of Oakland, sell or give to any minor child under the age of twelve years, nor allow any such child to use, handle or discharge any gun or pistol, or other similar instrument, from or by means of which any bullet, shot or other missile of any kind is or may be projected by means of cartridges, powder or other explosive.

Section 2. Every person violating any provision of this ordinance is guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not to exceed one hundred dollars, and in case such fine be not paid, then by imprisonment at the rate of one day for every two dollars of the fine so imposed.

Section 3. Sections 2 and 3 of 'An Ordinance Prohibiting the Carrying of Pistols and Slingshots,' approved May 4, 1881, is hereby repealed.

Section 4. This ordinance shall take effect immediately upon its approval.

(Approved May 15, 1891.  Vol. 3, p. 442.)"

Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, Cal. in Effect January 1, 1895: Also City Charter (Annotated) and List of Officers (Oakland, CA: Enquirer Publishing Company, 1895) 156. Ordinance no. 1143—An Ordinance to Prohibit the Use of Guns and Pistols by Certain Minors, §§ 1-4. Approved May 15, 1891.

## CONNECTICUT

Charter of the City of New Haven Page 142-143, Image 241-242 (1881) available at The Making of Modern Law: Primary Sources.

Charter of the City of New Haven. Trade. § 18. No person shall sell to any child under the age of sixteen years, without the written consent of the parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of cartridge, or of any fulminate.

6

**DELAWARE**

Vol. 26 Del. Laws 28, 28- 29 (1911)
Section 1. That from and after the first day of June, in the year of our Lord, one thousand nine hundred and eleven, it shall be unlawful for any person or persons, firm, company or corporation, to sell, or expose to sale, any pistol or revolver, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made especially for the defense of one's person, without first having obtained a license therefor, which license shall be known as "Special License to Sell Deadly Weapons;" provided, however, that this provision shall not relate to toy pistols, pocket knives, or knives used in the domestic household, or surgical instruments or tools of any kind.
Section 2. Any person or persons, firm, company or corporation, desiring to engage in the business of selling revolvers, pistols, or revolver or pistol cartridges, stilettos, steel or brass knuckles, or other weapons made for the defense of one's person, shall, after the above mentioned date, apply to the Clerk of the Peace of the County in which it is desired to conduct such business and shall obtain a license therefor, for which he, they, or it shall pay the sum of twenty-five dollars, which said license shall entitle the holder thereof to conduct said business for the term of one year from its date.
Section 3. It shall be unlawful for any person or per- sons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons, made especially for the defense of one's person.
Section 4. It shall be the duty of any person or persons, firm, company or corporation, desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times, a book which shall be furnished him by the Clerk of the Peace of the County wherein he does business in which said book he shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so pur- chased, the color of the person so purchasing the same, and the apparent age of the purchaser; and no sale shall be made weapon, etc. until the purchaser has been positively identified. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.

Vol. 30 Del. Laws 55, 55-56 (1919)
Section 222. It shall be unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made for the defense of one's person.
It shall be the duty of any person or persons, firm, company or corporation desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times a book which shall be furnished him by the Clerk of the Peace of the County wherein he does business, in which said book lie shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so purchased, the color of the person so purchasing the same, and the apparent age of the purchaser, and the names and addresses of at least two freeholders resident in the County wherein the sale is made, who shall positively identify the purchaser before the sale can be made; Provided, that no clerk,

7

employee or other person associated with the seller shall act as one of the identifying freeholders. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.

## FLORIDA

Ch. 12548—(no. 713), § 19, nos. 13-18, 1927 Fla. Laws, Special Acts 206, 211-213 (sine nomine 1927).
"Be It Enacted by the Legislature of the State of Florida…
   …Sec. 19.—Ordinances against crime, misconduct and nuisances.—The City Council shall have the power to pass ordinances on the following subjects, as it deems necessary, to-wit…
   …(13) To regulate or prohibit the sale, or use, of firecrackers, and all other fireworks.
   (14) To prohibit or regulate the sale, or use, of toy pistols, air guns and slungshots.
   (15) To prohibit or regulate the sale of firearms, cartridges, gun shells or other ammunition or firearms.
   (16) To regulate the carrying of firearms.
   (17) To prohibit and regulate the discharge of firearms, or other explosives.
   (18) To prohibit and regulate the carrying of dirks, metal knucks or other dangerous weapons, not classed as firearms."
Special Acts Adopted by the Legislature of Florida at its Twenty-first Regular Session, April 5, to June 3, 1927, Under the Constitution of A. D. 1885, vol. 2 (s.l.: s.n., 1927), 211-13. Chapter 12548—(No. 713), An Act to Abolish the Present Municipality of Blounston, in Calhoun County, Florida, and to Establish, Organize and Incorporate a Municipality to Be Known as the City of Blountstown, in Lieu Thereof; to Designate the Territory Embraced within the City of Blountstown, and to Provide for Its Jurisdiction, Powers and Privileges, § 19, nos. 13-18. Approved June 6, 1927.

1927 (vol II) Fla. Laws 212, pt. 15.
The City Council shall have the power to pass ordinances on the following subjects as it deems necessary . . to prohibit or regulate the sale of firearms, cartridges, gun shells or other ammunition for firearms.

## HAWAII

1933 Haw. Sess. Laws 36-37, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 3.
Every person residing or doing business or temporarily sojourning within the Territory on the effective date of this Act who possesses a firearm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, not already registered in the name of the present possessor, or who possesses ammunition of any kind or description, except shotgun ammunition, shall, within ten days of said effective date, register the same with the chief of police of the city and county of Honolulu or the sheriff of the county, other than the city and county of Honolulu, wherein is his place of business, or if there be no place of business, his residence, or if there be neither place of business nor residence, his place of sojourn. Every person arriving in the Territory after the effective date of this Act, who brings with him firearms or ammunition of the type and description set out in this section, shall register the same in similar manner within forty-

8

eight hours after arrival. The registration shall be on such forms as may be designated by the bureau of crime statistics and shall include a description of the class of firearm or firearms and ammunition owned by him, or in his possession, together with the name of the maker and the factory number, if known or ascertainable, and the source from which possession was obtained.

## ILLINOIS

An Ordinance for Revising and Consolidating the Several Ordinances of the City, ch. 31, §§ 617–628, MONMOUTH, ILLINOIS, THE MUNICIPAL CODE (Review Printing 1900). 1900. "CHAPTER XXXI.
FIRE ARMS, GUNPOWDER AND EXPLOSIVES.

617. The keeping for sale or selling of gunpowder, cartridges or loaded shells without a license therefor, is prohibited, and no license shall be issued allowing the keeping in store of more than twenty-five pounds of gunpowder at any one time, unless kept in some secure magazine or fire-proof powder-house, located at least one hundred feet from any other occupied building, and when kept in a store or place for retail, it shall be kept in tin or other metallic cannisters or cases, and in a part of the building remote from any fire, lamp, candle or burning matter liable to produce explosion, and whoever shall violate this section, or any provision of it, shall be subject to a penalty of twenty dollars.

618. Every person licensed to sell gunpowder shall keep a sign with the words 'Gunpowder and Ammunition for Sale,' in plain letters, in some conspicuous place in front of the building where such powder is kept. And no sales of gunpowder, except in unopened cans shall be made after night, and any person convicted of violation of any of the provisions of this section shall be subject to a penalty of ten dollars.

619. Whoever shall bring or cause to be brought into the city any gunpowder concealed in any box or other package marked as containing other articles, shall be subject to a penalty of twenty-five dollars.

620. The carrying of gunpowder through the streets or other public places in a careless or negligent manner, or the remaining with such powder in any public place longer than necessary for the transportation of the same from one place to another, shall subject the party offending to a penalty of not less than five dollars.

621. It shall not be lawful for any person to manufacture within the city limits any explosive material or compound to be used for any purpose, the manufacture of which would be dangerous to life or property, under the penalty of fifty dollars and the further penalty of twenty-five dollars for each and every day such explosive material shall be manufactured after notice to discontinue from the mayor.

622. It shall not be lawful to store or keep in any building, or other place, within the city, or convey through any street, alley or public place in the city, any dynamite, nitro-glycerine, or other explosive material or compound, other than gunpowder, unless a permit in writing for such purpose be first obtained from the mayor, under a penalty of fifty dollars for each and every offense, and a further penalty of twenty-five dollars for each and every day such explosive material, or compound, may remain stored, kept or deposited in the city.

623. Whoever shall bring or cause to be brought into the city any gunpowder or other like explosive powder or substance concealed in any box, barrel or package, or any package or case containing gunpowder or other like explosive powder or substance marked or purporting to be

9

other than what such package or case actually contains, shall be subject to a penalty of not less than ten dollars nor more than one hundred dollars.

