# EXHIBIT 4

## UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| HEIDI BERGMANN-SCHOCH *et al.*, | Hon. Christine P. O'Hearn, U.S.D.J. |
|  | Hon. Matthew J. Skahill, U.S.M.J. |
| *Plaintiffs*, |  |
|  | Docket No.: 1:25-cv-997 |
| v. |  |
|  | Civil Action |
| JENNIFER DAVENPORT *et al.*, |  |
|  | **EXPERT REPORT OF** |
| *Defendants.* | **PROFESSOR ERIC RUBEN** |

The undersigned, Professor Eric Ruben, hereby declares that the following is true and correct:

I am over the age of eighteen years, competent to testify to the matters contained in this Declaration, and I testify here based on my personal knowledge and information. I have been asked by the New Jersey Office of the Attorney General to prepare an expert report regarding parameters of lawful self-defense at the Founding. If I am called as a witness, I would testify competently to the truth of the matters declared herein.

### BACKGROUND AND QUALIFICATIONS

1.      I am a legal scholar whose work spans the fields of criminal law, constitutional law, and legal ethics. A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

2.      I received a Bachelor of Arts degree from Dartmouth College in 2003, graduating *magna cum laude*, and a Juris Doctorate degree from New York University School of Law ("NYU Law") in 2007, graduating *cum laude*.

3.    Since 2023, I have served as an Associate Professor of Law with tenure at the Dedman School of Law at Southern Methodist University ("SMU Law"). From 2019 to 2023, I was an Assistant Professor of Law at SMU Law. From 2018 to 2019, I was an Adjunct Professor of Law at NYU Law. Since 2014, I have served as a fellow at the Brennan Center for Justice at NYU Law.

4.    I have taught law school courses at SMU Law and NYU Law. Those courses include Constitutional Law, Criminal Law, Professional Responsibility, Second Amendment, and Regulation of Weaponry in Democratic Societies.

5.    My research investigates how substantive and procedural law regulate and protect rights to violence and the instruments of violence. I draw heavily on historical, criminological, sociological, and public health sources, and deploy methodologies including doctrinal, historical, and empirical analysis.

6.    I have written extensively about firearm regulations, defensive force, and the right to keep and bear arms. That work has appeared in leading law journals including the CALIFORNIA LAW REVIEW, DUKE LAW JOURNAL, GEORGETOWN LAW JOURNAL, HARVARD LAW REVIEW FORUM, MINNESOTA LAW REVIEW, IOWA LAW REVIEW, SOUTHERN CALIFORNIA LAW REVIEW, VIRGINIA LAW REVIEW ONLINE, YALE LAW JOURNAL, and YALE LAW JOURNAL FORUM. My work has served as the basis for written and oral testimony before the U.S. Senate Judiciary Committee, amicus briefs, and popular commentary appearing in outlets such as *ABC News*, *MSNBC*, *CNN*, *Atlantic*, *New York Times*, *Wall Street Journal*, *Washington Post*, *USA Today*, and *NPR*.

7.    Much of my scholarship seeks to contextualize self-defense law, weapons regulation, and the right to keep and bear arms as a historical matter, as well as engage with historical legal doctrines and arguments. *See, e.g.*, *Scientific Context, Suicide Prevention, and the Second Amendment After* Bruen, 108 MINN. L. REV. 3121 (2024) (exploring the legal treatment of suicide and suicide prevention, contextualizing that legal treatment against the backdrop of contemporaneous religious, moral, and medical views at the Founding and today); *One Year Post-Bruen: An Empirical Assessment*, 110 VA. L. REV. O. 20 (2024) (with Rosanna Smart & Ali

2

Rowhani-Rahbar) (assessing the impact of *Bruen*'s historical methodology); *Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L.J. 99 (2023) (with Joseph Blocher) (analyzing the use of historical analogy in Second Amendment case law); *Self-Defense Exceptionalism and the Immunization of Private Violence*, 96 S. CAL. L. REV. 509 (2023) (contextualizing modern self-defense immunity provisions within our criminal procedure tradition); *Public Carry and Criminal Law After* Bruen, 135 HARV. L. REV. F. 505 (2022) (considering the relationship between armed self-defense and the historical deadly weapon doctrine); *Law of the Gun: Unrepresentative Cases and Distorted Doctrine*, 107 IOWA L. REV. 173 (2021) (among other things, considering weapons use in self-defense at present and at the Founding); *An Unstable Core: Self-Defense and the Second Amendment*, 108 CAL. L. REV. 63 (2020) (considering historical self-defense law and its relationship with emerging Second Amendment doctrine); *From Theory to Doctrine: An Empirical Analysis of the Right to Keep and Bear Arms After* Heller, 67 DUKE L.J. 1433 (2018) (with Joseph Blocher) (among other things, assessing the use of historical reasoning in case law in the eight years after *Heller*); *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121 (2015) (with Saul Cornell) (considering the relationship between regional case law about the right to bear arms and gun culture in the nineteenth century).

8. My scholarship on the Second Amendment and weapons regulation has been cited in numerous federal and state court opinions, including a concurring opinion in *United States v. Rahimi*, 602 U.S. 680, 746 (2024) (Jackson, J., concurring), and both the majority and dissenting opinions in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022).

9. My article, *An Unstable Core: Self-Defense and the Second Amendment*, 108 CAL. L. REV. 63 (2020), considered common law self-defense in Anglo-American history. The framing for the article was motivated by the Supreme Court's decision in *District of Columbia v. Heller*,

3

which held that self-defense is the "core" and "central component" of the right to keep and bear arms.[1] This declaration is based primarily on my research for that project.

10.     I have provided expert declarations in *Richards v. Bonta*, No. 3:23-CV-00793 (S.D. Cal.) and *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-02563 (D. Col.). *Richards* and *Rocky Mountain Gun Owners* concern the constitutionality of firearm waiting period laws in California and Colorado, respectively.

## RETENTION AND COMPENSATION

11.     I have been retained by the New Jersey Office of the Attorney General to render an expert opinion in this case. I am being compensated at a rate of $750 an hour for my work on this declaration, and at a rate of $950 an hour for time spent on depositions or testimony. My compensation is not contingent on the results of my expert analysis or the substance of my opinions or testimony in this matter.

## BASIS FOR OPINIONS AND MATERIAL CONSIDERED

12.     The opinions I provide in this report are based on my review of the complaint filed in this lawsuit; my review of the underlying statute; and my education, expertise, and research into relevant legal history—including a variety of scholarly works, legislation, cases, popular and learned commentaries, and various related materials.  The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

## SCOPE OF ANALYSIS AND PROFESSIONAL OPINION

13.     I have been retained by the New Jersey Office of the Attorney General to provide my professional opinion on the well-understood legal principles of an individuals' right to lawful self-defense at the Founding.

14.     The history of self-defense law is an extensive topic. My declaration focuses on aspects of that history that I believe are most relevant in the context of this Second Amendment dispute: at and around the time of the ratification of the Second Amendment, lawful self-defense

---

[1] *District of Columbia v. Heller*, 554 U.S. 570, 599, 630 (2008).

required necessity and proportionality, and those requirements have been engrained in the American legal tradition, both before and since the ratification of the Second Amendment.

15.    Based on extensive reviews and analysis of the relevant evidence, it is my professional opinion that:

- Since the Founding, the law of self-defense limited defensive force in various ways.

- Two key elements for lawful self-defense at the Founding and after were necessity and proportionality. The law incorporated two proxies for necessity: imminence and the duty to retreat before using lethal defensive force in public.

- The requirements of necessity and proportionality function to further the public interest in minimizing unnecessary violence, and especially lethal violence.

- The law has long recognized broader latitude for lethal self-defense within the home under the "castle doctrine," which eliminates the duty to retreat when an inhabitant is attacked by a noninhabitant inside the home.

## OVERVIEW

### I.    SELF-DEFENSE DOCTRINE MINIMIZES UNNECESSARY VIOLENCE.

16.    The law of self-defense is a carefully circumscribed body of law.  The government criminalizes acts of physical aggression in order to achieve its basic goal of minimizing private violence.[2] Our tradition treats lawful self-defense as an exception to this general sanction that operates as a defense to criminal charges, but not an immunity from them.[3]

---

[2] *See* Joshua Dressler, *Justification and Excuses: A Brief Review of the Concepts and the Literature*, 33 WAYNE L. REV. 1155, 1163 (1987) (noting that "the taking of human life" is "the most serious crime against a person that can be committed").

[3] *See* Eric Ruben, *Self-Defense Exceptionalism and the Immunization of Private Violence*, 96 S. CAL. L. REV. 509, 517-23 (2023) (providing an in-depth account of how self-defense has long been adjudicated as a defense to criminal charges for crimes of violence).

17.      Self-defense is only lawful when necessary and proportional. Those requirements have the effect of shepherding conflicts away from violence, and especially lethal violence.[4] As one prominent criminal law scholar put it:

> Force can be used only when necessary. Deadly force can be used *only* to prevent death or great bodily harm and, in many jurisdictions, only if there is no possibility of retreat. . . . The law prefers retreat and loss of honor to the unnecessary taking of life. And it generally construes the requirements of retreat and necessity very strictly.[5]

18.      Anglo-American self-defense law traditionally "tilt[s] in favor of the preservation of human life."[6] Edward Coke referenced the "precious regard the Law hath of the life of man."[7] William Blackstone did the same, explaining a person's duty to retreat by reference to "a real tenderness of shedding his brother's blood."[8]

19.      Traditionally, these values dovetailed with the notion that the state monopolized lawful force. Indeed, historically, homicide was justified only under limited circumstances in which a person "acted as an actual or implicit agent of the sovereign,"[9] such as the prevention of a small number of specified felonies. Killing purely in private self-defense, and not to prevent one of those specified felonies, was commonly understood to be excusable only after trial and conviction, and requiring a sovereign pardon.[10]

---

[4] See Paul H. Robinson, *A Right to Bear Firearms But Not to Use Them? Defensive Force Rules and the Increasing Effectiveness of Non-Lethal Weapons*, 89 B.U. L. REV. 251, 252–53, 256 (2009).

