Harfenist Kraut & Perlstein, LLP
Steven J. Harfenist, Esq.
(Atty Id. No. 045671989)
3000 Marcus Avenue, Suite 2E1
Lake Success, NY 11042
T: (516) 355-9600
F: (516) 355-9601
E: sharfenist@hkplaw.com
*Attorneys for Plaintiffs*

Stephen D. Stamboulieh*
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
T: (601) 852-3440
E: stephen@sdslaw.us
MS Bar No. 102784
*Admitted Pro Hac Vice

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-----------------------------------------------------------------X

HEIDI BERGMANN-SCHOCH, COALITION OF NEW
JERSEY FIREARM OWNERS, GUN OWNERS OF
AMERICA, INC., and GUN OWNERS FOUNDATION,

Plaintiffs,

-against-

JENNIFER DAVENPORT, in her official capacity as
the Attorney General of New Jersey, JEANNE
HENGEMUHLE, in her official capacity as the
Acting Superintendent of the New Jersey State Police, and
LACHIA BRADSHAW, in her official capacity as the
Burlington County Prosecutor,

Defendants.

**Civil Action No.:
25-CV-997(CPO)(MJS)**

-----------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND
IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT**

**TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES .........................................................................................iv

SUMMARY OF ARGUMENT .....................................................................................1

ARGUMENT .................................................................................................................3

   I.  NEW JERSEY'S BAN ON THE CARRY OF HOLLOW POINT
      AMMUNITION IS ATEXTUAL AND AHISTORICAL, AND SO
      PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ..................3

      A.  New Jersey's Ban on Hollow Point Ammunition Clearly Implicates
          the Second Amendment's Plain Text........................................................3

          1.  The Term "Arms" Includes Firearm Ammunition .............................4

          2.  Ammunition Is Obviously Necessary for a Firearm to Function ........6

          3.  Hollow Point Ammunition Is Suitable for Self-Defense.....................9

          4.  Defendants' Own History of Hollow Point Ammunition
              Undermines Their Argument ..............................................................16

          5.  The Design Features of Modern Hollow Point Ammunition Make
              It Perfectly Suited for Self-Defense..................................................19

      B.  The Hollow Point Carry Ban Is Ahistorical...........................................22

          1.  Defendants' "Particularly Dangerous Instrument" Analogues Bear
              No Resemblance to Their Hollow Point Carry Ban ..........................26

          2.  This Court Should Reject Defendants' Backdoor Interest
              Balancing..........................................................................................35

          3.  Defendants' Appeals to Common Law Fall Flat ..............................35

        C.  The Historical Record Actually Supports Plaintiffs..............................36

II. PLAINTIFF GOF HAS STANDING..........................................................39

CONCLUSION ...................................................................................40

# TABLE OF AUTHORITIES

*Page*

**U.S. Constitution**

Amendment I.................................................................................. 10, 26, 39

Amendment II ........................................................................................ *passim*

**Statutes**

18 U.S.C. § 921(a)(21)(C) ..............................................................................10

1811 N.J. Laws 300, § 1 ................................................................................30

1881 Ark. Acts 192, § 3 ................................................................................31

N.J.S.A. § 2C:3-4(b)(2)..................................................................................12

N.J.S.A. § 2C:58-4.5(b) ................................................................................29

**Cases**

*Bevis v. City of Naperville*
  85 F.4th 1175 (7th Cir. 2023) ....................................................................11

*Bianchi v. Brown*
  111 F.4th 438 (4th Cir. 2024) ........................................................ 11, 12, 20

*Brown v. United States*
  256 U.S. 335 (1921)....................................................................................13

*Commonwealth v. Selfridge*
  2 Am. St. Trials 544 (Mass. 1806)..............................................................13

*District of Columbia v. Heller*
  554 U.S. 570 (2008).............................................................................. *passim*

*Duncan v. Bonta*
  133 F.4th 852, 867 (9th Cir. 2025) ...............................................................5

*Espinoza v. Mont. Dep't of Revenue*
  591 U.S. 464 (2020)....................................................................................24

*First Choice Women's Res. Ctrs., Inc. v. Davenport*
  2026 U.S. LEXIS 1949 (Apr. 29, 2026)......................................................39

*Florida v. Jardines*
  569 U.S. 1 (2013)........................................................................................22

*Graham v. Connor*
  490 U.S. 386 (1989)....................................................................................15

*Hanson v. Smith*
  120 F.4th 223, 235 (D.C. Cir. 2024)...........................................................30

*Jackson v. City & County of San Francisco*
  576 U.S. 1013 (2015).....................................................................................7

*Koons v. Platkin*
   673 F. Supp. 3d 515 (D.N.J. 2023)..................................................................21
*Lara v. Comm'r Pa. State Police*
   125 F.4th 428 (3d Cir. 2025) ........................................................ 24, 33
*Luis v. United States*
   578 U.S. 5 (2016) ........................................................................................5
*Markham v. Clark*
   978 F.2d 993 (7th Cir. 1992) .......................................................................34
*McDonald v. City of Chicago*
   561 U.S. 742, 782-83 (2010) ......................................................................22
*N.Y. State Rifle & Pistol Ass'n v. Bruen*
   597 U.S. 1 (2022)............................................................... *passim*
*Reid v. Covert*
   354 U.S. 1 (1957).......................................................................................18
*Snope v. Brown*
   145 S. Ct. 1534 (2025)................................................................................4
*State v. Wells*
   1 N.J.L. 486, 492 (1790).............................................................................12
*Texas v. BATFE*
   737 F. Supp. 3d 426 (N.D. Tex. 2024) ........................................................39
*United States v. Cruikshank*
   92 U.S. 542 (1875).....................................................................................10
*United States v. Hicks*
   649 F. Supp. 3d 357 (W.D. Tex. 2023) ........................................................5
*United States v. Miller*
   307 U.S. 174 (1939)....................................................................................5
*United States v. Rahimi*
   602 U.S. 680 (2024)............................................................... *passim*
*Vt. Fed. of Sportsmen's Clubs v. Birmingham*
   741 F. Supp. 3d 172 (D. Vt. 2024) ..............................................................4

**Other Authorities**

4 William Blackstone, Commentaries on the Laws of England
   (John Taylor Coleridge ed., 1825)................................................................28
Amicus Brief of Peace Officers Research Association of California, et al. *May v. Bonta*, No. 23-4356 (9th Cir. Feb. 23, 2024).........................................21
Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012)..............................................................................................5
Brad Fitzpatrick, *How FBI Protocol Testing Changed Ammunition*, Speer ............9

David Alan Johnson, *Revolutionary War Weapons: The American Long Rifle*, Warfare History Network (Apr. 2005) ....................................................37

David B. Kopel, *The Racist Roots of Gun Control*, Encounter Books (Feb. 23, 2018) .................................................................................... 30, 31

David Kenik, Armed Response: A Comprehensive Guide to Using Firearms for Self-Defense (2005)....................................................................15

Douglas Ankney, *Private Citizens Carrying Guns Commit Fewer Crimes than Cops*, Criminal Legal News (July 17, 2019) ........................................21

*Expanding Bullet*, Wikipedia ...........................................................................6

*Facilitate*, Dictionary.com ...............................................................................9

General Sir Arthur Thurlow Cunynghame, My Command in South Africa, 1874-1878 (1880)...........................................................................16

*How the British Gun Control Program Precipitated the American Revolution*, 6 Charleston L. Rev. 283 (2012).....................................................30

*Is the M193 Round Good for Self-Defense?*, HOP Munitions (May 30, 2025) ......18

J.R. Lott and C.E. Moody, *Do Armed Civilians Stop Active Shooters More Effectively than Uniformed Police?*, Crime Prevention Research Center (May 17, 2025)..........................................................................21

Joshua Berry, *The DOD Law of War Manual Returns Hollow Point Bullets to Armed Conflict*, Just Security (Aug. 4, 2015).....................................17

Korva Coleman, *In Killing New York Gunman, Police Also Shot Bystanders*, NPR (Aug. 25, 2012) ..............................................................................21

Kyle Cheney, *Did the Suspected WHCD Shooter Hit a Secret Service Officer? DOJ Says It's Not Sure Yet*, Politico (Apr. 28, 2026) .........................................21

Maartje Abbenhuis et al., *Humanitarian Bullets and Man-Killers: Revisiting the History of Arms Regulation in the Late Nineteenth Century*, Int'l Rev. of the Red Cross (Nov. 2022).....................................................................17

Massad F. Ayoob, In the Gravest Extreme: The Role of the Firearm in Personal Protection (1980) .......................................................................14

Matthew E. Thomas, Historic Powder Houses of New England: Arsenals of American Independence (2013)...............................................................30

*Minie Ball: The Civil War Bullet that Changed History*, HistoryNet .....................37

Richard Sheposh, *Semi-Automatic Rifle*, EBSCO (2025) .....................................37

Stonehenge, British Rural Sports (1871) .............................................................16

*The American Revolution Against British Gun Control*, David B. Kopel (2012)...30

Transcript of Oral Argument
    *Wolford v. Lopez*, No. 24-1046 (U.S. Jan. 20, 2026) .........................................32

Ty McCormick, *How Many Countries Have Gun Rights Enshrined in Their Constitutions?*, Foreign Policy (Apr. 5, 2013) ..................................... 18, 34

U.S. Department of Defense, Law of War Manual (July 2023)........................ 18, 19

*Varon-T Disruptor*, Memory Alpha.........................................................................14

William Harris, *10 Innovations that Led to the Modern Bullet*, HowStuffWorks
  (Apr. 16, 2024)......................................................................................... 37, 39

William K. Emerson, Marksmanship in the U.S. Army: A History of Medals,
  Shooting Programs, and Training (2004) .........................................................36

## SUMMARY OF ARGUMENT

The Second Amendment obviously protects the public carry of the most common and popular self-defense ammunition in the country. Defendants' arguments to the contrary range from the flatly incorrect, to self-contradictory, to histrionic. This Court should grant Plaintiffs' Motion for Summary Judgment.

