# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| HEIDI BERGMANN-SCHOCH, COALITION OF NEW JERSEY FIREARM OWNERS, GUN OWNERS OF AMERICA, INC., and GUN OWNERS FOUNDATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> JENNIFER DAVENPORT, in her official capacity as Attorney General of New Jersey, JEANNE HENGEMUHLE, in her official capacity as Acting Superintendent of the New Jersey State Police, and LACHIA L. BRADSHAW, in her official capacity as the Burlington County Prosecutor, <br><br> *Defendants*. | Hon. Christine P. O'Hearn, U.S.D.J. <br> Hon. Matthew J. Skahill, U.S.M.J. <br><br><br> Docket No.: 1:25-cv-997-CPO-MJS |

---

## REPLY BRIEF IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

---

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY
124 Halsey Street
Newark, New Jersey 07101
(609) 696-5366
Jonathan.Mangel@law.njoag.gov
*Attorney for Defendants*

Stephen Ehrlich
  *Deputy Solicitor General*

David E. Leit
  Assistant Attorney General
      Of Counsel

Liza B. Fleming (NJ Bar ID. 441912023)
Jonathan B. Mangel (NJ Bar ID. 281382018)
Amanda I. Morejón (NJ Bar ID. 405942022)
Lucy I. Sprague (NJ Bar ID. 471242024)
Andrew H. Yang (NJ Bar ID. 066382013)
  *Deputy Attorneys General*
      On The Brief

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................... i

TABLE OF AUTHORITIES ............................................................................. ii

PRELIMINARY STATEMENT ........................................................................1

ARGUMENT ....................................................................................................3

  I.   THE PLAIN TEXT OF THE SECOND AMENDMENT DOES NOT
      COVER PUBLIC CARRY OF HOLLOW POINT BULLETS.....................3

    A.  HPBs Are Neither "Arms," Nor Necessary for the Operation of a Firearm
       Such That They Are Entitled to Second Amendment Protection. ................3

    B.  HPBs Are Ill-Suited and Disproportionate for the Second Amendment's
       "Central Component" of Self-Defense. ........................................................6

  II.  THE HPB CARRY LAW IS CONSISTENT WITH OUR NATION'S
      HISTORICAL TRADITION OF FIREARMS REGULATION. ...................8

    A.  Plaintiffs Misconstrue the Proper Historical Analysis Under *Bruen* and
       *Rahimi*. .......................................................................................................8

    B.  Historical Analogues Reveal a Principle of Legislatures Restricting
       Particularly Dangerous Instruments as They Become a Public Safety
       Problem. .....................................................................................................13

    C.  The Principles of Common-Law Self Defense from the Founding Underpin
       the HPB Carry Law Today....................................................................17

  III. PLAINTIFF GOF SHOULD BE DISMISSED FOR LACK OF STANDING.
      ...................................................................................................................19

CONCLUSION ...............................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Bevis v. City of Naperville,*
     85 F.4th 1175 (7th Cir. 2023) ........................................................................14

*Bianchi v. Brown,*
     111 F.4th 438 (4th Cir. 2024) ................................................. passim

*Blunt v. Lower Merion Sch. Dist.,*
     767 F.3d 247 (3d Cir. 2014) ........................................................................19

*Capen v. Campbell,*
     708 F. Supp. 3d 65 (D. Mass. 2023) ...........................................................5

*Christian v. James,*
     -- F.4th --, 2026 WL 1378796 (2d Cir. May 18, 2026) ...............................10

*District of Columbia v. Heller,*
     554 U.S. 626 (2008)........................................................................ passim

*Duncan v. Bonta,*
     133 F.4th 852 (9th Cir. 2025) ................................................. 4, 5, 16

*First Choice Women's Resource Centers Inc. v. Davenport,*
     146 S. Ct. 1114 (2026)...............................................................................20

*Hanson v. District of Columbia,*
     120 F.4th 223 (D.C. Cir. 2024)............................................... 14, 17

*Kipke v. Moore,*
     165 F.4th 194 (4th Cir. 2026) .....................................................................17

*Lara v. Comm'r Pa. State Police,*
     125 F.4th 428 (3d Cir. 2025) .......................................................... 10, 11, 17

*McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
     140 F.4th 568 (4th Cir. 2025) ......................................................... 11, 13, 18

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
     597 U.S. 1 (2022)............................................................................ passim