624. No person shall carry or convey any gunpowder, guncotton, nitro-glycerine, dynamite or other like explosive substance, in or through any street, avenue, alley or other public place, in a careless or negligent manner, or in any quantity not exceeding five pounds, except the same be enclosed in secure canisters, cases or kegs; nor shall remain with the same in any street, alley or other public place, longer than may be necessary for the carrying or transportation thereof from one place to another, under a penalty of five dollars in each case.

625. Any person keeping gunpowder or other like explosive material in any building within the city, shall, in writing, notify the fire marshal where in such building such powder or explosive is kept, and shall, in the event of such building taking fire, or being in danger of taking fire from any other building adjacent thereto, immediately cause said gunpowder or other explosive material to be removed therefrom, or, in case of his not being able to remove the same, he shall forthwith notify the chief of fire department or other officer in command at such fire, of the location and quantity thereof; and for any neglect or failure to comply with the requirements of this section, such person shall be liable to a fine of not less than ten dollars nor more than one hundred dollars.

626. Whoever shall, within the corporate limits of the city, fire or discharge any cannon, gun or pistol or other firearm, shall be subject to a penalty of not less than three dollars nor more than twenty-five dollars for each offense: Provided, that the discharge of fire-arms by the members of any military company, when on parade, and in accordance with the command of their commanding officer or by any officer or other person in the performance of any legal duty or lawful act, when the same may be done without endangering the safety of any person, or the injuring of any property, shall not be deemed violations hereof.

627. Whoever shall, without permit from the mayor, set off, fire or explode any toy pistol, torpedo, fire cracker, roman candle, sky rocket, or other fireworks, or shall make or kindle any bonfire within the city, shall incur a penalty of not less than one dollar nor more than five dollars for each and every offense: Provided, that the setting off or exploding of fireworks, or the making or kindling of bonfires, except upon paved streets, on the fourth day of July in any year, shall not be deemed violations of this section.

628. No person shall within the city, sell, loan or furnish to any minor, except the parent or guardian of such minor, any gun, pistol, fowling piece or other firearms, or any pistol or toy of any sort for the explosion of percussion caps, under a penalty of not less than five dollars." The Municipal Code of Monmouth, Comprising the Laws of Illinois Relating to the City of Monmouth and the Ordinances of the City Council, Codified and Revised and Published by Authority of the City Council (Monmouth, IL: Review Printing Co., 1900), 164–66. An Ordinance for Revising and Consolidating the Several Ordinances of the City of Monmouth, Chapter 31—Fire Arms, Gunpowder and Explosives, §§ 617–628. Passed October 10, 1900; Approved October 11, 1900.

## INDIANA

An Act to Prohibit the Sale, Gift, or Bartering of Deadly Weapons or Ammunition Therefor, to Minors, ch. 40, §§ 1-2, 1875 Ind. Laws 59, 59 (Sentinel Company 1875).
"CHAPTER XL.

10

AN ACT to prohibit the sale, gift, or bartering of deadly weapons or ammunition therefor, to minors.
[APPROVED FEBRUARY 27, 1875.]
SECTION 1. Be it enacted by the General Assembly of the State of Indiana, That it shall be unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol.
SEC. 2. Be it further enacted, That any person who shall violate any of the provisions of the foregoing section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined in any sum not less than five dollars, nor more than fifty dollars."
Full Text: 1875, IN, ch. 40, §§ 1-2
Laws of the State of Indiana, Passed at the Forty-Ninth Regular Session of the General Assembly, Begun on the Seventh Day of January, A. D. 1875 (Indianapolis, IN: Sentinel Company, 1875), 59. Chapter 40—An Act to Prohibit the Sale, Gift, or Bartering of Deadly Weapons or Ammunition Therefor, to Minors, §§ 1-2. Approved February 27, 1875.

The Revised Statutes of the State of Indiana, the Revision of 1881 and All General Laws Enacted to that Revision (1888) Section 1986-87, Furnishing Deadly Weapon to Minor. 1881.
1986. It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol. 1987. Any person who shall violate any of the provisions of this section shall be deemed guilty of a misdemeanor, and, on conviction hall be fined not less than five dollars nor more than fifty dollars.

1905 Ind. Acts 688, Weapon— Furnishing to Minor, § 450.
It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol or revolver. Any person who shall violate any of the provisions of this section shall be deemed guilty of a misdemeanor, and, on conviction hall be fined not less than five dollars nor more than fifty dollars.

## KANSAS

1883 Kan. Sess. Laws 159, An Act to Prevent Selling, Trading or Giving Deadly Weapons or Toy Pistols to Minors, and to Provide Punishment Therefor, ch. 105, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.

11

§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nor more than ten dollars.

## LOUISIANA

An Act to Increase the Revenue of the State of Louisiana by Levying a License Tax on the Sale of Pistols, no. 65, §§ 1–4, 1904 La. Acts 175, 175–76 (The Advocate).
"ACT NO. 65.
By Mr. Brand.
AN ACT
To increase the revenue of the State of Louisiana by levying a license tax on the sale of pistols or pistol cartridges, and rifles or rifle cartridges, blank pistols and blank pistol cartridges, and providing penalties for the non-payment of such license tax.

Section 1. Be it enacted by the General Assembly of the State of Louisiana, That every wholesale dealer in pistols or pistol cartridges and rifles and rifle cartridges, blank pistols and blank pistol cartridges in this State, shall pay an annual license tax on said business, graduated as follows:

First class: When gross sales are ten thousand dollars or more the license shall be fifty dollars.

Second class: When gross sales are under ten thousand dollars and more than five thousand dollars the license shall be thirty-five dollars.

Third class: When gross sales are under five thousand dollars the license shall be twenty-five dollars. Provided no dealer shall be deemed wholesale dealer unless he or they sell to dealers for resale.

Sec. 2. Be it further enacted, etc., That every retail dealer in pistols or pistol cartridges, and rifles or rifle cartridges, blank pistols and blank pistol cartridges, in this State, shall pay an annual license tax on said business graded as follows:

First class: When the gross sales are five thousand dollars or more the license shall be two hundred dollars.

Second class: When the gross sales are under five thousand dollars and more than two thousand five hundred dollars, the license shall be one hundred and fifty dollars.

Third class: When the gross sales are less than two thousand five hundred dollars, the license shall be one hundred dollars.

That said license shall be collected by the Tax Collectors of the State in the same manner and at the same time as are collected other license taxes.

Sec. 3. Be it further enacted, etc., That whoever shall sell, at wholesale or retail pistols or pistol cartridges and rifles or rifle cartridges, blank pistols and blank pistol cartridges, without first obtaining the license herein provided, or without first obtaining the license which may be imposed by any municipal or parochial authority for the sale of pistols or pistol cartridges and rifles or rifle cartridges, blank pistols and blank pistol cartridges, shall be guilty of a misdemeanor and upon conviction shall be fined not less than fifty dollars or imprisoned not more than sixty days, or both at the discretion of the court.

Sec. 4. Be it further enacted, etc., That this act shall go into effect January 1, 1905, and that all laws in conflict herewith are hereby repealed."

12

Acts Passed by the General Assembly of the State of Louisiana at the Regular Session Begun and Held in the City of Baton Rouge, on the Ninth Day of May, 1904 (Baton Rouge, LA: The Advocate, 1904), 175–76. Act Number 65—An Act to Increase the Revenue of the State of Louisiana by Levying a License Tax on the Sale of Pistols or Pistol Cartridges, and Rifles or Rifle Cartridges, Blank Pistols and Blank Pistol Cartridges, and Providing Penalties for the Non-Payment of Such License Tax [H. B. 81], §§ 1–4. Approved June 29, 1904.

## MARYLAND

The Baltimore City Code: Comprising the Statutes and Ordinances Relating to the City of Baltimore, at 171 - Art. XVI, Section 27 (1869)
"27.  If the said board of police shall have reason to believe that in the neighborhood of any election polls in the said city or elsewhere, within any election precinct of the same, there is any depot or collection of fire arms or other weapons or ammunition intended to be used for the purpose of intimidating or injuring voters, or interfering with the freedom or peace of any election then pending or approaching, it shall be the duty of said board to apply to the Criminal Court, or some justice of the peace of said city, for a warrant, on proper oath, to search the premises, and the said court or justice shall issue the same without delay, and shall cause the said arms, weapons and ammunition, if found, to be seized and delivered to said board, to be detained until the day after the returns of said election shall have been made, and until the same shall be disposed of by law."