[5] Stephen J. Schulhofer, *The Gender Question in Criminal Law*, 7 SOC. PHIL. & POL'Y 105, 115 (1990).

[6] Darrell A. H. Miller, *Self-Defense, Defense of Others, and the State*, 80 L. & CONTEMP. PROBS. 85, 89 (2017).

[7] EDWARD COKE, THE THIRD PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONCERNING HIGH TREASON, AND OTHER PLEAS OF THE CROWN, AND CRIMINAL CAUSES 56 (1st ed. 1644).

[8] 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, *185 (1769); *see also id.* at *186 ("[T]he law sets so high a value upon the life of a man, that it always intends some misbehaviour in the person who takes it away, unless by the command or express permission of the law.").

[9] Miller, *supra* note 6, at 88–89. Of course, as with other legal areas, commentators do not agree on a single self-defense philosophy. George Fletcher noted that the law governing defensive force is a "composite" and "hybrid" model that reflects "deeper ideological clashes." GEORGE P. FLETCHER, RETHINKING CRIMINAL LAW 874 (Oxford Univ. Press 2000) (1978).

[10] Miller, *supra* note 6, at 87–95; *see also* Thomas A. Green, *The Jury and the English Law of Homicide, 1200-1600*, 74 MICH. L. REV. 413, 436 (1976) ("[T]hose who acted in defense of property fared better under the evolving law than those who acted solely in defense of their person.").

20.     Over time, the law has come to treat self-defense as a justification for violence; but invoking the right to self-defense still exposes a person to the same criminal justice system that punishes unjustified violence,[11] and still requires a showing of necessity and proportionality.[12]

## II. THE TRADITIONAL COMMON LAW REQUIREMENT OF NECESSITY

21.     By the 1500s, consensus had already formed that a person killing in self-defense could go free only if the person reasonably believed the killing was necessary.[13] From then on, common law treatises regularly underscored the role of necessity. In the eighteenth century, Matthew Hale wrote that it must be "necessity, which obligeth a man to his own defense and safeguard."[14] William Hawkins agreed that "[i]t must be owing to some unavoidable Necessity, to which the Person who kills another must be reduced without any manner of Fault in himself."[15] Blackstone likewise limited excusable homicide in self-defense to "sudden and violent cases; when certain and immediate suffering would be the consequence of waiting for the assistance of the law."[16]

---

[11] Some modern stand-your-ground laws deviate from this procedural characteristic of self-defense. In Florida, for example, defendants can invoke self-defense as an immunity to prosecution, avoiding trial altogether. *See* FLA. STAT. §§ 776.012–.013 (2019). Treating self-defense as an immunity is a decidedly ahistorical innovation. *See generally* Ruben, *supra* note 3.

[12] Paul Robinson's treatise on criminal law defenses provides the following definition of self-defense: "Conduct constituting an offense is justified if: (1) an aggressor unjustifiably threatens harm to the actor; and (2) the actor engages in conduct harmful to the aggressor (a) when and to the extent necessary for self-protection, (b) that is reasonable in relation to the harm threatened." 2 PAUL ROBINSON, CRIM. L. DEF. § 132 (June 2025 Update). The first requirement, an unjustifiable threat to the actor, is what Robinson terms a "triggering condition" for self-defense. It reflects the fact that lawful self-defense cannot arise in the absence of a threat, and even then, only arises when the threat is unjustified. One generally cannot invoke self-defense against a police officer executing an arrest, for example, nor after first unlawfully attacking someone. *See id.* § 131(b)(2). The focus of this declaration is on the second and third requirements ((2)(a) and (2)(b)), which correspond to the longstanding requirements of necessity and proportionality.

[13] See Bernard J. Brown, *The Demise of Chance Medley and the Recognition of Provocation as a Defence to Murder in English Law*, 7 AM. J. LEGAL HIST. 310, 310–11 (1963).

[14] 1 MATTHEW HALE, THE HISTORY OF THE PLEAS OF THE CROWN 478 (1736).

[15] WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 69 (1716).

[16] 4 BLACKSTONE, COMMENTARIES, *supra* note 8, at *184.

22.     The first reported self-defense opinion in the United States, *State v. Wells*, was issued in New Jersey in 1790, the year after New Jersey became the first state to ratify the Second Amendment (and the rest of the Bill of Rights) and one year before the Second Amendment's ratification by the required three-fourths of the States.[17] After the defendant struck a fatal blow with a club during a fight,[18] he told witnesses that he never believed himself to be in serious danger.[19] The New Jersey Supreme Court used the defendant's statements to reject his claim of self-defense: "[N]o man is justified or excusable in taking away the life of another unless the *necessity* for doing so is apparent as the *only* means of avoiding his own destruction or some very great injury, neither of which appears to have been reasonably apprehended in the present case."[20]

23.     In 1806, this understanding was repeated in the jury charge in *Commonwealth v. Selfridge*, which was characterized as a "leading American authority on the Law of Self-Defense."[21] Fearing an attack, Thomas Selfridge purchased a pistol.[22] He later encountered an enemy, carrying a walking stick, on a Boston street. A confrontation ensued, Selfridge was struck over the head with the walking stick, and he fired the pistol, killing his adversary.[23] At his trial for manslaughter, Selfridge claimed self-defense.[24]

---

[17] *State v. Wells*, 1 N.J.L. 424 (Sup. Ct. 1790).

[18] *Id.* at 426, 430.

[19] *Id.* at 430.

[20] *Id.* (emphasis added).

[21] *Commonwealth v. Selfridge*, 2 Am. St. Trials 544, 549 (Mass. 1806).

[22] *Id.* at 548. Evidence suggested that Selfridge "had been informed an attack upon him was intended." *Id.* at 693.

[23] *Id.* at 548. The precise sequence of events was disputed, but at minimum the fight arose suddenly. *Id.*

[24] *Id.* at 693 (noting that the killing by the defendant was "confessed as well as proved," leaving the "great question in the case[:] whether according to the facts shown to you on the part of the prosecution, or by the defendant, any reasonable, legal justification or excuse has been proved").

24.     Judge Isaac Parker's jury charge emphasized necessity as a core limitation on lethal defensive force.[25] In a statement representative of many others, Parker explained that self-defense only exculpates the defender if he "use[s] all the means in his power, otherwise, to save his own life or prevent the intended harm, such as retreating as far as he can, or disabling his adversary without killing him if it be in his power."[26]

25.     Today, necessity remains "the pervasive theme of the well defined conditions which the law imposes on the right to kill or maim in self-defense."[27] The D.C. Circuit noted in *United States v. Peterson*, an opinion used in leading casebooks to teach self-defense requirements,[28] that "'[t]he law of self-defense is a law of necessity'; the right of self-defense arises only when the necessity begins, and equally ends with the necessity; and never must the necessity be greater than when the force employed defensively is deadly."[29] As criminal law scholar Paul Robinson puts it, defensive force is only lawful "when and to the extent necessary for self-protection."[30]

26.     The requirements of imminence and retreat are two doctrinal proxies for ensuring that killing in self-defense is truly necessary. The permissible use of force in self-defense is generally limited to situations in which an individual has a reasonable anticipation of "imminent"

---

[25] *See, e.g., id.* at 697 ("If you believe under all the circumstances, the defendant could have escaped his adversary's vengeance, at the time of the attack, without killing him, the defense set up has failed, and the defendant must be convicted. . . . If you believe his only resort for safety was to take the life of his antagonist, he must be acquitted."); *id.* ("[U]nless the defendant has satisfactorily proved to you that no means of saving his life, or his person from the great bodily harm which was apparently intended by the deceased against him, except killing his adversary, were in his power—he has been guilty of manslaughter."); *id.* at 700 ("But if . . . he did not purposely throw himself in the way of the attack, but was merely pursuing his lawful vocations, and that in fact he could not have saved himself otherwise, than by the death of the assailant—then the killing was excusable, provided the circumstances of the attack would justify a reasonable apprehension of the harm which he would thus have a right to prevent.").

[26] *Id.* at 690.

[27] *United States v. Peterson*, 483 F.2d 1222, 1229 (D.C. Cir. 1973).

[28] *See, e.g.,* JOSHUA DRESSLER & STEPHEN P. GARVEY, CRIMINAL LAW CASES AND MATERIALS 496-502 (2025); SANFORD H. KADISH ET AL., CRIMINAL LAW AND ITS PROCESSES 856-58 (2022).

[29] *Peterson*, 483 F.2d at 1229 (citation omitted).

[30] 2 ROBINSON, *supra* note 12, at § 132.

harm.[31] If not, "there may be avenues open to the defendant to prevent [threatened violence] other than to kill or injure the prospective attacker."[32] Given the close relationship between imminence and necessity, it is arguably redundant for self-defense law to require showings of both.[33] Yet the dominant view, both historically and now, is to make separate inquiries into necessity and the temporal proximity of a threat.[34]

27.     Requiring retreat before the exercise of deadly force is also a manifestation of the necessity requirement, albeit one limited to certain lethal confrontations.[35] William Blackstone wrote:

> [T]he law requires that the person, who kills another in his own defence [during a sudden affray], should have retreated as far as he conveniently or safely can, to avoid the violence of the assault, before he turns upon his assailant; and that, not fictiously, or in order to watch his opportunity, but from a real tenderness of shedding his brother's blood.[36]

28.     Judge Parker adopted this view in *Selfridge*, stating that before using lethal force in self-defense, a man must "use all the means in his power, otherwise, to save his own life or prevent the intended harm, such as retreating as far as he can."[37]

---

[31] *See* WAYNE R. LAFAVE, 2 SUBSTANTIVE CRIMINAL LAW § 10.4(d), at n.51 & 52 and accompanying text (October 2025 Update) (collecting citations).