First, *the flatly incorrect*. Defendants claim that hollow point bullets are not "Arms" under the Second Amendment's plain text, and so the Amendment simply has *nothing to say* at the threshold about New Jersey's one-of-a-kind ban on public carry. But that ignores plain meaning and binding precedent. The U.S. Supreme Court has explained that the term "Arms" includes "'any thing … to cast at or strike another,'" and covers "modern instruments that facilitate armed self-defense." Hollow point bullets are *literally* "cast at" others, and they certainly "facilitate" self-defense. Nothing more is needed to gain a presumption of constitutional protection.

Alternatively, Defendants claim that their 1978 ban is "consistent with" historical tradition, despite precisely *zero* regulation of hollow point ammunition during its first century of existence. Defendants' unrelated historical regulations evince no Founding-era tradition of restricting the types of *ammunition* Americans could carry – for self-defense or otherwise. And Defendants' later history consists of racist and outlier regimes that fail as analogues several times over under *Bruen*'s methodology. Defendants' ban is as ahistorical as it comes.

1

Second, *the self-contradictory*.  Defendants rely on unpersuasive out-of-Circuit opinions to suggest that the Second Amendment protects only "self-defense" weapons, as opposed to purportedly "military-grade" ones.  And, because hollow points allegedly were "designed for military use," Defendants claim they may be banned.  But not only is this *not* true – hollow points were developed for *hunting*, and decades before Defendants' expert claims – but also Defendants admit the military does not widely use hollow points today.  Ironically, the military's bullet of choice – the full metal jacket – is the only alternative New Jersey allows.  Defendants thus simultaneously demand Plaintiffs use the military round, while claiming Plaintiffs have no right to use military arms.  That is self-defeating and untenable.

Third, *the histrionic*.  Defendants' brief contains no shortage of sensationalist rhetoric maligning the hollow point bullet as "excessive," "phenomenally lethal," and even "contrary to the laws of humanity."  One might think Defendants are describing nuclear Armageddon, not everyday handgun ammunition that literally no other State in the country considers objectionable enough to ban.  Nevertheless, Defendants assert, these terrifying characteristics render hollow points entirely "disproportionate" and "unsuitable for lawful self-defense," simply because they are *too good* at what they do – stopping a threat and saving a life.  But Defendants' rhetoric is misplaced.  The law of self-defense does not micromanage the deadly

2

force one may use *when deadly force is justified*.  Lawful self-defenders are not imprisoned merely because their criminal attacker 'brought a knife to a gunfight.'

**ARGUMENT**

**I.     NEW JERSEY'S BAN ON THE CARRY OF HOLLOW POINT AMMUNITION IS ATEXTUAL AND AHISTORICAL, AND SO PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT**

Arguing that the Second Amendment does not protect the right of law-abiding Americans to use hollow point ammunition (or hollow point bullets, hereinafter "HPB") for self-defense in their publicly carried firearms, Defendants make two claims.  First, they argue that the Second Amendment's plain text is not even implicated by New Jersey's flat ban on carrying the country's most common self-defense ammunition, theorizing that (i) ammunition is not an "Arm," (ii) ammunition is not necessary for a firearm to function, and (iii) hollow point ammunition is disproportionate for self-defense.  Second, Defendants argue that a hodgepodge of disparate and late-coming historical sources coalesce into a tradition sufficient to justify their ban.  Both claims miss the mark.

**A.     New Jersey's Ban on Hollow Point Ammunition Clearly Implicates the Second Amendment's Plain Text**

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  At the outset, as something of a throwaway argument, Defendants claim "[t]he Second Amendment's plain text protects 'only'

3

'arms' that are '"in common use"' today for self-defense." Combined Brief in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment ("XMSJ") at 9. But the Second Amendment's plain text contains *neither* of those qualifiers. To the contrary, HPBs clearly fall within the meaning of "Arms" as originally understood.[1]

### 1.     The Term "Arms" Includes Firearm Ammunition.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court explained that the Second Amendment's term "Arms" is broad, including "'any thing that a man wears for his defense, or takes into his hands, or useth in wrath to cast at or strike another.'" *Id.* at 581. Resisting the reality that a bullet is literally *the object* that is "'cast at [and] strike[s] another,'" Defendants demur that

---

[1] Defendants cite a single Vermont district court for the proposition that "'a plaintiff must prove that the regulated weapons are in common use in order to qualify for presumptive protection under the Second Amendment.'" XMSJ at 9 (quoting *Vt. Fed. of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 187 (D. Vt. 2024)). But the Supreme Court never said "common use" is a prerequisite to presumptive textual protection. On the contrary, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008), and "*we use history* to determine which modern 'arms' are protected by the Second Amendment...." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 28 (2022) (emphasis added); *see also Snope v. Brown*, 145 S. Ct. 1534, 1535 (2025) (Thomas, J., dissenting from denial of certiorari) (*Bruen*'s own author concluding "AR-15s are clearly 'Arms' under the Second Amendment's plain text" without resort to common-use analysis). Properly understood, common use is just *one way* to demonstrate that an item is protected. *See* Section I(B), *infra*. Indeed, "the traditions of the American people … demand[] our unqualified deference," and so not even historical analogues can "provide … justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 597 U.S. at 26, 47; ECF 41-11 at 24-25. But even if Defendants were correct (they are not) that a common use showing is required, Plaintiffs have shown that hollow point ammunition is not only common but in fact ubiquitous for self-defense, among concealed carrier and police officer alike, nationwide. ECF 41-11 at 24-26.

ammunition is merely a "firearm accessory," not "a weapon in itself." XMSJ at 10.

And, rejecting *Heller*'s reference to "bows *and arrows*" as "Arms" – the obvious

historical analogue to firearm ammunition – Defendants grasp at straws, theorizing

that one might "independently" poke at someone with an arrow, without use of the

bow.[2] But the Supreme Court has put the issue to rest, explaining in *United States*

*v. Miller*, 307 U.S. 174, 180 (1939), that "'[t]he possession of arms also implied the

possession of ammunition,'" and referencing a number of Founding-era statutes

*requiring* persons to arm themselves with "cartridges" and "bullets" and "lead" and

"powder." Unsurprisingly, then, numerous courts have found that the Second

Amendment protects ammunition. *See* Plaintiffs' Memorandum of Law in Support

of Summary Judgment ("MSJ") at 22-23 (compiling cases). Defendants offer this

Court no reason to depart from that overwhelming weight of authority.[3]

---

[2] Relying on an unpersuasive Ninth Circuit decision finding detachable box magazines not to be "Arms" and therefore to be outside the scope of the Second Amendment, Defendants theorize that ammunition is similarly "by itself … harmless." XMSJ at 11 (citing *Duncan v. Bonta*, 133 F.4th 852, 867 (9th Cir. 2025)). But in the same vein, a firearm too is "harmless," when "detached from" the ammunition that keeps it running. And while most guns can still be fired without use of a magazine (by single loading each round), no firearm can be discharged without use of ammunition. Using Defendants' logic, New Jersey could ban firearm triggers and barrels, on the theory that they are not "Arms" when "detached from a firearm." "What a marvelous, Second Amendment loophole!" *United States v. Hicks*, 649 F. Supp. 3d 357, 360 (W.D. Tex. 2023), *rev'd on other grounds*, 2025 U.S. App. LEXIS 18297 (5th Cir. July 23, 2025). And in any case, Defendants forget that Plaintiffs wish to publicly carry hollow points *in their firearms*, not "independently[] and detached" from them. XMSJ at 11.

[3] Even if ammunition was not part of the term "Arms" (and it clearly is), "[c]onstitutional rights … implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 192 (2012) ("Authorization of an act

### 2. Ammunition Is Obviously Necessary for a Firearm to Function

Defendants admit that "bullets 'as a general class' are necessary to operate a firearm," but demur that "HPBs are not necessary for a firearm to function." XMSJ at 12. But all this proves is that "he who writes the resolved clause wins the debate."[4] The question at *Bruen*'s threshold inquiry is whether the Second Amendment's plain text covers the conduct in question, *i.e.*, whether the case involves a "firearm regulation." *Bruen*, 597 U.S. 1, 17; *see also United States v. Rahimi*, 602 U.S. 680 (2024) (emphasis added) ("*when* a firearm regulation is challenged … the Government'" bears the historical burden). Here, the answer is obviously "yes" – New Jersey bans the carrying of Americans' most popular self-defense ammunition.