*Nat'l Ass'n for Gun Rts. v. Lamont,*
     153 F.4th 213 (2d Cir. 2025) ......................................................................13

*Nat'l Rifle Ass'n v. Bondi,*
     133 F.4th 1108 (11th Cir. 2025) ..................................................................18

*Ocean State Tactical, LLC v. Rhode Island,*
     95 F.4th 38 (1st Cir. 2024) ................................................................ 14, 15

*Or. Firearms Fed'n v. Kotek,*
     682 F. Supp. 3d 874 (D. Or. 2023).............................................................5, 6

*Pa. Prison Soc. v. Cortes,*
     508 F.3d 156 (3rd Cir. 2007).......................................................................20

*Pitsilides v. Barr*,
  128 F.4th 203 (3d Cir. 2025) ...........................................................................11
*State v. Wells*,
  1 N.J.L. 424 (1790)...........................................................................................7
*Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023)..........................................................................................20
*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)..........................................................................................20
*United States v. Cox*,
  906 F.3d 1170 (10th Cir. 2018) .........................................................................4
*United States v. Lopez*,
  514 U.S. 549 (1995)..........................................................................................16
*United States v. Miller*,
  307 U.S. 174 (1939)............................................................................................4
*United States v. Rahimi*,
  602 U.S. 680 (2024)................................................................................. passim

**Other Authorities**

Nat'l Inst. of Justice, U.S. Office of Justice Programs, *Firearms Examiner Training* (July 12, 2023), https://tinyurl.com/yw2hu2b5 ...............................4

## PRELIMINARY STATEMENT

The Second Amendment does not grant the right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Instead, to invalidate New Jersey's law regulating carrying hollow point bullets ("HPB Carry Law"), Plaintiffs must prove HPBs are (1) "Arms" (2) that are "in common use" for lawful self-defense. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 28, 32 (2022). And even if they can satisfy those requirements, the HPB Carry Law is constitutional because it is "consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Plaintiffs' opposition fails both steps.

At step one, public carry of HPBs is not protected by the plain text of the Second Amendment because HPBs are not "Arms" nor are they necessary for a firearm to function. And moreover, the excessive lethality of HPBs makes them disproportionate for lawful self-defense. Plaintiffs nonetheless demand that any "modern instruments that facilitate armed self-defense" should satisfy the term "Arms," ECF 44 at 1, 9, 10, 20. *But see Heller*, 554 U.S. at 581 ("Arms" refer to "weapons that were not specifically designed for military use and were not employed in a military capacity."). Courts across the country have rejected this overbroad reading as applied to firearm accessories like HPBs. New Jersey's HPB Carry Law falls outside the scope of the Second Amendment.

1

But even if HPBs were "Arms," the HPB Carry Law comports with the principles underpinning our Nation's tradition of regulating particularly dangerous instruments when they pose a danger to public safety. *See Rahimi*, 602 U.S. at 692. Contrary to Plaintiff's assertions, the law is not "ahistorical" merely because there was no historical twin "restricting the types of ammunition Americans could carry" in 1791. *See* ECF 44 at 1. "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30; *see Rahimi*, 602 U.S. at 701. And Defendants' experts have identified reams of historical laws regulating dangerous instruments that are unnecessary and disproportionate for lawful self-defense that impose a comparable burden on the right to armed self-defense as New Jersey's HPB Carry Law. *See Bruen*, 597 U.S. at 29. Plaintiffs nevertheless attempt to eschew rigorous historical analysis at every turn in favor of speculation that they need to carry phenomenally lethal "stopping power" in New Jersey's public spaces. *See* ECF 44 at 15. That is inconsistent with this Nation's historical tradition of regulation and with the necessity and proportionality principles of self-defense that underpin the Second Amendment. This Court should deny Plaintiffs' motion and grant summary judgment to Defendants.

2

## ARGUMENT

I.   **THE PLAIN TEXT OF THE SECOND AMENDMENT DOES NOT COVER PUBLIC CARRY OF HOLLOW POINT BULLETS.**

To receive Second Amendment protection, an instrument must be an "arm" that is "in common use today for self-defense." *Bruen*, 597 U.S. at 32 (citation modified). Because HPBs are neither "arms" nor commonly used for self-defense, Plaintiffs' challenge fails at step one of the *Bruen* framework.