## MASSACHUSETTS

A Collection Of Original Papers Relative To The History Of The Colony Of Massachusetts-Bay Page 492, Image 497 (1769) available at The Making of Modern Law: Primary Sources. 1769 Laws of the Colony of Massachusetts, That notwithstanding the ancient law of the country, made in the year 1633, that no person should sell any arms or ammunition to any Indian upon penalty of 10L. for every gun, 5L. for a pound of powder, and 40s. for a pound of shot, yet the government of the Massachusetts in the year 1657, upon the design to monopolize the whole Indian trade did publish and declare that the trade of furs and peltry with the Indians in their jurisdiction did solely and properly belong to their commonwealth and not to every indifferent person, and did enact that no person should trade with the Indians for any fort or peltry, except such as were authorized by the court, under the penalty of 100l. for every offence, giving liberty to all such as should have license from them to sell, unto any Indian, guns, swords, powder and shot, paying to the treasurer 3d. for each gun and for each dozen of swords; 6d. for a pound of powder and for every ten pound of shot, by which means the Indians have been abundantly furnished with great store of arms and ammunition to the utter ruin and undoing of many families in the neighboring colonies to enrich some few of their relations and church members.

Report of Commissioners on Revision of Ordinances Page 141, Image 146 (1882) available at The Making of Modern Law: Primary Sources.
Of Explosive Compounds. Penalty for selling guns, pistols, cartridges, etc., to children. § 1. Whoever sells to a child under the age of sixteen years, without the written consent of its parent or guardian, any cartridge or fixed ammunition of which any fulminate is a component part, or a

13

gun, pistol, or other mechanical contrivance arranged for the explosion of such cartridge or of any fulminate, shall be liable to a penalty of not less than five nor more than fifty dollars.

The Revised Ordinances of 1885, of the City of Boston, as Passed and Approved December 14, 1885. (With Amendments Thereto, Passed and Approved, to May 1, 1886): Being the Ninth Revision. To Which are Added the Revised Standing Regulations of the Board of Aldermen. 9th Rev. Page 172, Image 182 (1886) available at The Making of Modern Law: Primary Sources. Ordinances of the City of Boston. Of Fire-Arms, Bonfires, and Brick-Kilns. § 4. No person shall sell to any child under the age of sixteen years without the written consent of a parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol, or other mechanical contrivance arranged for the explosion of such cartridge, or of any fulminate. But the provisions of this section shall not apply to paper caps of which the only component parts are chlorate of potash and sulphide of antimony, nor to any appliance for exploding the same. The provisions of this section shall be inserted in every license granted for the sale of gunpowder.

1919 Mass. Acts 139, An Act Relative to the Issuance of Search Warrants for the Seizure of Firearms, Weapons and Ammunition Kept for Unlawful Purposes, ch. 179, §§ 1-2
"§ 1. A court or justice authorized to issue warrants in criminal cases may, upon complaint under oath that the complainant believes that an unreasonable number of rifles, shot guns, pistols, revolvers or other dangerous weapons, or that an unnecessary quantity of ammunition, is kept or concealed for any unlawful purpose in a particular house or place, if satisfied that there is a reasonable cause for such belief, issue a warrant to search such property.
§ 2. If the court or justice finds that such property is kept for an unlawful purpose, it shall be forfeited and disposed of as the court or justice may by order direct."

## MICHIGAN

1883 Mich. Pub. Acts 144, An Act To Prevent The Sale And Use Of Toy Pistols, § 1.
That no person shall sell, give, or furnish to any child under the age of thirteen years, any cartridge of any form or material, or any pistol, gun, or other mechanical contrivance, specially arranged or designated for the explosion of the same.

## MINNESOTA

MINNEAPOLIS, MINNESOTA, CITY CHARTER AND ORDINANCES, An Ordinance Relating to and Prohibiting the Sale, Gift or Delivery to Certain Persons of Firearms, §§ 1–3 (Law Passed 1916) (Brown & Phelps 1926).
"SALE OF FIREARMS TO MINORS
An Ordinance Relating to and Prohibiting the Sale, Gift or Delivery to Certain Persons of Firearms, Guns, Pistols, Cartridges, Percussion Caps, Powder or Other Explosives in the City of Minneapolis.
   (Passed April 28, 1916. Approved May 4, 1916. Published May 9, 1916 in The Minneapolis Daily News, 42 C. P. 399.)
The City Council of the City of Minneapolis do ordain as follows:

14

Section 1. No person shall hereafter, within the City of Minneapolis, sell, give or deliver to any person under the age of eighteen years, or to any intoxicated person, or to any person under the influence of intoxicating liquors of any kind, or to any person under the influence of opium, cocaine, or chloral hydrate, or any of their compounds or derivatives, or to any person under the influence of any narcotic or drug whatever, any firearms, gun, pistol, cartridge, percussion cap, powder or any other explosive whatever.

Sec. 2. Any person who shall violate any provision of this ordinance shall, upon conviction thereof, be punished by a fine not exceeding one hundred dollars, or by imprisonment until such fine is paid not exceeding ninety days.

Sec. 3. This ordinance shall take effect and be in force from and after its publication." Arthur C. Pulling, ed., Minneapolis City Charter and Ordinances: Municipal Court Acts and Rules of Practice, Park Ordinances, Rules of City Council (Minneapolis, MN: Brown & Phelps, 1926), 774. Minneapolis Petty Offence Ordinances, An Ordinance Relating to and Prohibiting the Sale, Gift or Delivery to Certain Persons of Firearms, Guns, Pistols, Cartridges, Percussion Caps, Powder or Other Explosives in the City of Minneapolis, §§ 1–3. Passed April 28, 1916; Approved May 4, 1916; Published May 9, 1916.

## **MISSISSIPPI**

1878 Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 1-3.
§ 1. That any person not being threatened with, or having good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a long journey, or peace officers, or deputies in discharge of their duties, who carries concealed, in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description, shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars, and in the event the fine and cost are not paid shall be required to work at hard labor under the direction of the board of supervisors or of the court, not exceeding two months, and for the second or any subsequent offence, shall, on conviction, be fined not less than fifty nor more than two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor not exceeding six months under the direction of the board of supervisors, or of the court. That in any proceeding under this section, it shall not be necessary for the State to allege or prove any of the exceptions herein contained, but the burden of proving such exception shall be on the accused.
§ 2. It shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months.
§ 3. Any father, who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any weapon of the kind or description in the first section of this act described [pistols, knives, etc.], shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor under the direction of the board of supervisors or of the court.

15

Josiah A.Patterson Campbell, The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes Page 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources.

Carrying Concealed Weapons, § 2986. It shall not be lawful for any person to sell to any minor or person intoxicated knowing him to a a minor or in a state of intoxication, any weapons of the kind or description in the foregoing section described, or any pistol cartridge and on conviction he shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court not exceeding six months. § 2987. Any father who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any person of the kind or description in the forgoing section described, shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor as provided in the proceeding section. § 2988. Any student of any university, college, or school, who shall carry concealed, in whole or in part, any weapon of the kind or description in the foregoing section described, or any teacher, instructor or professor who shall knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor and on conviction be fined not exceeding three hundred dollars, and if the fine and costs are not paid, be condemned to hard labor as above provided.

Privilege Tax in Town of Macon, § 1, MACON BEACON, Jun. 13, 1896, at 3 (Macon, Mississippi).
"ORDINANCE NO. 49.
Privilege Tax in Town of Macon.
   Sec. 1. Be it ordained by the Mayor and Board of Alderman of the Town of Macon, that the tax on privileges hereinafter named be and the same is hereby fixed as follows, to-wit…
…On each shooting gallery …..[1] 7 50…
…On each person or firm selling pistols ….. 12 50
On each person or firm selling pistol cartridges ….. 2 50..."

1898 Miss. Laws 22, An Act Creating Privilege Taxes On Certain Industries In Mississippi, ch. 5, § 63.
Pistol Cartridges: On each firm or dealer in pistol cartridges, capable of being fired in pistols or out of shells, for the manufacture of same - 5.00.

Ordinance no. 485, THE COMMONWEALTH, Jun. 16, 1905, pt. 1, at 3 (Greenwood, Mississippi).
"(Ordinance No. 485.)
AN ORDINANCE relating to deadly weapons; cartridges not to be sold to infant or drunk person.
   Be it ordained by the Mayor and Board of Aldermen of the City of Greenwood, Miss., that it shall not be lawful for any person to sell, give or lend to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any deadly weapon, or other weapon, the carrying of which concealed is prohibited, or pistol cartridge; and on conviction thereof he shall

16

be punished by a fine of not more than one hundred dollars or imprisoned in the municipal prison not more than thirty days, or both.

    Approved April 11, 1905.”

“Ordinances of the City of Greenwood, Mississippi.” The Commonwealth, June 16, 1905, Part 1, p. 3. Volume 9; Number 24. Ordinance Number 485—An Ordinance Relating to Deadly Weapons; Cartridges Not to Be Sold to Infants or Drunk Persons. Approved April 11, 1905.