[32] *See id.* § 10.4(d).

[33] *See* KADISH ET AL., *supra* note 28, at 846 ("[If imminence is a proxy for necessity,] why should imminence and necessity be independent requirements?").

[34] *Id.* Different authorities have offered different articulations of the imminence requirement. In Blackstone's description, the timing of the unjustified threat had to be quite close to the defensive response, "when certain and immediate suffering would be the consequence of waiting for the assistance of the law." 4 BLACKSTONE, COMMENTARIES, *supra* note 8, at *184. Blackstone's might be closest to the "imminence" formulation that predominates in many jurisdictions. But the standard has been relaxed elsewhere. The Model Penal Code, for example, permits the use of defensive force when "immediately necessary" in response to unlawful force by another "on the present occasion." MODEL PENAL CODE § 3.04(1) (AM. LAW INST., Proposed Official Draft 1962).

[35] RICHARD MAXWELL BROWN, NO DUTY TO RETREAT (1991).

[36] 4 BLACKSTONE, COMMENTARIES, *supra* note 8, at *184–85.

[37] *Commonwealth v. Selfridge*, 2 Am. St. Trials 544, 691 (Ma. 1806).

10

29.     The law has long treated the home differently than the public square when articulating this proxy for necessity. In particular, when lethal self-defense occurs in the home, the law historically removed the retreat requirement. This greater scope for lethal defensive force in the home was linked to long-recognized characteristics of a person's abode. As Blackstone explained, "the law of England has so particular and tender a regard to the immunity of a man's house, that it stiles it his castle, and will never suffer it to be violated with impunity."[38] Hale linked the "castle doctrine" to the home's status as a place of refuge and safety. A person exercising self-defense "in his own house need not fly, as far as he can, as in other cases of *se defendendo*, for he hath the protection of his house to excuse him from flying, for that would be to give up the possession of the house to his adversary by his flight."[39]

30.     The historical tradition of providing greater leeway for lethal self-defense in the home, by removing the retreat requirement, was adopted in the United States. As Judge Benjamin Cardozo noted in 1914:

> It is not now and never has been the law that a man assailed in his own dwelling is bound to retreat. If assailed there, he may stand his ground and resist the attack. He is under no duty to take to the fields and the highways, a fugitive from his own home. . . . Flight is for sanctuary and shelter, and shelter, if not sanctuary, is in the home. That there is, in such a situation, no duty to retreat is, we think, the settled law in the United States as in England.[40]

Today, the "castle" doctrine continues to be accepted by all American jurisdictions.[41]

31.     In the mid-1700s, some English commentators questioned the requirement of retreating in public places, but that view was not adopted in England nor reflected in self-defense

---

[38] 4 BLACKSTONE, COMMENTARIES, *supra* note 8, at *223.

[39] 1 HALE, *supra* note 14, at 486.

[40] *People v. Tomlins*, 213 N.Y. 240, 243 (1914) (Cardozo, J.).

[41] *See* KADISH ET AL., *supra* note 28, at 855.

law in United States at the Founding.[42] No-duty-to-retreat-in-public achieved more judicial endorsement in the second half of the 1800s, but the traditional approach—requiring retreat in public—remained the law elsewhere.[43] Indeed, no-duty-to-retreat-in-public has never achieved universal acceptance. At the turn of the nineteenth century, leading legal commentator Joseph Beale wrote an article advocating duty-to-retreat as the optimal rule.[44] When the influential Model Penal Code was drafted in 1962, its authors agreed.[45] In 1978, George Fletcher predicted that states that had opted for no-duty-to-retreat would return to the traditional requirement of retreat.[46] That did not happen, however, in large part because of an effort led by gun rights groups to turn away from the traditional requirement of retreat and adopt modern conceptions of Stand-Your-Ground.[47] Today, "[i]n decisions based on common-law principles, there has been a distinct tendency to favor a requirement of retreat in settings outside the home, with many decisions requiring retreat when possible and courts in half a dozen additional states treating the possibility of retreat as a factor to be considered in judging necessity."[48] While many states—"roughly 30" of them—have passed

---

[42] *See, e.g.*, MICHAEL FOSTER, REPORT OF SOME PROCEEDINGS ON THE COMMISSION OF OYER AND TERMINER (1762); *see also* Joseph H. Beale, *Retreat from a Murderous Assault*, 16 HARV. L. REV. 567, 573-76 (1903) (discussing Foster's writing on retreat); BROWN, *supra* note 35, at 7 (discussing duty to retreat in England).

[43] Judicial opinions adopting a no-retreat rule in public places in the latter half of the 1800s credited the notion of personal autonomy that ascended during that time period, coupled with a sense that requiring an innocent person to retreat because of another's wrongful threat was codifying cowardice. *See, e.g.*, *Erwin v. State*, 29 Ohio St. 186, 199– 200 (Ohio 1876) ("[A] true man, who is without fault, is not obliged to fly from an assailant, who, by violence or surprise, maliciously seeks to take his life or do him enormous bodily harm."). The jurisdictions that adopted no-retreat rules in public places broke with Founding-era legal history and tradition, which considered retreat, where possible to do safely, not as cowardice but as virtuous because it preserved human life.

[44] *See* Beale, *supra* note 42, at 573–76.

[45] MODEL PENAL CODE § 3.04(2)(b)(ii) (AM. LAW INST., Proposed Official Draft 1962).

[46] FLETCHER, *supra* note 9, at 867–68 ("Though the case law remains conflicted, the future might well be reflected in the Model Penal Code's recommending the duty to retreat as the norm.").

[47] *See* LAFAVE, *supra* note 31, § 10.4(f) (discussing National Rifle Association's push for stand-your-ground laws).

[48] KADISH ET AL., *supra* note 28, at 852.

laws departing from the historical retreat requirement,[49] other requirements of necessity and proportionality have been retained.[50]

## III. The Traditional Common Law Requirement of Proportionality

32.    The requirement of proportionality limits permissible defensive force to that which is "reasonable in relation to the harm threatened."[51] As Paul Robinson has noted, "[t]here can be little doubt that proportionality is a clearly recognized requirement in Anglo-American Law."[52] Proportionality in self-defense law reflects the legal system's "recognition of the value of human life"[53] and a general belief that excessive force is unnecessary and unreasonable.

33.    The concept of proportionality in self-defense law has existed since before the Founding.  For example, in the 1705 case *Cockroft v. Smith*, Sir John Holt, the Chief Justice of England, declared that the plea of self-defense is unavailable during an affray "where the second assault is *excessive*," such as when Smith "bit a joint off from the plaintiff's finger" after the plaintiff "ran his finger towards Smith's eyes."[54] As Chief Justice Holt explained, "hitting a man a little blow with a little stick on the shoulder, is not a reason for him to draw a sword and cut and hew the other."[55]  In the mid-1700s, the requirement of proportionality was also emphasized by

---

[49] *See id.*

[50] *See, e.g., Erwin v. State*, 29 Ohio St. 186, 199 (Ohio 1876) (adopting stand-your-ground, but then noting that the "taking of life in defense of one's person cannot be either justified or excused, except on the ground of *necessity*," which must be "imminent at the time . . . and no man can avail himself of such necessity if he brings it upon himself").

[51] 2 Robinson, *supra* note 12, at § 132; *see* LaFave, *supra* note 31, at § 10.4(b) ("[T]he amount of force [one] may justifiably use must be reasonably related to the threatened harm which [one] seeks to avoid."); *cf.* 4 Blackstone, Commentaries, *supra* note 8, at 181–82 (noting that "[t]he law of England . . . is too careful of the lives of the subjects . . . nor will suffer with impunity any crime to be *prevented* by death, unless the same, if committed, would also be *punished* by death").

[52] Paul H. Robinson, *Criminal Law Defenses: A Systematic Analysis*, 82 Colum. L. Rev. 199, 218 n.72 (1982).

[53] *See* Robinson, *supra* note 52, at 218 (explaining why "an actor [with] no other option but deadly force to prevent the stealing of apples . . . [must] sacrifice her apples out of regard for the life of the thieves"); *see also supra* notes 7–8 and accompanying text (quoting Blackstone and Coke).

[54] *Cockroft v. Smith*, [1705] 11 Mod. 43, 88 Eng. Rep. 872 (K.B.) (Holt, C.J.) (emphasis in original).

[55] *Id.*

13

leading legal commentators like Blackstone, who blended a proportionality requirement with the duty to retreat.[56]

34.    The proportionality requirement was invoked in both of the Founding-era cases discussed above: *Wells* and *Selfridge*. In *Wells*, the defendant picked up and wielded a club during a fistfight, resulting in a skull fracture and the victim's death.[57] The defendant's self-defense claim failed in part because he used a lethal weapon despite a nonlethal threat. As the court put it, "[T]he attack of the deceased was without any kind of weapon that might have rendered it necessary for the prisoner to avail himself of the instrument which occasioned the death."[58] The court expressly linked its determination of unnecessary, disproportionate force to the specific method of self-defense chosen by the defendant.

35.    In addition to charging the jury on the requirement of necessity, Judge Parker in *Selfridge* also instructed that if the circumstances of the attack "denote an intention to take away [Selfridge's] life, or do him some enormous bodily harm; [he] may lawfully kill the assailant."[59] Judge Parker then elaborated, linking the lawfulness of lethal force to the weapon used by an aggressor: "I doubt whether self-defense could in any case be set up, where the killing happened in consequence of an assault only, unless the assault be made with a weapon which if used at all, would probably produce death."[60]

---

[56] *See* 4 BLACKSTONE, COMMENTARIES, *supra* note 8, at *185 ("The party assaulted must therefore flee … as far as the fierceness of the assault will permit him: for it may be so fierce as not to allow him to yield a step, without manifest danger of his life, or enormous bodily harm; and then in his defence he may kill his assailant instantly.").