Defendants' machinations about how the Second Amendment does not extend to "'any weapon whatsoever'" (XMSJ at 2) are misplaced, because the boundaries of the Second Amendment's protections are properly to be determined by historical analysis – *i.e.*, after the plain text is implicated. Nevertheless, Defendants shirk that historical burden, focusing only on a "specific subset of that class," arguing that "the HPB Carry Law is not a prohibition on all ammunition." XMSJ at 11-12 & n.12. Defendants theorize that, "taken to its logical conclusion, Plaintiffs' argument would

---

also authorizes a necessary predicate act."). Since, as Defendants admit, firearms are useless without ammunition, the Second Amendment must protect ammunition all the same.

[4] M. Stanton Evans.

mean that every sub-type of ammunition … would be constitutionally protected." XMSJ at 12 n.12. Not so. Rather, "every sub-type of ammunition" would be *entitled to historical analysis* to determine whether it is protected. In reality, it is *Defendants'* argument, taken to *its* logical conclusion, that would mean *no ammunition ban* would even make it to historical review, so long as a law regulated only a "specific subset," not the "general class." *Id.* at 11-12. That is not the law.[5]

Next, arguing that the plain text is not even implicated by New Jersey's HPB carry ban, Defendants offer up reasoning that has been explicitly rejected by the Supreme Court. Defendants malign that Plaintiffs "simply 'prefer'" and "'wish' … to use HPBs"[6] but that, even without such ammunition, Plaintiffs are still "[]able to carry a loaded firearm" – just using *other* ammunition that is subpar for self-defense. XMSJ at 13. But this sort of argument – that the law "leav[es] open avenues for

---

[5] *See also Jackson v. City & County of San Francisco*, 576 U.S. 1013, 1016 (2015) (Thomas & Scalia, JJ., dissenting from denial of certiorari) ("nothing in our decision in *Heller* suggested that a law must rise to the level of the absolute prohibition" before implicating "the Second Amendment right").

[6] Defendants claim that, while Plaintiffs "prefer" and "wish" to use HPBs, "Plaintiffs never allege that their ability to use a firearm for self-defense is impaired by lack of access to HPBs." XMSJ at 13. Not so. Defendants contradict themselves on this point. *See* XMSJ at 23 ("Plaintiffs argue that the HPB Carry Law violates their right to self-defense"); ECF 1-2 at ¶18 (GOA member "prefers to use hollow point ammunition … should he ever need to use his firearm to defend"); ECF 1-3 at ¶7 ("preference is … hollow point ammunition … for self-defense"); ECF 1-1 at ¶5 ("CNJFO's members … routinely carry their handguns in public," but "New Jersey law … requires these individuals carry less effective ammunition … in public for self-defense"), ¶20 ("I am responsible for my own safety," "I want to be able to carry the best possible ammunition" to protect "my life," however "New Jersey makes it illegal" and "thus, I am relegated to carrying ammunition that is less effective"); ECF 1 at ¶¶88, 92 ("this member is not able to possess adequate self-defense tools"), ¶93 (desiring "best possible ammunition in a self-defense scenario").

7

civilian self-defense," because New Jersey "allow[s] its residents to possess and carry many other types of ammunition" (*id.* at 3) – is a nonstarter. As the Court explained in *Heller*, "[i]t is no answer to say, as [Defendants] do, that it is permissible to ban the possession of [HPBs] so long as the possession of other [ammunition] (*i.e.*, [full metal jacket]) is allowed. It is enough to note, as we have observed, that the American people have considered [HPBs] to be the quintessential self-defense [ammunition]. … Whatever the reason, [HPBs] are the most popular [ammunition] chosen by Americans for self-defense … and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629.

Finally, Defendants seek to minimize the obvious self-defense benefits of HPBs, claiming that Plaintiff Bergmann-Schoch's "preference has no bearing on the firearm's ability to function or her ability to exercise her right to lawful self-defense." XMSJ at 13. Of course, Defendants' own witness testified that the New Jersey State Police carry hollow point ammunition *precisely* for the benefits it offers over full metal jacket ammunition. ECF 41-5 at 34:17-35:9. Indeed, Defendants' tenuous claim that HPBs have "no bearing" on self-defense is eviscerated by the reality that virtually everyone who carries a handgun for self-defense in this country loads it with HPBs. But apparently, Defendants know something that tens of

8

millions of American citizens, military personnel, and law enforcement – including the FBI's world-renowned ballistics testing laboratory[7] – do not.[8]

### 3.    Hollow Point Ammunition Is Suitable for Self-Defense.

Next, Defendants claim that hollow point ammunition lacks Second Amendment protection because it is "unsuitable for lawful self-defense."  XMSJ at 14.  To that end, Defendants suggest analysis of the "history," "design features," "lethality," and "proportionality" of HPBs, on the theory that *this is what courts do* to "determin[e] whether an arm is in proportional [sic] to the end of self-defense" and therefore protected.  *Id.* at 16-18, 15.  But not only is Defendants' proposed test entirely made up, it conflicts with *itself*, not to mention the Court's clear pronouncements on the Second Amendment.

---

[7] *See* Brad Fitzpatrick, *How FBI Protocol Testing Changed Ammunition*, Speer, https://tinyurl.com/2wwzfsrb (last visited Apr. 30, 2026) ("FBI protocol testing is an effective method for law enforcement agencies to determine bullet performance, but it has also improved self-defense bullet designs.  Bullet manufacturers began striving to develop projectiles that performed well in FBI protocol testing....").

[8] Defendants confuse "useful" with "necessary," claiming that HPBs are "unnecessary for … self-defense."  XMSJ at 1, 3.  But the Supreme Court never said that the Second Amendment protects only the right to have the bare minimum of implements *necessary* for the slightest of self-defense.  To the contrary, the Court explained that the text "covers modern instruments that" so much as "*facilitate* armed self-defense."  *Bruen*, 597 U.S. at 28.  "Facilitate" means "to make easier or less difficult."  *Facilitate*, Dictionary.com, https://tinyurl.com/2m7fpwt5 (last visited Apr. 29, 2026).  Indeed, had Defendants' bare-minimum-necessary argument carried the day in *Heller*, then the decision would have come out differently, as the District of Columbia had argued that homeowners still could defend themselves because "possession of other firearms (*i.e.*, long guns) is allowed."  *Heller*, 554 U.S. at 629.  Of course, the Court eviscerated that argument.  *Id.* Indeed, if Defendants' argument were the law, then why stop at HPBs?  Rather, New Jersey could ban full metal jacket ammunition, as well as lead ball ammunition, leaving its residents free to use only rubber bullets, arguing that they deliver the *bare minimum* force "necessary" to repel an attacker.  No court has adopted such reasoning.

First, the Second Amendment does not *only* protect self-defense. To the contrary, the Court has long described the Second Amendment as broadly protecting the ownership and use of arms "'for a *lawful purpose*.'" *United States v. Cruikshank*, 92 U.S. 542, 553 (1875) (emphasis added). And there are plenty of lawful purposes besides protecting one's life. *See Heller*, 554 U.S. at 624 (emphasis added) (noting "lawful purposes *like* self-defense").[9] To say that self-defense tools are the *only* protected "Arms" is like saying the First Amendment *only* protects religious texts.

Second, Defendants cannot reconcile their proposed factorial test with *Bruen*'s plain instruction. The Second Amendment's "general definition" of "Arms" "covers modern instruments that *facilitate* armed self-defense." *Bruen*, 597 U.S. at 28 (emphasis added). Hollow point ammunition certainly makes self-defense easier. Defendants admit as much. XMSJ at 5, 17 (HPBs more effective to "stop" and "knock down" a threat). That is sufficient to "start … with a strong presumption" under the text (*Heller*, 554 U.S. at 581) that the Second Amendment protects HPBs.

Moreover, *Bruen* already repudiated the notion that governments have the authority to "deny" Second Amendment rights "based on a perceived lack of need or suitability." *Bruen*, 597 U.S. at 13; *cf.* XMSJ at 1 (HPBs "unnecessary for …

---

[9] *See, e.g.*, *Heller*, 554 U.S. at 599, 600 ("prevent[ing] elimination of the militia" and guaranteeing an armed citizenry "as a safeguard against tyranny"); *id.* at 599 ("hunting"); *Bruen*, 597 U.S. at 80 (Kavanaugh, J. & Roberts, C.J., concurring) ("training in firearms handling"); 18 U.S.C. § 921(a)(21)(C) ("enhancement of a personal collection or … a hobby").

self-defense"), at 14 (claiming "HPBs are unsuitable").  Instead, the "the traditions of the American people … demand[] our unqualified deference," *Bruen*, 597 U.S. at 26, and the American people overwhelmingly have spoken with respect to their ubiquitous use of hollow points.

Third, Defendants cite unpersuasive out-of-Circuit cases upholding bans on pejoratively named "assault weapons" to claim that the Second Amendment protects only weapons "'most appropriate and typically used for self-defense,'" as opposed to purportedly *military*-style weapons.  XMSJ at 14 (citing *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), and *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024)).  But if that were true (it is not),  then Defendants' argument fails on its own terms.  If Defendants are right that Americans have *no right* to use what the military uses, the reality is that the military uses "'full metal jacket' ammunition" (XMSJ at 16), which is the main alternative to hollow point ammunition.  Thus, in Defendants' world, Plaintiffs cannot use *either* type ammunition – full metal jackets, because the military *uses* them, and HPBs, because the military *does not use* them.