   A.   **HPBs Are Neither "Arms," Nor Necessary for the Operation of a Firearm Such That They Are Entitled to Second Amendment Protection.**

Plaintiffs' challenge to the HPB Carry Law is foreclosed by the text of the Second Amendment. The term "Arms" in the Second Amendment is "fixed according to its historical understanding," *Bruen*, 597 U.S. at 28, and generally includes "'[w]eapons of offence'" that are "'use[d] in wrath to cast at or strike another,'" *Heller*, 554 U.S. at 581 (citation modified). As Defendants explained (ECF 43-1 at 10–11), HPBs are not "Arms" because, on their own, they are useless.

Plaintiffs resist this conclusion, incorrectly suggesting that by this logic, a firearm would not be an "Arm" because on its own, "a firearm too is 'harmless.'" *See* ECF 44 at 5 n.2. But unlike HPBs, which are ammunition, a firearm is itself a "weapon[] of offence," *Heller*, 554 U.S. at 581, and thus it is clearly an "Arm"—with or without ammunition. An HPB, by contrast, is not a "weapon[] of offence," and "[w]ithout an accompanying firearm," it cannot be described as an item that a

3

person "takes into his hands, or useth in wrath to cast at or strike another.'" *Id.* An HPB, like a silencer, is "a firearm accessory; it's not a weapon in itself." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). So "it can't be a 'bearable arm' protected by the Second Amendment." *Id.* Plaintiffs' reliance on *United States v. Miller*, 307 U.S. 174 (1939)—to argue that "possession of arms also implied the possession of ammunition," ECF 44 at 12—is likewise misplaced. There, the Court was merely explaining that the colonial-era militia system imposed an implied obligation to all adult males to *physically* possess both "arms and ammunition" for potential service. *Miller*, 307 U.S. at 180. *Miller* did not perform a linguistical analysis, nor did it suggest that ammunition is itself an "Arm" in a linguistic sense.

In any event, as Defendants explained, ECF 43-1 at 11–13, even assuming there is "an implicit, corollary right to bear the components or accessories necessary for the ordinary functioning of a firearm," *Duncan v. Bonta*, 133 F.4th 852, 866 (9th Cir. 2025), HPBs specifically are not necessary for a firearm to function, even if bullets in general may be. Although Plaintiffs do not contend that HPBs are necessary for the functioning of firearms, or that their firearms could not function with non-expanding ammunition,[1] Plaintiffs incorrectly argue that because

---

[1] The U.S. National Institute of Justice Firearms Examiner Training Program lays out the cycle of fire for modern firearms and does not support the notion that HPBs versus non-expanding bullets affect the ability of the firearm to function. *See* Nat'l Inst. of Justice, U.S. Office of Justice Programs, *Firearms Examiner Training* (July 12, 2023), https://tinyurl.com/yw2hu2b5.

ammunition is necessary for a firearm to function, "every sub-type of ammunition," including HPBs, falls within the plain text of the Second Amendment. *See* ECF 44 at 6–7. But the ancillary right to have ammunition necessary for armed self-defense has never been understood as the right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Rahimi*, 602 U.S. at 691 (quoting *Heller*, 554 U.S. at 626). And courts across the country have rejected Plaintiffs' argument for other accessories. For example, while "*magazines as a general class* might be owed constitutional protection," large-capacity magazines "as a specific subset of that class are never necessary for a firearm to function." *Capen v. Campbell*, 708 F. Supp. 3d 65, 89 (D. Mass. 2023), *aff'd* 134 F.4th 660 (1st Cir. 2025); *see Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 912–13 (D. Or. 2023) (same); *Duncan*, 133 F.4th at 868 (holding "the Second Amendment's plain text does not encompass a right to possess" LCMs because "firearms that accept magazines operate as intended when equipped with magazines with ten or fewer rounds" despite acknowledging "enhancement" of a gun fitted with the accessory).

Plaintiffs err in trying to extend *Heller*'s logic that it is not "permissible to ban the possession of handguns so long as the possession of other *firearms* (i.e., long guns) is allowed," 554 U.S. at 629 (emphasis added), to HPBs, which are one specific sub-type of *ammunition*. Ammunition is not itself an "Arm." So "[u]nlike the total handgun ban in *Heller*," a law restricting HPBs "does not restrict 'an entire

5

class of arms,' but merely a subset of an accessory to firearms." *Kotek*, 682 F. Supp. 3d at 913. Even if bullets "as a general class" are "necessary" to operate a firearm, HPBs are not, so they fall outside the scope of the Second Amendment.