1906 Miss. Laws 367, Privilege Taxes, ch. 114, § 3887.
Dealers in Deadly Weapons: On each person or firm dealing in pistols, dirk knives, sword canes, brass or metallic knuckles, or other deadly weapons (shotguns and rifles excepted) - 100.00. And which shall be in addition to all and any other taxes or privileges paid. On each firm or dealer selling air guns, target or flobert rifles (and this shall apply even if the same has a license to sell merchandise, pistols or cartridges) - $25.00.

YAZOO CITY, MISSISSIPPI, THE CHARTER AND CODE OF THE ORDINANCES, ch. 20, §§ 293-300 (sine nomine 1908).
“CHAPTER 20.
MISDEMEANORS…
Dealers to keep record of cartridges and weapons sold.
    Sec. 296. Every merchant or dealer or pawnbroker that sells bowie knives, dirk knives, pistols, brass or metallic knuckles, or slungshots, or pistol or rifle cartridges, shall keep a record of all sales of such weapons and cartridges sold, showing the description of the weapon and kind and caliber of cartridges so sold, the name of the purchaser, and the description of weapons and the quantity of cartridges and date of sale. This record to be opened to public inspection at any time to persons desiring to see it. The dealer who violates this section shall be guilty of a misdemeanor, and upon conviction, shall be fined not less than seven dollars and fifty cents nor more than twenty-five dollars.
The same; and cartridges not sold to infant or drunk person.
    Sec. 297. It shall not be lawful for any person to sell, give, or lend to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any deadly weapon, or other weapon the carrying of which concealed is prohibited, or pistol cartridge; and, on conviction thereof, he shall be punished by a fine of not less than twenty-five dollars nor more than two hundred dollars, or imprisoned not exceeding ninety days, or both.

## MISSOURI

Chester H. Krum, Reviser, The Revised Ordinance City of St. Louis. No. 17188. Approved April 7, 1893 Page 885, Image 894 (1895) available at The Making of Modern Law: Primary Sources. 1887.
Ordinances of the City of St. Louis. Minors – Conditions of Sale to, of Ammunition. – No person shall sell to any child under the age of sixteen years, without the written consent of the parents or guardian of such child, any cartridge of fixed ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of such cartridge, or of any fulminate.

## NEW HAMPSHIRE

17

New Hampshire Province Laws, 1689, 288-89
[CHAPTER 27.]
[NO ARMS OR AMMUNITION TO BE SUPPLIED, TO INDIANS OR FRENCH WITHOUT A LICENSE.]
[Mass. Archives, vol. 107, p. 113. Court Records, June 14, 1689.]
It is ordered by the Govern'r & Councel & Repr'sentatives of this Colony, that no Person whatsoever, during the time of hostility w'th the Indeans pr'sume directly or Indirectly to sell Barter give, or by any meanes Supply any indian or Indians, or the neighbouring French, w'th Armes or Am'unition of any kinde whatsoever without licence first obtained from the Govern'r & Councell, on paine of being reputed Enemyes to the Crowne & English Nation, & to be proceeded ag't as Such w'th utmost Severity of Law.
June 14: 1689: Voted In the affirmative
As attests Ebenezer Prout Clerk
Consent'd to by the Govern'r and Councill June 14'o June 1689.

## **NEW JERSEY**

Act of Mar. 28, 1912, ch. 225, §§ 1-5, N.J. Laws 364, 364-66.
"BE IT ENACTED by the Senate and General Assembly of the State of New Jersey:
    '1. Any person who shall carry any revolver, pistol, firearm, bludgeon, blackjack, knuckles, sand-bag, slung-shot or other deadly, offensive or dangerous weapon, or any stiletto, dagger or razor or any knife with a blade five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor; provided, however, that nothing in this act shall be construed to prevent any sheriff, prosecutor, deputy sheriff, jailer, police officer, constable, State detective, member of a legally organized detective agency, or any other peace officer from carrying weapons when engaged in the discharge of his duty; nor to duly authorized military or civil organizations, when parading nor to members thereof when going to and from the places of meeting of their respective organizations; nor shall this act apply to any person having a written permit to carry such weapon, firearm, stiletto, razor, dagger or knife, or slung-shot, obtained from and signed by the mayor of any city, borough or other municipality, or from any judge of the Court of Common Pleas, which permits such officers are hereby authorized to grant. Such permits shall be issued at the place of residence of the person obtaining the same, and, when issued shall be in force in all parts of the State for a period of one year from date of issue, unless sooner revoked by the officer granting the same, and said permit shall be dated and shall be recorded in the office of the clerk of the county where granted within ten days after the granting of same, and in the event of the recipient failing to record the same as herein provided said permit shall be deemed and taken to be revoked and cancelled. It is further provided, that nothing contained herein shall prevent any person from keeping or carrying about his or her place of business, dwelling house or premises any of such weapons, firearms, stilettos, daggers, razors, knives or slung-shots, or from carrying the same from any place of purchase to his or her dwelling house or place of business, or from his or her dwelling house or place of business to any place where repairing is done, to have the same repaired and returned; and it is provided further, that nothing in this act shall be construed to make it unlawful for any person to carry a gun, rifle or knife in the woods or fields, or upon the waters of this State, for the purpose of hunting or target practice.

18

2. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slung-shot, billy, sandclub, sand-bag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases, or gives any gun, revolver, pistol or other firearm, or any air-gun, spring-gun or other instrument or weapon in which the propelling force is spring or air, or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of twenty-one years, is guilty of a misdemeanor; provided, however, that nothing in this section shall prevent any person between the ages of sixteen and twenty-one from obtaining any gun, revolver, pistol or other firearm, air or spring-gun, if the consent in writing of the parent or guardian of said minor so to do be presented to the person from whom such weapon be obtained agreeable to the provisions of this act.

3. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sand-club, sand-bag, metal knuckles, bludgeon, dagger, dirk, dangerous knife, razor, stiletto, revolver, bomb or other high explosive, or any other dangerous or deadly instrument or weapon, with the intent to use the same unlawfully against another is guilty of a high misdemeanor; the possession by any person other than a public officer or one having a permit for the same as herein provided, of any weapons specified in the foregoing section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of this section.

4. Every person selling a pistol, revolver or other firearm of a size which may be concealed upon the person whether such seller is a retail dealer, pawnbroker or otherwise, shall keep a register in which shall be entered at the time of sale the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre, make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm. Every person who shall fail to keep a register and to enter therein the facts required by this section, shall be guilty of a misdemeanor. Such register shall be open at all reasonable hours for the inspection of any peace officer. Every person becoming the lawful possessor of such a pistol, revolver or other firearm, who shall sell, give or transfer the same to another person without first notifying the police authorities, shall be guilty of a misdemeanor. This section shall not apply to wholesale dealers.

5. All acts and parts of acts inconsistent with the provisions of this act shall be and the same hereby are repealed, and this act shall take effect immediately.
Approved March 28, 1912."
Acts of the One Hundred and Thirty-Sixth Legislature of the State of New Jersey, and Sixty-Eighth under the New Constitution (Trenton, NJ: MacCrellish & Quigley, 1912), 364-366. Chapter 225—A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes (Revision of 1908)," Approved June Fourteenth, One Thousand Eight Hundred and Ninety-Eight, §§ 1-5. Approved March 28, 1912.

**NORTH CAROLINA**

1893 N.C. Sess. Laws 468–69
"CHAPTER 514.
An act to prevent the sale of deadly weapons to minors.

19

Section 1: That it shall be unlawful for any person, corporation or firm knowingly to sell or offer for sale, give or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling shot.

Sec. 2. That any person, corporation or firm violating this act shall be guilty of a misdemeanor, and upon conviction for each and every offense shall be fined or imprisoned, one or both, in the discretion of the court."

An Act to Revise, Consolidate and Amend the Insanity Laws of this State, ch. 1, § 52, 1899 N.C. Sess. Laws, Pub. Laws, 3, 20-21 (Edwards & Broughton 1899).
"CHAPTER 1.
An act to revise, consolidate and amend the insanity laws of this state…
…SEC. 52. It shall be unlawful for any person to sell or give to any inmate of a state hospital any intoxicating drink, any narcotic, and poison or poisonous substances, or any deadly weapon, or any cartridge or ammunition for firearms of any kind, and every person violating this section shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined or imprisoned at the discretion of the court…"
Public Laws and Resolutions of the State of North Carolina Passed by the General Assembly at its Session of 1899 (Raleigh, NC: Edwards & Broughton, 1899), 20-21. Chapter 1—An Act to Revise, Consolidate and Amend the Insanity Laws of this State, § 52. Ratified February 17, 1899.