[57] *State v. Wells*, 1 N.J.L. 424, 426 (Super. Ct. 1790).

[58] *Id.* at 430.

[59] *Commonwealth v. Selfridge*, 2 Am. St. Trials 544, 691 (Mass. 1806).

[60] *Id.* at 696.

36.     Today, as at the Founding, the proportionality requirement is a generally accepted requirement for lawful self-defense in U.S. jurisdictions.[61]  For instance, the Model Penal Code Commentaries emphasize that it is a "common law principle that the amount of force used by the actor must bear a reasonable relation to the magnitude of the harm that he seeks to avert."[62]

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently to the above.

## **CERTIFICATION**

I certify that the foregoing statements made by me are true to the best of my knowledge. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_Professor Eric Ruben, J.D._

Dated: January 22, 2026

---

[61] _See_ 2 ROBINSON, _supra_ note 12, at § 131(d).

[62] MODEL PENAL CODE AND COMMENTARIES 47 (Official Draft and Revised Comments 1985).

# Exhibit A

# ERIC RUBEN

SMU Dedman School of Law
3315 Daniel Avenue • Dallas, TX 75205
214-768-2581 • eruben@smu.edu
http://ssrn.com/author=2436317

## ACADEMIC EXPERIENCE

**SMU Dedman School of Law**, Dallas, TX
*Associate Professor of Law* (with tenure), May 2023-present
*Assistant Professor of Law*, August 2019-May 2023
*Courses*: Constitutional Law, Criminal Law, Professional Responsibility, Constitutional Interpretation, Second Amendment and Weapons Regulation
*Honors*: Robert G. Storey Distinguished Faculty Fellow, 2023-2024; Elected Graduation Hooder, 2022, 2023

**Brennan Center for Justice at New York University School of Law**, New York, NY
*Fellow*, December 2014-Present

**New York University School of Law**, New York, NY
*Adjunct Professor*, January 2018-January 2019
*Course*: The Regulation of Weaponry in Democratic Society

## EDUCATION

**NEW YORK UNIVERSITY SCHOOL OF LAW**, New York, NY
J.D., May 2007, *cum laude*
*New York University Law Review*, Articles Editor
Florence Allen Scholar (top 10% after 4 semesters)
Law Students for Human Rights, Board Member and Treasurer
Administrative and Regulatory State, T.A. for Prof. Peggy Cooper Davis

**DARTMOUTH COLLEGE**, Hanover, NH
B.A. in Government, Minor in Mathematics, June 2003, *magna cum laude*
Honors in writing and philosophy; recipient of Lombard Post-Graduate Fellowship

## JUDICIAL CLERKSHIP

**The Honorable Julio M. Fuentes, U.S. Court of Appeals, Third Circuit**, Newark, NJ
*Judicial Clerk*, August 2007-August 2008

## ACADEMIC PUBLICATIONS

*Judge-Scholar Collaboration and the Second Amendment*, 78 SMU L. REV. 397 (2025) (with Andrew Willinger)

*Location of Firearm Suicides in the United States, 2003-2021*, 8 JAMA NETW. OPEN (2025) (with Camerin Rencken, Rosanna Smart, and Ali Rowhani-Rahbar)

ERIC RUBEN                                                                                    JANUARY 2026

*Scientific Context, Suicide Prevention, and the Second Amendment After* Bruen, 108 MINN. L. REV. 3121 (2024)

*One Year Post-*Bruen*: An Empirical Assessment*, 110 VA. L. REV. O. 20 (2024) (with Rosanna Smart & Ali Rowhani-Rahbar)

*Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L.J. 99 (2023) (with Joseph Blocher)
- *cited in United States v. Rahimi*, 144 S. Ct. 1889, 1929 (2024) (Jackson, J., concurring); *Koons v. Att'y Gen.*, 2025 WL 2612055 (3d Cir. 2025); *Fooks v. State*, 337 A.3d 83 (Md. 2025); *Nat'l Rifle Ass'n v. Bondi*, 133 F.45h 1108 (2025) (Rosenbaum, J., concurring); *Lara v. Comm'r Penn. State Police*, 125 F.4th 428 (3d Cir. 2025); *Range v. Att'y Gen. United States of Am.*, 124 F.4th 218 (3d Cir. 2024) (Krause, J., dissenting); *Bianchi v. Brown*, 111 F.4th 438, (4th Cir. 2024); *Ocean State Tactical v. Rhode Island*, 99 F.4th 38 (1st Cir. 2024)

*Self-Defense Exceptionalism and the Immunization of Private Violence*, 96 S. CAL. L. REV. 509 (2023)

*Public Carry and Criminal Law After* Bruen, 135 HARV. L. REV. F. 505 (2022)
- *formed basis for* quotes in the New York Times and Washington Post, as well as interview on Vox's Today Explained podcast

*"Second-Class" Rhetoric, Ideology, and Doctrinal Change*, 110 GEO. L.J. (2022) (with Joseph Blocher)
- *companion piece* published in the Washington Post
- *featured in* episodes of Strict Scrutiny and Vox's The Most Dangerous Branch podcasts

*Law of the Gun: Unrepresentative Cases and Distorted Doctrine*, 107 IOWA L. REV. 173 (2021)
- *cited in* the brief filed by the Giffords Law Center to Prevent Gun Violence in *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Apr. 26, 2021)

*The Gun Rights Movement and "Arms" Under the Second Amendment*, BRENNAN CTR. FOR JUST. (2021)

*An Unstable Core: Self-Defense and the Second Amendment*, 108 CALIF. L. REV. 63 (2020)
- *cited in* various briefs including those filed by Criminal Law Scholars and United States Senators in *Bruen*, *supra*

*You Can Lead a Horse to Water:* Heller *and the Future of Second Amendment Scholarship*, 68 DUKE L.J. O. 1 (2018) (with Joseph Blocher)

*From Theory to Doctrine: An Empirical Analysis of the Right to Keep and Bear Arms After* Heller, 67 DUKE L.J. 1433 (2018) (with Joseph Blocher)
- *cited in* various briefs including one filed by Second Amendment Law Professors in *Bruen*, *supra*
- *cited in Mance v. Sessions*, 896 F.3d 390 (5th Cir. 2018)
- *featured in* the New York Times, Wall Street Journal, and USA Today, among others

*Justifying Perceptions in First and Second Amendment Doctrine*, 80 LAW & CONTEMP. PROBS. 149 (2017)

*Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017) (with Darrell A. H. Miller)

ERIC RUBEN                                                                    JANUARY 2026

*Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121 (2015) (with Saul Cornell)
- *cited in* the majority opinion and quoted in the dissenting opinion in *Bruen*, *supra*
- *cited in* various briefs including those filed by the NAACP Legal Defense & Education Fund and New York State in *Bruen*, *supra*
- *cited in Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021), among others
- *companion piece* published in The Atlantic

**Work-in-Progress**

*Mapping State-Level Gun-Free Zone Legislation Across the US: 2024 Landscape* (with Camerin Rencken, Ali Rowhani-Rahbar, and Rosanna Smart)

*Which Founding Matters? 1791, 1868, and the Temporal Focus of Second Amendment Originalism* (with Gregg Costa)

*The Politics and Law of Gun-Free Zones: An Empirical Analysis in the Wake of* Bruen (with Ali Rowhani-Rahbar & Rosanna Smart)

*Numeracy and Constitutional Interpretation*

**Edited Volumes**

*Protests, Insurrection, and the Second Amendment*, BRENNAN CTR. FOR JUST. (2021)

*Second Generation of Second Amendment Law and Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017) (with Darrell Miller)

**GRANTS**

**Arnold Ventures**, "Gun-Free Zones: Legislative Landscape and Relationship with Firearm Violence," Co-Principal Investigator with Ali Rowhani-Rahbar (Lead) and Rosanna Smart, ~$600,000 (2024-2026)

**ACADEMIC PRESENTATIONS**

"Who, What, and Where: Second Amendment Questions the Supreme Court Will Finally Answer This Term and Questions It Continues to Avoid," AALS Hot Topic Panel (January 2026)

"Colloquium on Constitutional Law Pedagogy," SMU Dedman School of Law (December 2025) (organizer)

"Gun-Free Zones and Post-*Bruen* Judicial Interpretation," National Research Conference for the Prevention of Firearm-Related Harms (November 2025)

"History and Tradition," Seton Hall Journal of Legislation and Public Policy Symposium (October 2025)

"The Right to Bear Arms—An International Perspective," Legal Italy Conference (June 2025)

"The Second Amendment After *Rahimi*," Brennan Center for Justice at New York University School of Law (June 2025)

3

"The State of Gun Laws & Responses in the United States," Boston University Law's International Law Journal Symposium (February 2025)

"The Evolution of Gun-Free Zone Legislation, 2004-2024," National Research Conference for the Prevention of Firearm-Related Harms (December 2024)

"Judge-Scholar Collaboration and the Second Amendment," SMU Law School Symposium (October 2024)

"Social and Non-Physical Impacts of Guns," Everytown for Gun Safety Research Convening (February 2024)

"Scientific Context, Suicide Prevention, and the Second Amendment After *Bruen*," William & Mary Law School (January 2024)

"One Year Post-*Bruen*: An Empirical Assessment," National Research Conference for the Prevention of Firearm-Related Harms (November 2023)

"Scientific Context, Suicide Prevention, and the Second Amendment After *Bruen*," Minnesota Law School (October 2023)

"One Year Post-*Bruen*: An Empirical Assessment," Fordham Law School (October 2023)

"Public Carry and Gun-Free Spaces After *Bruen*," Southeastern Association of Law Schools Conference (July 2023)

"The Second Amendment and the Supreme Court After *Bruen*," Brennan Center for Justice at New York University School of Law (May 2023)

"Gun Laws in Tennessee: Understanding the Current Landscape," University of Tennessee College of Law (April 2023)