Finally, Defendants claim HPBs' "disproportionately lethal character … causes them to exceed historical principles of self-defense...."  XMSJ at 18.  But Defendants' own legal regime belies that argument.  New Jersey law already allows Plaintiffs to use HPBs for self-defense *at home*, apparently taking no issue with any lack of "proportionality" there.  Defendants offer no logical reason against extending

11

this status quo outside home, where "[m]any Americans hazard greater danger...."
*Bruen*, 597 U.S. at 33.

But Defendants' appeal to "proportionality" misses the mark for a more fundamental reason.   Each one of Defendants' authorities discusses the proportionate *escalation of force* used in self-defense.[10]   Indeed, the age-old "proportionality" principle that Defendants invoke simply provides that one may not "respond[] to a *nonlethal* threat with *lethal* force."  XMSJ at 20 (emphasis added).  Thus, a *shove* might warrant a *shove* in return, or a punch a punch but, absent further aggression risking imminent "death or serious bodily harm," the use of "deadly force" is off the table.  *See* N.J.S.A. § 2C:3-4(b)(2).  Thus, as Defendants' cases demonstrate, one cannot "use … a *penknife* to wound and ultimately kill an *unarmed* attacker" posing no threat of lethal force.  XMSJ at 20 (emphases added) (citing *State v. Wells*, 1 N.J.L. 486, 492 (1790)).  Likewise, responding to a knock from an attacker's "walking stick" – which cannot "'probably produce death'" – by firing a "pistol" demonstrates the disproportionality between *nonlethal* and *lethal* force.  *Id.*

---

[10] Defendants repeatedly cite the Fourth Circuit's *Bianchi* decision to claim that the Second Amendment does not protect arms that are "excessive" and "'disproportionate to the end of personal protection'...."  XMSJ at 21, 22 (quoting *Bianchi*, 111 F.4th at 451).  But *Bianchi* dealt with firearms, not ammunition, and in any case, it cited no authority for that proposition, which conflicts with *Heller*'s recognition of lawful purposes *beyond* self-defense.  *See* Section I(A)(3), *supra*.

12

at 21.  And suffering "a little blow with a little stick on the shoulder" does not justify one to "draw a sword and cut or hew the other."  *Id.* at 19-20.[11]

But none of these authorities establishes some sort of "proportionality" principle *when lethal force is authorized*.  Rather, once deadly force is justified, the law does not micromanage the "proportionality" of the force used to defend against death or grave bodily harm.  *See Brown v. United States*, 256 U.S. 335, 343 (1921) ("Detached reflection cannot be demanded in the presence of an uplifted knife.").  Indeed, Plaintiffs are unaware of any case where a victim *lost* a self-defense claim because they used a *larger-caliber* bullet than their attacker – say, a .45 ACP round in response to an attacker with a .22 LR, even though the .45's 230-grain slug might seem "catastrophic" when compared to the .22's more anemic 40-grain bullet.  Nor is it inappropriate to use a firearm to defend against a knife attack, or to defend with a rifle even though the assailant has a handgun.  To be sure, defenders have been charged for continuing to fire *after* a threat has been stopped, or *before* a lethal threat presents itself.  But there is no self-defense principle of being 'too aggressive,' firing 'too many rounds,' or using ammunition that is 'too devastating' *in the moment that one's life is on the line*.  On the contrary, the defender is entitled to stop the threat.

---

[11] Defendants' "proportionality" problem gets even worse in their Statement of Material Facts, ECF 43-2.  There, Defendants cite *Commonwealth v. Selfridge*, 2 Am. St. Trials 544 (Mass. 1806), and one of their experts' reports, in apparent support of their proposition that HPBs are disproportionate *even when* deadly force is justified.  *See* ECF 43-2 at ¶¶38, 40.  But in each of those Statements of Material Fact, what Defendants actually demonstrate is that the law focuses on the *necessity* of deadly force, not its *proportionality* once deemed necessary.  *See id.*

Defendants' references to "excessive lethality" and "maximal lethal force" are made-up concepts with no legal basis. XMSJ at 2-3.

At bottom, Defendants' appeal to lethal "proportionality" offers something resembling a Star Trek defense, wherein the "Varon-T disruptor" was "banned in the Federation due to its vicious nature: the disruptor literally tore the body apart at the molecular level from the inside out, resulting in a relatively slow and excruciating death by disintegration...."[12] But Defendants' claims – like Star Trek – are fantasy. Real-world examples confirm the necessity of responding to lethal force with as advantageous of a tool as one can muster. As famed firearms and self-defense instructor Massad Ayoob writes, an attacker often "will have surprise in his favor, and this is an almost insurmountable advantage to him."[13] Indeed, "tension has dumped a load of adrenaline into his bloodstream that enhances his already sharp watchfulness to a superhuman degree. … It will be at least a few minutes, if you're an average man, before your reflexes and the acuteness of your sensory perception reach full capacity" in response. *Id.* at 54. Thus, all the "disproportion" is already in the hands of the criminal assailant, and "[t]here are few situations in which you will be on an equal footing with an armed intruder." *Id.* at 52.

---

[12] *Varon-T Disruptor*, Memory Alpha, https://tinyurl.com/35mjmyes (last visited May 1, 2026).
[13] Massad F. Ayoob, In the Gravest Extreme: The Role of the Firearm in Personal Protection 52 (1980).

14

Not to mention, handguns are – and have always been – a suboptimal self-defense tool.  As David Kenik, cofounder and Executive Director of the Police Officers Safety Association, writes, "[h]andguns actually have little stopping power relative to rifles and shotguns."[14]  Handgun bullets "may have killing power, but lack stopping power. … The impact and damage may not be enough to stop the aggression...."  *Id.* at 118.  Meanwhile, many attackers strike while under the influence of mind-altering drugs, making them less likely to feel pain and more likely to "sustain wounds with seemingly little result.  There are many reports of criminals who, having sustained multiple severe gunshot wounds at the hands of police, kept on fighting."  *Id.* at 122.  Yet in spite of these high stakes, Defendants' preferred result would be that Plaintiffs operate at an even *greater* disadvantage.

One searches the Second Amendment in vain for concern about "proportionality" between criminals and law-abiding citizens.  Rather, the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense...."  *Heller*, 554 U.S. at 635.  And in a case of self-defense, a citizen is forced to "make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving," *Graham v. Connor*, 490 U.S. 386, 397 (1989), against an attacker who often has greater speed, size, strength, and the

---

[14] David Kenik, Armed Response: A Comprehensive Guide to Using Firearms for Self-Defense 120 (2005).

15

element of surprise.  Would-be victims need every advantage they can get.  Effective ammunition helps to level the playing field, and the Second Amendment protects it.

### 4.    Defendants' Own History of Hollow Point Ammunition Undermines Their Argument

Relying on their expert Robert Spitzer,[15] Defendants claim that HPBs were "considered … inhumane" soon after their 1890s development, and so they were banned by the 1899 Hague Convention.  XMSJ at 16; ECF 43-5 ¶¶5-6.  And, although admitting that the United States never signed that agreement, Defendants posit that the U.S. military still "restricts the use of ammunition 'calculated to cause unnecessary suffering,'" which Defendants seem to imply includes HPBs.  XMSJ at 16.  But Defendants' argument misstates the historical reality, and the Spitzer Report grossly misrepresents the documents on which it purports to rely.

For starters, as Spitzer admits, for centuries prior to the late 1800s, bullets had been manufactured of pure lead.  ECF 43-5 at ¶5.  And after "full metal jacket" ("FMJ") ammunition hit the market,[16] it problematically was found that such new

---

[15] Defendants note that they "produced four expert reports, while Plaintiffs proffered none." XMSJ at 7 n.9.  Defendants apparently have confused the 'scales of justice' with a literal scale, wherein 'he who submits the heaviest set of pleadings wins.'  But a mountain of expert reports is not a prerequisite to a favorable judgment.

[16] Spitzer claims that HPBs were developed in the 1890s for military use. ECF 43-5 at ¶5.  But a basic Wikipedia search shows that this is not true.  Military HPBs "were not the first expanding bullets … hollow-point expanding bullets were commonly used for hunting thin-skinned game in express rifles as early as the mid-1870s." *Expanding Bullet*, Wikipedia, https://tinyurl.com/y6ztpe7x (last visited May 1, 2026) (citing General Sir Arthur Thurlow Cunynghame, My Command in South Africa, 1874-1878 79 (1880), https://tinyurl.com/2xu44kep) (Plaintiffs' Exhibit 9); *accord* Stonehenge, British Rural Sports 107-08 (1871), https://tinyurl.com/5n87nw8d ("A recent discovery has … made another revolution, because it has

16

bullets "kept their shape as they passed through the body" and did not deform like lead bullets had historically. *Id.* Thus, HPBs were developed to make FMJ bullets *function as ammunition had functioned before* – through deformation. In other words, HPBs were designed simply to revert ammunition lethality to the status quo that had existed for hundreds of years, including at the Founding.