### B. HPBs Are Ill-Suited and Disproportionate for the Second Amendment's "Central Component" of Self-Defense.

HPBs are also not protected by the Second Amendment for another reason: HPBs are neither necessary nor proportionate for self-defense. *See* ECF 43-1 at 14–24. HPBs are just the opposite: disproportionate for lawful civilian self-defense as understood by the Framers. Plaintiffs' various arguments to the contrary do not change this.

To start, Plaintiffs argue that HPBs "make[] self-defense easier," and incorrectly suggest that this alone means they are protected by the Second Amendment. *See* ECF 44 at 10. But that rule ignores the Supreme Court's instruction that "dangerous and unusual weapons" may be prohibited, *Heller*, 554 U.S. at 627, and subsequent jurisprudence noting that "excessively dangerous weapons ill-suited and disproportionate to" self-defense fall outside the Second Amendment's protection. *Bianchi v. Brown*, 111 F.4th 438, 452 (4th Cir. 2024).

Plaintiffs resist this limitation by arguing that HPBs are proportional for self-defense from a deadly threat and that Defendants' cited authorities only establish that lethal force may not be used to respond to a nonlethal threat. *See* ECF 44 at 12–13. Plaintiffs contend that once a lethal threat exists, any lethal weapon can be

6

utilized in return. *See id.* at 13. That is incorrect. As the Fourth Circuit explained, the "Framers aimed to safeguard the right to individual self-preservation, while recognizing appropriate limitations—*including those already inherent in the common-law right to self-defense.*" *Bianchi*, 111 F.4th at 450 (emphasis added). So "excessively dangerous arms were not reasonably related or proportional to the end of self-defense—but rather were better suited for offensive criminal or military purposes—and were thus understood to fall outside the reach of the right." *Id.* Such weapons with the "ability to inflict damage on a scale or in a manner disproportionate to the end of personal protection" are "beyond the scope of the Second Amendment." *Id.* at 451; *see Heller*, 554 U.S. at 581 (The scope of the Second Amendment is limited to "weapons that were not specifically designed for military use and were not employed in a military capacity.").

These longstanding historical limits on self-defense establish that HPBs are incompatible with the Second Amendment right, *Heller*, 554 U.S. at 624, since the objective features of HPBs make them ill-suited and disproportionate for self-defense. *See* ECF 43-1 at 16–18. And carrying "phenomenal[ly] lethal[]," *Bianchi*, 111 F.4th at 455, ammunition, as a matter of course, violates the principles of necessity and proportionality.[2] *See State v. Wells*, 1 N.J.L. 424, 430 (1790) (self-

---

[2] Plaintiffs cite the U.S. Department of Defense's Law of War Manual to try to undermine Defendants' arguments about the military origins of HPBs. ECF 44 at

defense failed where there was no indication the deadly weapon was "necessary" and where "much less would have been sufficient").

## II.    THE HPB CARRY LAW IS CONSISTENT WITH OUR NATION'S HISTORICAL TRADITION OF FIREARMS REGULATION.

Even if this Court finds HPBs are protected by the plain text of the Second Amendment, it should still uphold the HPB Carry Law because it is consistent with the principles underpinning our Nation's regulatory tradition.

### A.    Plaintiffs Misconstrue the Proper Historical Analysis Under *Bruen* and *Rahimi*.

As an initial matter, Plaintiffs misunderstand the framework governing the historical analysis. The Supreme Court has made clear that courts must distill from historical evidence "the principles that underpin our regulatory tradition" and then "consider[] whether the challenged regulation is consistent" with those principles. *Rahimi*, 602 U.S. at 692. In their attempt to rebut Defendants' historical evidence, Plaintiffs lodge four methodological objections, but each errs on the law.

First, Plaintiffs' argument that the popularity of a particular instrument "obviat[es] the need for historical analysis" is wholly unsupported. *See* ECF 44 at 22. Leaving aside that Plaintiffs' only factual support for this claim is the gun

---

16–19. But in doing so, Plaintiffs argue that HPBs are ineffective for *military* purposes, yet are somehow necessary for *civilians* to take down attackers "under the influence of mind-altering drugs" with "greater speed, size, strength, and the element of surprise." *Contrast id.* at 16–19, *with id.* at 15. Plaintiffs cannot have it both ways.