1905 N.C. Sess. Laws 547, Priv. Laws, An Act to Amend the Charter of the Town of Pine Bluff, in Moore County, ch. 188, § 6.
That the commissioners of said town shall have authority to pass all necessary by-laws and ordinances for the proper government of the town, and to enforce the same by means of suitable fines and penalties. Among the powers specifically conferred upon the commissioners are the following: . . . to prescribe conditions under which may be sold and used fire-arms of all kinds including toy guns and pistols and air-guns, brass knuckles, loaded canes, dirks, bowie and other knives used as weapons, ammunition and fire-works, not inconsistent with the general laws of the State[.]

An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§ 1-8, 1919 N.C. Sess. Laws 397, 397-399 (Commercial Printing Company 1919).
"CHAPTER 197
AN ACT TO REGULATE THE SALE OF CONCEALED WEAPONS IN NORTH CAROLINA.
The General Assembly of North Carolina do enact:
SECTION 1. That it shall be unlawful for any person, firm, or corporation in this State to sell, give away or dispose of, or to purchase or receive, at any place within the State from any other place within or without the State, without a license or permit therefor shall have first been obtained by such purchaser or receiver from the clerk of the Superior Court of the county in which such purchase, sale, or transfer is intended to be made, any pistol, so-called pump-gun, bowie knife, dirk, dagger or metallic knucks.
SEC. 2. That the clerks of the Superior Courts of any and all counties of this State are hereby authorized and directed to issue to any person, firm, or corporation in any such county a license or permit to purchase or receive any weapon mentioned in section one of this act from any

20

person, firm, or corporation offering to sell or dispose of the same, which said license or permit shall be in the following form, to wit:

North Carolina,

-------------------------------County.

I, ------------------------------------, clerk of the Superior Court of said county, do hereby certify that -----------------------------------whose place of residence is----------------------------------- Street, in ------------------------------------(or) in-----------------------------------Township ------------- -----------------------County, North Carolina, having this day satisfied me as to his, her (or) their good moral character, and that the possession of one of the weapons described in section one of this act is necessary for self-defense or the protection of the home, a license or permit is therefore hereby given said ------------------------------------to purchase one pistol, (or)-------------------------- ---------- from any person, firm, or corporation authorized to dispose of the same.

(If any other weapon is named, strike out word pistol.)

This ------------ day of ------------------------------------, 19---

------------------------------------,

Clerk Superior Court.

SEC. 3. That before the clerk of the Superior Court shall issue any such license or permit he shall fully satisfy himself by affidavits, oral evidence, or otherwise, as to the good moral character of the applicant therefor, and that such person, firm, or corporation requires the possession of such weapon mentioned in section one of this act for protection of the home: Provided, that if said clerk shall not be so fully satisfied, he shall refuse to issue said license or permit: and Provided further, that nothing in this act shall apply to officers authorized by law to carry firearms. The clerk shall charge for his services upon issuing such license or permit a fee of fifty cents.

SEC. 4. That the clerk of the Superior Court shall keep a book, to be provided by the board of commissioners of each county, in which he shall keep a record of all licenses or permits issued under this act, including the name, date, place of residence, age, former place of residence, etc., of each such person, firm, or corporation to whom or which a license or permit shall have been so issued.

SEC. 5. That each and every dealer in pistols, pistol cartridges and other weapons mentioned in section one of this act shall keep an accurate record of all sales thereof, including the name, place of residence, date of sale, etc., of each person, firm, or corporation, to whom or which any and all such sales are made, which said record shall be open to the inspection of any duly constituted State, county or police officer, within this State.

SEC. 6. That during the period of listing taxes in each year the owner or person in possession or having the custody or care of any pistol or other weapon mentioned in section one of this act shall be, and is hereby, required to list the same specifically, together with the value thereof, as is now required by law for listing other personal property for taxes: Provided, that all persons listing any such weapons for taxes as aforesaid shall also be required to designate his place of residence, local street address, or otherwise as the case may be.

SEC. 7. That any person, firm, or corporation violating any of the provisions of this act shall be guilty of a misdemeanor and fined or imprisoned in the discretion of the court.

SEC. 8. That upon submission or conviction of any person in this State for unlawfully carrying concealed weapons off of his own premises, the pistol or other deadly weapon with reference to which the defendant shall have been convicted shall be condemned and ordered confiscated and destroyed by the judge presiding at any such trial.

21

SEC. 9. That this act shall be in force from and after the first day of April, one thousand nine hundred and nineteen.

Ratified this 10th day of March, A.D. 1919."

Public Laws and Resolutions of the State of North Carolina Passed by the General Assembly at its Session of 1919 (Raleigh, NC: Commercial Printing Company, 1919), 397-9. Chapter 197—An Act to Regulate the Sale of Concealed Weapons in North Carolina, §§ 1-8. Ratified March 10, 1919.

## OHIO

1913 Ohio Laws 906, An Act: A Bill to Amend  and Supplement [Certain] Sections . . . and to Repeal [Certain] Sections of the General Code; Relating to Children and to Females under Twenty-One Years of Age and to Organizations which Include within Their Objects Matters Relating to Children, ch. 11, §§ 12966-67.
§ 12966. Whoever sells of exhibits for sale, to a minor under sixteen years of age, a pistol manufactured of a metallic or hard substance, commonly known as a "toy pistol" or air gun, or any form of explosive gun ,shall be fined not less than ten dollars nor more than fifty dollars or imprisoned not less than ten days nor more than twenty days, or both, and be liable in damages to any person injured by such sale. § 12967. Whoever sells, barters, furnishes or gives to a minor under the age of seventeen years, an air-gun, musket, rifle, shotgun, revolver, pistol, or other fire-arm, or ammunition therefor, or, being the owner or having charge or control thereof, knowingly permits it to be used by a minor under such age, shall be fined not more than one hundred dollars or imprisoned in jail not more than thirty days, or both.

## OKLAHOMA

Dorset Carter, Annotated Statutes of the Indian Territory: Embracing All Laws of a General and Permanent Character in Force at the Close of the Second Session of the Fifty-fifth Congress Page 243-244, Image 327-328 (1899) available at The Making of Modern Law: Primary Sources. Carrying Weapons, § 1250. Any person who shall wear or carry in any manner whatever as a weapon any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. Provided, that officers whose duties require them to make arrests, or to keep and guard prisoners, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. Provided, further that nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey or upon his own premises. § 1251. Any person, excepting such officers or persons on a journey and on their premises as are mentioned in section 1250, who shall wear or carry any such pistol as is used in the army or navy of the United States, in any manner except uncovered and in his hand, shall be deemed guilty of a misdemeanor. § 1252. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person, any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

22

## PENNSYLVANIA

An Act to Prohibit the Sale to Any Person Under Sixteen Years of Age of Deadly Weapons, Gunpowder, and Explosive Substances, in the Commonwealth of Pennsylvania, no. 124, § 1, 1881 Pa. Laws 111, 111–112 (Lane S. Hart).
"No. 124.
AN ACT
To prohibit the sale to any person under sixteen years of age of deadly weapons, gunpowder and explosive substances, in the commonwealth of Pennsylvania.
   Section 1. Be it enacted, &c., That any person, who shall knowingly and willfully sell or cause to be sold, to any person under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon, or who shall knowingly and willfully sell or cause to be sold to any such minor, any imitation or toy cannon, revolver or pistol so made, constructed or arranged as to be capable of being loaded with gunpowder or other explosive substance, cartridges, shot, slugs or balls, and being exploded, fired off and discharged, and thereby become a dangerous or deadly weapon, or who shall knowingly and willfully sell or cause to be sold to any such minor any cartridge, gunpowder or other dangerous and explosive substance, shall, in every such case, be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to pay a fine not exceeding three hundred dollars .

John Purdon, A Digest of the Laws of Pennsylvania: From the Year One Thousand Seven Hundred to the Sixth Day of July, One Thousand Eight Hundred and Eighty-Three.11th Edition Page 423-424, Image 472-473 (Vol. 1, 1885) available at The Making of Modern Law: Primary Sources. 1883.
Crimes, Carrying and Sale of Explosives, § 113. Any person who shall knowingly and willfully sell or cause to be sold to any person under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon, or who shall knowingly and willfully sell, or cause to be sold, to any such minor, any imitation or toy cannon, revolver or pistol so made, constructed or arranged as to be capable of being loaded with gunpowder or other explosive substance, cartridges, shot, slugs or balls and being exploded, fired off and discharged, and thereby become a dangerous or deadly weapon, or who shall knowingly and willfully sell, or cause to be sold to any such minor, any cartridge, gunpowder or other dangerous and explosive substance, shall in every such case, be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to pay a fine not exceeding three hundred dollars.