"The History of the Second Amendment: How We Got to Bruen–and Where We Go from Here," UCLA Criminal Justice Law Review Symposium (October 2022)

"Felons, Firearms, and Restoration," N.Y.U. L. Rev. & Duke Ctr. for Firearms Law Symposium (September 2022)

"Felons, Firearms, and Restoration," Duke Law School Firearms Law Workshop (June 2022)

"Public Carry and Criminal Law after *Bruen*," Harvard Law Review Symposium (March 2022)

"Self-Defense Exceptionalism," UC Davis Law Review Symposium (October 2021)

"Gun Law Reform: The Current Legal Landscape," NYU School of Law Symposium (March 2021)

"The Gun Rights Movement and 'Arms' Under the Second Amendment," Brennan Center Workshop (February 2021)

"Unrepresentative Litigation and Constitutional Distortion: The Case of the Gun-Centric Second Amendment," Drexel University School of Law Faculty Workshop (November 2020)

ERIC RUBEN                                                                                    JANUARY 2026

"An Unstable Core: Self-Defense and the Second Amendment," Video Interview, Duke Law (May 2020)

"'The Second Amendment Is Not a Second-Class Right': A Case Study in Constitutional Rhetoric," AALS Conference (January 2020)

"Mistake, Self Defense, and the Role of the Jury: Framing the Botham Jean/Amber Guyger Case," SMU Dedman School of Law (flash class) (October 2019)

"The Second Amendment After *Heller* and *Caetano*: Overlooked Implications for the Future of Weapons Regulation," Duke Law School Workshop (August 2019)

"The Second Amendment and Self-Defense," Hastings School of Law (January 2019); New York University School of Law (April 2018); and University of New Hampshire School of Law (April 2018)

"Guns and Free Speech," New York University School of Law (November 2017)

"Justifying Perceptions in First and Second Amendment Doctrine," Guns in a Civil Society Summit, Washington Alliance for Gun Responsibility (November 2017) and Symposium on Second Generation of Second Amendment Law & Policy, New York University School of Law (April 2016)

"Preemption and Firearms Law," Constitutional Governance Practicum at the Columbia Law School (September 2017)

"The Second Amendment: A Discussion," Fordham Law Chapter of the American Constitutional Society (September 2017)

"Discussion on Second Amendment Jurisprudence and Advocacy," NYU Law Chapter of the American Constitution Society (March 2016)

"An Introduction and Discussion on the Second Amendment," Cardozo Law Chapter of the American Constitution Society (March 2016)

"The Second Amendment: Gun Rights in America," John Jay College, New York, NY (November 2015)

**SELECTED PUBLICATIONS, PRESENTATIONS, AND MEDIA APPEARANCES FOR A GENERAL AUDIENCE**

**Publications**

*2025's Most Significant State Constitutional Cases*, STATE COURT REPORT (December 2025)

*Can the Right to Bear Arms Be Waived*, STATE COURT REPORT (November 2025)

*The Judge-Scholar Collaboration Driving Second Amendment Law*, BRENNAN CTR. (August 2025) (with Andrew Willinger)

*Are State Constitutional Clauses that Strengthen Gun Rights Relevant After* Bruen?, STATE COURT REPORT (February 2025)

*Iowa High Court Adds to Confusion Over New Right-to-Bear-Arms Amendment*, STATE COURT REPORT (January 2025)

ERIC RUBEN                                                                    JANUARY 2026

*SCOTUS's 2nd Amendment Decision Leaves Open Questions for State Courts*, STATE COURT REPORT
(June 2024)

*Second Amendment Meets Domestic Violence in the Supreme Court*, BRENNAN CTR. (November 2023)

Written Testimony, U.S. Senate Judiciary Committee, "Protecting Public Safety After New York State
Rifle & Pistol Association v. Bruen," Washington, D.C., March 15, 2023

*A Smarter Path to Gun Safety Through Property Rights*, N.Y. DAILY NEWS (July 2022)

*Three Supreme Court Cases to Watch Beyond Abortion Rights*, BRENNAN CTR. (with Alicia Bannon and
Harry Isaiah Black) (June 2022)

*A Right to Conceal and Carry?*, BRENNAN CTR. (with Emil Mella Pablo) (May 2022)

*No, Courts Don't Treat the Second Amendment as a "Second-Class Right*," WASH. POST (November
2021) (with Joseph Blocher)

*First Major Second Amendment Case Before the Supreme Court in Over a Decade Could Topple Gun
Restrictions*, THE CONVERSATION (October 2021)
> Republished in over a dozen other publications across the country and online, including
> MarketWatch, Iowa Capital Dispatch, Houston Chronicle, St. Louis Post-Dispatch, Idaho Press-
> Tribune, NewsBreak, and The Raw Story

*Claiming Self-Defense Isn't a Get-Out-of-Jail-Free Card*, BRENNAN CTR. (July 2020)

*The Supreme Court's Second Amendment Surprise*, BRENNAN CTR. (June 2020)

*What the Supreme Court's Latest Second Amendment Ruling Means for Future Cases*, BRENNAN CTR.
(May 2020)

*The Supreme Court Shouldn't Disrupt the Judicial Consensus on the Second Amendment*, SCOTUSBLOG
(November 2019) (with Joseph Blocher)

*Is the Handgun America's "Most Popular" Self-Defense Weapon? It's a Crucial Question at the Supreme
Court*, BRENNAN CTR. (November 2019)

*Misguided 'Second Amendment Protection Acts' Have the Opposite Effect of Their Intent*, BRENNAN CTR.
(June 2019) (with Adam B. Sopko)

*What to Know About the Supreme Court's First Gun Case in 9 Years*, THE TRACE (April 2019) (print
interview)

*The Second Amendment Allows for More Gun Control Than You Think*, VOX.COM (May 2018) (with
Joseph Blocher)

*There Is No Constitutional Bar to Further Gun Control*, N.Y. TIMES (June 2016)

*Exaggerated Claims of "Judicial Nullification" in Gun Cases*, THE JURIST (May 2016)

*Justice Scalia, the Second Amendment, and Judicial Conservatives*, CASETEXT (February 2016)

*The Slave-State Origins of Modern Gun Rights*, THE ATLANTIC (September 2015) (with Saul Cornell)

**Presentations**

"The Viability of *Bruen*: Challenges and Applications," National Lawyers Convention, Federalist Society (November 2025)

"Texas Gun Violence Prevention Forum," Texas Doctors for Social Responsibility (September 2024)

"El Paso Gun Violence Prevention Forum," Texas Doctors for Social Responsibility (March 2024)

Testifying Witness, Senate Judiciary Committee, Senate Judiciary Committee, "Protecting Public Safety After New York State Rifle & Pistol Association v. Bruen" (March 2023)

"*NYSRPA v. Bruen*—Challenges and Responses to NY's Concealed Carry Laws," New Yorkers Against Gun Violence (November 2022)

"From *Heller* to *Bruen*: The Past and Future of the Second Amendment," Potomac Law Group PLLC (July 2022)

"Public Carrying of Firearms: Understanding the Impact of the Supreme Court's Decision," John Hopkins Center for Gun Violence Solutions (July 2022)

"Guns vs. Speech: Does the 2nd Amendment Threaten the 1st?," Brennan Center for Justice Live Event (September 2021)

"The Second Amendment and State Efforts in Gun Violence Prevention," American Constitution Society Northeast Regional Convening (October 2019)

"The Gun Shop," Fulbright Film Series Panel Discussion (February 2018)

"The Second Amendment and Gun Laws: A Primer for Advocates," New York Lawyer Chapter of the American Constitution Society (October 2017)

"When the First and Second Amendment Collide," League of Women Voters Gun Safety Committee (September 2017)

"*Binderup* and the Future of As-Applied Second Amendment Challenges," Consortium for Risk-Based Firearm Policy (February 2017)

"2nd Amendment - Protecting Rights, Protecting People," The Liberty Series, Union League of Philadelphia (January 2017)

"As-Applied Second Amendment Challenges," Second Amendment Litigation and Jurisprudence Conference, Washington, D.C. (December 2016)

"David v. Goliath: The Gun Violence Prevention Movement and Challenging the NRA," Annual RebLaw Conference, Yale University Law School (February 2016)

ERIC RUBEN                                                                    JANUARY 2026

**Media Appearances**

Ted Alcorn, *New Yorkers Fill Gun Classes as Concealed Carry Applications Surge*, THE CITY (November 2025) (print)

Chip Brownlee, *The Supreme Court Is More Interested in Second Amendment Cases Than Ever Before*, THE TRACE (October 2025) (print)

Solcyré Burga, *Can Marijuana Smokers Legally Own Guns in the U.S.? What to Know as Supreme Court Set to Deliberate*, TIME (October 2025) (print)

Michelle Casady, *Litigation Roundup: Former Fifth Circuit Judge Costa, SMU Prof File Brief in Gun Case*, TEXAS LAWBOOK (September 2025) (print)

Beth Wang, *Novel NY Gun Ruling Opens Door for Public Nuisance Firearm Laws*, BLOOMBERG LAW (July 2025) (print)

Chip Brownlee, *Supreme Court Blocks Mexico's Lawsuit Against U.S. Gunmakers*, THE TRACE (June 2025) (print)

Mike Scarcella, *US Court Picks Ex-Judge Costa to Defend Texas Limits on Guns in Bars*, REUTERS (May 2025) (print)

Will Van Sant, *Trump's War on Law Firms May Imperil Gun Suits*, THE TRACE (April 2025) (print)

Avalon Zoppo, *DOJ Asks 5th Circuit to Publish Opinion Upholding Gun Ban for Felon*, NAT'L L. J. (November 2024) (print)

Nina Totenberg, *Can Ghost Guns Be Regulated as Firearms? The Supreme Court Will Decide*, NPR MORNING EDITION (October 2024) (print and radio)