Next, the Department of Defense (now Department of War) Law of War Manual explains precisely why the United States never agreed to restrict HPBs – "because evidence was not presented at the diplomatic conference that expanding bullets produced unnecessarily severe or cruel wounds."[17] Rather, in 1899, "the American representative … recognized that the ban was nonsense … and … the Defense and State Departments correctly determined in 2013 that the Declaration is not [customary international law]."[18] Thus, "there are no law of war rules specifically prohibiting or restricting … expanding bullets," and "such bullets are only prohibited if they are calculated to cause superfluous injury. The U.S. armed

_____

been found that by using a particular form of … hollow ball spreading out when it enters the body....") (Plaintiffs' Exhibit 10); *see also* Stonehenge, *supra*, at 109 (graphically depicting an HPB); Maartje Abbenhuis et al., *Humanitarian Bullets and Man-Killers: Revisiting the History of Arms Regulation in the Late Nineteenth Century*, Int'l Rev. of the Red Cross (Nov. 2022), https://tinyurl.com/yvssmspn ("Britain's employment of expanding bullets in the 1890s was not a particularly new or innovative military development."). This dooms Defendants' claim that HPBs can be banned on the grounds that they were "designed for military use."

[17] U.S. Department of Defense, Law of War Manual 356 (July 2023), https://tinyurl.com/3ve4txm2.

[18] Joshua Berry, *The DOD Law of War Manual Returns Hollow Point Bullets to Armed Conflict*, Just Security (Aug. 4, 2015), https://tinyurl.com/vw48nxdc.

17

forces have used expanding bullets...." Law of War Manual, *supra*, at 352-53, 356. Indeed, "expanding bullets are widely used by law enforcement agencies today, which also supports the conclusion that States do not regard such bullets are inherently inhumane or needlessly cruel." *Id.* at 358.[19]

In fact, completely undermining Defendants' argument, the Law of War Manual explains that the actual reason the U.S. military has avoided HPBs is because they are *not lethal enough*. Law of War Manual, *supra*, at 357 ("expanding bullets have been viewed as ineffective for military and technical reasons"). Rather, bullets such as the U.S. military's ubiquitous M193 bullet used in its 5.56 NATO cartridge were designed to utilize greater velocities from rifles (much greater than anything available in the 1890s) to fragment upon impact, doing far more damage to the body than mere HPBs fired from Plaintiffs' handguns.[20]

---

[19] Even if the United States had signed this agreement, "no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution." *Reid v. Covert*, 354 U.S. 1, 16 (1957). The Second Amendment has no analogue in international law – "[o]nly three countries – Guatemala, Mexico and the United States – have a constitutional right to arms.... [O]urs is the only one that does not explicitly include a restrictive condition." Ty McCormick, *How Many Countries Have Gun Rights Enshrined in Their Constitutions?*, Foreign Policy (Apr. 5, 2013), https://tinyurl.com/4475j6td. Recognizing the Second Amendment's uniqueness, the Supreme Court has explained that even "the English common law is not to be taken in all respects to be that of America...." *Bruen*, 597 U.S. at 39. International law simply has no place in constitutional interpretation – especially when it comes to our uniquely American Second Amendment.

[20] *See, e.g.*, *Is the M193 Round Good for Self-Defense?*, HOP Munitions (May 30, 2025), https://tinyurl.com/bdhv9wrj (noting that, "within its intended velocity range," an M193 bullet will not merely "expand like a hollow point," but rather "tumble[] end over end" and "fragment" "once it penetrates soft tissue").

Finally, it is true, as Defendants point out, that certain nations have restricted use of certain ammunition such as poison-filled bullets or fragmenting bullets designed to leave fragments in body that "escape detection by X-rays...." ECF 43-5 at ¶6. But those types of ammunition are designed to cause "unnecessary suffering" *after the fact* (*i.e.*, on the operating room table, and during recovery), while HPBs are designed to stop a deadly threat *at the moment* when self-defense is imminently necessary. Bans on *poison* ammunition have no relevance to Plaintiffs' intended use of HPBs for self-defense – instances where Defendants admit "'a last resort to save the life of a citizen'" is necessary. XMSJ at 24 n.16.

By invoking the international law of war and the practices of the U.S. military, Defendants hoist themselves with their own petard. Defendants' sources prove that HPBs do not cause "unnecessary suffering," nor are they restricted for use in warfare. Rather, HPBs were originally developed for hunting, and are widely used by military and police units, and tens of millions of American citizens – nationwide.

### 5. The Design Features of Modern Hollow Point Ammunition Make It Perfectly Suited for Self-Defense

Defendants next malign the "design features" of HPBs, arguing that they "flatten and expand" and "impart greater force upon a target," creating a "larger wound cavity" and "'transferring more of the bullet's energy into its target....'" XMSJ at 16-17. But as Defendants admit, these design features cause "more immediate" effects, having the tendency to "stop" and "knock down" an attacker.

19

*Id.* at 5, 17.  In other words, HPBs are *uniquely suited* for use in self-defense, when stopping an attacker quickly can be the difference between life and death.  *Cf. Bruen*, 597 U.S. at 28 (Second Amendment "covers modern instruments that facilitate armed self-defense").  Nevertheless, Defendants malign the purported "lethality" of HPBs, arguing that "HPBs allow users to injure and kill more easily."  XMSJ at 17 n.14.  But what Defendants minimize as "injure and kill," in reality serves to *preserve, protect, and defend* when used for the self-defense purposes Plaintiffs have alleged.  Defendants are entirely unable to explain why they believe it to be appropriate that virtually every police officer nationwide uses HPBs to "protect and serve," if it is true that HPBs are "'phenomenal[ly[ lethal[]'"[21] (*id.* at 37) weapons of war – "so lethal that [they have] been banned under the international laws of war," designed only for "offensive criminal or military purposes," causing "'catastrophic' injuries" and death through "disproportionate" wounds that have no legitimate "personal protection" value.  *Id.* at 17-18.  Both of those realities cannot simultaneously be true, and Defendants' inability to rationalize their diametric positions[22] speaks volumes.

---

[21] Defendants repeatedly employ this histrionic phrase from an out-of-Circuit opinion discussing certain *firearms* – not ammunition.  *See* XMSJ at 37 (quoting *Bianchi*, 111 F.4th at 455).  But Defendants cannot borrow a double-adjective combination from an unrelated case, wrap it in quotation marks, and then use it to describe something else entirely.

[22] The best Defendants do to distinguish between police and civilian use of HPBs is to claim that Plaintiffs have "incorrectly assume[d] that civilians have the same training, powers, and duties as a sworn officer of the law," who "swear[s] an oath to wield the power vested in them" to "protection of the public safety...."  XMSJ at 24 n.16.  But Plaintiffs have mistaken nothing.  For

Of course, regardless of the pros and cons of self-defense HPBs, and regardless of the lens through which one views police officers versus concealed carriers, Defendants' sensationalist rhetoric must be rejected on its face.    As the Supreme Court has explained, "[d]espite intense disagreement on the question whether the private possession of [HPBs] … increases or decreases gun deaths and injuries," the "right to keep and bear arms … is not the only constitutional right that

---

starters, Plaintiff Bergmann-Schoch is a former patrol and tactical police officer, who now hones her skills as a firearms instructor.  *See* ECF 41-6, Responses 7 & 17; ECF 1-3 at ¶4.  So she has *precisely* "the same training" as "a sworn officer of the law." *She was one.*

Moreover, as one recent study concluded, "[t]he FBI tracks active shooting cases.... Civilians with permits stopped the attacks more frequently and faced a lower risk of being killed or injured than police."  Abstract, J.R. Lott and C.E. Moody, *Do Armed Civilians Stop Active Shooters More Effectively than Uniformed Police?*, Crime Prevention Research Center (May 17, 2025), https://tinyurl.com/5n7ysnzp.  In fact, the "data directly contradicts th[e] concern" that "civilians lack the training police receive and may make things worse by intervening." *Id.* at 29. It is hard to see how HPBs in the hands of civilians are more dangerous than in the hands of, say, the NYPD, who shot *nine innocent bystanders* during one confrontation.  *See* Korva Coleman, *In Killing New York Gunman, Police Also Shot Bystanders*, NPR (Aug. 25, 2012), https://tinyurl.com/3x3fcpar.  Even members of the Secret Service –highly trained professionals whose *job* it is to never make mistakes – have missed their intended targets.  *See* Kyle Cheney, *Did the Suspected WHCD Shooter Hit a Secret Service Officer?  DOJ Says It's Not Sure Yet*, Politico (Apr. 28, 2026), https://tinyurl.com/y6nkhzhd ("A Secret Service officer … 'drew his service weapon and fired multiple times at Allen, who fell to the ground and suffered minor injuries but was not shot.'").