industry's own self-styled marketing strategy for HPBs, *see* ECF 41-11 at 25 n.7, such a test contravenes the historical analysis outlined in *Heller*, *Bruen*, and *Rahimi*. Even the language from *Bruen* that Plaintiffs cite in support of this argument is part of the Court's analysis comparing historical statutes which "codified the existing common-law offense of bearing arms to terrorize the people." *Bruen*, 597 U.S. at 47. So even when the Court upheld a challenged statute governing an item it found to be in "common use," it only did so *after* the type of analogical reasoning Plaintiffs urge this Court to forego. *See id.* The alleged popularity of HPBs does not in any way foreclose the historical analysis mandated by Supreme Court precedent.[3]

Second, Plaintiffs accuse Defendants of engaging in "prohibited interest balancing" by examining the State's public safety interest in the HPB Carry Law. ECF 44 at 35; *see id.* at 23. But conducting historical analysis based on self-defense principles at the Founding is textbook *Bruen* and *Rahimi* analogical reasoning. It

---

[3] Plaintiffs also conflate common *ownership* with the Second Amendment's protection for weapons in common *use* today for self-defense. *Compare* ECF 41-11 at 26 (arguing HPBs are "ubiquitous" among "ordinary Americans"), *with Bruen*, 597 U.S. at 32, 47 (reiterating the Second Amendment protects weapons in common use for self-defense). In *Bianchi*, the Fourth Circuit rejected this argument as an "ill-conceived popularity test" and explained "[u]nder this view, so long as enough law-abiding citizens own a type of firearm, that type of firearm cannot be prohibited." 111 F.4th at 460–61. Plaintiffs' arguments here would likewise lead to "absurd consequences because it totally detaches the Second Amendment's right to keep and bear arms from its purpose of individual self-defense." *Id.* at 460. "Such a trivial counting exercise makes a mockery of the careful interest balancing" conducted by the Framers when they crafted the Second Amendment. *Id.*

"[p]ull[s] principle from precedent, whether case law or history," which is a "standard feature of legal reasoning." *Rahimi*, 602 U.S. at 740 (Barrett, J. concurring). Plaintiffs acknowledge the Second Amendment is itself the original "interest balancing" on an individual's right to bear arms, *see* ECF 44 at 35 (quoting *Bruen*, 597 U.S. at 26), and individual self-defense is the "central component" of the right. *Bruen*, 597 U.S. at 29; *see Heller*, 554 U.S. at 599. For that reason, Supreme Court precedent tells us that a firearms law "must comport with the *principles* underlying the Second Amendment." *Rahimi*, 602 U.S. at 692 (emphasis added). And a search for historical principles would be incomplete without understanding the principles of self-defense on which the Framers built the Second Amendment.

Third, Plaintiffs err in claiming that the only relevant historical evidence is that from "when the Bill of Rights was adopted in 1791." ECF 44 at 23 (quoting *Bruen*, 597 U.S. at 37). Evidence of the public understanding of the Second Amendment "can include laws 'through the end of the 19th century' . . . because they can be evidence of a historical tradition and shed important light on the meaning of the Amendment as it was originally understood." *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) (quoting *Bruen*, 597 U.S. at 35); *see Christian v. James*, -- F.4th --, 2026 WL 1378796, at *4 (2d Cir. May 18, 2026) ("Making conclusions based on later evidence therefore cannot 'be mischaracterized as *contradicting* the understanding of the right in 1791'") (citing *Rahimi*, 602 U.S.

10

at 738 (Barrett, J., concurring); *McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568, 575 (4th Cir. 2025) ("[A] founding-era practice that gave rise to an enduring tradition is more likely to reflect the widespread understanding of the founding generation than a practice that was short-lived and may have been an outlier"). Pre-1791 evidence is also valuable: "If a founding-era practice stemmed from a 'long, unbroken line of common-law precedent,' that is strong evidence that the practice was part of a deeply rooted tradition and thus a 'part of our law.'" *McCoy*, 140 F.4th at 574–75 (quoting *Bruen*, 597 U.S. at 35). The Third Circuit has explicitly relied on *Rahimi*'s holding that the public meaning of the Second Amendment is "not just 'those regulations . . . that could be found in 1791,' but rather 'the principles underlying the Second Amendment,' with historical regulations providing evidence of those principles." *Lara*, 125 F.4th at 441. So long as there is no conflict among them, each period of history can provide evidence of the Second Amendment's meaning. And as Defendants have already explained, ECF 43-1 at 26, Founding-era silence does not present a conflict with Reconstruction-era regulation because we do not "'assume that founding-era legislatures maximally exercised their power to regulate' conduct." *Pitsilides v. Barr*, 128 F.4th 203, 209 (3d Cir. 2025) (quoting *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring)).