## RHODE ISLAND

1883 R.I. Pub. Laws 157, An Act In Amendment Of And in Addition To Chapter 92 Of The Public Statutes "Of Fire-arms and Fire-works", § 1
§ 1. No person shall sell to any child under the age of fifteen years, without the written consent of a parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of such cartridge or of any fulminate.

General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 372, Image 388 (1896) available at The Making of Modern Law: Primary Sources. 1883.

Firearms and Fire-works. § 7. No person shall sell to any child under the age of fifteen years, without the written consent of a parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of such cartridge or of any fulminate. § 8. Every person violating the provisions of the foregoing section shall be fined not less than ten dollars nor more than twenty dollars for each offence.

## SOUTH CAROLINA

John E. Breazeale, The Revised Statutes of South Carolina, Containing the Code of Civil Procedure, and the Criminal Statutes. Also The Constitutions of the United States and of the State, and the Rules of the Supreme and of the Circuit Courts of the State Page 431, Image 529 (Vol. 2, 1894) available at The Making of Modern Law: Primary Sources. 1890.

Chapter XXVIII Violations of the License Laws by Insurance and Other Companies, Emigrant Agents, owners or shows, etc., Persons Selling Pistols, etc. §490. No person or corporation within the limits of this State shall sell or offer for sale any pistol, rifle, cartridge or pistol cartridge less than .45 caliber, or metal knuckles, without first obtaining a license from the county in which such person or corporation is doing business so to do. The County Board of Commissioners of the several Counties of this State are authorized to issue licenses in their respective Counties for the sale of pistols and pistol and rifle cartridges of less than .45 caliber, and metal knuckles, upon the payment to the County Treasurer by the person or corporation so applying for said license of the sum of twenty-five dollars annually; and any person who shall sell or offer for sale any pistol, or pistol or rifle cartridge of less than .45 caliber, or metal knuckles, without having obtained the license provided in this Section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine not exceeding five hundred dollars, or by imprisonment not exceeding one year, or both, at the discretion of the court.

1893 S.C. Acts 426, An Act To Amend An Act Entitled "An Act To Provide For A License For The Sale Of Pistols Or Pistol Cartridges Within The Limits Of This State", § 2
. . . That the County Commissioners of the Several Counties of the State be, and they are hereby, authorized to issue licenses in their respective Counties for the sale of pistols and pistol cartridges upon the payment to County Treasurer by the person or corporation so applying for said licenses of the sum of twenty-five dollars annually.

1923 S.C. Acts 221
If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days.

24

1923 S.C. Acts 19-20, License Tax on Ammunition -- Candy -- Admissions -- Regulations to have force of law.

That every person, firm or corporation doing business within the State of South Carolina and engaging in the business of selling at retail or in any individual instance selling to the final consumer, such articles as are named in this section, for the privilege of carrying on such business, shall be subject to the payment of a license tax which shall be measured by and graduated in accordance with the volume of sales of such person, firm or corporation as follows: (a) There shall be levied, assessed, collected and paid upon all ammunition, including shells for shotguns and cartridges for rifles, pistols, revolvers, automatic pistols, rifles and machine guns, and upon such shells and cartridges partially prepared for use but lacking powder or shot or other necessary constituent, and upon blank shells and cartridges (but not upon powder or shot or caps not prepared and not in form to use in modern firearms), when sold at retail or to the ultimate consumer, the following: Upon all shotgun or other shells, two ($2.00) dollars per thousand rounds; Upon all cartridges, twenty-five (25) caliber or greater, two ($2.00) dollars per thousand rounds. (b) The license taxes imposed upon ammunition shall be paid by stamps to be affixed and cancelled by the retailer or other final seller, and said stamps shall be affixed to the smallest container in which or from which articles are sold, as soon as the original packages are opened or broken, or if received in no other form than that in which sold, as soon as the containers are placed in the place of business of the retailer; in the case of articles intendeded for sale in the packages in which received from outside the State of South Carolina without opening or alteration of any sort, each package must be immediately marked with the date of receipt and the place from which received and no stamps need be affixed so long as such package remains unopened and unaltered.

**TENNESSEE**

1883 Tenn. Pub. Acts 17, A Bill to Be Entitled An Act to Prevent the Sale, Loan or Gift of Pistol Cartridges in This State, ch. 13.

[I]t shall be unlawful for any person or persons to buy or sell or give away any pistol cartridges in this state. . . [A]ny person or persons violating this Act, shall be guilty of a misdemeanor, and on conviction thereof shall be fined not less than twenty-five or more than one hundred dollars. . . [P]rovided, however, that nothing in this act shall be construed to interfere with the sale of cartridges for rifle guns or shot guns, or cartridges for army or navy pistols.

Passed February 24, 1883

**U.S. GOVERNMENT**

Statutes at Large of the United States of America, vol. 40, pt. 1, ch. 18, tit. 19, § 900, nos. 10–12 (Government Printing Office 1919).

"CHAP. 18.—An Act To[1] provide revenue, and for other purposes.

…TITLE IX.—EXCISE TAXES.

   Sec. 900. That there shall be levied, assessed, collected, and paid upon the following articles sold or leased by the manufacturer, producer, or importer, a tax equivalent to the following percentages of the price for which so sold or leased…

…(10) Firearms, shells, and cartridges, except those sold for the use of the United States, any State, Territory, or possession of the United States, any political subdivision thereof, the District of Columbia, or any foreign country while engaged against the German Government in the present war, 10 per centum;

(11) Hunting and bowie knives, 10 per centum;

(12) Dirk knives, daggers, sword canes, stilettos,[3] and brass or metallic knuckles, 100 per centum…"

Statutes at Large of the United States of America, vol. 47, pt. 1, ch. 209, tit. 4, § 610 (Government Printing Office 1933) (Law Passed 1932).
"[CHAPTER 209.]
AN ACT
To provide revenue, equalize taxation, and for other purposes:
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled…
…SEC. 610. TAX ON FIREARMS, SHELLS, AND CARTRIDGES.
There is hereby imposed upon firearms, shells, and cartridges, sold by the manufacturer, producer, or importer, a tax equivalent to 10 per centum of the price for which so sold. The tax imposed by this section shall not apply (1) to articles sold for the use of the United States, any State, Territory, or possession of the United States, any political subdivision thereof, or the District of Columbia, or (2) to pistols and revolvers."

## **VIRGINIA**

An Act to Impose a Special License on Dealers in Pistols, ch. 722, §§ 1–5, 1896 Va. Acts 849, 849–50 (Everett Waddey Co., 1895) (Law Passed 1896).
"Chap. 772.—An ACT to impose a special license on dealers in pistols and pistol-cartridges in the counties of Accomac and Northampton.
Approved March 4, 1896.
1. Be it enacted by the general assembly of Virginia, That nothing in the revenue laws of Virginia relative to merchants or merchants' license shall be henceforth deemed or construed to authorize any person or mercantile firm to engage in the business of selling pistols[1] or pistol-cartridges in the counties of Accomac or Northampton without having first applied for and obtained, in the same manner as prescribed by the laws of the state for obtaining merchants' license, a special license as hereinafter provided, to be designated as special pistol and pistol-cartridge dealer's license.
2. No merchant or mercantile firm shall henceforth engage in or sell pistols or pistol-cartridges in the counties of Accomac and Northampton without having first procured a special license therefor, to be designated a special pistol and pistol-cartridge dealer's license.
3. Every person, merchant or mercantile firm engaged in the business of selling pistols or pistol-cartridges, or who may hereafter engage in said business in said counties, shall pay for the privilege of transacting said business in said counties a special license tax in the sum of ten dollars per annum, to be assessed and collected in the mode prescribed by law, and no such license shall be issued for any period less than one year, nor shall there be any abatement in any instance of the tax upon such license by reason of the fact that the person or persons so licensed shall have exercised such licensed calling for a period of less than one year. Any person selling

26

pistols or pistol-cartridges in the said counties of Accomac and Northampton contrary to the provisions hereof, or who shall in any manner violate the same, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than five dollars nor more than twenty-five dollars for each offence.

4. All acts and parts of acts inconsistent with the provisions hereof are hereby repealed in so far as they apply to said counties.

5. This act shall be in force from and after the first day of August, eighteen hundred and ninety-six."

Acts and Joint Resolutions Passed by the General Assembly of the State of Virginia, During the Session of 1895–'96 (Richmond, VA: Everett Waddey Co.,* 1895**), 849–50. Chapter 722—An Act to Impose a Special License on Dealers in Pistols and Pistol-Cartridges in the Counties of Accomac and Northampton, §§ 1–5. Approved March 4, 1896.