Champe Barton & Chip Brownlee, *Supreme Court Ruling Threatens Gun Charges Filed in Trump's Alleged Assassination Attempt*, THE TRACE (September 2024) (print)

Jim Salter, *Kansas Judge Throws Out Machine Gun Possession Charge, Cites Second Amendment*, AP NEWS (August 2024) (print)

Aria Jones & Julia James, *AG Ken Paxton threatens to sue Dallas over gun policy at State Fair of Texas*, DALLAS MORNING NEWS (August 2024) (print)

Taylor Goldenstein, *One year after shooting, Ken Paxton threatens to sue over new gun ban at the Texas state fair*, HOUSTON CHRONICLE (August 2024) (print)

Avalon Zappo, *Fifth Circuit to Weigh Dueling Readings of Supreme Court's Recently Clarified Gun Test*, NAT'L L. J. (July 2024) (print)

Jennifer Mascia, *How SCOTUS's Chevron Decision Threatens Gun Regulations*, THE TRACE (July 2024) (print)

Chip Brownlee, *SCOTUS Affirms Gun Ban for Alleged Domestic Abusers*, THE TRACE (June 2024) (print)

ERIC RUBEN                                                                                    JANUARY 2026

Betsy Woodruff Swan, *Hunter Biden Just Got Some Help From the Supreme Court on His Gun Conviction*, POLITICO (June 2024) (print)

Henry Gass & Patrik Jonsson, *Supreme Court Sets Limits on Second Amendment Rights*, CHRISTIAN SCIENCE MONITOR (June 2024) (print)

William Melhado, *U.S. Supreme Court Allows Gun Restrictions for Domestic Violence Suspects*, TEXAS TRIBUNE (June 2024) (print)

*Interview with Justin Honore*, Charter News (June 2024) (television)

Kevin Krause, *Black Market Gun Sales to Continue in Texas, Creating Worries About Gun Violence*, DALLAS MORNING NEWS (June 2024) (print)

Bob Egelko, *Gun Restrictions for Domestic Abusers Survive in SCOTUS. What It Means for California*, SAN. FRAN. CHRONICLE (June 2024) (print)

Lydia Wheeler & Kimberly Strawbridge Robinson, *Supreme Court Shows Division on History Test in Gun Decision*, BLOOMBERG LAW (June 2024) (print)

*Ask An Expert*, KCBS RADIO (June 2024) (radio)

Kevin Rector, *Will Latest Supreme Court Decision Affect California Bans on Assault Weapons, Magazines?*, L.A. TIMES (June 2024) (print)

Roque Planas, *The Supreme Court's Major Gun Decision Was a Warning to Extremist Judges*, HUFFPOST (June 2024) (print)

*The U.S. Supreme Court Overturns Federal "Bump Stock" Ban, but This Gun Control Case Has a Wrinkle*, KNX NEWS 97.1 FM LOS ANGELES (June 2024) (radio)

Chip Brownlee, *Supreme Court Strikes Down Ban on Rapid-Fire Bump Stocks*, THE TRACE (June 2024) (print)

Interview Regarding SCOTUS Decision in *Cargill v. Garland*, MSNBC (June 2024) (television)

Karen Zraick, *Does Having a Gun Make a Person Suspicious? Courts Aren't Sure Now*, NY TIMES (March 2024) (print)

John Simerman, *Concealing Guns Without a Permit: Some New Orleans Officials Fear the Worst*, NEW ORLEANS ADVOCATE (March 2024) (print)

Lydia Wheeler, *Bump Stock Ban Brings Agency Power Dispute to Supreme Court*, BLOOMBERG NEWS (February 2024) (print)

Heather Hollingsworth, Summer Ballentine & Jim Salter, *Could Missouri's 'Stand Your Ground' Law Apply to the Super Bowl Celebration Shooters?*, AP NEWS (February 2024) (print)

Marco Poggio, *For Immigrants, Gun Rights Debate Goes Beyond Firearms*, LAW360 (January 2024) (print)

ERIC RUBEN                                                                           JANUARY 2026

Michael Heise, *The Bruen Decision After One Year: An Empirical Look*, EMPIRICAL LEGAL STUDIES BLOG (December 2023) (print)

David W. Chen, *Courts Strike Down Gun Control Measures in Two States*, N.Y. TIMES (November 2023) (print)

Tom Brune, *Supreme Court Wrestles with Gun Limits After Ruling in New York Case*, NEWSDAY (November 2023) (print)

Michael Smerconish, SIRIUS XM POTUS 124 (November 2023) (radio)

Henry Gass, *Second Amendment Rights for Abusers? Justices Seem Skeptical*, CHRISTIAN SCIENCE MONITOR (November 2023) (print)

Caroline Love, *Can Alleged Domestic Abusers Keep Their Guns? The Supreme Court May Decide the Answer*, KERA NEWS (November 2023) (print and radio)

Marco Poggio, *Justices Skeptical of Keeping Domestic Abusers Armed*, LAW360 (November 2023) (print)

Tom Brune, *Supreme Court Gun Case Could Prompt New Challenges to New York Laws*, NEWSDAY (November 2023) (print)

*Should Domestic Abusers Lose Gun Rights?*, VOX'S TODAY, EXPLAINED (November 2023) (podcast)

Adam Liptak, *Supreme Court's Devotion to Gun Rights Faces a Challenging Test*, N.Y. TIMES (November 2023) (print)

Abbie VanSickle, *Texas Man at Center of Supreme Court Case Says He No Longer Wants Guns*, N.Y. TIMES (November 2023) (print)

Reena Diamante, *Supreme Court to Weigh Constitutionality of Gun Restrictions on Accused Domestic Abusers*, SPECTRUM NEWS (November 2023) (print and television)

Andrew Goudsward and Nate Raymond, *US Supreme Court Ruling May Help Hunter Biden Fight Gun Charge*, REUTERS (October 2023) (print)

Bloomberg Law Podcast with June Grasso, *Supreme Court to Rule on Guns for Domestic Abusers*, BLOOMBERG RADIO (September 2023) (radio and podcast)

Marco Poggio, *Access to Justice Cases to Watch This Term*, LAW360 (September 2023) (print)

*Carbon Capture is Coming to the King Ranch*, TEXAS STANDARD (August 2023) (radio)

Bloomberg Law Podcast with June Grasso, *Landmark Young People's Climate Ruling*, BLOOMBERG RADIO (August 2023) (radio and podcast)

Marco Poggio, Justices Eye Intersection Of Domestic Violence, Gun Rights, LAW360 (July 2023) (print)

*Supreme Court Conservatives Could Further Erode Gun Control in Next Term*, THE GUARDIAN (June 2023) (print)

10

Caroline Love, *Supreme Court Decides to Hear North Texas Case on Guns and Domestic Violence*, KERA NEWS (June 2023) (print)

Avalon Zoppo, *Justices Take Up Gun Case That Puts Landmark 2nd Amendment Ruling to the Test*, NATIONAL LAW JOURNAL (June 30, 2023) (print)

Joseph Stepansky, *How a US Supreme Court Ruling Is Transforming Gun Control*, AL JAZEERA (May 2023) (print)

Terrence T. McDonald, *Ruling on New Jersey Gun Law Shows Democrats Didn't Do Their Homework*, N.J. MONITOR (May 2023) (print)

*The Daniel Perry Case Shows Contradictions of Gun Enthusiasts in Texas*, ECONOMIST (April 2023) (print)

Peter Charalambous', *How Two Decades of Gun Culture Helped Shape America's 'Stand Your Ground' Laws*, ABC NEWS (April 2023) (print)

Caroline Love, *More Domestic Abusers Can Keep Guns After 5th Circuit Court Ruling — Risking Deadly Consequences*, KERA NEWS (April 2023) (print and radio)

Alex Swoyer, *Chaos in the Courts After Justices' Ruling that Firearm Regs Must Align with Nation's Founding*, WASHINGTON TIMES (April 2023) (print)

*Is That Really Legal*, with Eric Ruben (April 2023) (podcast)

Michael Macagnone, *Senate Hears About Legal Fallout from Supreme Court Gun Decision*, ROLL CALL (March 2023) (print)

*Senators Seek Solutions to Address Gun Violence in the Country Due to Supreme Court Decision*, FOX 2 (March 2023) (television and print)

Wisconsin Public Radio, *How Court Ruling on Domestic Violence Restraining Orders Shapes U.S. Gun Law*, NPR WISCONSIN (February 2023) (radio)

Briana Vannozzi, *Legal Challenges Delay Murphy's Gun Control Laws*, NJ SPOTLIGHT NEWS (February 2023) (television)

Scott Reeder, *Choosing Which Laws to Enforce*, ILLINOIS TIMES (January 2023) (print)

The John Howell Show, *Questions Surrounding the Assault-Style Weapons Ban: Will it Hold Up in Court?*, WLS CHICAGO (January 2023) (radio)

Peter Charalambous, *At Least 74 Illinois Sheriff's Departments Vow to Defy State Assault Weapons Ban*, ABC NEWS (January 2023) (print)

June Grasso, *Jackson Joins Supreme Court's Million Dollar Book Club*, BLOOMBERG LAW SHOW (January 2023) (radio and podcast)

Frank Main and Tina Sfondeles, *Why Illinois' New Assault Weapons Ban Might Not Hold Up in Court*, CHICAGO SUN TIMES (January 2023) (print)

ERIC RUBEN                                                                                    JANUARY 2026

Douglass Dowty, *Can You Bring a Gun to the Zoo? On a Bus? Syracuse Judge Eagerly Rewrites NY Firearms Law*, SYRACUSE POST STANDARD (December 2022) (print)

William Melhado, *Texas Judge Rules that Disarming Those Under Protective Orders Violates Their Second Amendment Rights*, TEXAS TRIBUNE (November 2022) (print)

Debra Cassens Weiss, *In "Scorching" Opinion, Federal Judge Considers Appointing Historian to Help Him in Gun Case*, ABA JOURNAL (November 2022) (print)