Defendants' notion that police officers are somehow more law-abiding or responsible than concealed carriers, merely because they "swear an oath," is similarly undermined by the data.  To the contrary, concealed carry "permit holders are some of the most highly vetted, trained, responsible and law-abiding citizens, who do not jeopardize public safety."  Amicus Brief of Peace Officers Research Association of California, et al. at 6, *May v. Bonta*, No. 23-4356 (9th Cir. Feb. 23, 2024), Doc. 57-1.  Indeed, this Court previously has found that "the vast majority of conceal carry permit holders are law abiding." *Koons v. Platkin*, 673 F. Supp. 3d 515, 577 (D.N.J. 2023). So law-abiding and responsible is this group of people that they have been found to commit crimes at rates far lower *than the police themselves*.  *See* Douglas Ankney, *Private Citizens Carrying Guns Commit Fewer Crimes than Cops*, Criminal Legal News (July 17, 2019), https://tinyurl.com/3tpm3xjw ("According to a study by the Crime Prevention and Research Center … citizens with a permit to carry a concealed weapon 'are convicted of misdemeanors and felonies at less than a sixth of the rate for police officers.'").

21

has controversial public safety implications." *McDonald v. City of Chicago*, 561 U.S. 742, 782-83 (2010) (plurality opinion). Defendants' hyperventilation about the evils of HPBs is simply irrelevant when it is "the traditions of the American people" that "demand[] our unqualified deference." *Bruen*, 597 U.S. at 26.

## B.    The Hollow Point Carry Ban Is Ahistorical

Finally attempting to shoulder their historical burden, Defendants posit that their outlier ban on hollow point ammunition "is 'consistent with the principles that underpin our regulatory tradition.'" XMSJ at 24. But at the outset, Defendants make four methodological attempts to lower the analytical threshold that their paltry historical showing must clear. But each claim misstates or ignores a key aspect of the Second Amendment's textual and historical framework.

First, Defendants deny that "'the *people's preferences prevail*,'" obviating the need for historical analysis. XMSJ at 25 n.17. But Defendants ignore that common use "keeps easy cases easy,"[23] because bans on the "most popular weapon[s] chosen by Americans for self-defense" are simply "invalid" on their face. *Heller*, 554 U.S. at 629; *see also id.* at 628-29 (bans on "'the most preferred'" weapons "would fail constitutional muster" under "any of the standards of scrutiny"). Thus, as the Court reiterated in *Bruen*, "even if" relevant historical analogues exist, "they provide no

---

[23] *See, e.g.*, *Florida v. Jardines*, 569 U.S. 1, 11 (2013) (obviating analysis of "reasonable expectations of privacy" under the Fourth Amendment when the "property-rights baseline" can resolve a case).

justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 597 U.S. at 47. In other words, modern-day common use renders even an otherwise-relevant historical tradition *irrelevant*.

Second, Defendants curiously insist that consideration of "how important the State's interest is" in violating the Second Amendment somehow has relevance under *Bruen*'s historical inquiry. XMSJ at 25 n.17. But Defendants conflate *Bruen*'s analogical "why" – the motivation or rationale behind a firearm regulation – with the repudiated pre-*Bruen* practice of granting "judicial deference to legislative interest balancing...." *Bruen*, 597 U.S. at 29, 26. On the contrary, courts must *compare* the reasons behind historical and modern laws without *making* subjective value judgments about the laws themselves. Again, "the traditions of the American people … demand[] our unqualified deference." *Id.* at 26. The "interest balancing *by the people*" already has been done. *Heller*, 554 U.S. at 635 (emphasis added).

Third, Defendants claim that *all historical time periods* are fair game for analysis, so long as evidence from those periods "all point[s] in the *same direction*...." XMSJ at 26 (emphasis added). But both the Supreme Court and the Third Circuit have rejected that notion. To the contrary, *Bruen* "generally assumed that the scope of the protection applicable to the … States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37. And where *Bruen assumed*, the Third Circuit definitively *held* –

23

Founding-era understandings control. *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) ("the constitutional right to keep and bear arms should be understood according to its public meaning in 1791"). Thus, "19th-century evidence [i]s 'treated as mere confirmation of what the Court thought had already been established,'" and "'postratification adoption … of laws that are *inconsistent* with the original meaning … obviously cannot overcome or alter th[e] text.'" *Bruen*, 597 U.S. at 37, 36. If the Founders did not restrict the types of ammunition Americans could carry, there is nothing for earlier or later history to "confirm."

Nor does "Founding-era *silence*" (XMSJ at 26) mean that Defendants can look to Reconstruction to backfill a tradition that never existed. As the Court explained in *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020), "a tradition" that "arose in the second half of the 19th century," even in "more than 30 States," "cannot by itself establish an early American tradition." *See also Bruen*, 597 U.S. at 36 (relying on *Espinoza*); *id.* at 82 (Barrett, J., concurring) ("if 1791 is the benchmark, then … appeals to Reconstruction-era history would fail for the independent reason that this evidence is simply too late (in addition to too little)"). Again, Defendants' out-of-Circuit cases for this proposition (XMSJ at 26) are irrelevant, because the Third Circuit has closed the door on this argument. *Lara*, 125 F.4th at 441.

Fourth, Defendants posit that, "if the challenged law addresses an unprecedented societal concern or a technological change, a more generalized

24

historical principle will suffice." XMSJ at 27. But that rule would only apply if ammunition *did not exist* at the Founding. Nor does the "more nuanced approach" (597 U.S. at 27) mean that Defendants can simply note that ammunition has developed over time, and then vaguely invoke the preservation of "public safety" as a historical principle. *Cf.* XMSJ at 31. If "public safety" were a valid analogical "why," *Bruen*'s test would backslide into interest balancing, sanctioning all manner of ahistorical gun control. But "a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). There is no higher level of generality than Defendants' vague appeals to "public safety." It reeks of prohibited interest balancing.

Nor does the advent of modern ammunition like HPBs call for a loosening in analytical stringency. Neither *Heller* nor *Bruen* treated modern advancements in firearms technology as so "unprecedented" or "dramatic" that they demanded a "more nuanced approach." To the contrary, "the historical analogies [t]here and in *Heller* [we]re relatively simple to draw" (*Bruen*, 597 U.S. at 27) – quite literally *in contrast to* the "more nuanced approach" *Bruen* then discussed. Modern factors like increased magazine capacity, firing rate, effective range, and terminal performance of handguns were of no moment.[24] And so Defendants cannot point to mere

---

[24] It is worth considering just how rapidly technology has developed in *other* areas of life – indeed, much more dramatically than in the firearm industry – and yet no one questions constitutional protection in those modern contexts. Consider the cell phone – an item that would

technological progression to shirk their historical burden.  *See* Section I(C), *infra* (discussing the history of ammunition development).

> **1.    Defendants' "Particularly Dangerous Instrument" Analogues Bear No Resemblance to Their Hollow Point Carry Ban**

Defendants assert a "long historical tradition" of restricting "particularly" and "excessively" "dangerous weapons and ammunition," and claim that banning the public carry of HPBs fits within this supposed "tradition."  It does not.  Nor does any such tradition exist in the first place.

**English Restrictions.**  Beginning with a collection of English enactments that allegedly "identified particular weapons for restriction," Defendants claim that these enactments were "foundations of the Second Amendment" and that this "tradition

---

appear to the Framers to be an utterly alien box of unfathomable wizardry.  Consider all that would have to be explained at the threshold just to make the cell phone make sense – electricity, batteries, magnetism, radio waves, semiconductors, coding, *the internet*, rockets, fossil fuels, and satellites in orbit.  And each *of those* would require further explanation.  Even so, no one at the Founding would have claimed that an "X" post warrants *less* constitutional protection than a pamphlet written with a quill pen.  To the contrary, "the First Amendment protects modern forms of communications...."  *Bruen*, 597 U.S. at 28.

In contrast, modern firearms would be immediately recognizable to the Framers.  Although guns have improved substantially, with the invention of the cartridge, box magazine, modern optics, and semiautomatic function, they are still at their core the same – machines made from metal and wood (and now plastic), held out in the hands or aimed from the shoulder by looking through sights, firing projectiles through the air using chemical propellants.  No doubt the Framers would be impressed with modern firearms – but not dumfounded – because modern firearms are the product of a logical, entirely predictable development.  Just because they are now *better* at what they do does not mean they receive lesser Second Amendment protection.  Indeed, "[w]e do not interpret constitutional rights that way. … [T]he Second Amendment extends" to firearms "that were not in existence at the time of the founding."  *Heller*, 554 U.S. at 582.

26

continued in the United States...." XMSJ at 29. But Defendants' attempt to ground their HPB ban in English law fails for at least two reasons.

First, Defendants never ultimately cite a corresponding Founding-era tradition of "regulat[ing] the types of arms … 'suitable' for self-defense...." XMSJ at 29. As Plaintiffs discuss *infra*, all Defendants muster from the Founding are 1) restrictions on the public carry of arms in a manner that caused terror and a public disturbance (*i.e.*, carrying "dangerous and/or unusual weapons"); and 2) gunpowder storage regulations enacted to mitigate the risk of catastrophic fires and explosions from volatile black powder. In other words, the Founders *did not*, in fact, restrict arms or ammunition based on purportedly "dangerous features...." XMSJ at 29. Defendants' supposed English tradition, if it existed, did not find its way to America.

Second, and relatedly, "English common-law practices and understandings … cannot be indiscriminately attributed to the Framers of our own Constitution." *Bruen*, 597 U.S. at 35. Defendants' dearth of relevant Founding-era regulation shows why. English history is often "probative of what the Constitution does *not* mean. The Framers drafted and approved many provisions of the Constitution precisely to depart from rather than adhere to certain pre-ratification laws, practices, or understandings." *Rahimi*, 602 U.S. at 720 (Kavanaugh, J., concurring).