Finally, Plaintiffs try to avoid *Bruen*'s dictate that "cases implicating unprecedented societal concerns or dramatic technological changes may require a

11

more nuanced approach," 597 U.S. at 27, by claiming that this "rule would apply only if ammunition *did not exist* at the Founding," ECF 44 at 25. But *Bruen* was clear that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 597 U.S. at 27. This case implicates both aspects—HPBs did not exist at the time the States ratified the Second and Fourteenth Amendments and the HPB Carry Law addresses an unprecedented societal concern: the lethal effects of modern ammunition and mass shootings. Plaintiffs' claim that the evolution of musket balls in 1791 to HPBs today is not a "dramatic technological change," *see* ECF 44 at 25, is directly undermined by the evidence.[4] A musket ball in a single-shot, muzzle-loading musket is dramatically different from ammunition designed to expand on contact, shot from a modern firearm, like a magazine-fed, semi-automatic firearm. *See* ECF 43-5 ¶¶ 4–7, 11–12; ECF 43-7 ¶¶ 21–24. Indeed, "it would have been shocking to the Framers to witness" the human costs HPBs are capable of exacting. *Bianchi*, 111 F.4th at 463. "Rapid advancements in gun" and ammunition "technology are a central cause" of today's increased lethality of firearms. *Id.*; *see Nat'l Ass'n for Gun Rts. v. Lamont*,

---

[4] For all of Plaintiffs' arguments on the facts, they have presented no expert evidence and failed to rebut Defendants' experts in any meaningful way. The gulf between the Plaintiffs' lack of evidence and Defendants' evidence indicates "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56 (a).

153 F.4th 213, 237–38 (2d Cir. 2025).[5] As explained below, regulations on instruments with shocking lethality are consistent with the historical principles underlying the individual right to self-defense, which is the "*central component* of the Second Amendment right." *See Bruen*, 597 U.S. at 29 (citation modified).

**B.    Historical Analogues Reveal a Principle of Legislatures Restricting Particularly Dangerous Instruments as They Become a Public Safety Problem.**

Under the *Bruen* and *Rahimi* standard, as properly understood, a firearms law "must comport with the principles underlying the Second Amendment" but "need not be a dead ringer' or a historical twin'" to its predecessors. *Rahimi*, 602 U.S. at 692. It is the "principles that underpin our regulatory tradition," *id.*, not merely the specific "applications of those principles found in particular laws," that are the crux of the analysis. *McCoy*, 140 F.4th at 574 (citing *Rahimi*, 602 U.S. at 692); *see*

---

[5] Plaintiffs' argument that other technology has advanced, like the smart phone, but that speech associated with such technology is entitled to the same First Amendment protection is unavailing. *See* ECF 44 at 25 n.24. To start, First Amendment challenges do not require the same historical analysis as Second Amendment challenges. In any event, Plaintiffs' claim that "modern firearms would be immediately recognizable to the Framers," *id.*, relies on a level of generality that fails to capture the devastating capacity of modern ammunition compared to Founding-era musket balls. Plaintiffs instead posit modern semi-automatic firearms and ammunition are "still at their core the same" as Revolutionary-era muskets and musket balls. *Id.* At this level of generality, no firearm could be regulated because all firearms "would be immediately recognizable to the Founders." *Id.*

*Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) ("Historical regulations reveal a principle, not a mold.").

The HPB Carry Law is consistent with several historical principles, most notably that legislatures have long exercised their power to regulate particularly lethal weaponry when it became clear such weaponry presented public safety risks. *See Bianchi*, 111 F.4th at 464 ("When a weapon's potential for widespread criminality or unreasonable capacity to inflict casualties became apparent to lawmakers, they did not hesitate to regulate in response."); *see also id.* (emphasizing tradition in which States could "ban[] the sale, manufacture, and possession of weapons that were particularly useful for offensive and criminal purposes"); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 45–50 (1st Cir. 2024); *Hanson v. District of Columbia*, 120 F.4th 223, 237–40 (D.C. Cir. 2024); *Bevis v. City of Naperville*, 85 F.4th 1175, 1199–1202 (7th Cir. 2023).