RICHMOND, THE CHARTER OF THE CITY, ch. 48, §§ 16-18 & 46-47 (sine nomine 1938) (Laws Passed From 1899 to 1934). 1899 and later.
"CHAPTER 48
CONCERNING VARIOUS NUISANCES…
…15. No minor shall have, keep or carry in the streets, alleys, lanes or parks of the city any toy pistol or toy rifle adapted to the use of explosive caps, cartridges or pellets, or which, by means of explosives, pneumatic pressure or mechanical contrivance, expels or discharges any ball, missile or projectile; nor shall any minor have, keep or carry upon the streets, alleys, lanes or parks of the city any firearms of any kind or description whatever. Any violation of any of the provisions of this section shall subject the offender to a fine of not less than five nor more than ten dollars, to be imposed, upon conviction, by the police justices, as the case may be. (April 10, 1903.)

16. No person shall sell, give, present or lend to any minor in the city, any toy pistol or toy rifle adapted to the use of explosive caps, cartridges or pellets, or which by means of explosives, pneumatic pressure or mechanical contrivance expels or discharges any ball, missile or projectile, nor any firearms of any description whatever; nor shall any person sell or give to any minor loaded cartridges, blanks or explosive caps of any character whatever. Any person violating the provisions of this section shall, upon conviction in either of the police courts, be fined not less than ten nor more than twenty dollars. (March 11, 1920.)

17. That all dealers in firearms and other deadly weapons shall keep an accurate register of the number and character of the weapons purchased, name of person from whom purchased and date of purchase, and likewise keep an accurate record of each sale of such deadly weapons, which shall show the date of sale, the name of the purchaser and the number and character of the weapon, which records shall be open to the inspection of any police officer of the city of Richmond, and a copy of which shall be made and certified by such dealer monthly to the chief of police of the city of Richmond. Any person violating the provisions of this section shall be liable to a fine of not less than five dollars nor more than twenty-five dollars for each offense, recoverable before the police justices of the city of Richmond, as the case may be. (May 11, 1916.)

18. No person, firm or incorporated company shall keep in any house in the city any loaded shell or shot or any explosive material of any sort not authorized by ordinance. And any person, firm or incorporated company violating the provisions of this section shall be fined not less than

27

twenty dollars nor more than one hundred dollars, and each day on which the same is kept in the city shall be a distinct offense, and punishable as such. (Code 1899.)…

…46. No person shall sell or exchange within the city limits of Richmond, any pistol, dirk, bowie knife, sling shot or any weapon of a like kind, or pistol or rifle ammunition, unless and until he shall first have obtained a permit to be granted by the chief of police, to sell or exchange such weapon and such permit shall be exhibited to the person to whom such weapon is sold or exchanged, and on request shall be exhibited for inspection by any police officer of the city of Richmond.

(a) No person shall purchase, or otherwise procure as his own property or for temporary use any pistol, dirk, bowie knife, sling shot or any weapon of a like kind, or pistol or rifle ammunition, unless and until he shall procure a permit from the chief of police granting permission to make such purchase or to procure the same for use as aforesaid, which permit shall be filed with the person from whom such purchase or exchange is made; provided, that nothing in this section shall apply to the sale or exchange of low power rifles or rifle ammunition known or designated as 22-calibre, commonly used for target practice purposes.

(b) Any person violating the provisions of this section shall be liable to a fine of not less than twenty-five nor more than one hundred dollars for each offense, recoverable before one of the police justices of the city of Richmond. (August 16, 1924.)

47. If any person carry about his person hid from common observation, any pistol, dirk, bowie knife, razor, sling shot, metal knucks or any weapon of like kind, he shall upon conviction thereof, be fined not less than one hundred dollars nor more than five hundred dollars or by imprisonment in jail for not less than six months, or by both such fine and imprisonment, such penalties to be imposed by the police justices of the city of Richmond as the case may be, but this ordinance shall not apply to any police officer, town or city sergeant, constable, sheriff, notary public, conservator of the peace, or to carriers of the United States mail in rural districts, or collecting officer while in the discharge of his official duty, provided, the circuit court of any county in term time, and any corporation court in term time, upon written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapons, may grant such permission for one year. The order making same shall be entered in the law order book of such court. (August 15, 1934.)"
The Charter of the City of Richmond as Amended to July 1, 1938 (Richmond, VA: s.n., 1939), 815-16 & 828-29. Chapter 48—Concerning Various Nuisances, §§ 16-18 & 46-47. Laws passed from 1899 to August 15, 1934.


1926 Va. Acts. 285-87, CHAP. 158-An ACT to improve a license tax on pistols and revolvers; to regulate the sale thereof and of ammunition therefor; and to provide that the proceeds of such tax shall be used for the establishment of a diseased and crippled children's hospital, §§ 1-9.
1. Be it enacted by the general assembly of Virginia, That it shall be the duty of every person residing in this State and owning a pistol or revolver therein, to pay on or before the first day of January of each year a license tax of one dollar on each pistol or revolver so owned, or in the event that such pistol or revolver shall be acquired by any such person on or after the first day of February, such license tax shall be forthwith paid thereon. The application for the license shall give the name of the owner, and the number, make and calibre [sic] of such pistol or revolver, which shall be set forth in the license. All pistol or revolver licenses shall run from the first day of January to the first day of the following January. Such license taxes shall be paid to the treasurer of the city or county wherein the said owner resides, and the said treasurer shall not

28

receive more for handling the funds arising from the tax imposed by this act than he receives for handling other State funds. The treasurers shall not receive compensation for their services in issuing the license cards herein provided for. Upon payment of the tax provided for in this section the person paying the same shall be entitled to a license card therefor, showing the year for which the license is paid, the county or city issuing the card, the serial number of the license, and the number, calibre [sic], make and owner of the pistol or revolver. When the license card is issued the treasurer shall record the name of the owner of the pistol or revolver, and the number, calibre [sic] and make thereof with the number of the license, in a book prepared for the purpose. The license cards and book shall be furnished by the boards herein provided and shall be paid out of the funds derived from the pistol and revolver licenses. If any such card should be lost the owner of the card shall pay to the treasurer twenty-five cents for a duplicate card.

2. It shall be the duty of every retailer selling a pistol or revolver in this State, at the time of such sale, to keep a record of the name and address of the purchaser and the number, make and calibre [sic] of the pistol or revolver, and to report once a month to the treasurer of his county or city the names of such purchasers, if any, together with the number, make and calibre [sic] of each pistol or revolver purchased; and all persons receiving or having in their possession a pistol or revolver for the purpose of repairing the same shall report to the treasurer of his county or city once a month giving the name and address of the owner and the calibre [sic], make and serial number of such pistol or revolver.

3. It shall be unlawful for any retailer in this State to sell ammunition for any pistol or revolver to any person unless the person desiring to make such purchase displays the license card for the current year provided for in this act.

4. Any person violating any provision of this act or using a license card not issued to him, for the purpose of purchasing ammunition, or using a license card for the purchase of pistol or revolver ammunition unless the ammunition is intended to be used for the weapon mentioned in the license card shall be guilty of a misdemeanor, and upon conviction shall be fined not less than twenty-five nor more than fifty dollars, or sentenced to the State convict road force for not less than thirty or not more than sixty days, or both, in the discretion of the tribunal trying the case.

5. The provisions of this act shall not apply to any officer authorized by law to carry a pistol or revolver nor to the pistol or revolver of such officer when such pistol or revolver is carried in discharge of his official duty, except that every officer shall list his pistol or revolver with the treasurer of his county or city annually by January first; nor to a pistol of an obsolete type kept as a souvenir, memento or relic, such as cap and ball type, etcetera, or souvenir used or captured by any person or relative in any war. But such pistol shall be registered as herein provided, upon satisfactory proof to the officer issuing such license that the pistol in question comes properly within this exception, in which case, no license tax shall be charged.

6. The tax hereby imposed shall be in lieu of all other taxes on such pistols and revolvers; but nothing in this act shall be construed to apply to such weapons in the stocks of licensed wholesaler or retailers.

7. All funds arising from pistol and revolver licenses, except as hereinbefore provided, shall be kept separate from other funds and shall be paid into the State treasury to establish a fund known as the diseased and crippled children's hospital fund, which shall be used for the purpose of establishing and maintaining within the State at such place or places as may be selected by the board hereinafter provided for, a hospital or hospitals for the care, treatment and vocational training of diseased and crippled children resident in Virginia, or for any such rehabilitation work that the board may deem wise.

29

Each treasurer shall between the first and fifteenth of July and between the first and fifteenth of January report to the auditor of public accounts collections, which he is required to make by this act, and shall at the same time pay into the State treasury the amount collected less the commissions which he is authorized to retain for collecting same as provided for in this act, and the auditor of public accounts shall keep said funds separate from other funds to be designated and known as "the diseased and cripple children's hospital fund."