Avalon Zoppo, *Judge May Appoint Historian After Justices' Turn to New Test in Gun Rights Cases*, NAT'L L. J. (November 2022) (print)

Keegan Hamilton, *Ghost Guns Are Causing Chaos in American Courts*, VICE NEWS (October 2022) (print)

Michael Waldman, *Guns Don't Belong at Polling Locations*, BRENNAN CTR. FOR JUST. (October 2022) (print)

Dana Difilippo, *New York Court Rulings Signal Trouble for New Jersey's Fresh Attempt to Regulate Guns*, N.J. MONITOR (October 2022) (print)

S.P. Sullivan, *N.J. Is Seeking Tough Restrictions for Carrying Guns in Public. Will They Hold up in Court?*, STAR-LEDGER/NJ.COM (October 2022) (print)

Kery Murakami, *Court Fights Begin Over Gun Bans in Places Like Subways and Bars*, ROUTE FIFTY (October 2022) (print)

Jonah E. Bromwich, *Court Gives New York State More Time to Argue for Its Gun Law*, N.Y. TIMES (October 2022) (print)

*Second Amendment Expert Discusses NY Gun Law Court Challenge*, SPECTRUM NEWS N.Y. 1 (October 2022) (television)

Jonah E. Bromwich, *Federal Judge Blocks N.Y. Gun Law, Finding Much of It Unconstitutional*, N.Y. TIMES (October 2022) (print)

Scott Neuman, *The 'Gun Dude' and a Supreme Court Case that Changed Who Can Own Firearms in the U.S.*, NPR (August 2022) (print)

Brandon Tensley & Eva McKend, *The Fight to Curb Gun Violence Without Inflaming Racial Biases*, CNN (July 2022) (print)

*What Can We Do About Gun Control?*, LAW DISRUPTED (July 2022) (podcast)

Chip Brownlee, *The Real Significance of the Supreme Court's Gun Decision*, THE TRACE (July 2022) (print)

Nusaiba Mizan, *Fact-check: Can Texans 'Too Dangerous to Carry a Loaded Gun in Public' Now Carry?*, AUSTIN AMERICAN-STATESMAN (July 2022) (print)

Marco Poggio, *How Bruen Ruling Will Change Gun Restrictions Scrutiny*, LAW 360 (July 2022) (print)

Naheed Rajwani-Dharsi, *How the New Federal Gun Law Will - and Won't - Affect Texas*, AXIOS DALLAS (June 2022) (print)

Wisconsin Public Radio, *What the Supreme Court's Ruling on a New York Gun Law Means for How We Apply the Second Amendment*, NPR WISCONSIN (June 2022) (radio)

Studio Tulsa, *Interview regarding* Bruen, NPR TULSA (June 2022) (radio)

Roque Planas, *Bombshell Supreme Court Gun Ruling Opens Up New State Battles*, HUFF POST (June 2022) (print)

Eric Lipton et al., *States Rush to Revamp Laws After Supreme Court's Gun Ruling*, NEW YORK TIMES (June 2022) (print)

Mark Weiner, *What Supreme Court Ruling Means for New Yorkers and Handgun Owners*, SYRACUSE POST-STANDARD (June 2022) (print)

Kaila Philo, *The Supreme Court Just Made It a Whole Lot Easier to Conceal-Carry a Gun*, GRID (June 2022) (print)

Chip Brownlee & Tom Kutsch, *What You Need to Know About the Senate Gun Reform Bill*, THE TRACE (June 2022) (print)

TV and Radio Interviews Regarding *Bruen*, June 23-24, 2022
    WPIX 11 NEW YORK (television)
    *Good Morning America*, ABC (television)
    *Morning Edition*, NPR (radio)
    *ABC News Prime*, ABC (television)
    *Balance of Power*, BLOOMBERG RADIO (radio)
    *All Things Considered*, NPR (radio)
    CBS RADIO (radio)
    CNN (television)

Michael Macagnone, *Supreme Court Bolsters Right to Carry Handgun in Public*, Roll Call (June 2022) (print)

Nicole Narea, *Blue States' Gun Control Efforts Hinge on the Supreme Court*, VOX (June 2022) (print)

John Fritze, *Should Guns Be Banned in Bars, Hospitals? Supreme Court Could Spur New 2nd Amendment Fight*, USA TODAY (June 2022) (print)

Brian Pascus, *Adams' Team Braces for Landmark Supreme Court Ruling on Guns*, CRAIN'S NEW YORK (June 2022) (print)

Timothy L. O'Brien, *An Executive Order That Might Actually Stop Gun Violence*, BLOOMBERG NEWS & WASHINGTON POST (June 2022) (print)

Ellen loanes, *What's in the Bipartisan Plan for Gun Control*, VOX (June 2022) (print)

Nusaiba Mizan, *Fact-check: How many mass shootings have occurred since Uvalde tragedy?*, AUSTIN AMERICAN-STATESMAN (June 2022) (print)

ERIC RUBEN                                                                    JANUARY 2026

Kery Murakami, *Supreme Court Could Make it Harder For States and Localities to Keep Guns Off Streets*, ROUTE FIFTY (June 2022) (print)

Alex Thomas, *Gun Companies Are More Vulnerable to Lawsuits Than You Think*, NEW REPUBLIC (June 2022) (print)

Ellen loanes, *What Does the Second Amendment Mean in 2022?*, VOX (June 2022) (print)

*NBC News Now with Joshua Johnson*, NBC NEWS (June 2022) (television)

Josh Clancy, *America and Guns—Did It Have to Be This Way?*, THE TIMES (May 2022) (print, England)

*Velshi on MSNBC*, MSNBC (May 2022) (television)

Jess Bidgood, *From Concealed Carry to Eliminating Permits, Gun Restrictions Have Loosened Since Sandy Hook*, BOSTON GLOBE (May 2022) (print)

Sherryn Groch & Billie Eder, *Why Can't America Fix Its Gun Crisis?*, SYDNEY MORNING HERALD (May 2022) (print)

Emilie Burditt, *Gun Laws, Reform Following School Shooting in Uvalde, Texas*, WISCONSIN PUBLIC RADIO (May 2022) (radio)

*Trump urges mental health initiatives at NRA event*, NEWSNATION PRIME (May 2022) (television)

*Interview Regarding Uvalde Shooting* FRANCE 24 (May 2022) (television, France)

Timothy L. O'Brien, *Uvalde Families Should Take Gunmakers to Court*, WASHINGTON POST and BLOOMBERG NEWS (May 2022) (print)

*Debate por el control de armas: el callejón sin salidaal que EE.UU. vuelve tras la matanza en Texas*, EL MERCURIO (May 2022) (print, Chile)

Kevin T. Dugan, *The NRA won after Sandy Hook, but today the gun lobby is in disarray and gun safety is slowly making gains in states*, NEW YORK MAGAZINE (INTELLIGENCER) (May 2022) (print)

Tyler Kingkade, *Uvalde shooting renews push for 'red flag' laws — 4 years after Texas Republicans blocked one*, NBC NEWS (May 2022) (print)

*NBC News Now with Joshua Johnson*, NBC News (May 2022) (television)

Annie McDonough, *SCOTUS could soon overturn New York's gun law. Here how the state could respond*, CITY AND STATE (May 2022) (print)

*Interview Regarding the Uvalde Shooting*, TIMES RADIO (May 2022) (radio, England)

*Coverage of the Uvalde Shooting*, CTV NEWS, (May 2022) (television, Canada)

Lindsay Whitehurst, Michael Tarm, & James Anderson, *Buffalo shooter's previous threat raises red-flag questions*, AP News (May 2022) (print)

14

Kevin McCoy, *Gun Rights Groups' Wave of Lawsuits Could Change America's Relationship With Firearms*, USA TODAY (February 2022) (print)

Brandan Pierson, *Manslaughter Charges Against Michigan Shooter's Parents Break New Legal Ground*, REUTERS (December 2021) (print)

*Kyle Rittenhouse and the "Self-Defense" Defense*, VOX'S TODAY, EXPLAINED (November 2021) (podcast)

*The Supreme Court, Concealed Carry, and How Your Laws Might Change*, NEW BOOKS NETWORK (November 2021) (podcast)

Kiara Alfonseca, *Arbery, Rittenhouse Cases Spotlight Self-Defense and Vigilantism*, ABC NEWS (November 2021) (print)

Marc Fisher & Mark Berman, *After Rittenhouse: Will Deadly Clashes Multiply as the Right to Self-Defense Expands?*, WASH. POST (November 2021) (print)

Willy Lowry, *Rittenhouse and Arbery Cases Expose Deep Rifts on Gun Rights and Vigilantism in US*, THE NATIONAL (November 2021) (print)

*The Claim of Self-Defense Raising Concerns in Recent Court Cases*, KCBS SAN FRANCISCO (November 2021) (radio)

Shaila Dewan, *Can Self-Defense Laws Stand Up to a Country Awash in Guns?*, N.Y. TIMES (November 2021) (print)

Interview, NYC's WPIX 11 TV (November 2021) (television)

Jonah E. Bromwich & Ashley Southall, *What Happens if the Supreme Court Strikes Down New York's Gun Law?*, N.Y. TIMES (November 2021) (print)

Bob Ortega, *Fears of Unlikely Federal Gun-Control Measures Lead to Raft of State Laws*, CNN.COM (November 2021) (print)

*U.S. Supreme Court Firearms Case Could Reshape Gun Control in America*, NPR DETROIT (WDET) (November 2021) (radio)

Interview, Houston's ABC 13 KTRK TV (November 2021) (television)

Noah Goldberg, *Supreme Court Appears Likely to Shoot Down New York Gun Law*, N.Y. DAILY NEWS (November 2021) (print)

*La Cour Supreme des États-Unis Examine un Dossier Majeur sur les Armes à Feu*, LE FIGARO (November 2021) (print)