**Founding-Era "Dangerous and/or Unusual Weapons."** Next, Defendants cite Founding-era restrictions on the "carrying" of so-called "dangerous and unusual

weapons," which they claim includes "unusually dangerous" firearms.  XMSJ at 28.

But that term does not mean what Defendants think it means.

When *Heller* referenced the "historical tradition of prohibiting the carrying of

'dangerous and unusual weapons'" (554 U.S. at 627), it cited Sir William

Blackstone's Commentaries on the Laws of England.  Importantly, Blackstone

categorized this prohibition as an "Offence[] Against the Public Peace."[25]  Thus, it

shared a common theme with the 12 other common-law offenses with which it was

codified.  All were "either … an actual breach of the peace; or constructively so, by

tending to make others break it."  *Id.*  The relevant text reads:

> The offence of riding or going armed, with dangerous or unusual
> weapons, is a crime against the public peace, by terrifying the good
> people of the land; and is particularly prohibited by the statute of
> Northampton.... [*Id.* at 148-49.]

In other words, this sort of regulation criminalized nothing more than "the

common-law offense[] of 'affray' or going armed 'to the terror of the people'...."

*Bruen*, 597 U.S. at 50.  Affray laws "regulated a niche subset of Second Amendment-

protected activity," not all public carry.  *Rahimi*, 602 U.S. at 770 (Thomas, J.,

dissenting).  Indeed, Blackstone made clear that the common-law offense required

something *more* than the public carry of a "dangerous or unusual weapon" in order

for criminal liability to attach.  The law required that the weapon not only be carried,

---

[25] 4 William Blackstone, Commentaries on the Laws of England 142 (John Taylor Coleridge ed., 1825).

28

and not even just that it be present in public ("riding or going armed"), but also that its presence breach "the public peace" and cause "terr[or]." And obviously, for this to happen, such weapon would have to be carried openly and visibly.

Thus, historical prohibitions against openly brandishing or discharging weapons to the terror of onlookers – and in breach of the peace – are no analogues for New Jersey's flat ban on the public carry of HPBs. Indeed, Plaintiffs wish to publicly carry *concealed* self-defense firearms loaded with HPBs.[26] So no one would see Plaintiffs' hollow points, which by definition are loaded *into* a magazine and chambered into a firearm.[27] No one could be terrorized, and no peace could be broken, were Plaintiffs to carry the *same* firearms, the *same* way, in the *same* places as they (and hundreds of thousands of police officers) do every day – just with different ammunition. New Jersey's regulations fail both *Bruen*'s "how" and "why."

**Founding-Era Gunpowder Storage.** Defendants next point to colonial and Founding-era regulations on the storage and transportation of gunpowder, claiming these regulations were "'for the good of public safety.'" XMSJ at 31. But Defendants' vague characterization is flat wrong. Historical gunpowder regulations were, at bottom, "fire-safety laws...." *Heller*, 554 U.S. at 632. In fact, "gunpowder-storage laws" generally "did not clearly prohibit loaded weapons, but required only

---

[26] Indeed, open carry is illegal in New Jersey. *See* N.J.S.A. § 2C:58-4.5(b).
[27] The same is true even if Plaintiffs openly carried.

29

that excess gunpowder be kept in a special container or on the top floor of the home."

*Id.* They therefore fail *Bruen*'s "how" and "why" at the outset.

The reason for such regulation was obvious. The black powder "of the 18th Century was far more volatile" than the smokeless powder of today, and so large stores of black powder called for careful storage protocols.[28] Indeed, in contrast to "[m]odern 'smokeless' gunpowder," which "is stable under most conditions," black powder was prone to accidental ignition via sparks or friction, even under controlled conditions. *Id.* For this reason, "Sunday worshippers were known to flee meetinghouses during lightning storms in the event that lightning might strike the building and ignite the hidden supply of gunpowder."[29]

Defendants' gunpowder regulations therefore were products of their time – disaster prevention efforts to mitigate the risks of rudimentary and inherently volatile compounds that simply do not exist in modern small arms ammunition. Unlike a large colonial gunpowder store, there is no risk that Plaintiffs' HPBs will level half the city. Thus, courts have rejected reliance on these "purely fire prevention measures" as justifying any sort of modern firearm regulation. *Hanson v. Smith*, 120

---

[28] *The American Revolution Against British Gun Control*, <u>David B. Kopel</u> (2012), https://tinyurl.com/34cyvmb8 (adapted from *How the British Gun Control Program Precipitated the American Revolution*, 6 Charleston L. Rev. 283 (2012)).

[29] Matthew E. Thomas, <u>Historic Powder Houses of New England: Arsenals of American Independence</u> 16-17 (2013); *see also* 1811 N.J. Laws 300, § 1 (prohibiting powder manufacture "within a quarter of a mile from any town or village").

F.4th 223, 235 (D.C. Cir. 2024). This Court should too. The "suggestion that they limited the Second Amendment right to keep and bear arms is silly." *Id.*

**Reconstruction-Era Pistol Cartridge Bans.** Next, Defendants claim that ammunition restrictions "evolved over time" because, when "enclosed metallic cartridges began to circulate in society around the 1870s," "'at least four states'" banned them for pistols. XMSJ at 31, 32. But that is not even true. Take Defendants' selectively quoted 1881 Arkansas law, for example. Buried within the statutory text that Spitzer replaced with an ellipsis (ECF 43-5 at ¶34), one finds an *exception* for pistols "such as are used in the army or navy of the United States, and known as the navy pistol...."[30] Not only does this exception mean the law provides *no support* for Defendants' proposition, but it also reveals something far more troubling. "Army and Navy" pistol laws were thinly veiled attempts by "white supremacist legislature[s]" to prevent newly freed slaves from owning firearms after the Civil War.[31] Indeed, "ex-Confederate soldiers already had their high-quality Army and Navy guns. But cash-poor freedmen could barely afford lower-cost, simpler firearms not of the Army and Navy quality." *Id.* It goes without saying that racist gun control laws are invalid analogues, because a historical analogue must "regulate[] arms-bearing for a permissible reason." *Rahimi*, 602 U.S. at 692. And

---

[30] 1881 Ark. Acts 192, § 3, https://tinyurl.com/4m7xw5pj.
[31] David B. Kopel, *The Racist Roots of Gun Control*, Encounter Books (Feb. 23, 2018), https://tinyurl.com/4njbujrk.

as several Justices recently made clear during oral argument in *Wolford v. Lopez*, racist and discriminatory laws are as far from having a "permissible reason" as it gets.  Indeed, Justice Kavanaugh explained that "we flatly reject[] … historical example[s]" that "were rooted in racial prejudice."[32]  Such history is "inadmissible to … somehow justify[] an exception to the constitutional right."  *Id.* at 101:20-22.

But even setting aside the obvious infirmities of Defendants' racist analogues, Defendants' examples are still too few to establish any national tradition.  Indeed, if only *four* states spanning 1881 to 1919 enacted a particular regulation – a time period when there were between 38 and 48 states in the Union – that regulation is by definition an "outlier[]."  *Bruen*, 597 U.S. at 65; *see also id.* at 46 ("we doubt that *three* [out of 13] colonial regulations could suffice to show a tradition").  Moreover, even if these laws broadly banned the purchase and sale of *all* pistol cartridges (they did not), they "provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today."  *Id.* at 47.  Without a similar ban on pistol ammunition at the Founding, these later outliers confirm nothing.

**Nineteenth-Century Bowie Knife Restrictions.**  Defendants next cite restrictions on "Bowie knives," bladed weapons that proliferated in the mid-19th

---

[32] Transcript of Oral Argument at 101:12-15, *Wolford v. Lopez*, No. 24-1046 (U.S. Jan. 20, 2026), https://tinyurl.com/3jzdthsv.

century.  XMSJ at 32-33.  But Defendants' reliance on these knife regulations to uphold a ban on all public carry of hollow points fails several times over.

First, this is *not a knife case*.  By appealing to ethereal historical "principles" like "public safety" – articulated at "such a high level of generality that it waters down the right," *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) – Defendants lose sight of their analytical task: proffering relevant Founding-era restrictions on the public carry of *ammunition*, to the extent they exist.  Absent that historical showing, neither *Heller*, *Bruen*, nor *Rahimi* authorize courts to uphold ahistorical firearm regulations using the 'next best thing.'  Bowie knives are nothing like bullets.

Second, these "'belated innovations of the mid- to late-19th-century … come too late to provide insight into the meaning'" of the Second Amendment.  *Bruen*, 597 U.S. at 36-37.  While Defendants note that Bowie knives date only to the 19th century, *bladed weapons* were nothing new.  *See Rahimi*, 602 U.S. at 692 (noting Founding-era "sabers").  Defendants do not attempt to ground their 19th-century *knife* regulations in a corresponding Founding-era tradition of restricting the public carry *of knives*.  Accordingly, they are temporal outliers in this Circuit, as a matter of law.  *See Lara*, 125 F.4th at 441 ("post-ratification history can confirm a court's understanding of Founding-era public meaning," but "'laws that are *inconsistent* with the original meaning … obviously cannot overcome or alter that text'").