Defendants' extensive historical evidence supports this principle. *See* ECF 43-1 at 29–38. As explained in Defendants' opening brief, a long historical tradition exists—originating in pre-Founding English history through the Prohibition era, continuing today—of restricting particularly dangerous weapons and ammunition once they spread in society and pose a public safety threat, while leaving open other avenues of self-defense. *See id.* at 28–34. Likewise, governments today may regulate arms and ammunition, like HPBs, that pose extreme safety threats through

14

characteristics that make them particularly dangerous or particularly susceptible to disproportionate criminal misuse. *See* ECF 43-2 ¶¶ 53–89 (detailing historical tradition of regulating dangerous weapons and ammunition); *id.* ¶ 89 (noting that "laws regulating specific dangerous weaponry reflects the public policy judgment that all posed a unique hazard or threat to public and physical safety"). Plaintiffs' attempts to undermine this historical tradition are unavailing.

To start, Plaintiffs fault pre-colonial and Founding-era restrictions on carrying "dangerous and unusual weapons" as insufficiently similar because they were supposedly limited to prohibitions on "openly brandishing or discharging weapons to the terror of onlookers." ECF 44 at 29. But such laws were not so limited. Rather, they included laws like East New Jersey's 1686 prohibition on "the concealed carry of 'pocket pistol[s]' or other 'unusual or unlawful weapons,'" *Bruen*, 597 U.S. at 47–48. In any event, other early laws were focused on weapons used to "breach the peace," *id.* at 41, and reflect the government's choice to regulate the types of arms that are "suitable" for self-defense, and restrict those that are not. Plaintiffs also try to discount early regulations on gunpowder storage and transport as not sufficiently similar because they were "disaster prevention efforts." ECF 44 at 29–30. But both gunpowder regulations and the HPB Carry Law address "public safety concern[s]" caused by a dangerous instrument. *Ocean State Tactical*, 95 F.4th at 52.

15

Plaintiffs next fault Reconstruction-era laws penalizing the sale or acquisition of pistol ammunition as "too few to establish any national tradition." ECF 44 at 32. But Plaintiffs never explain how their view coheres with our federalist system, in which "the States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear." *United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring). And with no contrary evidence that such laws were struck down as unconstitutional, treating the fact that more States did not pass similar laws as a sign of affirmative unconstitutionality is precisely the type of "'use it or lose it' view of legislative authority" Justice Barrett warned against; that is a flawed "assumption" originalism does not "require." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring).

Finally, Plaintiffs lodge several criticisms of Defendants' reliance on historical prohibitions on Bowie knives, but each falls flat. *See* ECF 44 at 33–34. Plaintiffs first complain that "this is not a knife case." *Id.* at 33. But the historical inquiry has never required identifying a "historical *twin*" or a "dead ringer" for the modern law. *Bruen*, 597 U.S. at 30. And regulations on Bowie knives arose because "Bowie knives were designed to—and did—cause significant harm in fights, with little self-defense value." *Duncan*, 133 F.4th at 876. HPBs are likewise considered to be "inhumane due to their increased lethality," ECF 43-2 ¶ 7, and thus the law "fit[s] nicely into the tradition of regulating weapons particularly capable of

16

unprecedented lethality," *Hanson*, 120 F.4th at 239 (noting that the "relevant historical tradition is based upon the regulation of weapons that are particularly capable of unprecedented lethality and not ... upon the regulation of Bowie knives specifically"). And while Plaintiffs claim these regulations came "too late," ECF 44 at 33, they do not identify any conflict with Founding-era restrictions, so there is no reason this Court should not consider them. *See Lara*, 125 F.4th at 441.

At bottom, the issue before this Court is not whether the HPB Law is a dead ringer for historical regulations on dangerous items such as gunpowder or Bowie knives, but whether a "long view of history" can "situate [this] restriction[]." *Kipke v. Moore*, 165 F.4th 194, 207 (4th Cir. 2026) (citation modified). This is especially true here, considering HPBs "implicat[e]" both "unprecedented societal concerns" and "dramatic technological changes." *Bruen*, 597 U.S. at 27; *see* ECF 43-2 at 3–9 (describing lethality of HPBs); *Bianchi*, 111 F.4th at 464 ("These are not our forebears' arms, and these are not our forebears' calamities."). New Jersey's HPB Carry Law fits the "how" and "why" of these historical regulations. Like these historical laws, HPBs are prohibited from public carry because they are unusually dangerous and thus pose a heightened threat to public safety.