8. The administration of the aid fund shall be under the direction of a board of seven physicians to be appointed by the governor. . . . [Description of board and its functions].

9. The State treasurer shall make payments from the fund hereinabove created on warrants from the auditor of public accounts, issued on vouchers certified by the chairman of the board hereinabove created on authority of the board.

## **WASHINGTON**

Ordinance No. 1492, §§ 1-5, Olympia City Council (1917) (Olympia, Washington).
"ORDINANCE NO 1492
AN ORDINANCE regulating the purchase and sale of firearms, deadly weapons, ammunition, and explosives in the City of Olympia, providing a penalty for the violation hereof; and declaring an emergency.
THE CITY COUNCIL OF THE CITY OF OLYMPIA DO ORDAIN AS FOLLOWS:

Section 1. It shall be unlawful for any person, firm or corporation, to purchase any gun, pistol, firearm or other deadly weapon, or any ammunition or explosive of any kind or character, without first obtaining a written permit therefor from the Chief of Police of the City of Olympia.

Section 2. The application for such permit shall be in writing and shall state the name of the person, firm or corporation from whom such purchase is to be made, the kind of firearm, ammunition, or explosive desired, and the purpose for which it is to be used.

Section 3. The issuance of such permit shall be in the discretion of the Chief of Police. Said permit shall be issued in duplicate. One copy to be retained by the Chief of Police and kept in his files, and the other to be delivered by the person, firm or corporation to whom it is issued, to the person, firm, or corporation from ^** the purchase is to be made, and no person, firm, or corporation shall sell any gun, pistol, firearm, deadly weapon, ammunition, or explosive without first obtaining from the purchaser the permit so issued by the Chief of Police. Such permit shall be kept in the files of the dealer and such files shall at all times be open to the inspection of any police officer of the City of Olympia, , and said permit shall have indorsed thereon by the dealer a description of the article sold and the factory number of all guns, so sold.

Section 4. Any person, firm, or corporation, violating any of the provisions of this ordinance shall, upon conviction thereof, be fined in any sum not exceeding One Hundred Dollars or imprisoned in the City Jailfor a period not exceeding thirty days, or both, in the discretion of the court.

Section 5. An emergency exists and this ordinance shall take effect immediately after publication."
Ordinance No. 1492, Olympia City Council, Ordinances, 1859-2018, Washington State Archives, Digital Archives, http://www.digitalarchives.wa.gov, accessed November 20, 2023. Olympia, Washington City Council, Ordinance No. 1492—An Ordinance Regulating the Purchase and Sale of Firearms, Deadly Weapons, Ammunition, and Explosives in the City of Olympia,

30

Providing a Penalty for the Violation Hereof; and Declaring an Emergency, §§ 1-5. Passed, May 15, 1917; Published May 17 and 24, 1917.

## WYOMING

An Act Defining Crimes, Regulating Criminal Procedure and for Other Purposes, ch. 73, § 97, in 1890 Wyo. Sess. Laws 127, 140.
"SEC. 97. It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of sixteen years any cartridges manufactured and designed for use in a pistol; and any person who shall violate any of the provisions of this section shall be fined in any sum not more than fifty dollars."
Session Laws of Wyoming Territory Passed by The Eleventh Legislative Assembly, Convened at Cheyenne, on the Fourteenth Day of January, 1890 (Cheyenne, WY: E. A. Slack, Daily Sun Office, 1890), 140. Chapter 73—An Act Defining Crimes, Regulating Criminal Procedure and for Other Purposes, § 97. Approved March 14, 1890.

Josiah A. Van Orsdel, Attorney General, Revised Statutes of Wyoming, in Force December 1, 1899 Including the Magna Charta, Declaration of Independence, Articles of Confederation, Organic Act of Territory of Wyoming, Act of Admission of the State of Wyoming, Constitution of the United States and of Wyoming, and the Rules of the Supreme Court Page 1253, Image 1253 (1899) available at The Making of Modern Law: Primary Sources. 1890.
Furnishing Deadly Weapons to Minor. § 5052. It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of sixteen years any cartridges manufactured and designed for use in a pistol; and any person who shall violate any of the provisions of this section shall be fined in any sum not more than fifty dollars.

Sources: https://firearmslaw.duke.edu/repository/search-the-repository/; HeinOnline

31

**EXHIBIT H**

## EXHIBIT H

## BOWIE KNIFE LAWS BY TYPE

| STATE | No Concealed Carry | No Carry | Greater Criminal Penalty | Tax/Punish for Sale | Tax Owner-ship | No Sale to Barred Groups* | No brandish |
|---|---|---|---|---|---|---|---|
| Alabama | 1839,1841 1876,1879 | | 1837 | 1837,1897 | 1837,1867 | 1876 | |
| Alaska | | | | | | | |
| Arizona | 1893,1901 | 1889 | | | | | |
| Arkansas | 1837,1838, 1875 | 1875,1881 | 1871 | 1881 | | | |
| California | 1896 | | | | | 1896 | 1855,1858 |
| Colorado | 1862,1867 1877,1881 1885,1891 | | | | | | 1881 |
| Connecticut | | | | | | | |
| Delaware | | | | | | | |
| District of Columbia | 1871,1892 | 1858 | | | | | |
| Florida | 1835,1868 1887 | | | 1838a | | | |
| Georgia | 1837 | 1837,1870 1873 | | 1837 | 1884/85 | 1860 | |
| Hawaii | | 1852,1913 | | | | | |
| Idaho | 1879,1909 | 1888 | | | | | 1864,1888 |
| Illinois | 1867,1876 1880,1881 1883 | | | | | 1881 | 1880 |
| Indiana | | | | | | 1905 | |
| Iowa | 1882,1887 1900 | | | | | | |
| Kansas | 1862,1863 1879,1887 | | | | | 1883 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Kentucky | 1813 | | | 1885 | | 1859 | |
| Louisiana | 1813,1842, 1855 | 1870 | | | | | |
| Maine | | 1841,1884 | | | | | |
| Maryland | 1872,1886 1890 | | | | | | |
| Massachusetts | | | | | | | |
| Michigan | 1887,1891 | | | | | | |
| Minnesota | 1870,1882 1884 | 1851 | | | | | |
| Mississippi | 1878,1896^ | | 1837,1838 | | 1841,** 1854 | | 1840 |
| Missouri | 1871,1883 1890,1897 | 1917,1923 | | | | | |
| Montana | 1864,1883 | | 1879 | | | | 1885 |
| Nebraska | 1881,1890, 1899 | 1872 | | | | | |
| Nevada | 1905 | | 1873 | | | 1881 | |
| New Hampshire | | | | | | | |
| New Jersey | 1895,1905 | | | | | | |
| New Mexico | 1852,1853, 1859/60, 1864/65, 1887 | 1869 | | | | | |
| New York | | 1885 | 1885 | | | | |
| North Carolina | 1879 | | | | 1856,1858 | 1846b | |
| North Dakota | 1895,1915 | | | | | | |
| Ohio | 1859,1880, 1894 | | | | | | |
| Oklahoma | 1890,1903 | 1890,1891 | | | | | |
| Oregon | 1885 | | | | | | |
| Pennsylvania | 1897 | | | | | | |
| Rhode Island | 1893,1896 | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1908 | | | | | | |
| South Carolina | 1880 | | | | | 1923 | |
| South Dakota | | | | | | | |
| Tennessee | 1838,1863, 1867 | 1869,1873 1881,1893 | 1838,1856 | 1838,1867 | | 1856,1867 | 1801 |
| Texas | | 1870,1871 1879,1898 | 1856 | | | 1897 | 1899 |
| Utah | 1888 | 1877 | | | | | |
| Vermont | | 1892 | | | | | |
| Virginia | 1838, 1847/48, 1867, 1869/70, 1881/82, 1887, 1895/96 | | 1838 | | 1874/75 | | |
| Washington | 1881,1892, 1896,1897 | | | | | | 1854,1859 1869,1881 |
| West Virginia | 1870 | 1882,1891 1925 | | | | | |
| Wisconsin | 1883,1896 | | | | | | |
| Wyoming | | | | | | 1890,1925 | 1884,1899 |
| TOTAL STATES | 38 | 19 | 9 | 6 | 5 | 13 | 10 |
| TOTAL LAWS | 99 | 34 | 11 | 8 | 8 | 15 | 16 |

Source: https://firearmslaw.duke.edu/repository/search-the-repository/ unless otherwise noted. Note that the unit of analysis is the law, not the state, though these are organized by state.

*Barred groups included Native Americans/Indians, African Americans/Enslaved, minors.

** 1841 Miss. Chap. 1, p. 52. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

^ 1896 Miss. L. chap. 104, pp. 109-10. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

a  1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838). See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

b 1846 N.C. L. chap. 42. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/