Noah Goldberg, *Supreme Court Could Nix New York Gun Law that Limits Right to Carry Guns in Public*, N.Y. DAILY NEWS (November 2021) (print)

Amelia Thomson-DeVeaux, *How the Supreme Court Could Make It Easier to Carry Guns in Public*, FIVETHIRTYEIGHT (November 2021) (print)

ERIC RUBEN                                                                                          JANUARY 2026

Devin Dwyer, *Gun Owners Ask Supreme Court to Back Concealed Carry for Self-Defense*, ABC NEWS LIVE (November 2021) (television and print)

*US Supreme Court to Hear High-Stakes Gun Rights Case*, VOICE OF AMERICA (November 2021) (print)

Tiana Headley, *New York Is America's Latest Battleground Over Gun Rights*, THE RIVER (November 2021) (print)

Robert Gavin, *Law Beat: Supreme Court Ready for Possible Landmark Gun Case from Rensselaer County*, ALB. T. UNION (October 2021) (print)

Marcia Coyle, *'Originalists' Gorsuch, Kavanaugh, Barrett Under Microscope in 2nd Amendment Case*, NAT'L L.J. (October 2021) (print)

*The Attitude With Arnie Arneson*, WNHN (October 2021) (radio)

*SCOTUS Returns for Blockbuster Term,* ABC NEWS LIVE (October 2021) (television)

*This Week with George Stephanopoulos*, ABC NEWS (October 2021) (television)

Dan Frosch and Elizabeth Findell, *Air Force Found Largely Responsible for Texas Church Shooting,* WALL STREET JOURNAL (July 2021) (print)

Yanqi Xu, *Fourth Circuit Ruling: Federal Laws Banning Handgun Sales to Young Adults Violate Second Amendment*, NC POLICY WATCH (July 2021) (print)

Erik Larson, *California Gun Laws Reviled by NRA Face Pivotal Court Test*, BLOOMBERG NEWS (June 2021) (print)

*Agenda Svijet*, HRT (May 2021) (television)

Jennifer Mascia, *The Supreme Court's Next Big Gun Case, Explained*, THE TRACE (May 2021) (print)

*"The Week" with Joshua Johnson*, NBC PEACOCK TV (April 2021) (television)

*Open Carry Laws, Public Safety, and* Young v. Hawaii, LAWYER 2 LAWYER (April 2021) (podcast)

Jolana Humpalova, *To Limit or Not to Limit? Weapons Divide America, It Has the Most in the World*, SEZNAM ZPRÁVY (April 2021)

Matt Reynolds, *Lawyers Involved in the Gun Debate Are Primed for the Supreme Court to Take the Next Big Case*, ABA JOURNAL (December 2020) (print)

Stephen Gutowski, *Gun Lawsuits Flood in After Barrett Supreme Court Confirmation*, WASHINGTON FREE BEACON (December 2020) (print)

Olivia Li, *On Guns, Barrett's Philosophy Leaves Little Room for Public Safety*, THE TRACE (September 2020) (print)

Greg Stohr, *Gun Cases Could Prompt Supreme Court to Bolster Second Amendment*, BLOOMBERG NEWS (June 2020) (print)

16

Eric Ruben                                                                           January 2026

Annie McDonough, *What Does SCOTUS' Second Amendment Case Mean for New York?*, City & State New York (April 2020) (print)

*U.S. Supreme Court Leaves Bump Stock Ban in Place*, CT Public Radio (March 2020) (radio)

*Virginia Assault Weapon Bill Shot Down by Senate Committee*, KCBS (February 2020) (radio)

Kaley Johnson, *White Settlement Church Shooter Had a Long Criminal History. So How Did He Get a Gun?*, Fort Worth Star-Telegram (January 2020) (print)

*2020 Will Be a Big Year for the Gun Issue*, The Trace (January 2020) (print)

Adam Liptak, *After Long Gap, Supreme Court Poised to Break Silence on Gun Rights*, N.Y. Times (December 2019) (print)

*Supreme Court Watchers See Chief Justice as Possible Fifth Vote to Dismiss Major Gun Case*, The Trace (December 2019) (print)

Richard Wolf, *Supreme Court May Expand Second Amendment Rights Despite Repeal of Disputed Gun Restrictions*, U.S.A. Today (December 2019) (print)

John Kruzel, *Supreme Court Poised to Hear First Major Gun Case in a Decade*, The Hill (December 2019) (print)

Matt Cohen, *Gun Violence Costs Americans Billions Every Year. A California Mayor Has a Plan to Make Gun Owners Pay for It*, MotherJones.com (August 2019) (print)

Jennifer Mascia, *What to Know About the Supreme Court's First Gun Case in 9 Years*, The Trace (April 2019) (print)

*A Historic Ruling on Guns, Ten Years Later*, 1A, NPR (June 2018) (radio)

Jon Schuppe, *Low-Crime Village Bans Military-Style Guns, Citing Parkland and Other Mass Shootings*, NBCNews.com (April 2018) (print)

Andrew Wong, *Why the US Is So Different From the UK and Australia When It Comes to Gun Control*, CNBC.com (March 2018) (print)

Kiran Alvi, *US: Most Mass Shootings Not Committed by Mentally Ill*, AlJazeera.com (November 2017) (print)

Jared Keller, *Is The End of the Assault Rifle Nigh?*, Pacific Standard (February 2017) (print)

*Does the Second Amendment Leave Any Room for Gun Control Laws?*, Take Two, KPCC (Southern California Public Radio) (June 2016) (radio)

*Guns in the Spotlight: Do Americans Really Need an Assault Weapon to Protect Themselves?*, Paul Henry Show, TV3 (New Zealand) (June 2016) (television)

## Other Legal Experience

**Morvillo Abramowitz Grand Iason & Anello, P.C.**, New York, NY

17

*Litigation Associate*, November 2008-November 2014

**U.S. Department of State, Office of the Legal Advisor**, Washington, D.C.
    *Summer Intern*, May-June 2007

**Davis Polk & Wardwell LLP**, New York, NY and Madrid, Spain
    *Summer Law Clerk*, May-August 2006 (offer extended)

**Civil Association for Equality and Justice (ACIJ)**, Buenos Aires, Argentina
    *Legal Intern*, May-August 2005

## UNIVERSITY SERVICE

Judicial Clerkship Committee, SMU Dedman School of Law (2025-present)
Endowed Lectures and Faculty Forum Committee, SMU Dedman School of Law (2025-present)
Faculty Advisor, 1L Inn of Court, SMU Dedman School of Law (2024-present)
Promotion Committee, Legal Research Professors, SMU Dedman School of Law (2024-present)
Library & Technology Committee, SMU Dedman School of Law (2024-present)
Appointments Committee, SMU Dedman School of Law (2023-2024)
Academic Standards Committee, SMU Dedman School of Law (2022-2023)
Admissions/Financial Aid Committee, SMU Dedman School of Law (2022-2023)
SMU Law Hooder (2022, 2023) (selected by vote of graduating 3Ls)
SMU Law AALS Representative (2020, 2021, 2022, and 2023)
Curriculum/Academic Standards Committee, SMU Dedman School of Law (2020-2022)
Teaching Committee, SMU Dedman School of Law (2020-2022)
Faculty Advisor, 1L Inn of Court, SMU Dedman School of Law (2020-2021)
Faculty Advisory Board, Deason Criminal Justice Reform Center (2019-present)
Endowed Lectures and Faculty Forum Committee, SMU Dedman School of Law (2019-2020)
Faculty Secretary, SMU Dedman School of Law (2019-2020)

## REFEREE ACTIVITY

HARVARD LAW REVIEW
STANFORD LAW REVIEW
UNIVERSITY OF PENNSYLVANIA LAW REVIEW
YALE LAW JOURNAL

## EXPERT REPORTS

Rocky Mountain Gun Owners v. Polis, 23-cv-2563 (D. Col.)

Richards v. Bonta, 23-cv-00793 (S.D. Cal.)

## BRIEFS AND OTHER ADVOCACY

Brief of Second Amendment Law Scholars as Amici Curiae in Support of Petitioner, United States v. Hemani, No. 24-1234 (U.S.) (Dec. 19, 2025)

Brief and Oral Argument of Appointed Amici Curiae Eric Ruben and Gregg Costa to Defend the Merits of Texas Penal Code §§ 46.03(a)(4), 46.03(a)(7), and 46.03(a)(8), Ziegenfuss v. Martin, 24-cv-01049 (N.D. Tex.) (court appointed) (brief: September 12, 2025; oral argument: December 11, 2025)

Brief of Second Amendment Law Scholars as Amici Curiae in Support of Petitioner, United States v. Rahimi, No. 22-915 (U.S.) (August 21, 2023)
- cited in Vidal v. Elster, 602 U.S. 286, 328 (2024) (Sotomayor, J., concurring)
- cited in United States v. Rahimi, 602 U.S. 680, 743 (2024) (Jackson, J., concurring)

Brief of Second Amendment Law Professors as Amici Curiae in Support of Neither Party, New York State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S.) (July 20, 2021)
- cited in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 103 (2022) (Breyer, J., dissenting)

Statement of Professors of Constitutional Law to Senate Judiciary Committee: The Right to Keep and Bear Arms and the Constitutionality of Expanded Background Checks (March 22, 2021)

Brief of Second Amendment Law Professors as Amici Curiae in Support of Defendant-Appellee, Wade v. The Board of Regents of the University of Michigan, MSC No. 156150 (Mich. Sup. Ct.) (March 1, 2021)

Brief of Second Amendment Law Professors as Amici Curiae in Support of Neither Party, New York State Rifle & Pistol Ass'n v. City of New York, No. 18-280 (U.S.) (May 14, 2019)
- cited in New York State Rifle & Pistol Ass'n v. City of New York, 590 U.S. 336, 341 n.1 (2020) (Alito, J., dissenting)