33

Third, these knife regulations never formed a consensus with respect to public carry. As Defendants' own materials reveal, the vast majority of jurisdictions to have regulated Bowie knives did so only as to *concealed carry*, leaving open the option to open carry. *See* ECF 43-5 at Exhibit H. Outright bans on *all carry* of Bowie knives were a minority view. *See id.* Once again, outlier regulations cannot sustain Defendants' sweeping ban on *all public carry* of HPBs.

**Foreign Bans on Hollow Point Ammunition.** Finally, Defendants claim that HPBs themselves have been banned – just not in the United States. XMSJ at 33-34 (citing bans from "Germany and France" on "poisoned ammunition"[33] and international treaties on HPBs). But those countries do not recognize a right to keep and bear arms in the first place. *See* McCormick, *supra*. To Plaintiffs' knowledge, this may be the first post-*Bruen* case to see governmental defendants rely on *foreign* gun control in an attempt to shed light on the meaning of the *U.S. Constitution* – an approach as absurd as it is untenable. *See Markham v. Clark*, 978 F.2d 993, 994 (7th Cir. 1992) ("We cannot find a case … perhaps because the point is obvious.").

---

[33] Of course, restrictions on poisoned ammunition are irrelevant. As Plaintiffs explained, such ammunition is designed to wound *after the fact*, while HPBs are designed to stop a deadly threat *at the moment* when self-defense is imminently necessary. *See* Section I(A)(4), *supra*.

34

### 2. This Court Should Reject Defendants' Backdoor Interest Balancing

Defendants spend the next section of their brief attempting to graft their paltry historical record onto *Bruen*'s "how" and "why." *See* XMSJ at 35-37. But rather than reasoning by analogy, Defendants engage in prohibited interest balancing. Indeed, Defendants claim their ban on the public carry of HPBs is "tailored," "does little to burden the right," "does not functionally prevent individuals from carrying firearms," "protect[s] the public from harm and possible death," and advances "public safety." *Id.* at 35, 36. Such language could have been lifted directly from a pre-*Bruen* interest-balancing case. *Cf. Bruen*, 597 U.S. at 18-19 (repudiating those cases). But "[t]he Second Amendment 'is the very *product* of an interest balancing by the people'...." *Id.* at 26. No further balancing is permissible.

### 3. Defendants' Appeals to Common Law Fall Flat

Finally, Defendants make a last-ditch proportionality argument, rehashing their previous claim that HPBs are not "necessary" for self-defense. XMSJ at 37-38. Although this argument fails for the reasons already discussed in Section I(A)(3), *supra*, this Court should reject Defendants' limitless logic for another reason: if governments can micromanage the people's choice of defensive *ammunition*, then so might governments attempt to regulate all other aspects of gun ownership. Suddenly, the use of one caliber could be banned, because another (less effective) caliber exists. The same might apply to firearms themselves – banning

35

semi-automatics as too "catastrophic," while still allowing revolvers.  But it is "no answer to say … it is permissible to ban" some arms simply because "other[s] … [are] allowed."  *Heller*, 554 U.S. at 629.  The same applies to ammunition.  New Jersey's argument has already been made and rejected at the highest level.

## C.    The Historical Record Actually Supports Plaintiffs

Contrary to Defendants' claim of a historical tradition supporting their ban on HPBs, the historical record is replete with evidence supporting *Plaintiffs*.  Indeed, ammunition has continued to develop over time, yet there is a corresponding dearth in legislative attempts to restrict it.    Rather, prior generations embraced technological advancements with open arms, demonstrating a longstanding American tradition of welcoming the latest and greatest ammunition designs.

Start with the single-shot smoothbore musket, the dominant citizen and infantry arm at the Founding.  It fired a lead ball, which was not particularly known for its accuracy:  "[i]nfantry tactics of that time called for a fast-loading weapon that could produce a volume of fire, and the musket provided exactly this – volume without much accuracy."[34]  But the reign of the lead ball – and the musket that fired it – did not last long.  Technological advancements addressed the smoothbore's

---

[34] David Alan Johnson, *Revolutionary War Weapons: The American Long Rifle*, Warfare History Network (Apr. 2005), https://tinyurl.com/mv6jjw2h; *see also* William K. Emerson, Marksmanship in the U.S. Army: A History of Medals, Shooting Programs, and Training 5 (2004) (observing that smoothbore muskets could be reloaded more quickly than muzzleloading rifles and therefore were the "usual weapons").

36

shortcomings, quickly rendering it obsolete.  First came the proliferation of rifled barrels, featuring spiraled internal grooves to impart spin on fired projectiles, which stabilized them in flight and greatly increased accuracy.[35]  Then came changes to the projectiles themselves:  a "major breakthrough arrived in the 1850s, courtesy of a French army officer named Claude-Étienne Minié.  His eponymous bullet was still made of lead, but it was conical, not round."  *Id.*  The "Minié ball" was "easier to load" into rifles (*id.*) and, by virtue of its shape, "dramatically increased both range and accuracy."[36]

Up until this point, shooters had to load projectiles into firearms separately from the chemical propellants that launched them.  Depending on the firearm's design, this loading process could be slow and cumbersome.  *See* Harris, *supra*.  But in the 19th century, "[a]ll of this changed … with the introduction of the bullet cartridge – a self-contained unit that housed primer, propellant and projectile in a brass casing."  *Id.*  Loading (and reloading) times immediately improved and, coupled with the 1885 introduction of semiautomatic rifles capable of automatically loading the next cartridge after each fired shot,[37] the modern firearm was born.

---

[35] William Harris, *10 Innovations that Led to the Modern Bullet*, HowStuffWorks (Apr. 16, 2024), https://tinyurl.com/uexxfz5t.

[36] *Minie Ball: The Civil War Bullet that Changed History*, HistoryNet, https://tinyurl.com/y5vth7nd (last visited May 1, 2026).

[37] Richard Sheposh, *Semi-Automatic Rifle*, EBSCO (2025), https://tinyurl.com/2cbxrvd3.

37

Subsequent developments to the bullet cartridge further increased ammunition effectiveness. An improvement over the initial *rimfire* cartridge design was the *centerfire* cartridge – so named due to the positioning of the propellant's primer in the center of the casing. *See* Harris, *supra*. Centerfire cartridges accommodated more gunpowder and larger bullets, resulting in increased lethality. *See id.*

Finally, the advent of smokeless powder likewise influenced bullet design. Simultaneously stable yet hot-burning, smokeless powder propelled bullets at significantly higher velocities than lead projectiles were able to handle. Thus, "[t]he solution … was to give bullets a thicker skin, or a jacket," often made from copper. Harris, *supra*. Lead bullets fully jacketed with protective, dissimilar metal – or "full metal jacket" bullets – have proliferated ever since. *Id.* These FMJ rounds, and the derivative HPBs at issue in this case, now form the two predominant centerfire ammunition cartridge types available on the market today.

In other words, across history, one principle is clear. As ammunition developed from rudimentary lead balls into self-contained, conical cartridges giving far greater range, accuracy, reliability, and yes, lethality, at no point did earlier American governments ever seek to restrict citizen access. Indeed, if there was historical evidence of such a practice, Defendants have not provided it here. New Jersey's 1978 ban remains *the sole outlier* to restrict the public carry of hollow point ammunition. That is definitionally ahistorical.

38

## II.    PLAINTIFF GOF HAS STANDING

Defendants concede that Plaintiffs Bergmann-Schoch, GOA, and CNJFO "likely ha[ve] standing here," but dispute standing with respect to GOF.  XMSJ at 39.  Defendants claim GOF merely "gestures at associational standing," but fails to "actually identify any … members."  *Id.*  But GOF does not *need* to have members, because it "has the indicia of membership sufficient to confer associational standing," MSJ at 10, and another district court has agreed under nearly identical facts.  *See Texas v. BATFE*, 737 F. Supp. 3d 426, 438 (N.D. Tex. 2024) ("The foregoing, together, suffice for GOF's associational standing.").

Nor must GOF "identify" its supporters by name.  As the Supreme Court recently explained in *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 2026 U.S. LEXIS 1949 (Apr. 29, 2026), "[d]emands for private donor information … chill protected First Amendment associational rights even when those demands contemplate disclosure only to government officials...."  *Id.* at *17 (quotations omitted).  Disclosure of "private member or donor information" (*id.* at *19) as a precondition to challenge a law is a constitutional non-starter.  Defendant Davenport should know that – she just lost *First Choice* at the Supreme Court.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be granted.

Dated:  Lake Success, New York
    May 7, 2026

        HARFENIST KRAUT & PERLSTEIN, LLP

By:   *Steven J. Harfenist*
       Steven J. Harfenist
       *Attorneys for Plaintiffs*
       3000 Marcus Avenue, Suite 2E1
       Lake Success, New York 11042
       T: (516) 355-9600
       F: (516) 355-9601
       E: SHarfenist@hkplaw.com

       Stephen D. Stamboulieh
       MS Bar No. 102784
       Stamboulieh Law, PLLC
       P.O. Box 428
       Olive Branch, MS  38654
       T: (601) 852-3440
       E: stephen@sdslaw.us
       *Admitted Pro Hac Vice