C.    **The Principles of Common-Law Self Defense from the Founding Underpin the HPB Carry Law Today.**

The HPB Carry Law is also consistent with the common-law principles underlying the "*central component* of the Second Amendment right: individual self-

17

defense.[6] *Bruen*, 597 U.S. at 29 (citation modified). The historical inquiry requires assessing "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* "The written laws of the Founding era must be understood in the light of that predominant common-law regime." *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1128 (11th Cir. 2025). When the Second Amendment was adopted, the common law of self-defense had "made its way across the Atlantic, and early American courts routinely applied it." *See McCoy*, 140 F.4th at 575. Under this tradition of self-defense, the law "tilt[s] in favor of the preservation of human life." ECF 43-2 ¶ 36. The core principles were necessity and proportionality: a person claiming self-defense had to prove their use of force was both necessary and that it was proportional, or "reasonable in relation to the harm threatened." *Id.* ¶ 37.

---

[6] Plaintiffs refuse to engage with these self-defense principles, dismissing them out of hand and instead speculating about situations in which they will use HPBs to kill off "an attacker who often has greater speed, size, strength, and the element of surprise" or who is "under the influence of mind-altering drugs, making them less likely to feel pain and more likely to sustain wounds with seemingly little result." *See* ECF 44 at 15–16 (citation modified). Based on this speculation, Plaintiffs claim the right to carry excessively lethal ammunition. *Rahimi* analysis demands more, especially on a facial challenge, which is "the most difficult challenge to mount successfully," because it requires Plaintiffs "establish that no set of circumstances exists under which the [law] would be valid." *Rahimi*, 602 U.S. at 693 (citation modified). Therefore, even if we accept Plaintiffs' hypotheticals, Plaintiffs still lose if Defendants can "demonstrate that [the HPB Carry Law] is constitutional in some of its applications." *See id.*; ECF 43-1 at 23–24.

Federal courts have relied upon the common law of self-defense, as understood at the Founding, to hold that bearing arms that are excessive for self-defense is not protected by the Second Amendment. For example, in *Bianchi*, the Fourth Circuit analyzed Maryland's laws prohibiting civilian possession of assault weapons, and found them consistent with "a storied tradition of legislatures perceiving threats posed by excessively dangerous weapons and regulating them commensurately." 111 F.4th at 461. As "individual self-defense" is the "central component" of the Second Amendment right, *Bruen*, 597 U.S. at 29, the HPB Carry Law comports with the principle that necessity and proportionality "tilt[] in favor of the preservation of human life."[7] ECF 43-2 ¶ 36 (citation modified). The HPB Carry Law is consistent with the history of the Second Amendment's core right to defend oneself in a manner that is both *necessary* and *proportional* to the threat one faces.

## III.    PLAINTIFF GOF SHOULD BE DISMISSED FOR LACK OF STANDING.

Associational standing requires "specific allegations establishing that at least one identified member had suffered or would suffer harm." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 280 (3d Cir. 2014). Because GOF fails to identify a single

---

[7] Despite agreeing that "individual self-defense is 'the *central component*' of the Second Amendment right," Plaintiffs fail to consider the law of self-defense as understood when the Second Amendment was adopted. *Compare* ECF 41-11 at 27 (citing *Bruen*, 597 U.S. at 29), *with id.* at 5 (arguing HPB Carry Law violates Second Amendment because Plaintiffs "hazard greater danger outside the home than in it").

19

member that has suffered or will suffer harm, it lacks standing. *See* ECF 43-1 at 39. GOF's reliance on *First Choice Women's Resource Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114 (2026), to try to circumvent this requirement, *see* ECF 44 at 39, is misplaced. *First Choice* held that an organization's receipt of a subpoena seeking donor information inflicted an Article III injury to its First Amendment rights because demands for such would discourage donors from associating with the organization. 146 S. Ct. at 1124–26. Nothing in *First Choice* disturbs the standard for associational standing, which is satisfied where the plaintiff has "identified members" and "represent[ed] them in good faith." *Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023). GOF "may assert claims on behalf of its members . . . only where the record shows that the organization's *individual members themselves have standing to bring those claims*." *Pa. Prison Soc. v. Cortes*, 508 F.3d 156, 163 (3rd Cir. 2007). So GOF must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Because GOF has failed to do so, it lacks associational standing.

## CONCLUSION

This Court should enter summary judgment for Defendants.

20

Dated:        June 4, 2026        Respectfully submitted,

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

By:   */s/ Jonathan B. Mangel*
      Jonathan B. Mangel
      Deputy Attorney General

21